No. 23-15285

IN THE

# United States Court of Appeals for the Ninth Circuit

IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION

MARY CARR, INDIVIDUALLY AND ON BEHALF OF
ALL OTHERS SIMILARLY SITUATED; ET AL.,

*Plaintiffs-Appellees,*

v.

GOOGLE LLC; ET AL.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of California,
No. 21-md-2981; No. 20-cv-5761

## EXCERPTS OF RECORD
## VOLUME II OF V (ER31-301) (Public Volume – Redacted)

Katherine B. Wellington
HOGAN LOVELLS US LLP
125 High St., Suite 2010
Boston, MA 02110

Neal Kumar Katyal
Jessica L. Ellsworth
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
neal.katyal@hoganlovells.com

June 8, 2023

*Counsel for Defendants-Appellants*

*(Additional Counsel Listed on Inside Cover)*

Brian C. Rocca
Sujal J. Shah
Michelle Park Chiu
Minna Lo Naranjo
Rishi P. Satia
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, CA 94105
Telephone: (415) 442-1000
Facsimile: (415) 422-1001
brian.rocca@morganlewis.com

Richard S. Taffet
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
Telephone: (212) 309-6000
Facsimile: (212) 309-6001
richard.taffet@morganlewis.com

Kyle W. Mach
Justin P. Raphael
Emily C. Curran-Huberty
MUNGER, TOLLES, & OLSON LLP
560 Mission Street
Twenty Seventh Floor
San Francisco, CA 94105
Telephone: (415) 512-4000
Facsimile: 415-512-4077
kyle.mach@mto.com

Glenn D. Pomerantz
Kuruvilla Olasa
MUNGER, TOLLES, & OLSON LLP
350 South Grand Avenue
Fiftieth Floor
Los Angeles, CA 90071
Telephone: (213) 683-9100
Facsimile: 415-512-4077
glenn.pomerantz@mto.com

*Counsel for Defendants-Appellants*

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

FEB 27 2023

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

In re: GOOGLE PLAY STORE
ANTITRUST LITIGATION.

_____

MARY CARR, Individually and on behalf of
all others similarly situated; et al.,

        Plaintiffs-Respondents,

 v.

GOOGLE LLC; et al.,

        Defendants-Petitioners.

No. 22-80140

D.C. No. 3:20-cv-05761-JD
Northern District of California,
San Francisco

ORDER

Before: M. SMITH and BRESS, Circuit Judges.

The motion for leave to file a reply in support of the petition (Docket Entry
No. 7) is granted. The reply has been filed.

The court, in its discretion, grants the petition for permission to appeal the
district court's November 28, 2022 class action certification order. *See* Fed. R.
Civ. P. 23(f); *Chamberlan v. Ford Motor Co.*, 402 F.3d 952 (9th Cir. 2005) (stating
standard). Within 14 days after the date of this order, petitioners shall perfect the
appeal in accordance with Federal Rule of Appellate Procedure 5(d).

Pages 1 - 62

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

IN RE GOOGLE PLAY STORE            )
ANTITRUST LITIGATION               )   **NO. 21-md-02981 JD**
_____    )

San Francisco, California
Thursday, August 4, 2022

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff Epic Games:

        CRAVATH SWAINE AND MOORE LLP
        825 Eighth Avenue
        New York, New York 10019
   **BY:   LAUREN ANN MOSKOWITZ, ATTORNEY AT LAW**

For the Consumer Class Plaintiffs:

        KAPLAN FOX AND KILSHEIMER LLP
        850 Third Avenue - 14th Floor
        New York, New York 10022
   **BY:   HAE SUNG NAM, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Marla F. Knox, RPR, RMR, CRR
        CSR No. 14421, Official United States Reporter

```
 1    APPEARANCES:   (CONTINUED)

 2    For the Consumer Class Plaintiffs:

 3                             BARTLIT BECK LLP
                              1801 Wewatta Street - Suite 1200
 4                             Denver, Colorado 80202
                     BY:   KARMA M. GIULIANELLI, ATTORNEY AT LAW
 5
                              BARTLIT BECK LLP
 6                             54 West Hubbard Street - Suite 300
                              Chicago, Illinois 60654
 7                     BY:   LEE M. MASON, ATTORNEY AT LAW

 8    For Plaintiff Brian McNamara:

 9                             COTCHETT, PITRE & MCCARTHY LLP
                              San Francisco Airport Office Center
10                             840 Malcolm Road
                              Burlingame, California 94010
11                     BY:   NANCI NISHIMURA, ATTORNEY AT LAW
                             JAMES G.B. DALLAL, ATTORNEY AT LAW
12
       For Plaintiff Daniel Egerter:
13
                              PRITZKER LEVINE LLP
14                             1900 Powell Street - Suite 450
                              Emeryville, California  94608
15                     BY:   ELIZABETH PRITZKER, ATTORNEY AT LAW

16    For State of California:

17                             OFFICE OF THE ATTORNEY GENERAL
                              OF CALIFORNIA
18                             California Department of Justice
                              455 Golden Gate Avenue - Suite 11000
19                             San Francisco, California 94102
                     BY:   PAULA L. BLIZZARD, ATTORNEY AT LAW
20
       For State of Utah:
21                             OFFICE OF THE UTAH ATTORNEY GENERAL
                              160 East 300 South - Fifth Floor
22                             Salt Lake City, Utah 84114
                     BY:   BRENDAN P. GLACKIN, ATTORNEY AT LAW
23                           LAUREN M. WEINSTEIN, ATTORNEY AT LAW

24             (APPEARANCES CONTINUED ON FOLLOWING PAGE)

25
```

```
 1   **APPEARANCES:**  (CONTINUED)

 2   For Plaintiff Pure Sweat Basketball, Inc:

 3                       HAGENS BERMAN SOBOL SHAPIRO LLP
                         715 Hearst Avenue - Suite 202
 4                       Berkeley, California  94710
                    BY:  **BENJAMIN J. SIEGEL, ATTORNEY AT LAW**
 5                       **BEN M. HARRINGTON, ATTORNEY AT LAW**

 6                       SPERLING & SLATER P.C.
                         55 West Monroe Street - Suite 3200
 7                       Chicago, Illinois  60603
                    BY:  **EAMON P. KELLY, ATTORNEY AT LAW**
 8
     For State of North Carolina:
 9
                         NORTH CAROLINA DEPARTMENT OF JUSTICE
10                       Post Office Box 629
                         Raleigh, North Carolina  27690
11                  BY:  **SARAH BOYCE, ATTORNEY AT LAW**

12   For Plaintiff Match Group, LLC:

13                       HUESTON HENNINGAN LLP
                         523 West 6th Street - Suite 400
14                       Los Angeles, California  90014
                    BY:  **JOSEPH A. REITER, ATTORNEY AT LAW**
15
     For Plaintiff Peekya App Services, Inc.:
16
                         HAUSFELD LLP
17                       1700 K Street NW - Suite 650
                         Washington, D.C.  20006
18                  BY:  **MELINDA R. COOLDIGE, ATTORNEY AT LAW**

19   For Defendants:
                         MORGAN LEWIS & BOCKIUS LLP
20                       One Market Street
                         Spear Street Tower
21                       San Francisco, California 94105
                    BY:  **BRIAN C. ROCCA, ATTORNEY AT LAW**
22                       **SUJAL SHAH, ATTORNEY AT LAW**
                         **MINNA L. NARANJO, ATTORNEY AT LAW**
23

24        (APPEARANCES CONTINUED ON FOLLOWING PAGE)

25
```

```
 1   APPEARANCES:  (CONTINUED)

 2   For Defendants:

 3                        MUNGER, TOLLES & OLSON LLP
                          560 Mission Street, 27th Floor
 4                        San Francisco, California 94105
                  BY:  JUSTIN P.  RAPHAEL, ATTORNEY AT LAW
 5
                          MUNGER TOLLES & OLSON LLP
 6                        350 South Grand Avenue - 50th Floor
                          Los Angeles, California 90071
 7                BY:  GLENN D. POMERANTZ, ATTORNEY AT LAW
                       KURUVILLA J. OLASA, ATTORNEY AT LAW
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1   the most recent, and I think it is probably the closest to the

2   facts of this case.

3        So in the *Apple* case the Plaintiffs had a theory pretty

4   similar to what the Plaintiffs have here that if the service

5   fee in the Apple app store was lower, then the prices of the

6   apps and -- in the Apple app store would be lower as well.

7        And the Plaintiffs' expert there -- there was overwhelming

8   evidence of focal point pricing, just like we have here,

9   97 percent of the prices have focal points.  And their expert

10  didn't account for focal point pricing.

11       The model wasn't capable of capturing that factor.  And

12  Judge Gonzalez-Rogers said:  "That model is discluded.  I'm

13  denying class certification because it is not picking up on the

14  factors that will affect pass-through."

15       **THE COURT:**  I don't necessarily agree with that.  I'm

16  sorry.  I just don't think that is necessarily right.  I don't

17  think that is a barrier to Rule 23.  Maybe fodder for

18  cross-examination, maybe other things for trial.  The fact that

19  you can impeach the model does not mean that the class can't be

20  certified.

21       **MR. RAPHAEL:**  Well, I think, Your Honor, that what we

22  have here is more than impeaching the model as to whether --

23  again, I compare it to the case with regressions, which is what

24  we usually see.  It is what Dr. Singer used --

25       **THE COURT:**  You usually see in price fixing cases.  In

1    monopolization cases you see all different sorts of things.  I

2    know from my experience.  Section 2 is just a different

3    analysis.

4        You know, price fixing cases are often off-the-shelf,

5    linear regressions that everybody agrees on and have been

6    carved in stone for decades.

7        Section 2 is more complicated, more sophisticated.  It is

8    more dynamic.  It is a different proposition.  So, I'm not -- I

9    don't think focusing on these Section 1 cases is going to help

10   you here.

11       **MR. RAPHAEL:**  Well, Your Honor, I guess -- I do agree,

12   Your Honor, that the pass-through here is more complicated.  I

13   think the problem is in a case that is more complicated we have

14   a formula that is vastly more simple, and we have a formula

15   that is being used in circumstances where Dr. Singer conceded

16   that it can't be used.

17       **THE COURT:**  I don't think he conceded that.

18       **MR. RAPHAEL:**  Could I point Your Honor to the

19   transcript?

20       **THE COURT:**  No, that's okay.  I was here.  Okay.

21   Anything else on common evidence and why that doesn't

22   predominate?

23                    (Pause in proceedings.)

24       **MR. RAPHAEL:**  Your Honor -- you know, Your Honor, I

25   would just say that I think Dr. Singer's model does not capture

Pages 1 - 121

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

IN RE GOOGLE PLAY STORE            )
ANTITRUST LITIGATION               )   NO. 21-md-02981 JD
_____)

                         San Francisco, California
                         Tuesday, July 19, 2022


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff Epic Games:
                         CRAVATH SWAINE AND MOORE LLP
                         825 Eighth Avenue
                         New York, New York 10019
                    BY:  **LAUREN ANN MOSKOWITZ, ATTORNEY AT LAW**

                         FAEGRE DRINKER BIDDLE & REATH LLP
                         Four Embarcadero Center
                         27th Floor
                         San Francisco, California 94111
                    BY:  **PAUL J. RIEHLE, ATTORNEY AT LAW**


For the Consumer Class Plaintiffs:
                         KAPLAN FOX AND KILSHEIMER LLP
                         850 Third Avenue
                         14th Floor
                         New York, New York 10022
                    BY:  **HAE SUNG NAM, ATTORNEY AT LAW**
                         **GREGORY K. ARENSON, ATTORNEY AT LAW**


         **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

**APPEARANCES**:   (CONTINUED)

For the Consumer Class Plaintiffs:
                     BARTLIT BECK LLP
                     1801 Wewatta Street
                     Suite 1200
                     Denver, Colorado 80202
              BY:  **KARMA M. GIULIANELLI, ATTORNEY AT LAW**

                     BARTLIT BECK LLP
                     54 West Hubbard Street
                     Suite 300
                     Chicago, Illinois 60654
              BY:  **LEE M. MASON, ATTORNEY AT LAW**


For Plaintiff Brian McNamara:
                     COTCHETT, PITRE & MCCARTHY LLP
                     San Francisco Airport Office Center
                     840 Malcolm Road
                     Burlingame, California 94010
              BY:  **JAMES G.B. DALLAL, ATTORNEY AT LAW**


For State of California:
                     OFFICE OF THE ATTORNEY GENERAL
                        OF CALIFORNIA
                     California Department of Justice
                     455 Golden Gate Avenue
                     Suite 11000
                     San Francisco, California 94102
              BY:  **PAULA L. BLIZZARD, ATTORNEY AT LAW**


For State of Utah:
                     OFFICE OF THE UTAH ATTORNEY GENERAL
                     160 East 300 South
                     Fifth Floor
                     Salt Lake City, Utah 84114
              BY:  **BRENDAN P. GLACKIN, ATTORNEY AT LAW**
                   **LAUREN M. WEINSTEIN, ATTORNEY AT LAW**


            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

```
 1   APPEARANCES:  (CONTINUED)

 2   For Defendants:
                             MORGAN LEWIS & BOCKIUS LLP
 3                           One Market Street
                             Spear Street Tower
 4                           San Francisco, California 94105
                   BY:   BRIAN C. ROCCA, ATTORNEY AT LAW
 5                       SUJAL SHAH, ATTORNEY AT LAW

 6                           MUNGER, TOLLES & OLSON LLP
                             560 Mission Street, 27th Floor
 7                           San Francisco, California 94105
                   BY:   JUSTIN P.  RAPHAEL, ATTORNEY AT LAW
 8
                             MUNGER TOLLES & OLSON LLP
 9                           350 South Grand Avenue
                             Fiftieth Floor
10                           Los Angeles, California 90071
                   BY:   GLENN D. POMERANTZ, ATTORNEY AT LAW
11

12   Also Present:        Michelle M. Burtis, Ph.D.
                          Hal J. Singer, Ph.D.
13                        Nathan Hatch

14

15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | **Tuesday - July 19, 2022**                                    **2:00 p.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---o0o--- |
| 4 | **THE CLERK:**  Now calling Civil Case 21-md-2981, In Re |
| 5 | Google Play Store Antitrust Litigation. |
| 6 | **THE COURT:**  Okay.  Welcome.  Let's see.  Who do we have? |
| 7 | Who's here? |
| 8 | **DR. BURTIS:**  Hi, Your Honor.  I'm Michelle Burtis. |
| 9 | **THE COURT:**  Dr. Burtis. |
| 10 | **DR. BURTIS:**  Yes. |
| 11 | **THE COURT:**  Okay.  And who is this? |
| 12 | **MR. HATCH:**  My name is Nathan Hatch.  Nathan Hatch. I'm |
| 13 | helping with the slides. |
| 14 | **THE COURT:**  All right.  And you're with Dr. Burtis? |
| 15 | **MR. HATCH:**  Yes. |
| 16 | **THE COURT:**  You're not an attorney? |
| 17 | **MR. HATCH:**  No. |
| 18 | **THE COURT:**  Okay.  Oh, if you're fully vaccinated and |
| 19 | you're comfortable, you can remove your masks.  It's totally up |
| 20 | to you, but you're certainly welcome to do that. |
| 21 | And for plaintiffs? |
| 22 | **DR. SINGER:**  Your Honor, Hal Singer. |
| 23 | **THE COURT:**  We have to use the mics. |
| 24 | **DR. SINGER:**  Hal Singer, Your Honor, for plaintiffs. |
| 25 | **MR. DALLAL:**  And, Your Honor, my name is James Dallal.  I |

 1  am an attorney, but we do not have any non-attorney members in

 2  our team.  So my role in this proceeding will be limited to the

 3  slides.

 4      **THE COURT:**  You're just handling the slides.

 5      Okay.  All right.  Well, I'm here for one of my favorite

 6  types of hearings.  So here is our format.  We're going to

 7  swear you in.  And we'll begin with plaintiffs.  I have the

 8  list of topics that you two negotiated in descending order of

 9  criticality, importance; right?  Okay.  And I'm going to set

10  the stage with a question of my own that I want both of you to

11  focus on as you go through this.

12      And then, at the end of it, I'll ask if there are any

13  lawyers who have questions.  You can come up and make an

14  appearance and ask your questions.  Whether I let you ask the

15  questions or not, we'll see; but I'll certainly let you pose

16  the question.

17      Okay.  Let's begin.  So you can stay seated, or you can

18  stand at the podium, either way.  But just have a microphone in

19  front of you.  Otherwise, we won't be able to hear you.  Okay?

20      All right.  Bhavna, would you swear in the economists.

21      **THE CLERK:**  Yes.

22      Please raise your right hand.

23          (Dr. Burtis and Dr. Singer placed under oath.)

24      **DR. BURTIS:**  I do.

25      **DR. SINGER:**  I do.

1        **THE CLERK:**  Thank you.

2        **THE COURT:**  All right.  So we'll go down the topics in

3   Exhibit 1, starting with that first topic, which is

4   "Dr. Singer's Estimates of Google's But-For Service Fee Rates."

5        Here is what I would like you to focus on as we have our

6   discussion.  I would like to understand the method and the

7   techniques that the plaintiffs are going to use to establish

8   that there is some uniform way of determining that, but for the

9   challenged conduct, Google would have had lower service fees to

10  the developers.  That's Part 1.

11       And Part 2 is the same premise with respect to the but-for

12  conduct; that there is some uniform way of establishing that

13  consumers would have paid less for apps.  That is what I'm most

14  interested in.

15       Now, remember that the point here is to determine the

16  reliability and confidence of the methods that are going to be

17  used by the economists.  I'm most interested in hearing about,

18  for example, anything that the defendants think Dr. Singer is

19  doing that is well beyond the purview of what an economist

20  would normally do, and Dr. Singer's response to that.  The more

21  cross-examination points, "Well, Dr. Singer didn't take into

22  account certain factors, X, Y, and Z," I'm not interested in.

23  All right?  This is about reliability, acceptance, the ability

24  to replicate results, the soundness of the technique.  That is

25  what our focus is on.  Okay?

1        All right.  So, Dr. Singer, you are on plaintiff side.

2   Why don't you begin.  Topic 1.

3        **DR. SINGER:**  Thank you so much.  And good afternoon,

4   Your Honor.  It's very nice to see you again.

5        **THE COURT:**  By the way, you two can -- this is meant to be

6   an interactive exchange.  So you can pose questions to each

7   other, not interrupting, but certainly during your

8   presentations.  And if I don't like the question, I'll just ask

9   you to move on, but you can certainly ask.  Okay?  It's meant

10  to be more of a conversation.  All right?  That's the hot tub

11  aspect.

12       **DR. SINGER:**  Sure.

13       **THE COURT:**  You don't deliver monologues in a hot tub.

14  You interact.

15                         (Laughter.)

16       **THE COURT:**  At least the hot tubs that you want to be in.

17  Okay.

18       **DR. SINGER:**  So the first topic, Your Honor, is my

19  estimation of the but-for take rates.  I like to call them the

20  take rates.  I think Google calls them the service rates.

21  Hopefully, we can still be friends.

22       I used two different models to model the but-for take

23  rates.  I have one model for the app distribution market, and I

24  have a separate model for the in-app aftermarket support

25  services.  And if it's okay with you, I'd like to present each

1    one separately in succession, just so that we don't get

2    confused.  They're separate markets, separate models.  Is that

3    okay, Your Honor?

4          **THE COURT:**  That's fine.

5          **DR. SINGER:**  Okay.  Thank you so much.

6          So if we start with the app distribution market, I only

7    have three points here.

8          The first point is, the Rochet-Tirole model is generally

9    accepted and fits the facts of this case.

10         Can I see Slide 1, please?

11         You'll see on Slide 1 a two-sided market here.  Now, we

12   need a two-sided platform model to capture the two-sided nature

13   of the Android app distribution market.  Google is centered in

14   this figure, you can see, and Google is the matchmaker.

15   They're bringing together consumers on one side of the market

16   and app developers on the other side of the market.  And

17   they're taking advantage of this wonderful thing called

18   indirect network effects, which is what makes this a two-sided

19   market.

20         Indirect network effects means that as more developers

21   come to the platform, the consumers on the other side of the

22   market derive greater value for being members or on the

23   platform and vice versa.  As more consumers come to the

24   market -- come to the platform, the developers find the

25   platform more valuable.  Hence, the name "indirect network

1    effects."  Okay?

2        And the good news here is that a Nobel Prize winner,

3    Jean Tirole, and his co-author, Jean-Charles Rochet, created

4    the foundational model of pricing in a two-sided market, and

5    that's the model that I used to estimate the but-for take rate.

6        Point Number 2, the Rochet-Tirole model employs real-world

7    data for this case.

8        Can I see Slide 2, please?

9        This is going to show you all of the inputs that informed

10   the Rochet-Tirole model.  Now, I'm not going to take you

11   through them all, Your Honor.  But I would like to point out

12   that once we have the right model, what we have to do is

13   provide inputs to the model.  And this is where we get into the

14   dispute.  Okay?

15       Now, I use real-world data.  Just to give an example,

16   Google's marginal cost was a key input.  It comes from their

17   financial data.  I need prices on both sides of the market.

18   That was calculated from Google's transactional data.

19       Pass-through is an input.  And there is a dispute over

20   the -- on the pass-through for sure; but I'd like to table that

21   one, because we're going to have an entire debate on

22   pass-through, and focus on what I think is the remaining issue

23   for this model.

24       Now, for this pass, I use the Rochet-Tirole model to

25   estimate a but-for take rate -- that is, the price that's

1    charged to the developers in a but-for world absent the

2    challenged conduct -- holding the subsidy to consumers on the

3    other side of the market constant.

4         And another pass -- and we're going to debate this too;

5    it's called the play points model -- I do the opposite.  I

6    solve for the but-for subsidy in the advent of more

7    competition, holding constant the take rate.

8         And then I do a third one called the hybrid.  We're not

9    going to debate that one today, but just so that you know, I've

10   done that one as well.

11        And my third and final point for this section -- then I

12   can pass the baton over to Dr. Burtis -- is that other than

13   suggesting that it can't be used marketwide, Dr. Burtis largely

14   gives the Rochet-Tirole model a pass.  She doesn't dispute that

15   the Rochet-Tirole model is standard.  She doesn't dispute that

16   it's widely accepted in the literature.  She lodges two primary

17   attacks.  The first is that it can't be estimated on a

18   marketwide basis, and the second is she has the problem with

19   the pass-through.

20        **THE COURT:**  If I could, so the Rochet-Tirole model is

21   going to yield one number for everyone?

22        **DR. SINGER:**  Yes.

23        **THE COURT:**  A percentage for everyone?

24        **DR. SINGER:**  What it's going to yield on this go-through,

25   Your Honor, is a but-for headline take rate.  And the reason

 1   why I'm going to use it to generate a but-for headline take

 2   rate, a singular but-for headline take rate is because Google

 3   uses a singular headline take rate in the actual world.  That's

 4   the 30 percent number.

 5          Now, it's true that Google occasionally will negotiate --

 6          **THE COURT:**  They use it for what?  For --

 7          **DR. SINGER:**  They use it as the starting place for every

 8   developer's price to join the platform.  It is true --

 9          **THE COURT:**  In other words, that's the list price, so to

10   speak?

11          **DR. SINGER:**  That's a nice way of putting it.  In a

12   pharmaceutical case, it might be called the rack price; but

13   here, I consider it as the headline rate.

14          And what Google does, Your Honor, is they selectively

15   enter into discounts off the headline rate.  But all

16   negotiations begin with the headline rate, and importantly,

17   none of the negotiations are done on an individual basis.  None

18   of them.

19          When Google makes an exception to the but-for headline

20   take rate, as it did -- for example, Your Honor, you'll

21   remember in 2018, Google cut the second year -- the

22   subscription -- sorry -- the take rate for subscription

23   products in Year 2 from 30 to 15 percent.  That applied to

24   every developer who had a subscription product.  That was not

25   negotiated on an individualized basis.  Anybody who had a

1    subscription product was entitled to the 15 percent.

2    All right?

3        So that's the Reason Number 1 that this model should be

4    applied on a marketwide basis, because I want to mimic what

5    Google does, how it constructs its pricing, just as it does in

6    the actual world, absent the challenged conduct.

7        Dr. Burtis would have you believe that in the but-for

8    world, Google would enter into hundreds, if not thousands, of

9    individualized negotiations with each app developer.  And I ask

10   you, if they're not doing that today, why would they do that in

11   the but-for world in the absence of the challenged conduct?

12   The business model is going to stay the same.

13       And there's one other reason, Your Honor, and then I'll

14   turn over the baton; and that is -- for using it on a

15   marketwide basis; and that is, Google is offering the same

16   basic service to all developers.  Right?  It is a matchmaker.

17   "Come to our platform and we'll provide you a boatload of

18   users."  These aren't individualized or differentiated products

19   that Google's offering.  By and large, everyone who comes gets

20   the same service.

21       So for those two reasons, Your Honor -- we're mimicking

22   what Google does in the actual world and it's the same basic

23   product -- for those two reasons, it makes sense to have a

24   model that delivers a singular but-for headline rate.  The

25   Rochet-Tirole model is the best model in the literature that

1    can do that, and that's exactly what I used it for.

2         **THE COURT:**  And what is that number?

3         **DR. SINGER:**  The but-for take rate -- well, in the --

4    going by memory, it's around 15 percent in the but-for world.

5    It's 30 percent today.  I go to 15 percent.

6         And importantly, any developer who is able to negotiate --

7    not individually, but within its group.  Whatever developer was

8    able to secure a lower discount rate, a discount off that

9    30 percent, I applied the same discount in proportional terms

10   that they achieved in the actual world into the but-for world.

11        **THE COURT:**  Let me ask you this:  Do you know how many

12   developers got special deals off the list price?

13        **DR. SINGER:**  Very small number.  I can tell you that there

14   was one program called LRAP, the Living Room Accelerator

15   Program, Your Honor, LRAP, and I believe about 50 of the

16   largest developers got deals.  But, again, everyone got the

17   same deal.  It was not individually negotiated.  And these

18   developers, I think, accounted for one-tenth of 1 percent of

19   the developers in the database.

20        **THE COURT:**  All right.  Dr. Burtis, what's wrong with

21   that?

22        **DR. BURTIS:**  Well --

23        **THE COURT:**  Do you have any objection to the R-T model?

24        **DR. BURTIS:**  So let me say just a few things.

25        **THE COURT:**  A little closer to the mic.

1          DR. BURTIS:  How that's?  Better?

2          THE COURT:  Slightly.  Can you pull it a little closer to

3    you?  Good.  Okay.

4          DR. BURTIS:  How's that?

5          THE COURT:  That's better.

6          DR. BURTIS:  Okay.  Okay.  So, Your Honor, a few things

7    about these various models.  First, I wasn't asked to evaluate

8    whether or not these models were the right models for merits,

9    and so I'm not going to talk to you about that.  The only issue

10   for me is whether these models can analyze the issue of whether

11   or not all of the but-for service fee rates would be lower.

12         And so I wanted -- and let me just say something about

13   these models, because Dr. Singer -- I think he still has his

14   slide up here for Table 3.  This is essentially the model.  So

15   this is not like -- you might be, you know, used to econometric

16   models, for example, where you estimate an overcharge.  What

17   these models are, it's like a list of equations; and

18   Dr. Singer, you know, inserts or inputs particular numbers into

19   the equations and then solves them for a single number.

20         And so the point that I'm going to make here is that all

21   of those inputs -- and you can look at Table 3 or Table 5.

22   He's got a couple of slides -- every one of those inputs is

23   either an aggregate, like total consumer expenditure in

24   Google Play, or it's an average.

25         Like, for example, in -- it's not up anymore.  In Table 3,

1    I believe the average price for all apps he has in there is

2    $3.99.  And in his model for IAPs -- that's the in-app

3    purchases -- which is a separate model, the average price is

4    $8.99.  Even though there's tremendous variation in those

5    prices, it's just a single number.

6        Every one of those numbers in these models are like that.

7    They're either an aggregate or an average.

8        So a couple of things.  One is that Dr. Singer said there

9    was absolutely no individualized negotiations.  That's not

10   actually true.

11       **THE COURT:**  Let me just -- I may have missed your answer,

12   but as a concept, though, the Rochet-Tirole approach is sound

13   in this market, if you assume it's a two-sided platform market;

14   right?

15       **DR. BURTIS:**  So as I said, you know, I don't want, as an

16   expert who's here for Google, to say that this is the right

17   model for --

18       **THE COURT:**  I'm not saying -- no, that's not the issue.

19   The issue is --

20       **DR. BURTIS:**  Okay.

21       **THE COURT:**  -- is this so far off the charts that --

22       **DR. BURTIS:**  Oh, no.

23       **THE COURT:**  -- no reasonable economist would ever use a

24   Rochet-Tirole model to analyze -- you may not agree with the

25   output or the inputs, but just the model selection itself,

1    you're okay with that?

2         **DR. BURTIS:**  You know, it is used in economic literature,

3    Your Honor.  It is.

4         **THE COURT:**  Okay.

5         **DR. BURTIS:**  It is, of course, not used to analyze common

6    impact.  But it is used in the way that Dr. Singer is using it

7    here, which is kind of an average or overall effect, because

8    the model is -- it does produce a single answer and it does

9    produce either impact for everybody or no impact for everybody.

10   It's just -- you know, it's a one-for-all or all-for-one kind

11   of result.

12        And let me say, the other thing about the model is that it

13   turns on Dr. Singer's assumption about what will happen to

14   Google's market share in the but-for world.  That's very key in

15   these models.

16        And so one thing that happens in these models is, like, if

17   you reduce their market share for, like, 1 percent or

18   2 percent, just a little bit, what you're going to get is a

19   reduction in the service fee rate for everybody.  And that is

20   not the way that competition in this market has worked.  Right?

21        What we see -- and I talk about this in my report when I

22   talk about the characteristics of this business -- developers

23   and apps are very different from one another.  And there are

24   some developers with really popular apps, and they have the

25   ability to move consumers from one store to another.  And so

1    Google will focus on those developers and they will offer those

2    developers deals.  And, in fact, they have individually

3    negotiated deals with certain developers.  And I talk about

4    this in my report.  And in my report, in Exhibit 8, there's,

5    like, a list of all of these developers who got these special

6    deals.

7        So the model is fine for what it is, for the way that it

8    is used in the literature, but it's not addressing the issue of

9    common impact.  Right?  It's assuming --

10       **THE COURT:**  Well, Dr. Singer says that Google's business

11   practice, what it does every day with developers is to start

12   with the list price, the rack rate of 30 percent.

13       Do you disagree with that?

14       **DR. BURTIS:**  I think that's an assumption on his part.

15       What Google has done is offered different rates.  It has

16   offered 15 percent to --

17       **THE COURT:**  Well, that may be; but the starting point, the

18   baseline is 30 percent.  You walk in the door at the

19   Play Store; 30 percent is on the table.  Then you may have the

20   consumer demand to negotiate a sweeter deal for yourself if

21   you're a developer.

22       But do you disagree -- and, if so, you need to tell me

23   why.  Do you disagree with the proposition that the list rate,

24   the rack rate, is 30 percent for everybody?  That's the

25   starting point, at least, for everybody in the Play Store.

1    **DR. BURTIS:**  So I guess I do disagree.  I mean, it's -- it

2    is unclear how -- why we can just assume that a rate of

3    15 percent is a discount off of 30.  I mean, it's 15 percent.

4    And I don't know -- I mean, there's no reason that you have to

5    say that it's a discount off of 30.  It is what it is.

6        And just to go back to the deal -- to the developers who

7    are negotiating these deals with Google, they are negotiating

8    for services.  And each of these deals are customized to the

9    individual developer.  They are heavily negotiated for

10   sometimes months, and it is the value of those services that

11   are being negotiated.

12       **THE COURT:**  Okay.

13       **DR. BURTIS:**  And so I do want to just make one last point

14   about this model because -- and I think Dr. Singer and I agree.

15   The fundamental dispute between us or the primary dispute

16   between us is on the pass-through rate.

17       And just to focus you on that, you can see in this slide

18   the pass-through rate is 89.9 percent in both the actual world

19   and the but-for world.  And that, too, is an average,

20   Your Honor.  And it is used throughout Dr. Singer's models.

21       **THE COURT:**  Well, let me ask you this:  How many

22   developers did not pay 30 percent as a percentage?

23       **DR. BURTIS:**  I don't know if I have that number.

24       So in Exhibit 8, what I have is a list of developers who

25   are -- who are getting these deals, the special deals.

1    In addition to those, any developer who has subscriptions,

2    they will get a lower rate on every subscription that is more

3    than a year old.  And right now, I don't know exact- -- I don't

4    know that I have that number in my report, like how many

5    developers there are.

6    **THE COURT:**  Well, I mean, is it your understanding that

7    most developers pay the 30 percent and some get a discount, or

8    is it vice versa?

9    **DR. BURTIS:**  Oh, no.  Most -- more than most pay

10   30 percent, Your Honor, because, again, the idea or the feature

11   of this marketplace is that there are thousands of developers;

12   there are thousands of developers who have apps with consumer

13   spend.  Right?  And those are the developers that we're talking

14   about who pay the service fee.

15   And the distribution of those developers is very uneven.

16   You have this long tail of developers who are very, very small;

17   and then you have, you know, a very small number of developers

18   who are very, very big, who generate hundreds of millions of

19   dollars in consumer spend every year.

20   And so those are the developers, of course, with the

21   really popular apps and who are able -- some of those

22   developers are able to sway the consumers from one store to the

23   other.

24   So, but all of those small developers, the tail of

25   developers, are paying 30 percent.  Or at least, I should say,

1    they did pay 30 percent until last July, about a year ago.  And

2    Google reduced the service fee rate to 15 percent on the first

3    $1 million of consumer spend.  And when they did that, it's

4    like 97 percent, or some number like that, of developers are

5    now paying 15 percent because, of course, they don't earn a

6    million dollars.

7         **THE COURT:**  Okay.  Pass-through rate, you were about to

8    say something about that.

9         **DR. BURTIS:**  Well, I just wanted to --

10        **THE COURT:**  First, what does that 89.9 percent -- what

11   does that represent?

12        **DR. BURTIS:**  So the way that this works, and the way that

13   it works within the context of the plaintiffs' claims here, is

14   that the plaintiffs are claiming that this service fee rate is

15   too high and that in the but-for world, it would be lower.  And

16   the developers are the ones who pay that service fee.  Right?

17   And then the developers set prices.  They set the prices of the

18   apps and these in-app purchases and subscriptions.

19        And the question is:  When the developers get a lower

20   service fee rate, do they pass it through to the consumers in

21   lower prices?

22        And in Dr. Singer's model here, he uses 89.9 percent as

23   the average pass-through rate.  So --

24        **THE COURT:**  All right.  So one way of looking at it is,

25   for every dollar in service fees, the developer is having the

1    consumer pay 89.9 cents of it.

2        **DR. BURTIS:**  I would say every dollar in savings --

3    right? -- between the actual and the but-for world,

4    89.9 percent of it gets passed through to the consumers in

5    lower prices.

6        **THE COURT:**  All right.  Okay.

7        **DR. SINGER:**  Your Honor, is it okay if I respond to a few

8    things that she said?

9        **THE COURT:**  Okay.  I don't want to derail her too much,

10   but go ahead.  And Dr. Burtis can certainly do the same.

11       **DR. BURTIS:**  No, that's fine.  I'm done.

12       **DR. SINGER:**  And I'll make it very, very quick, I hope;

13   and then we can go to the next point, which is the

14   Landes-Posner model for the in-app aftermarket services.

15       Just four very quick points.  She said that every -- every

16   input into the model is an average or an aggregate.  I just

17   want to point out that's not quite true.

18       The marginal cost is a key input to the model.  And the

19   marginal cost -- this is Google's marginal cost for operating

20   the store, which I've estimated to be between 7 and 10 percent,

21   depending on which cost of revenues, depending on which cost

22   you include.  I wouldn't call that an average marginal cost.  I

23   wouldn't call that an aggregate.  It's just Google's marginal

24   cost, just an input to the model.

25       I will grant you that the pass-through rate that I use to

1    come up with the but-for headline take rate is the average

2    across all the individual Google categories over which I

3    estimated a pass-through as a preview of the pass-through

4    debate.  But as you may or may not know, I have

5    category-specific pass-through rates.

6        But when I go to project a but-for take rate that's going

7    to mimic this kind of singular uniform but-for rate that Google

8    uses in the actual world, I need it to spit out one number.  So

9    I can't put in every individual pass-through rate by category.

10   I put in the average pass-through rate.

11       **THE COURT:**  We do this all the time.  There's nothing

12   wrong with an average.  I mean --

13       **DR. SINGER:**  No, I don't have a problem with that.  Just,

14   in this model, in this circumstance, it's calling for an

15   average.  I have --

16       **THE COURT:**  Unless Dr. Burtis says the average is

17   misleading because the range is so huge, it's a number that

18   doesn't really exist anywhere.

19       Is that your --

20       **DR. BURTIS:**  Yeah, that's it.  That would be --

21       **THE COURT:**  And why is that?

22       **DR. BURTIS:**  -- a good guess.

23       **THE COURT:**  I can't imagine Google has that many options

24   that it gives to people.

25       **DR. BURTIS:**  Oh, but this is the pass-through rate.

1    **THE COURT:**  No, no.  For example, that 3.99 product price

2    rate, you said that was a misleading average.  But why is that?

3    **DR. BURTIS:**  Well, the 3.99 is the developer's price, the

4    developer's price of an app.  And apps can be --

5    **THE COURT:**  It's an average.  It's Dr. Singer's average

6    for that.

7    **DR. BURTIS:**  Yes.

8    **THE COURT:**  Yeah.

9    **DR. BURTIS:**  And, I mean, apps are -- the prices of apps

10   are highly variable.  But --

11   **THE COURT:**  I don't have a problem with that.  But what's

12   wrong with using an average, even if they're highly variable?

13   **DR. BURTIS:**  So in general, the -- I'm going to -- I'll

14   use the pass-through rate as my example here and not the price,

15   because it matters.

16       The question is:  If you use an average, is there -- as

17   you put it; right? -- is there so substantial variation

18   underneath that average that you can't get the conclusions that

19   you need to get?  Do you need to go more into the data to

20   really understand what the conclusion of the analysis is?

21       So Dr. Singer has a pass-through rate of 89.9 percent.

22   Even his estimates, you know, when he does these individual

23   pass-through rates, vary from, like -- I don't have his in

24   front of me, but it's like 26 percent to 99.99 percent.  Okay?

25       Mine, the pass-through rates that I have found using data,

 1   many, many of those pass-through rates are zero.  And so using

 2   an average in this particular -- for this particular input will

 3   generate much -- substantively different results, depending on

 4   which of those numbers you put into the model.

 5        **THE COURT:**  All right.  So let's go with that.  That

 6   doesn't mean the model itself is so flawed that nobody would --

 7   no reasonable economist would use it.  I mean, you don't like

 8   the inputs.  That's perfectly fine.  That would be something

 9   for the trier of fact to take into account, were the inputs

10   accurate or not.  But as a concept, a couple higher levels, the

11   model itself is okay.  Is that fair?

12        **DR. BURTIS:**  As I said, the model exists in the

13   literature; and I'm not here to say that this is a model that

14   nobody uses.  I won't say that about this model.  Whether it's

15   the right model, I don't know, and I don't have an opinion.

16        But I guess my overall point is it is a model that can

17   only return one answer for everybody.  Either everybody's

18   impacted or everybody's not.

19        **THE COURT:**  I'm trying to figure out why, as a practical

20   matter in an antitrust case, why is that a problem?  If Google

21   has a 30 percent number -- I know you disagree with how widely

22   that's used.  But it looked to me like there was a fair amount

23   of evidence that 30 percent is a number that Google used

24   internally and externally.  So what's wrong with saying, "Well,

25   it should have been 15, not 30"?

1      **DR. BURTIS:**  So, Your Honor, for example, I know that,

2    you know, in the broader landscape of this litigation, there

3    are individual developers who are bringing claims against

4    Google and they might want to use this model; but if they use

5    this model, they're going to come and they're going to have

6    their own set of inputs.  And their -- and, you know, the fight

7    will be about:  Well, is that input the right input?

8      And conceivably, you know, if you have a bunch of big

9    developers, they could have -- each one of them could have

10   their own model.  You know, I don't know that it's necessarily

11   going to be this one; but if it's this type of model, then it's

12   going to be different for different developers.

13     **THE COURT:**  Okay.  But we're looking at a class now, a

14   putative class.  Whether it gets certified or not, we shall

15   see.

16     But as a technique for a putative class, what, in your

17   view, is fundamentally junk science -- because that's sort of

18   the buzzword test -- about coming up with one but-for

19   pass-through rate for the class?

20     **DR. BURTIS:**  Well, that one's -- that's a big question,

21   Your Honor.  So I thought you were going to ask me about the

22   model, and now you're going to ask me about pass-through rate.

23   So the pass-through rate is a much larger discussion.  And if

24   we want to talk about that, I can, and the methodology that is

25   used to generate that.

 1          Regarding this model, I would say, I don't think this
 2    model itself is junk science.  I wouldn't say that.  All I'm
 3    saying here is that, you know, Dr. Singer, he didn't try to
 4    adapt the model, to really test the issue of common impact
 5    here.  He didn't do anything to test.  And the way that I think
 6    about what we're doing at this stage of the litigation is, we
 7    have to answer that question.  Can we make the assumption that
 8    there's a single model with a single set of inputs that fairly
 9    represents all these developers?
10          That's what he should have done, but he didn't.  He just
11    said:  You know what?  Here's the model.  I'm going to use all
12    these averages, and I get a result and it applies to everybody.
13          And so I think, when you do these things, that there's
14    something that precedes using a model like this that is all
15    built on averages, and that analysis is missing.
16          **THE COURT:**  What is that?  What analysis is missing?
17          **DR. BURTIS:**  Well, we could talk about pass-through rate.
18    Right?  Should we put in one pass-through rate?  And we can
19    talk about that, because that's a large discussion.
20          **THE COURT:**  That's what I'm asking.
21          **DR. BURTIS:**  Yes.  Yeah.
22          **THE COURT:**  Okay.  So let me just try it again.
23          There is evidence in the record that Google itself has a
24    30 percent number -- okay? -- for everybody.  It gets tailored
25    over time.  You can have different deals.  But when you walk

1    into the Google restaurant, the price on the menu is

2    30 percent, and you can have a conversation with your server at

3    that point about whether you're going to get a special deal.

4        What is wrong about -- I'm just not following why you

5    think it's so fundamentally wrong for a but-for model to have a

6    single starting point number as well.

7        **DR. BURTIS:**  Because it is the way that competition takes

8    place in this industry.  Because the way that these app stores

9    compete with one another -- and it's not just Google, but it's

10   Samsung and Amazon -- they don't reduce their service fee rates

11   across the board.  You know, what they do is they say:  Oh,

12   here's a really important set of developers, and we need those

13   developers to stay on or to get on our App Store, and so we are

14   going to give them -- we're going to compete for them.

15       And so the plaintiffs' allegation is here:  In the but-for

16   world, there would be more competition.  Well, okay.  How would

17   that competition work?  It would work the same way that it does

18   in the actual world.  These app stores would go after those

19   developers.  There wouldn't be a reduction in the service fee

20   rate from whatever it is now to what Dr. Singer has found with

21   one of his models.  That's just not the way that it works in

22   the actual world.

23       **THE COURT:**  Well, how does it work, in your view?

24       **DR. BURTIS:**  It works the way that I was trying to

25   describe.  Google says:  Oh -- or Samsung.

1      Like, Samsung, for example, Epic was a really -- you know,

2  it was a big deal to get Epic in their store.  So they offered

3  them a special deal.  When Amazon was competing for developers,

4  they went out -- they wanted game developers because the game

5  developers have a lot of consumers; and so Amazon went after a

6  small set of game developers with really popular game apps.

7  And so that's the way these stores compete with one another.

8      And so if you say, "Well, there's going to be more

9  competition in the but-for world," well, there's going to be

10  more of that.

11     **THE COURT:**  Well, okay.  I thought I had asked you whether

12  you knew how many developers were off of the 30 percent rate.

13  I think you answered you didn't know.

14     So the fact that there may be an Epic here and there, why

15  does that fundamentally throw off the idea that you can have a

16  uniform number for class purposes?

17     **DR. BURTIS:**  So, I'm sorry.  Are you asking me does it

18  matter how many there are?

19     **THE COURT:**  If you don't know how many people get a

20  non-30 percent rate, how can -- your argument seems to be:  Oh,

21  there's so much individualized negotiation.  But what I hear

22  you also saying is you don't know how much individualized

23  negotiation there actually is.

24     So I understand that -- look, in every case, every

25  price-fixing case, every Section 2 case, every Section 7 case,

1  there are variables.  There is no -- I have never seen an

2  antitrust case where everybody in a class was treated exactly

3  the same way.  And that's okay.  We don't need that.

4  Otherwise, you'd never have a class certified.

5      We just need a reasonable method that would allow me to

6  decide whether or not the antitrust injury for the consumers is

7  something I can determine on a class-wide basis reasonably.

8  Not with the precision of splitting an atom; just reasonably.

9      And I'm still not -- and, okay.  I understand some big

10 players get sweet deals.  They're not going to pay 30 percent.

11 They might pay 10 or 15 or something.  Or they might have

12 ladders:  first 5 million is 30, next 5 million is 10.

13     But how does that derail Dr. Singer's fundamental

14 proposition that there is at least one number that reasonably

15 fits the class?

16     **DR. BURTIS:**  Well, I would say, Your Honor, that,

17 you know, if -- what you're describing is that there are really

18 big differences between -- even if it's a small number of

19 large, important customers and a large number of very small

20 customers.  And to the extent there are those fundamental

21 differences, then we should separate them and treat them

22 differently.

23     **DR. SINGER:**  May I just weigh in very quickly?

24     **THE COURT:**  Sure.

25     **DR. SINGER:**  Then we can change and go to the next topic.

1          **THE COURT:**  Yes.

2          **DR. SINGER:**  We've got to get down the line.

3          I just want to say two things left, back to what

4     Dr. Burtis said.

5          One, she made a point about that the model, you know, you

6     put in a different but-for market share and the but-for

7     headline rate changes.  Of course it does.  She didn't say it

8     changes severely because she couldn't.  Right?

9          So I think the best estimate that I can go out and find in

10    the literature for the but-for headline market share in a world

11    in which Google refrains from the restraints that it used to

12    end competition in the app distribution market was to look at

13    how much share loss AT&T suffered after its tie was broken

14    between local access and long distance telephony.  That turned

15    out to be 60 percent.  In other words, I allow Google to

16    maintain a 60 percent share of all transactions in the but-for

17    world.

18         But if I'm wrong and Dr. Burtis thinks that I'm being too

19    aggressive and the right number should be 70 percent, you could

20    put the number 70 percent in the Rochet-Tirole model and it

21    would generate a slightly different but-for take rate.

22         But that's a fight about the inputs.  I don't hear that as

23    being an issue that implicates individualized analysis.  It's

24    all done using common methods and common evidence.

25         I'd like to make just one last point.  Then we can move

1    on, if that's okay.  You asked her for the --

2        **THE COURT:**  The issue is, your common approach is gliding

3    over glaring disparate -- disparately situated developers.  And

4    how are you going to assure me that that's not the case?

5        **DR. SINGER:**  Right.  It's not because the deviations from

6    the headline rate in the actual are so limited.

7        Dr. Burtis studies three examples of discounts.  Right?

8    One of them is that LRAP program, L-R-A-P, Living Room

9    Accelerator.  50, 50 developers in that.  Okay?  Of all the

10   hundreds of thousands of developers, there were 50.

11       The next experiment she examines is the subscription

12   experiment.  And there were a lot of subscription -- there were

13   a bunch of developers that have subscription products.  But

14   everybody who has a subscription product -- if you or I came up

15   with a subscription app, we would be eligible for the

16   15 percent take rate in Year 2 if our customers hung around for

17   two years.  No individualized.

18       And the third thing she studies, I think, is the

19   million-dollar -- you know, the first million dollars for small

20   businesses.  All that applies commonly.  There's no individual

21   negotiation there.

22       And if it's okay, those are the only --

23       **THE COURT:**  Well, let me ask you --

24       **DR. SINGER:**  Yes.  Oh, you wanted a number.  A number

25   roughly?

1    **THE COURT:**  No.  Just, where in your report do you look at

2    the deviation from the headline rate?

3    **DR. SINGER:**  Oh.  What I do is, in each app category --

4    Your Honor, I believe it's Tables 13 and 14 -- I have

5    calculated what every developer, by category, was able to

6    secure in the actual world off the headline rate of 30 percent.

7    And if the set of developers --

8    **THE COURT:**  13 and 14?

9    **DR. SINGER:**  Yes.  Those are my damages by -- I'm doing

10   this by memory, but Singer initial report, 13 and 14, shows

11   damages first in the app distribution market by category.

12   **THE COURT:**  I'm not seeing -- what page is that on?  This

13   is your initial report; right?

14   **DR. SINGER:**  Yes.  If it's not 13 and 14, it's 14 and 15.

15   It's pretty late in the report.

16   I'll pause while we find it.  Is it important?

17   **THE COURT:**  Yes, this matters to me.  I'd like to --

18   **DR. SINGER:**  Yes.  It was Table 13, page 133, Your Honor.

19   **THE COURT:**  Oh, 133.  Okay.  All right.

20   All right.  So what is Table 13 showing?

21   **DR. SINGER:**  Table 13 is showing how to arrive at

22   aggregate damages by app category.

23   And your question, if I recall it correctly, is:  How did

24   I take into consideration the discounts that were actually

25   achieved in the -- that were achieved in the actual world off

 1   the headline rate, and how did I project those in the but-for

 2   world?

 3       So if you look at the column that's titled "Actual Take

 4   Rate," you can see there is some variation.  Not much.  I think

 5   Table 14 might be more illustrative.

 6       Let's look at Table 14, if that's okay.  Table 14 is on

 7   page 134.  You'll see there is some variation.  You'll see that

 8   Music and Audio got a big discount off the actual take rate for

 9   in-app purchases.  You see that, Your Honor, the 19.1 percent?

10       **THE COURT:**  Let's just go -- I'm more interested in 13.

11   This is the Google Play market; right?

12       **DR. SINGER:**  That's the primary market.  That's correct.

13       **THE COURT:**  Let's look at that one first.

14       **DR. SINGER:**  That's fine.

15       **THE COURT:**  All right.  There's actual take rate.  Tiny

16   variations.  What does that mean?

17       **DR. SINGER:**  That means there was almost no deviation,

18   almost no transactions that occurred off the 30 percent default

19   headline rate in the primary market for app distribution.

20       **THE COURT:**  And how did you -- let's just pick Food and

21   Drink, 29.9 percent.

22       **DR. SINGER:**  Right.  So I can go into the database,

23   Your Honor, and for each transaction in the database, I get to

24   see the take rate, the applicable take rate that was paid by

25   the developer on that transaction.

1     **THE COURT:**  Actual pays?

2     **DR. SINGER:**  The actual take rate.  That's correct.

3     And so you'll see there's not much variation -- I'm

4     looking at Table 13.  There's not much deviation from the

5     30 percent, which I think just makes my point that --

6     **THE COURT:**  That would account for individual deals and --

7     **DR. SINGER:**  That accounts for all individual deals.

8     If you go to Table 14, you'll see.  Some --

9     **THE COURT:**  No.  I like 13.

10     **DR. SINGER:**  I was trying to help Dr. Burtis.

11     **THE COURT:**  All right.  So that is your way of -- you

12     actually tested using Google's actual developer fee contracts

13     and agreements?

14     **DR. SINGER:**  I'm looking at the transaction data.  I don't

15     have to look at the agreements.  I have the transaction data

16     which shows me the actual discounts that were secured.  And

17     this is my --

18     **THE COURT:**  That would account for every individualized

19     deal?

20     **DR. SINGER:**  Correct.  And there weren't that many of

21     them.  And this is key.

22     **THE COURT:**  Dr. Burtis, that looks pretty good.  What's

23     wrong with that?

24     **DR. BURTIS:**  So, well, it doesn't account for everything

25     because it doesn't account for the individualized deals where

1   they're negotiating the services, but that is a small number of

2   developers.

3        **THE COURT:**  Dr. Singer, I think, just said it did.  So --

4        **DR. BURTIS:**  It does not.

5        **THE COURT:**  Why is that?

6        **DR. BURTIS:**  Because it just doesn't.  In the transactions

7   data, that's just not there.

8        **THE COURT:**  Well, "It just doesn't" doesn't help me.

9        Food and Drink, Dr. Singer is saying he looked at every

10  service fee agreement in the Food and Drink app category, every

11  one.

12       **DR. BURTIS:**  So --

13       **DR. SINGER:**  Every transaction.

14       **THE COURT:**  What did he leave out?

15       **DR. BURTIS:**  So --

16       **THE COURT:**  How could he have missed anything?

17       **DR. BURTIS:**  If he is looking at the service fee rates in

18  the transactions data and he did it right, then that would be

19  correct.

20       But you asked him the question about the individualized

21  deals.  And all I'm saying is that there are some of those

22  deals, and you are not going to see the effects of those deals

23  by looking at the service fee rate because what they're doing

24  is they're negotiating for services.  You know, they want

25  certain things from Google.  They're not going to have a

1   different rate.  They're going to have more, you know,

2   something.  More -- I won't say it out loud but --

3       **THE COURT:**  All I care about is the rate.  I mean, what --

4       **DR. BURTIS:**  Okay.  I mean --

5       **THE COURT:**  Well, it's not "okay."  This case is about the

6   rate.  What difference does it make whether they got a

7   complimentary doormat because they paid a high rate?  I mean,

8   they're still paying the rate.  I don't really understand what

9   you're saying.

10      **DR. BURTIS:**  Well, I would say it is the way that Google

11  has competed.  And so in the but-for world, if there's more

12  competition, then Google would compete more like it did in the

13  actual world, and so you'd have to take account of that other

14  way of competing.

15      **THE COURT:**  Well, let me -- okay.  Just looking at that

16  Table 13 in Dr. Singer's opening report -- and I'm looking at

17  Docket Number 254-4, which, unfortunately, is sealed, at least

18  for the moment -- I'm not hearing anything from you,

19  Dr. Burtis, that tells me that the actual take rate number for

20  each of those categories of apps is underinclusive in any way.

21  In other words, I'm not hearing you say that any rate actually

22  paid by a developer in one of those app categories was not

23  included.  Is that right?  You're not saying that they --

24  anything was omitted.

25      **DR. BURTIS:**  Well, how far did you go in your data?

1     **DR. SINGER:**  This has every transaction during the class

2  period.

3     **DR. BURTIS:**  All the way through 2021?

4     **DR. SINGER:**  Yes.

5     **DR. BURTIS:**  So you're showing everybody who got a lower

6  rate in July of 2021?  Because --

7     **DR. SINGER:**  No, no, no.  Across the entire class period.

8     Just to be clear, any discount that you got -- any

9  discount that you got in the actual world -- right? -- from the

10  headline take rate was applied in the but-for world from a

11  lower headline take rate -- right? -- assuming that Google

12  refrained from engaging in the challenged conduct.

13     **DR. BURTIS:**  So, Your Honor, if you look at my Figure 4,

14  you can see it by year.

15     **THE COURT:**  Which one?

16     **DR. BURTIS:**  Figure 4.

17     **THE COURT:**  In your report?

18     **DR. BURTIS:**  Yes.  It's on page 44.

19     And you can see that over time, the share of the

20  developers -- this is the U.S. developers, the class of

21  U.S. developers.  You can see that that share fell over time.

22     **THE COURT:**  The service fee rate?

23     **DR. BURTIS:**  The share of developers who were getting the

24  30 percent rate.

25     **THE COURT:**  Oh, I'm sorry.  Figure 4, you said.

1          **DR. BURTIS:**  Yes.

2          **THE COURT:**  Okay.  Page 45.  Okay.

3          Okay.  So what does that have to say about the

4     completeness of the data used in Table 13 in Dr. Singer's

5     report?

6          **DR. BURTIS:**  Well, you know, I didn't check his Table 13.

7     They should be -- if -- you know, I use this transactions data

8     to do this too; so they should be the same.

9          **DR. SINGER:**  I'm happy to move on to 1(b), the take rate

10    for the in-app transactions, if you'd like; or if you'd like to

11    skip right to pass-through --

12         **THE COURT:**  Well, I just --

13         **DR. SINGER:**  Oh, sorry.  I didn't know --

14         **THE COURT:**  Table 13, I just want to be crystal clear

15    about this.  So you're saying, Dr. Singer -- and you can

16    correct me if I misunderstood -- but the actual take rate in

17    Table 13, and I guess also for Table 14, same column, accounts

18    for every service fee agreement in each of those app categories

19    for the time period that you had the data?

20         **DR. SINGER:**  It does, Your Honor.

21         And I just want to make sure.  You're using the word

22    "agreement."  I didn't study the agreements.  You probably

23    don't want me to be reading agreements.  I have the transaction

24    data.

25         **THE COURT:**  That's what I mean.

1      **DR. SINGER:**  Yes.

2      **THE COURT:**  The actual --

3      **DR. SINGER:**  Transactions.

4      **THE COURT:**  The actual charge --

5      **DR. SINGER:**  Yes.

6      **THE COURT:**  -- from Google to the developer?

7      **DR. SINGER:**  Correct.  Every one.

8      **THE COURT:**  So the variation is quite slight?

9      **DR. SINGER:**  It's quite slight in that initial app

10  distribution market; that is correct.

11      You see a little more variation in Table 14.  I don't know

12  why I'm so excited to take you there.  But you see a little

13  more variation in Table 14, and we can talk about --

14      **THE COURT:**  Even taking Dr. Burtis's comment that there

15  were some heavyweights, so to speak, who got special deals,

16  once they're all aggregated, the effect is quite tiny in terms

17  of getting off the 30 percent rate?

18      **DR. SINGER:**  In the app distribution market, that is true.

19  That's not necessarily the case when we go to in-app.  But

20  whatever discounts a category was able to secure, those same

21  discounts off a lower headline rate were applied in the but-for

22  world.

23      **THE COURT:**  Just last chance, Dr. Burtis.

24      **DR. BURTIS:**  I'm good.  I'm good, Your Honor.  I'm happy

25  to move on.

1          **THE COURT:**  Nothing to say about that?

2          **DR. BURTIS:**  It is not part of our central dispute.  So

3     I'm happy to move on.

4          **THE COURT:**  Okay.  1(b).

5          **DR. SINGER:**  Excellent.  And I'll make this quick and

6     painless, I hope.

7          So this is -- you're going to see a lot of symmetry here.

8     I just have three points for how I estimated the but-for take

9     rate for in-app services.

10         So Point Number 1, I use a classic model from the

11    literature, the Landes-Posner model, which is generally

12    accepted and fits the facts of the case.

13         Now, unlike app distribution, where Google was playing the

14    role of a matchmaker, the aftermarket for in-app services is a

15    one-sided market between developers on the one hand and

16    suppliers of these aftermarket services on the other, with no

17    indirect network effects.  It is a simple transaction between

18    the buyer, which is the developer, and a seller of the

19    aftermarket services and includes things such as payment

20    processing, recordkeeping, and unlocking of content needed to

21    consummate a purchase of in-app content through the app.

22         Now, given the lack of indirect network effects, we need a

23    one-sided model to reflect the one-sided nature of the

24    aftermarket for in-app services.

25         And there's good news here as well, Your Honor, in that we

1  have two famous antitrust scholars, William Landis and Judge

2  Richard Posner, who have derived how a dominant firm changes

3  its prices in response to entry by -- this is a technical

4  term -- a competent fringe, or just by a new set of entrants

5  that hadn't been there, now upsetting the dominant firm's

6  monopoly.  They have derived a model.  It's very common and

7  classic in the literature that economists use for these sorts

8  of situations.

9        Point Number 2, the Landes-Posner model employs real-world

10  data from this case.

11        If I could put up Slide 3, Your Honor, it's going to look

12  just like the slide for the Tirole model, but now we're looking

13  at the Landes-Posner, what went into estimating the but-for

14  take rate for in-app services.

15        Do we have that up?  One down.  You're on Rochet-Tirole.

16  Can you come down to Posner?  There you go.  Thank you so much.

17        So armed with the right model, we now have to provide

18  inputs to the model and determine changes in the price for

19  in-app aftermarket services.

20        And this is where Dr. Burtis and I get into a similar

21  dispute from what he just had.  She takes issue with my

22  pass-through, which, again, is an input; but we're having an

23  entire debate over pass-through --

24        **THE COURT:**  To start, what does that 29.2 percent take

25  rate mean?

1      **DR. SINGER:**  This is the actual -- this is the actual take

2    rate -- sorry.  Which -- I don't see it in front of me.  Let me

3    come over here.

4      **THE COURT:**  Your columns are redacted.  The third thing

5    down.

6      **DR. BURTIS:**  It's the actual service fee rate on average.

7      **THE COURT:**  Sorry?

8      **DR. BURTIS:**  It's the average.  It's the average service

9    fee rate for in-app purchases.

10      **THE COURT:**  I know, but what does that mean?  Who's paying

11    what to whom --

12      **DR. SINGER:**  Oh.

13      **THE COURT:**  -- in that 29.2 percent?

14      **DR. SINGER:**  Yes.  That is what developers pay, on

15    average, to transact in these in-app aftermarket transactions

16    to Google.  That is, Google is taking 29.3, on average, of the

17    revenue -- right? -- away from the developer and pocketing it.

18    Right?  That's what the 29.3 stands for.

19      **THE COURT:**  For billing services or whatever?

20      **DR. SINGER:**  Well, a few more things.  Yes, a few more

21    things.  I went through that list of recordkeeping, payment

22    processor.  And, you know, give you an idea, the competitive

23    rate -- you saw this in my report, Your Honor -- for payment

24    processing is between about 2 and 4 percent.

25      May I go on?

1          **THE COURT:**  Yeah, please.

2          **DR. SINGER:**  Okay.  All right.  Now, here, too, I use all

3     of the real-world data available to me.  Just an example of

4     some of the rows, consumer expenditures on in-app products and

5     Google's revenues were obtained from Google's financial and

6     transaction data.  And the table shows how I calibrated the

7     model based on the real-world data to get the but-for rate for

8     this in-app aftermarket.  Okay?

9          Point Number 3, other than suggesting it can't be used

10    marketwide, Dr. Burtis, again, largely gives the Landes-Posner

11    model a pass.  She doesn't dispute that Landes-Posner is

12    standard or that it's widely accepted in the literature.  She,

13    again, complains that I performed a marketwide analysis rather

14    than solving for hundreds or thousands of but-for headline take

15    rates again.  And she's wrong for similar reasons that I think

16    we just went through for app distribution.

17         Again, Google doesn't negotiate take rates for in-app

18    support services individually with tens of thousands of app

19    developers.  It would make zero economic sense.  That's all

20    they'd be doing all day if that's what they did.

21         The second point --

22         **THE COURT:**  Well, in Table 14, the take rate -- actual

23    take rate is much more variable.

24         **DR. SINGER:**  It is.  And so I can go to some examples.

25    Like in the music category, Your Honor, on Table 14, you'll see

1    that those developers did very well at securing a discount,

2    19.1 percent, on average.

3         I think we have some --

4         **THE COURT:**  Why is a uniform number, then, going to be

5    useful in this --

6         **DR. SINGER:**  Because in the but-for world, the discount

7    that these big guys, like Pandora, were able to achieve would

8    be achieved off of a lower but-for headline rate.  We still

9    need a model to produce for us a singular but-for headline

10   rate.  From that lower rate, we then can allow for some

11   individual prices or variation by categories to replicate the

12   kind of discounts that were secured in the actual world.

13        But what the model is going to give us is a singular

14   headline rate that would serve, just like in the actual world,

15   as a starting point for all negotiations.

16        **THE COURT:**  Dr. Burtis, what's wrong with that?

17        **DR. BURTIS:**  You know, I would say the same thing,

18   basically, Your Honor.

19        **THE COURT:**  Okay.  I mean, just to break that down a

20   little bit, you don't take issue with the Landes-Posner model

21   as a model for the case; is that right?

22        **DR. BURTIS:**  Economists use this -- these kinds of

23   equations.  I certainly wouldn't say that this is, you know,

24   junk science in that regard.  I think the issue for me is

25   whether this model is capable of answering the question of

1  whether all of those rates would really fall in the but-for

2  world.  And, you know, it is a model that doesn't provide us

3  with the opportunity to really determine that question.  It

4  just --

5       THE COURT:  But why?  I know that's your position.  But

6  why?

7       DR. BURTIS:  You mean why would it be possible that not

8  all the rates --

9       THE COURT:  Why do you tell me that this won't work?  What

10 you just said, why is that the case?

11      DR. BURTIS:  Oh, because it's the mechanics of the model,

12 Your Honor.  I mean, you only get one answer out of this model.

13 You get -- you either get a reduction or you don't get a

14 reduction.  So there's -- the model doesn't give us the

15 opportunity to answer the question:  Is it possible that

16 somebody's not impacted?

17      THE COURT:  Okay.  But does the data show that --

18 anything's possible, but you've got to look at the data in the

19 world as it is today.  Did you find anything in the data of the

20 world that says your concern has some teeth to it?  In other

21 words, it has to be more than just economic abstraction.  You

22 have to say this model doesn't fit the actual data we have.

23      Do you have that?

24      DR. BURTIS:  Yes.  And in my report, I talk about the way

25 that these app stores compete and the way that they compete for

1   individual developers.  And so, in my view, in the but-for

2   world, there would be -- even with more competition, even if we

3   assume, in the but-for world, Google has more competition, if

4   we also believe that that competition is going to manifest

5   itself the same way that it does in the actual world, there

6   will be developers who will not get a lower service fee rate.

7        THE COURT:  Okay.  I don't have a problem with that.  But

8   why does that mean you have to throw out everything Dr. Singer

9   did?

10       DR. BURTIS:  Because his model doesn't allow for that

11  possibility.  He -- he -- you know, it's --

12       THE COURT:  Let me struggle to put it differently, if I

13  just might jump in.  Okay?  But what is the weight of that?  I

14  mean, if his model doesn't allow it but it has a 5 percent

15  impact, that's okay.  If his model doesn't allow it but it

16  throws off the numbers by 55 percent, that would be an issue.

17       So we're not looking for perfection.  This is an antitrust

18  case in a United States District Court.  So I'm trying to

19  figure out, in the messy world of apps and consumers and

20  developers and platforms -- we're not looking for an artificial

21  uniformity or singularity.  If it doesn't exist in the real

22  world, we're not going to demand one in a model.

23       So it may be -- I mean, did you quantify how much of

24  this -- what is the weight or the impact on Dr. Singer's model?

25  I mean, is it so bad that it's throwing out all the data, or is

1  it just a couple of things here and there are not getting

2  picked up?

3      **DR. BURTIS:**  So I guess -- so I did not try to develop an

4  alternative model that I could use.

5      **THE COURT:**  I'm not asking you that.

6      **DR. BURTIS:**  Okay.

7      **THE COURT:**  I'm asking you to pick apart your colleague

8  here.  Just tell me why he's wrong.

9      And I understand some things may be missing.  I'm trying

10  to get a sense of the gravity of that.  All right?  I'm okay --

11  I'll just be candid.  I'm okay if a few things are missing and

12  it doesn't -- it's a tenth of a percentage point.  I'm just

13  using this as illustrations.  I'm not okay if a few things are

14  missing or some things are missing and it's a 50 percent -- the

15  target's off by 50 percent.  I'm not hearing where you are on

16  that; so help me understand.

17      **DR. BURTIS:**  So I would say, Your Honor, the -- so the

18  magnitude issue is more like a damages issue.  I think that

19  that's the kind of the question that you're asking me.  Like,

20  how bad is this model in terms of the damages?  And, you know,

21  I think that depends on who this model doesn't fit.

22      If it turns out that it doesn't fit the small developers,

23  well, they're small -- right? -- and so the difference in the

24  damages will be small; but if this model doesn't fit, you know,

25  the top ten developers, then that's huge because those top --

1        **THE COURT:**  I'm asking you, just to jump in, you keep

2    saying "if."  Does this fit it or not?  I need your opinion.  I

3    mean, I understand there are lots of "ifs," but what is your

4    conclusion?  Does Dr. Singer's model actually fit the small

5    developers, the whale developers, or does it not?  That's what

6    I'm trying to understand.

7        **DR. BURTIS:**  I think it would -- well, again, I would like

8    to move to the issue of pass-through because I think --

9        **THE COURT:**  Let's answer my question first.  Okay?

10       **DR. BURTIS:**  Well, if we -- if we -- it wouldn't fit a lot

11   of developers.  It would be a big deal because, in my view,

12   that pass-through number is very wrong.

13       **THE COURT:**  All right.  Well, did you quantify how many --

14       **DR. BURTIS:**  Yes.

15       **THE COURT:**  Where is --

16       **DR. BURTIS:**  There's all kinds of -- not in this model,

17   but I quantified the issue with regard to pass-through.

18       **THE COURT:**  Okay.  All right.  Well, all right.  If you

19   want to do it that way, that's fine.  Go ahead.

20       **DR. SINGER:**  Your Honor, I had one more point for --

21       **THE COURT:**  I want to hear the pass-through.

22       **DR. SINGER:**  Oh, I'm sorry.

23       **DR. BURTIS:**  Oh, you want to go to pass-through?

24       **THE COURT:**  Yes.

25       **DR. SINGER:**  I think I was designated as the presenter of

1  the pass-through, since it's my model.

2          **THE COURT:**  Well, I think I get it.

3          What's your -- just go ahead, yeah.

4      **DR. BURTIS:**  All right.  So I'm going to -- I'm going to

5  sort of jump to something sort of to the end.  Okay?  But it is

6  addressed in this.

7          So I want to go to my Slide 14.

8          **THE COURT:**  14.  All right.  What page is that?

9      **DR. BURTIS:**  I only have slides.  It's a slide.

10         **THE COURT:**  Oh, it's a slide?  Oh, okay.  Sorry.

11     **DR. BURTIS:**  Yeah.

12         **THE COURT:**  This thing you handed -- okay.  All right.

13     **DR. BURTIS:**  Okay.  So we can talk -- and we should -- we

14  should talk about the methodology that Dr. Singer used to find

15  the pass-through rate that he uses in his models, and he

16  also -- he also uses that in his damage model.

17         And just stepping back for a minute, Your Honor, the

18  models that we were looking at are -- Dr. Singer uses those to

19  find the but-for service fee rate.  Right?  And so the ultimate

20  question, though, for these consumers is:  Even if that service

21  fee rate was lower, did the developers pass those lower service

22  fee rates on to consumers in lower prices?

23         And so he not only uses the pass-through rate in that

24  model, but he uses the pass-through rate to answer that

25  fundamental question.  So it's a really important issue, and

1   this is a big, I think, dispute between us.  Okay?  So I can

2   talk about his methodology, or -- I'll give you a brief --

3   well, I don't know how to do this because it's long.  Do you

4   want me to?

5      **THE COURT:**  Whatever you'd like.  I'll tell you what,

6   though.  Let's take a -- we can take about a ten-minute break

7   and give the court reporter an opportunity to cool her hands

8   off.  So we'll start again at about 3:15.

9      **DR. BURTIS:**  Okay.

10      **THE CLERK:**  All rise.  Court is in recess.

11              (Recess taken at 3:06 p.m.)

12          (Proceedings resumed at 3:14 p.m.)

13      **DR. BURTIS:**  Okay?

14      **THE COURT:**  Please.

15      **DR. BURTIS:**  Okay.

16      **DR. SINGER:**  Your Honor -- oh, sorry.

17      May I make a suggestion?  Because we're going to be

18   debating my logit model, the appropriateness and reliability of

19   my logit model, I'm available, if you'd like me to go first --

20      **THE COURT:**  No.  We will.  I just want to have Dr. Burtis

21   round out her thought before we --

22      **DR. SINGER:**  Okay.

23      **THE COURT:**  -- took our break.

24      **DR. BURTIS:**  Okay.  Thank you, Your Honor.

25      So --

1          THE COURT:  Looking at Table 14.

2          DR. BURTIS:  Yes.  The slide on page 14 is an exhibit that

3     was in my report.

4          THE COURT:  Yes.

5          DR. BURTIS:  And we will talk about Dr. Singer's

6     methodology and how he got his pass-through rates.  I will tell

7     you now that that is a methodology that I've never seen used

8     before.  I mean, you were asking me these questions about,

9     you know, is this a standard methodology, about the other

10    models.  Dr. Singer's methodology for the pass-through rates is

11    not.  It is not standard.  I have never seen it before.

12         Dr. Singer was asked at his deposition if he's ever used

13    it before, and he said no, and he also said that he hasn't seen

14    it used.

15         THE COURT:  This is the one minus --

16         DR. BURTIS:  Yes.  One minus the share formula, correct.

17         THE COURT:  One minus the share.

18         DR. BURTIS:  One minus the share formula.

19         I've never seen it actually used in any article, even.

20    So, but we can talk about that.

21         The other two bars -- and what these represent are the

22    percentage of pass-through rates that are positive.  That's

23    what is on this graph.  And so I looked at the actual data.

24    Google did lower its service fee rate for certain developers

25    over time during the class period.

1        I was able to look at -- I had, like, four different

2   databases.  I was able to look at over 450,000 different -- I

3   call them "SKUs," which is either a paid app or an in-app

4   purchase or a subscription, and I looked at all three of those

5   different types of monetizations.

6        And what I found -- I just asked the question:  Did the --

7   did the price of that SKU fall after the service fee rate was

8   reduced?  And I found that in only 2 percent, over all of these

9   SKUs, only 2 percent fell.  And, by the way, this -- I did

10  this --

11       **THE COURT:**  Where is that in your report?

12       **DR. BURTIS:**  This is actually Figure 13 in my report.  So

13  it would be -- the discussion of that is around Figure 13.

14       **THE COURT:**  Okay.  All right.

15       **DR. BURTIS:**  And just to be clear, I did this by comparing

16  prices one month before the service fee rate fell and one month

17  after.  I did it six months before and six months after.  I

18  also said, I'm going to look over the life of the app.  Did the

19  price ever fall over the life of the app?  So I did all of

20  those different experiments.

21       This particular one is the one month before and the one

22  month after.

23       **THE COURT:**  All right.  Just, what page is that?

24       **DR. BURTIS:**  My pages are sticking together.

25       Does anybody know what page it is?

1       Oh, there it is.  It's page 102.

2       **THE COURT:**  Oh, okay.  And this is the one-month test?

3       **DR. BURTIS:**  This is a one-month test.  But all of the

4   results are reported in my report.

5       **THE COURT:**  Okay.  So --

6       **DR. BURTIS:**  They are substantively the same.

7       **THE COURT:**  Just one second.

8       I do not have a table on page 102 of your report.  I'm

9   looking at Docket Number -- it's the sealed version, 254-5.

10      **DR. BURTIS:**  Look at 103.

11      **THE COURT:**  103?  Figure 13 on 103?

12      **DR. BURTIS:**  Yes.

13      **THE COURT:**  Okay.  That's the one.  And this is the

14  one-month --

15      **DR. BURTIS:**  Yes.

16      **THE COURT:**  That's the same thing that we were looking at

17  in this chart.

18      **DR. BURTIS:**  Yes.

19      **THE COURT:**  Oh, I see.  Okay.

20      Okay.  Go ahead.

21      **DR. BURTIS:**  Okay.

22      **THE COURT:**  And what does this represent?

23      **DR. BURTIS:**  So the 2 percent represents, across all of

24  these different SKUs, 2 percent of those SKUs fell in price one

25  month after the service fee rate reduction.

1    And I was looking at -- I tried to focus my attention on

2    rate reductions that were at least ten points.  So it wasn't a

3    rate reduction from, like, 30 to 29.  It had to go from -- if

4    it started at 30, it had to be at least -- it had to go to at

5    least 20.

6         **THE COURT:**  And what does that 2 percent mean?

7         **DR. BURTIS:**  What that means is that only 2 percent of

8    those SKUs would have been at a lower price in the but-for

9    world, and only those consumers then who purchased those SKUs

10   would have been impacted.

11   And, again, this is just -- this is based on the actual

12   data.  And I had four databases.  I had the transactions data.

13   I created my own data by scraping Google Play.  I had their

14   app-level data.  I asked them for more data, you know, so that

15   I could do these experiments.

16   And I will note that Dr. Williams, one of the developer

17   experts, did a similar analysis.  He didn't have all the

18   databases.  He didn't have my scraped database, for example.

19   And his experiment was a little different.  But for him, he

20   found 8 percent of the prices were lower after a service fee

21   rate reduction.

22   So the point is that we -- both of us are finding that

23   pass-through in this industry, a pass-through of a service fee

24   rate reduction, at least for the SKUs that we are looking at,

25   was very infrequent.

1    **THE COURT:**  And the number that Dr. Singer got, that

2    99.99 percent, that's based on the one minus share formula; is

3    that right?

4    **DR. BURTIS:**  Correct.

5    **THE COURT:**  Okay.  Tell me a little bit about

6    methodologically -- I get it.  Nobody's used it before.

7    Dr. Singer said he's never used it before.  What is it about it

8    methodologically that doesn't work, in your view?

9    **DR. BURTIS:**  Okay.  So, first, I want to tell you what it

10   is, but it sounds like you kind of know already.

11       I want to go to Slide 3.

12   **THE COURT:**  Slide 3.  Okay.

13   **DR. BURTIS:**  And, basically, this is what the methodology

14   is that Dr. Singer employed.  He takes -- he does this for a

15   developer in a category with a particular kind of monetization

16   type, like subscriptions, for example; and he counts the number

17   of sales that that developer made in that month.

18   **THE COURT:**  I'm with you on that.  Why doesn't -- what's

19   wrong with this?

20   **DR. BURTIS:**  Okay.

21   **THE COURT:**  Why is this, in your view, a bogus formula?

22   **DR. BURTIS:**  Okay.  So one thing I want to -- I want to

23   explain just the implication of doing it this way.

24       Remember when I said, you know -- I was talking about

25   developers.  And there's, like, thousands and thousands of

 1   developers; and more than most of them are really, really

 2   small.  Like, you know, 90 percent of them are really, really

 3   small.  And that's also true of apps.  We have a lot of apps

 4   that are really, really small.  So when you use this

 5   methodology -- right? -- and you're calculating the share of

 6   those apps in that way, every one of those shares is going to

 7   be very, very small.

 8        And so that -- that is why he gets the result that he

 9   does -- right? -- because you have all these apps; each one of

10   them has a very, very small share; and the formula is one minus

11   that share.  And so that's kind of the intuition of what's

12   generating this result.

13        Okay.  But in my opinion, there are three flaws with this

14   methodology.

15        Okay.  So the first problem is that this formula, the one

16   minus the share formula, is the wrong formula for this case.

17   In this case, we have a service fee rate.  And that service fee

18   rate depends on price.  We call it an -- I've been calling it

19   an *ad valorem* cost.  Right?  So if the service fee is -- if the

20   price is a dollar and the service fee is 30 cents --

21   30 percent, then it's 30 cents.  But if the price is different

22   and that rate is still 30 percent, then the service fees in

23   dollars changes.  Okay?

24        And that is -- it is very different than a per unit cost

25   because those per unit costs don't depend on price.  The price

1   can be whatever, you know, it is; and it's always going to be

2   whatever -- whatever that cost is per unit.  You don't have

3   that kind of circularity, if you will, between the service fee

4   rate, which depends on price, and the price.  So you've got to

5   treat these things differently.

6       Dr. Singer's pass-through formula that he found in this

7   article -- and we can go to Slide --

8       **THE COURT:**  I have the article.

9       **DR. BURTIS:**  -- 6.

10      **THE COURT:**  Yeah.

11      **DR. BURTIS:**  If you look at Slide 6, it brings out part of

12   the article.  And it says that the formulas in that article

13   assume a per unit tax.  So the formula is based on a per unit

14   tax, but what we have in this case is this *ad valorem* cost or

15   you can think of it as a tax.

16       So there's this fundamental difference between what this

17   formula is measuring and what Dr. Singer should have measured

18   in this case.  Okay?

19      **THE COURT:**  So, and the one minus share formula is not

20   captured in this Nathan Miller article; right?

21      **DR. BURTIS:**  It is, Your Honor.  But that formula is based

22   on a per unit cost.  And so that formula, it is in the article,

23   but it is the wrong formula for this case.

24      **THE COURT:**  And so when you say that you've never seen

25   Dr. Singer's one minus share formula used, it's because of

1    that?

2      **DR. BURTIS:**  Well, that -- that is part of it, yeah.  But

3    even -- so the formula itself, one minus the share, is coming

4    from a particular kind of demand model called the logit.  And

5    that logit demand model is used frequently in the literature,

6    usually to get at elasticities.

7         But economists do not use the logit model, even when they

8    have a per unit cost, to get at pass-through rates.  That's not

9    the way that we think about pass-through rates.  We don't use a

10   formula like that.  It's too restrictive.  Right?  There's too

11   many assumptions built into the logit model.

12        And there are articles, and I cite these in my report.  It

13   says, you know, if you use the logit model to do things like

14   pass-through, the restrictions are too severe and you're going

15   to get unreasonable results.  You're going to get results that

16   don't make economic sense.

17        And so even for a per unit cost, I haven't seen

18   economists -- when they study pass-through, I have not seen

19   them use that formula.

20        What we usually do and, you know, what I've done many

21   times -- and, you know, even whoever is on the other side of an

22   antitrust case, you know, we're always doing the same thing.

23   We're always saying:  Well, I want to look at the relationship

24   between cost and price.  I want to see what happens to price

25   when cost changes.

1        And that is the standard methodology that we use, and

2   that's the methodology that I used in the graph that we were

3   just looking at.

4        **THE COURT:**  Okay.  Let's just pause there.

5        Dr. Singer?

6        **DR. SINGER:**  Yes.  Thank you.

7        And Dr. Burtis went into a bit of 2(d), which is fine, in

8   that section.  And I have some really important points I'd like

9   to make in 2(d).  But I think because she came back to 2(a), to

10  attack the logit, I think it makes most sense if we take out

11  2(a) and then, if we could, maybe move to 2(d) --

12       **THE COURT:**  Fine.

13       **DR. SINGER:**  -- afterwards.

14       Okay.  So on the logit model, I just have four points.

15       But before I even start off, I just want to say this.

16  Dr. Burtis cited something I said during my deposition.  And

17  you should know, Your Honor, that I tend to do mostly

18  monopolization cases.  And just as Dr. Burtis said, when I look

19  at pass-through, as I'm doing right now in the *Pork Antitrust*

20  case, I'm looking at changes in the wholesale prices on changes

21  in the retail price.  Right?

22       In this case, by contrast, we have a problem, and that is

23  the take rate on 93 percent of the transactions in the

24  database --

25       Can you put up Slide 4, please?

1    92.4 percent of the transactions in the database were all

2    at that headline 30 percent rate.  It is impossible to try to

3    find how app prices vary in response to changes in take rates

4    when the take rates don't change.  It's a problem.  Right?

5        And even in that very teeny-tiny segment of the pie, the

6    3.1 percent, the 4-point -- where Dr. Burtis goes looking for

7    experiments to exploit, it's all botched.  And I'm going to

8    show that to you when we get to 2(d).  You can't get any

9    information out of those changes in the small part of the

10   triangle, small part of that figure.  Okay?

11       So let me now make my -- what we are trying to do is that,

12   given this limited sample of changes in take rates, I looked

13   for an economic model of consumer demand that would allow me to

14   make predictions of how an app developer would change its price

15   in response to a change in the take rate, given the nature of

16   the demand that that app developer faced.  Okay?  That's why

17   we're here.

18       Point Number 2, the logit model captures the demand faced

19   by app developers.  I couldn't use it if it didn't.  Okay?  The

20   logit model is a generally accepted methodology based on

21   published literature in the field.

22       Can I see Slide 5, please?

23       I was a little surprised when Dr. Burtis said she had

24   never seen it used.  She certainly has read my expert report.

25   Here is a published article, Your Honor, by Werden and Froeb of

1   the Department of Justice in the context of a merger review.

2   And in a merger, the merging parties always like to claim that

3   there are going to be some cost savings that come about from

4   allowing the two firms to merge.  And in a typical merger

5   analysis, the economists debate whether the price effect from

6   those cost savings can negate the loss in competition by

7   allowing two rivals to merge.  And whoever wins that battle is

8   going to have the net -- whether it's going to be a net price

9   savings for consumers --

10                 (Court reporter clarifies.)

11       **DR. SINGER:**  So the merger opponents are going to claim

12   that the anticompetitive effects dominate, and the merger

13   proponents are going to argue that the cost savings dominate.

14   But that's the battle.

15       And in those battles, in those merger battles -- which I

16   don't partake in because my practice tends to take me into

17   monopolization, which is why I answered the question as I did

18   in my deposition.  In those merger battles, the logit model is

19   commonly used to map a change in the merging parties' costs

20   that come about from merger synergies into a change in price.

21       If you think about it, it's precisely what I'm trying to

22   do here.  I need a model that would allow me to map a change in

23   cost that come about from a lower take rate into a change in

24   the app developer's pricing.

25       Now, let me move now to --

1    **THE COURT:**  So you're saying there's no off-the-shelf

2    model that fits this?  You had to come up with this yourself?

3    **DR. SINGER:**  No, Your Honor.  Respectfully, that's not

4    what I'm saying.  Let me just try to -- can I put it in my --

5    **THE COURT:**  You don't have to be respectful.

6    **DR. SINGER:**  I want to be.

7    **THE COURT:**  You know better than I do.  So you're --

8    **DR. SINGER:**  We have one --

9    **THE COURT:**  -- saying --

10   **DR. SINGER:**  -- of two paths.

11     (Simultaneous speaking; court reporter interrupts.)

12   **THE COURT:**  One at a time.  I get to go first.

13   Your colleague here says that she's never seen anything

14   like this before.  And what I hear you saying is:  Okay.  I

15   adapted something from the merger context.

16   There must be some tool that economists use that doesn't

17   require you to lean into a wholly different sector.

18   **DR. SINGER:**  It's not exclusively used in the merger

19   context.  I'm just using this as an example of how it has been

20   used in the merger context.

21   What I'm telling Your Honor is that we have one of two

22   ways to get to the finish line here.  One would be the way that

23   Dr. Burtis and I have seen in monopolization cases before,

24   where you take advantage of variation in the wholesale rates

25   and you see whether or not the retailers pass along those

1    changes in the forms of prices.  We do a regression.  You've

2    probably seen it yourself.  Changes in prices at the retail

3    changes wholesale.

4        Okay.  Given that there is almost no variation in the take

5    rate here -- right?  92.4 percent of all transactions over the

6    class period occurred at that 30 percent headline rate -- we

7    can't use the standard tool; but fortunately, economists have

8    derived other pathways to try to figure out, to try to estimate

9    the pass-through rate.

10       And there, you need to describe the demand faced by the

11   developer because if you know they're facing a linear demand

12   curve or a logit demand curve or an AIDS -- there are all sorts

13   of demand specifications -- you can make a prediction about

14   what the pass-through rate would be.

15       And that's what I've done here.

16       **THE COURT:**  Why are you two so wildly different on that?

17       **DR. SINGER:**  Why are they -- I imagine that Dr. Burtis and

18   I both probably spend most of our time in monopolization cases,

19   typical price-fixing conspiracies where we get to see

20   variations in wholesale rates.  And so the kind of analysis

21   that we typically employ or I would employ as the plaintiff's

22   expert, and she would rebut as the defendant's expert, would be

23   one of these simple regressions of change on wholesale rate,

24   change on retail rate.  That's probably why we both see the

25   world the way that we do.

1          But what I would submit is that the logit model does get

2     used in antitrust settings to try to come up with a mapping --

3          **THE COURT:**  That's fine.  Why are you two so wildly

4     different?  She's at 2 percent and you're at 99.

5          **DR. SINGER:**  Oh, that's because her experiments are

6     botched, Your Honor.  And we're going to get to 2(d).

7          **THE COURT:**  We're going to jump around because we're

8     getting on in time.

9          Just tell me why her 2 percent number is not right.

10         **DR. SINGER:**  Okay.  So, for example, we'll go to her

11    subscription products.  Okay?  So I'm moving into 2(d), if

12    that's okay.  We're going to go to her subscription products.

13         She wants to exploit a change in the subscription take

14    rate in Year 2 of the subscription.  Remember, it went from 30

15    to 15 percent.  And she wants to go looking for a change in the

16    app's price for those subscription products.  But Google threw

17    up an impediment to changing the price.

18         Can I go to Slide --

19         I'm in 2(d) now.  It's just going to take me one second,

20    Your Honor, to tell you the slide number.

21         This is the testimony from --

22         Try Slide 12, please.

23         I'm jumping now to 2(d), Your Honor.  Just one second.

24         I'm sorry.  Slide 13.

25         This is deposition testimony, Your Honor, from an app

1  developer who is saying that Google didn't provide the

2  mechanics to lower the price of the subscription service in

3  Year 2 without also altering the price in Year 1.  Okay?

4       And so there are other reasons besides this impediment

5  thrown up by Google.  Let me tell you the second reason.

6  All right?

7       There was no economic incentive for a developer of a --

8       **THE COURT:**  You're saying that you think there's evidence

9  that after this 15 percent rate went into effect, the

10  developers could not pass that on?

11      **DR. SINGER:**  Correct.  They couldn't pass it on without

12  changing the first-year subscription price for the subscription

13  products.

14      **THE COURT:**  Can't do it; right?  Just, as a practical

15  matter, you can't do that?

16      **DR. SINGER:**  They just couldn't do it.

17      And so she's out looking for changes in that second year

18  subscription because she's focusing on the SKU, and she can't

19  find the changes.  And I'm telling you it's a rigged experiment

20  because the app developers couldn't lower their prices.

21      **THE COURT:**  Pause on that.

22      So, Dr. Burtis?

23      **DR. BURTIS:**  Oh, yes.  Thank you.

24      So I want to --

25      **THE COURT:**  So Dr. Singer is saying --

1        **DR. BURTIS:**  Okay.

2        **THE COURT:**  -- you looked --

3        **DR. BURTIS:**  Got it.

4        **THE COURT:**  -- looked in the wrong area, yeah.

5        **DR. BURTIS:**  Okay.  So he's focusing on subscriptions.

6   Okay?  His -- right now he's talking about subscriptions.

7        You can go to Slide 15, and you can see that the same

8   result exists for IAPs.  And this has nothing to do with

9   subscriptions.  These are the results for the one-month

10  comparison, the six-month comparison, and the life of the SKU.

11       And, by the way, Your Honor, when I did the subscription

12  experiment, I said:  I want to know -- I'm only going to put

13  this subscription in my analysis if that SKU's rate overall --

14  right? -- one year -- the SKU doesn't depend on the -- on how

15  long the subscription is.  I want -- I want the rate to go from

16  30 to at least 20.  So that developer had a 20 percent,

17  you know -- I'm sorry.  He was paying a 20 percent rate instead

18  of a 30 percent rate.  And yet the subscription numbers still

19  are what they are.

20       So Dr. Singer is saying they couldn't lower price because

21  they would have to -- the thing is, what happened with those

22  guys in my sample, all of their subscriptions were more than a

23  year old -- or not all of them, but a large number of them.  So

24  they could have lowered their price if they chose to.

25       **DR. SINGER:**  That's not -- that's just not true.

1          **DR. BURTIS:**  But --

2          **DR. SINGER:**  I'm sorry.  That's not a true statement.

3          **DR. BURTIS:**  But even so, Your Honor, it doesn't matter.

4     I mean, most of my SKUs are IAPs, and you can see that the same

5     result holds for the IAPs.  The same result holds for the paid

6     apps.  This is -- it's not just -- this is not being explained

7     by the inability to change your price.  These developers are

8     simply not responding to the service fee rate reduction.

9          **THE COURT:**  All right.  Let's not -- I don't -- we're not

10    going to debate the evidence.

11         So what about IAP and the apps?

12         **DR. SINGER:**  No, she got those wrong too.  Everything is

13    wrong.  Every experiment that she conducts is wrong.

14         **THE COURT:**  Why is that true for those two?

15         **DR. SINGER:**  Okay.  So I just want to -- before we leave

16    subscriptions, I didn't hear an answer to whether a developer

17    had the ability to lower the price in the second year of the

18    subscription.

19         **THE COURT:**  We're going to pass over that.

20         **DR. SINGER:**  Okay.

21         **THE COURT:**  Just tell me why the other two were not good,

22    in your view.

23         **DR. SINGER:**  Two reasons, Your Honor.  One is that she

24    looks at too narrow of a window.  Her windows are one month

25    before and one month after the price change.  What we are

1   trying to --

2       **THE COURT:**  Well, I think she did one month; then she did

3   six months --

4       **DR. SINGER:**  I'm going tell you all of them.

5       **THE COURT:**  Right.

6       **DR. SINGER:**  She looks at one month before, one month

7   after; six months before, six months after.  Then she

8   introduces a new slide that says "Life of the SKU."  We dug

9   into that a bit.  It wasn't much longer.  It ranged between

10  four months and eight months.

11      And the bottom-line takeaway, Your Honor, is we are trying

12  to model a but-for world in which the take rate was permanently

13  lower from the inception of the Play Store.  Right?  We're not

14  trying to model a but-for world where you go eight years and

15  then all of a sudden in one month, the take rate gets down.

16  Prices, of course, are sticky.  And you wouldn't expect a

17  developer to make an adjustment after one month.  You probably

18  wouldn't expect a developer to make an adjustment on six

19  months.  It's just too short of a time frame for the SKUs that

20  are affected to impact and work their way into the financials

21  so as to induce the developer to go back and look at its price.

22      Can I pull up, please -- let me see if I can get, on this

23  point, Slide 14.

24      Her analysis, secondly, it's completely contaminated by

25  looking only at SKUs.  Right?  And when you look at SKUs, you

1    miss the forest for the trees.  You miss the total revenues

2    that are affected.

3         So if Google makes a take rate change and it only applies

4    to the SKU -- right? -- if the SKU -- this is like -- you can

5    think of a SKU at, like, a supermarket.  It's the code.  If the

6    SKU accounts for too small of a portion of the developer's

7    revenues -- right? -- then the developer isn't going to go back

8    and reprice its product for the entirety of the product at

9    issue.

10        And here, in this example, Your Honor, it's my Slide 14,

11   it shows you again for subscription developers that the SKUs

12   that were affected -- Dr. Burtis, I think, misspoke when she

13   said the vast majority of the revenues were from that second

14   year -- the SKUs that were affected accounted for less than

15   5 percent of those developers' revenues.  So why would you

16   expect a developer to go back and revisit its pricing when this

17   effect -- when this take rate reduction touched such a small

18   percentage of the app developer's revenues at issue?

19        Can I -- is it okay if I can also go to --

20        **THE COURT:**  Well, let's hear the answer.

21        **DR. BURTIS:**  Okay.  Let's start at Slide 16.

22        So this is an example which has been anonymized that is in

23   the data, and you can see that the service fee dropped from

24   30 to 15 around sometime in 2017, Your Honor.  And you can see

25   that this price did not change all the way through 2021.

1    **THE COURT:**  Well --

2    **DR. SINGER:**  Can I respond to that one?

3    **THE COURT:**  I'm perfectly fine that you found one example.

4    **DR. BURTIS:**  Oh.

5    **DR. SINGER:**  She didn't find --

6    **THE COURT:**  But my --

7    **DR. SINGER:**  She didn't find one.

8    **THE COURT:**  Hold on.

9    The issue is, is this so pervasive that it would be

10   impossible to translate Dr. Singer's work across a class?

11   Now, we visited this issue several times.  There are going

12   to be countless variations here and there.  The issue is:  Does

13   it matter?  And for me, that means for Rule 23 purposes, does

14   that mean that common issues are going to be subsumed -- or

15   "overwhelmed" is a better word -- common issues will be

16   overwhelmed by individualized inquiries?

17   And, okay.  You found one, and I --

18   **DR. BURTIS:**  Oh.

19   **THE COURT:**  I mean --

20   **DR. BURTIS:**  No, no, no.

21   **THE COURT:**  But this would be -- you said this was an

22   anonymized example of one app developer.  But --

23   **DR. BURTIS:**  The only reason I'm showing you this example,

24   Your Honor -- and there are a few more line graphs like this in

25   my report.  The only reason I'm showing you this is that

```
 1    Dr. Singer's representation that it was only four to six months
 2    or six to eight months, or whatever he said, is actually not
 3    true.  There are some --
 4         THE COURT:  Oh, I see.
 5         DR. BURTIS:  -- apps in here or some SKUs in here that
 6    have quite a long life.
 7         THE COURT:  All right.
 8         DR. BURTIS:  And for those, it would not be true.
 9    But I do want to say --
10         DR. SINGER:  Can I respond to this slide first?
11         DR. BURTIS:  No.  Can I just --
12         THE COURT:  Just one second.
13         DR. BURTIS:  -- make this point?
14    Because it's an interesting point that he's making here
15    about, well, it took longer than six to eight months.
16    So, Your Honor, do you know what that means?  That means
17    that those consumers who bought over that six to eight
18    months -- right? -- are different than the ones who bought
19    later.  So now what he's saying is, we have to know how long it
20    would take.  We know that the price reduction -- we know there
21    was no price reduction.  Right?  But let's say it took six to
22    eight months.  Well, the ones that bought in that pre-period
23    are not impacted.  So, you know, yeah, it's another --
24         DR. SINGER:  May I respond?
25         DR. BURTIS:  -- individualized problem with this whole
```

1  pass-through analysis.

2      **DR. SINGER:**  Can I respond?

3      **THE COURT:**  Please.  Yes.

4      **DR. SINGER:**  I just want to make sure.  She didn't want to

5  use the name of the developer.  Would you like me to suppress

6  the name of the developer here as well?

7      **THE COURT:**  It's okay.  You can use the name, if you'd

8  like.

9      **DR. SINGER:**  Okay.  It's iHeartRadio.  And this is

10  really important.  Okay?

11      Well, because you made a mistake in the graph.  All right?

12  It happens.

13      But if you could flip back and forth, please, between

14  Exhibit -- this slide and the following slide, you're going to

15  show that Dr. Burtis stumbled on two different prices in the

16  data set for iHeartRadio.

17      I'm going to move over here, Your Honor.  Are you going to

18  be able to hear me if I move over, or should I just stay put?

19  I'll stay put.

20      **THE COURT:**  Just stay there.

21      **DR. SINGER:**  If you look at the iHeartRadio on Exhibit 17,

22  you'll see it at 4.99.  4.99.  Now, if we could flip back,

23  please, to the prior slide, you'll see it at 5.99.  How could

24  this happen?  Right?

25      It happened because Dr. Burtis is so singularly fixated

1   with a SKU analysis, she missed the fact that iHeartRadio

2   introduced a lower price at 4.99 in response to Google dropping

3   its take rate in July of 2017 from 30 to 15 percent.  This was

4   a special deal that they calculated -- that they struck.

5        And in response to the deal, if I could show Your Honor, I

6   went back -- when I saw this discrepancy when we got the

7   exhibits, we went back into the database --

8        **THE COURT:**  Let me just make sure I understand.

9        **DR. SINGER:**  -- and we calculated --

10       **THE COURT:**  Hold on.

11       **DR. SINGER:**  Excuse me.

12       **THE COURT:**  Let me make sure I understand.  So you're

13   saying on page 16, this is iHeartRadio.  On page 16, she has it

14   priced at 5.99.

15       **DR. SINGER:**  Yes.

16       **THE COURT:**  And that predates -- that's the pre-15 percent

17   reduction price.

18       You found that after the 15 percent was implemented by

19   Google, they actually dropped their price to 4.99?

20       **DR. SINGER:**  Let me tell you exactly what I found.  Both

21   prices exist in the database, but iHeartRadio started selling

22   the 4.99 on the Google Play Store app as opposed to the

23   4.99 [sic].  Here's how I know.

24       As soon as I saw the discrepancy of 4.99 to 5.99, I went

25   into the sales data, the transaction data; and I took a

1 | weighted average of what iHeartRadio was making for the
2 | product iHeart Plus -- right? -- which contains multiple
3 | SKUs.
4 |     The reason why she missed it is because all of her
5 | analyses are SKU focused and this contaminates everything that
6 | she does.  She's missing the forest for the tree.
7 |     May I draw what happened?
8 |     **THE COURT:**  This is endemic to her analysis.
9 |     **DR. SINGER:**  Endemic to her analysis.
10 |     May I draw what happened, Your Honor, after December 2017
11 | on --
12 |     **THE COURT:**  Sure.  Yes.
13 |     **DR. SINGER:**  So the weighted average starts falling from
14 | 5.99 to 4.99, and it asymptotes -- which is a fancy word --
15 |                     (Court reporter clarifies.)
16 |     **DR. SINGER:**  I'm sorry.  I got so excited about this
17 | example.
18 |     It asymptotes at 4.99.  It's a fancy word for it
19 | approaches and then it basically hovers at 4.99.
20 |     So what I've done, Your Honor, I've drawn this on for you.
21 | And if I could just introduce it.  May I just pass it up to
22 | you?  Is that okay?
23 |     **THE COURT:**  Sure.  Hand it to the CRD.
24 |                     (Document handed up to the Court.)
25 |     **THE COURT:**  Thank you.  Okay.

1    **DR. SINGER:**  And so this is the takeaway, Your Honor, from

2    this whole exercise.  I assert that with the exception of five

3    cherry-picked examples, all of Dr. Burtis's analyses focus on

4    too narrow of a window:  one month or six months and then

5    she's done this life of the SKU, which is four to eight months.

6        She comes back with five cherry-picked examples, which, by

7    the way, shouldn't surprise you in a database of hundreds of

8    thousands of apps and millions of transactions that she can

9    find five.  But even on her favorite, the iHeartRadio, it

10   actually shows example of pass-through.

11       Can I show you how it performs relative to the --

12   **THE COURT:**  Very quickly.  This is a little more granular

13   than I actually find useful.  Just round it out.  Then I want

14   to ask my next big question.

15       **DR. SINGER:**  May I go --

16       **THE COURT:**  Sure.

17       **DR. SINGER:**  Can I go to the flip chart?

18       **THE COURT:**  Yeah.  Use the whiteboard.

19       **DR. SINGER:**  So the question is:  What does the logit

20   model predict for iHeartRadio when it realizes a reduction in

21   the take rate from 30 to 15 percent?  Let me show you exactly

22   what the logit model predicts.

23       The logit model says, start with the original price of

24   5.99 -- right? -- and subtract one minus the developer's share

25   within the category.

1        We didn't get to talk about these, but Google picked the

2    categories by design, and then app developers select into that

3    category in a way to position themselves in the marketplace.

4    All right?

5        I calculate that iHeartRadio's share within the category

6    is 7 percent.  So the logit model would predict that its

7    pass-through would be one minus 7 percent.  Right?  And it

8    saved 15 percentage points on that original price of 5.99.

9    That's what the logit model would predict.  And if you grind

10   through the math, you get a predicted price of $5.15.  That's

11   what the logit would predict.  Right?  In the real world, they

12   dropped their price to $4.99 -- right? -- which is off by 16

13   cents.  Right?

14       But this is her favorite example.  And her favorite

15   example confirms the predictive power of the logit here.

16       **DR. BURTIS:**  May I respond?

17       **THE COURT:**  Please.

18       **DR. BURTIS:**  Okay.

19       **THE COURT:**  Then we're going to move on.  But go ahead,

20   yeah.

21       **DR. BURTIS:**  So -- so the graph on my Slide 16, there are

22   people who are buying at 5.99.  So those people who

23   purchased -- this isn't a made-up line.  There are transactions

24   that occur at 5.99.  So --

25       **DR. SINGER:**  Yeah.

1          **DR. BURTIS:**  I'm sorry.

2          Dr. Singer's claim here is that in over 450,000 of these

3     SKUs, you know, all of these developers, even if they only had

4     one SKU, introduced another SKU, and then somehow there was a

5     weighted average that explains everything.  So I -- he did

6     not -- he certainly did not make that claim in his report, in

7     his reply report, Your Honor.  You know, he did not show -- he

8     certainly did not establish that.

9          The last thing I do want to say is, going back to his

10    formula, the one minus the share formula is wrong.  Okay?  If

11    he wanted -- if he's trying to prove something with his

12    formula, he needs to use the formula that actually works.  Even

13    with the logit model, it has a service fee rate.  And it is not

14    that formula.

15         So, and we can go through and I can explain to you why

16    that is, but that is the wrong formula.

17         **THE COURT:**  All right.  I think that's covered enough on

18    your part.

19         Here's how I want to close this out.  I am tentatively,

20    more or less, comfortable with the service -- the developers

21    side of the platform, two-sided platform, all right, in terms

22    of calculating a but-for rate.

23         What is much less clear to me, Dr. Singer, is why a

24    developer would have passed through to the consumer any savings

25    that would have been the result of a reduced rate charged by

1    Google and, more importantly, how you would establish that on a

2    class-wide basis.

3         **DR. SINGER:**  Sure.  So let me break that -- it's a

4    two-parter.

5         So why would you do it?  Why would you do it is that

6    you're competing against everyone within the category.  Right?

7    And if you're similarly --

8         **THE COURT:**  Are you really?  I mean, one of the charms of

9    games is that there are killer games, that only that one game

10   will do and people love it and it's a unique product, and

11   that's why they make billions of dollars after their initial

12   development costs, because they're not substituting in some

13   other game.  Someone who wants to play Fortnite is not

14   necessarily playing Madden NFL.  So they're unique.  They

15   strike me as much more --

16        **DR. SINGER:**  Yes.

17        **THE COURT:**  -- unique.

18        **DR. SINGER:**  And the logit model allows for some product

19   differentiation, exactly what you said.  That is, they're not

20   perfect substitutes.  These games with --

21        **THE COURT:**  My point is, though -- let me just jump in, in

22   the interest of time -- if you have a game that everyone loves

23   and there's no substitute for it, why ever would you pass any

24   cost reduction on to your consumers?

25        **DR. SINGER:**  That's a great --

1        **THE COURT:**  Why wouldn't you just add the 30 percent to

2    your own account?

3        **DR. SINGER:**  It's a great question.  And the logit model

4    predicts that if you so dominate your category, the way that

5    you suggest -- remember, I did a second cut in my reply report

6    by subcategories.  So if your game so dominates the category

7    such that its share is close to a hundred percent, the logit

8    model would predict that you wouldn't pass through any of the

9    savings.  Right?

10       If you were at 95 percent within your category -- for

11   example, Pandora is at 75 percent within the music category.

12   So the logit model predicts that Pandora would only pass

13   through 25 percent of a savings from a take rate reduction,

14   which should be very intuitive.

15       In a -- we use the word "atomistic."  But a very small

16   firm that lacks market power prices, according to economic

17   theory, at marginal cost, and so it passes through 100 percent

18   of any cost change.  Just as the logit model would predict if

19   your share was zero, you would pass through a hundred; but as

20   you gain market power --

21       **THE COURT:**  This is where I'm not seeing why class-wide

22   treatment makes sense when there's this variation in the

23   pass-on rate.

24       **DR. SINGER:**  Okay.

25       **THE COURT:**  You have a heavyweight, you think -- I'm just

 1    talking among friends here; so nothing is carved in stone.

 2         Every category is going to have a heavyweight or two.  The

 3    market leaders, so to speak.  Everybody wants to go to Spotify.

 4    Everybody wants to go to whatever the food and wine site is.

 5    Okay?  And then there are going to be a number of people trying

 6    to catch up.

 7         So I just -- I'm not -- how do you come up with a single

 8    uniform figure that would be the basis of consumers' antitrust

 9    injury?

10         **DR. SINGER:**  I allow for, Your Honor -- remember in my

11    Table 14, I compute aggregate damages for each category

12    separately.  Right?  So I'm allowing for variation in

13    pass-through rates.  When I -- I first solve for the change in

14    the take rate, and then I apply the category-specific

15    pass-through rate.

16         So to use your example in music, where music is dominated

17    by Pandora with a 75 percent market share, the average

18    pass-through rate in the music category, you'll see on that

19    table, is around 40 percent.  Now, we know from what we talked

20    about earlier that the average across all categories was

21    89.9 percent.

22         So I'm allowing for the possibility that for those

23    categories or subcategories that are dominated by a single

24    developer or maybe two developers, the pass-through rate will

25    be lower.

1    But what I'm offering is a common methodology that will

2    give you the predicted pass-through rate for all developers.

3        **THE COURT:**  Well, just pause for a moment.

4        **DR. SINGER:**  Sure.

5        **THE COURT:**  Just tell me how that -- what the methodology

6    is that allows you to reliably and accurately predict, just for

7    lack of a better word, that developers' greed is not going to

8    get in the way.

9        In other words, how do you know someone's not going to

10   say, "This is fantastic.  Google has gouged me 30 percent.  Now

11   they're only gouging me 15.  That other 15 is going right in my

12   account"?

13       **DR. SINGER:**  I think the question, as I'm internalizing

14   it, is:  How do you know that the logit model is reliable to

15   make predictions in the but-for world here?  That's how I'm

16   internalizing it.  Is that okay?

17       **THE COURT:**  That's fine.

18       **DR. SINGER:**  All right.  And you don't know until you test

19   it.  And so the very first thing that I did was I gathered all

20   the data and I ran separate regressions by category.

21       And the logit model makes a very specific prediction about

22   the relationship between an app's share within its category and

23   its price; and, in particular, the prediction is that as the

24   app's price goes up, it should lose share within the category,

25   reflecting the fact that all of these apps within the category

1    are substitutes in some way, in some way.

2        And I estimated this model for every category, and I found

3    a very tight fit.  What I mean by that is that the coefficient

4    that related an app developer's price with an app developer's

5    share was negative and statistically significant at the highest

6    levels of statistical significance, the 1 percent level.  And

7    the R-squared was over 86 percent.  That is, the model -- the

8    logit model was explaining 86 percent of the variation in an

9    app's share within the category.

10       **THE COURT:**  But 86 percent is a little low, isn't it?

11       **DR. SINGER:**  Now, in terms of R-squared, Your Honor, it's

12   actually pretty high in terms of published work in R-squared.

13       But the real statistic of the two that matters is the

14   p-value on those price parameters.  What I found was that for

15   34 of the 35 categories, transportation is an outlier.  It was

16   a category that Google actually removed in 2016.  But

17   transactions -- a few scant transactions remained, so I left it

18   in as a category.

19       For 34 out of 35, the data obeyed the prediction of the

20   logit model.  Right?  I couldn't have used the logit model's

21   implied pass-through rate of one minus the developer's share

22   unless I tested and confirmed for myself --

23       **THE COURT:**  You think there's a single number that can be

24   used for all of the consumer transactions?

25       **DR. SINGER:**  I don't.  I don't, Your Honor.

1       I used the 89.9 to plug into the Rochet-Tirole model --

2   and this is an important caveat -- when I'm solving for a

3   but-for take rate.

4       When I do the Play Points model, we get to consumer injury

5   without recourse to a pass-through rate.  Pass-through is not

6   necessary for the Play Points model.  That's that second

7   iteration of Rochet-Tirole.

8       But when we go down the take rate path, we need to plug in

9   the average pass-through rate so that we can get a singular

10  but-for headline rate.  Right?  But then once we know what the

11  but-for take rate, the headline rate is, we allow the take rate

12  to vary by category, and we allow the pass-through rate to vary

13  by category based on how individual apps dominate, you know,

14  the shares within the category so that we can arrive -- this is

15  Tables 13 and 14 that we looked at earlier -- so that we can

16  arrive at a category-specific damages, which is a pot of

17  savings that come off the actual savings.

18      **THE COURT:**  By app category?

19      **DR. SINGER:**  By each of the 35 categories.

20      Dr. Burtis got upset when I lumped the games together.

21  And so even though the parameter and the games model was highly

22  statistically significant and negative, I went back and I used

23  Google's designated subcategories for games.

24      **THE COURT:**  Let me ask you this.

25      **DR. SINGER:**  Yes.

```
 1          THE COURT:  I'm not on any of these devices.  So I think I
 2    understand how this works, but just give me a break if I get it
 3    wrong.
 4          But I'm on Google Play.  I have an Android phone.  I'm on
 5    Google Play.  I buy one app, one app, and it's a sports app.
 6    It helps me keep track of my swimming workout.  Okay?  And it
 7    costs me -- it's 4.99 a month.  That's it.  That's all I have.
 8          What check am I going to get?
 9          DR. SINGER:  Can we look at Table 14?  I'll tell you
10    exactly.
11          THE COURT:  Sure.  Yeah.  Just tell me mechanically.  I'm
12    not so interested in the number, but how you're going to derive
13    that.
14          So Table 14.  Okay.
15          DR. SINGER:  Oh, yes.  I'm going to have to look at my
16    report.
17          THE COURT:  Is it Table 13?
18          DR. SINGER:  No.  I think 13, Your Honor, is for the
19    initial market, the Android app distribution market; but in
20    your hypothetical, I take it there was no price to download the
21    app in the first instance.  So we're in in-app.
22          THE COURT:  It's just a monthly fee.
23          DR. SINGER:  Right.  Right, right, right.  Okay.  So let's
24    look at Table 14.
25          Do you happen to have the page number in front -- oh, I
```

1    got it.

2            THE COURT:  134.

3            DR. SINGER:  Okay.  All right.

4        All right.  So we have a consumer who made one purchase

5    within the sports category; right?

6            THE COURT:  Yes.

7            DR. SINGER:  And so what we do is we say that for every

8    $10 of expenditure that that consumer made during the class

9    period, we can figure out that they were overcharged on the

10   order of 9.9 percent.

11       And we get there by comparing the actual take rate to the

12   but-for take rate within the category.  Right?  That was from

13   the Landes-Posner model.

14       And then we look at what the pass-through rate is for

15   sports.  You'll notice, Your Honor, it's at 81 percent.  That's

16   lower than the typical category, and that's because there's a

17   few guys in there who really dominate the category.  Right?

18           THE COURT:  That number is a product of the logit formula;

19   right?

20           DR. SINGER:  Correct.  Correct.

21           THE COURT:  Okay.  All right.

22           DR. SINGER:  And you'll see what their but-for expenditure

23   would have been for every $10 they spent, and the savings is

24   99 cents, and so that would mean a 9.9 percent.

25       That means that if a consumer class member stepped forward

1    and said that they had spent a hundred dollars, we could figure

2    out precisely what their overcharge was.

3         **THE COURT:**  All right.  So the method is the same,

4    regardless of the app category.  It's going to have different

5    numbers within each app category, but the method is uniform for

6    all the app categories.

7         **DR. SINGER:**  Of course.  And there's one last point, as I

8    pointed out in my report.  Then I'll turn over the mic, I

9    promise.

10        I could do this at an app-by-app level as well, but the

11   table that I would have presented to you would have gone on

12   for -- yes.  But mechanically, it's just writing code in the

13   computer.  We could allow for these percentage overcharges to

14   vary by app.  But what I've offered is a reliable and common

15   methodology that could apply to every member of the class.

16        **THE COURT:**  All right.  Now, just at the methodology

17   level, Dr. Burtis --

18        **DR. BURTIS:**  Yes.

19        **THE COURT:**  -- not the inputs and outputs, but the macro

20   level --

21        **DR. BURTIS:**  Yes.  I do want to say one --

22        **THE COURT:**  -- what's wrong with this?

23        **DR. BURTIS:**  Well, there's a couple of things.

24        I do want to go back.  This is a -- this is directly

25   related to the methodology and Dr. Singer's claim regarding the

1   use of the logit model in mergers and his claim that that

2   article --

3       **THE COURT:**  I would love to hear that, but I've got to

4   tell you something.  It's 4:10.  I'm getting tired.

5       **DR. BURTIS:**  Okay.

6       **THE COURT:**  Just help me with the first part.

7       **DR. BURTIS:**  Okay.

8       **THE COURT:**  What's wrong -- I mean, okay.  I know you

9   disagree with the inputs and the outputs, but the method --

10      **DR. BURTIS:**  The method is wrong.

11      **THE COURT:**  -- doesn't sound wrong.

12      What's wrong?

13      **DR. BURTIS:**  Your Honor, the method is wrong.  Okay?  And

14  so the method is wrong because the formula is wrong.  The

15  formula does not take account of the service fee rate being a

16  function of price.  And this is -- you won't want to hear all

17  this, but if he had done -- if the authors of that article that

18  he used for that formula had done -- had asked the question

19  "What is the pass-through rate for a service fee rate?" --

20  right? -- if you had a cost that depends on the price of the

21  product, what would the formula be?  The formula would be

22  different.  Okay?  So the formula is wrong.

23      Okay.  Two, the right formula depends on something that

24  Dr. Singer has not estimated.  It depends on the marginal cost

25  of the developer.

1        And I'm not talking about the marginal cost being the

2   service fee rate.  I am talking about the other marginal costs.

3        This is in Dr. Singer's report.  There's a formula for

4   C-star.  It's in paragraph 225 of his report.  C-star should

5   have been what was considered in the pass-through rate.  It was

6   not in that article.  Okay?

7        So the formula is wrong.  I just want to keep making that

8   point.

9        **DR. SINGER:**  May I respond?

10       **DR. BURTIS:**  No, not yet.

11       **DR. SINGER:**  Okay.

12                        (Laughter.)

13       **DR. BURTIS:**  Okay.  So, second point, and you are cueing

14   into an important point when you're asking your question about

15   the big developer who has a -- is really important in the

16   category.  Okay?  Even if you don't believe that the formula is

17   wrong, Dr. Singer's implementation of this formula, of his

18   formula, is wrong because, remember, the logit -- the whole

19   logit demand system works off of shares.  Okay?  Shares are

20   super important in that.  The dependent variable is a share.

21   It is not the quantity, like we usually think of in demand.

22       And a fundamental requirement of that logit model is that

23   all of the products in that share have to be substitutes.  I'm

24   not saying they have to be in the same relevant market.  I'm

25   not saying that.  They have to be substitutes, though.  And

1    they are not.  Dr. Singer acknowledged they are not.

2         I have two examples --

3         **THE COURT:**  Well, let me ask you, though.  These are

4    Google categories.

5         **DR. BURTIS:**  They are Google --

6         **THE COURT:**  Google is grouping all of these apps into the

7    category.

8         **DR. BURTIS:**  No, actually.  Google is not grouping them.

9    Google identifies a set of categories, and then the developer

10   selects the category that they want to go into.

11        **THE COURT:**  So they self-select.  But the menu -- Google

12   gives you 35 choices, or whatever, and says:  You pick.

13        **DR. BURTIS:**  Yes.

14        **THE COURT:**  That's fine.  But, okay.  So I understand the

15   interchangeability for share, but this is the way Google does

16   its business.  So Dr. Singer can only work with what Google

17   actually does.

18        And I don't see why calling it a share, quote/unquote,

19   within a Google-designated category structure is a problem.

20        **DR. BURTIS:**  So it was Dr. Singer's choice to use logit.

21        **THE COURT:**  I understand.

22        **DR. BURTIS:**  You know, he picked that model.  And so if he

23   picks that model, then whatever Google does and whatever the

24   categories there are, he is required to figure out what

25   products are substitutes.  He can't use the Google categories

 1   if they're not substitutes.

 2        And I have two slides, 9 and 10.

 3        **THE COURT:**  Let me just go back to the sports apps because

 4   those are the only ones I know.  I don't run.  I swim.

 5        **DR. BURTIS:**  Right.

 6        **THE COURT:**  Okay?  So I'm never going to use a running

 7   app.

 8        **DR. BURTIS:**  Perfect.

 9        **THE COURT:**  So how does that play out?

10        **DR. BURTIS:**  They are not substitutes.

11        **THE COURT:**  Okay.

12        **DR. BURTIS:**  Or -- I mean, that one --

13        **THE COURT:**  Dr. Singer would treat them as part of the

14   same --

15        **DR. BURTIS:**  Yes.  And that one, I mean, maybe there's

16   some little ambiguity, Your Honor.  But, you know, is Thomas

17   the Tank Engine a substitute for Doom, you know, this violent

18   game?  We hope not.  We hope that parents are more vigilant.

19        The other slide I have --

20        **THE COURT:**  Just, I want to hear more.  So what?  What

21   does that --

22        **DR. BURTIS:**  Yes.  So --

23        **THE COURT:**  -- lead you to conclude?

24        **DR. BURTIS:**  Thank you.  Yes.

25        So what he should have done, if he wanted to use the logit

1    model -- it was his choice.  He wanted to use it.  So if you're

2    going to use it, do it right.  Figure out the groupings of

3    products that are truly substitutes for one another.

4         You don't -- you don't estimate a games logit.  You might

5    estimate -- you know, I don't know how many -- 10, 12, 20

6    different games logit equations, all of which have products

7    that are substitutes.

8         **THE COURT:**  Well, now let me ask you.  Let's say that's

9    true, and let's say the top number, whatever, is now 20.  How

10   does that affect the output for that equation?

11        **DR. BURTIS:**  Well, first of all, that whole exercise is a

12   complicated and individualized analysis, because now you're

13   going app by app and you're trying to figure out which category

14   does this app go in.  Is there a category I need to construct

15   with a certain set of apps?  That, in and of itself, is a very

16   individualized analysis.

17        **DR. SINGER:**  Is it okay if I respond?

18        **THE COURT:**  Go ahead.

19        **DR. BURTIS:**  Okay.  So the other thing that I --

20        **THE COURT:**  Okay.  So then what does that do to the

21   number?  So how does that make the number -- if you did it that

22   way, how would that make the number -- would it make it bigger?

23   Would it make it smaller?  What would the impact on the number

24   be?

25        **DR. BURTIS:**  So what I would tell you is, first of all,

1   you'd have a lot more numbers.  Right?

2       And, by the way, all of this is not really addressing your

3   question about the dominant app because they're all averages

4   over these categories or subcategories.  Okay?

5       But we still -- we still haven't solved a major problem

6   with this formula.  Now we have all these logit equations.

7   Right?  But now we need the right formula.  And in order to get

8   the right formula, now we are on another individualized

9   analysis.  We need to go find the marginal cost of these apps

10  because if that marginal cost is zero, then the pass-through

11  rate is zero.

12      And in this industry, what does marginal --

13      **THE COURT:**  And that's by operation of the formula?

14      **DR. BURTIS:**  The right formula, Your Honor.  The right

15  formula.  Okay?

16      And let me just say one thing about this, one last thing.

17  All of what I'm telling you -- right? -- that you have to

18  consider the marginal costs of the developer; you have to have

19  the right formula and the economic literature that supports

20  that; the theoretical literature; the empirical literature --

21  all of that is consistent with my results where I go and I look

22  at all of those SKUs SKU by SKU and I say:  What happened to

23  the price?  You know, did it change when there was a service

24  fee rate reduction?

25      All of that economics is consistent with that data,

1    because what we know about this industry -- we know two

2    important things about this industry.  One is that the marginal

3    costs of many of these developers are very low.  This is in the

4    economics literature, article after article.

5        **THE COURT:**  Isn't that kind of the issue?  I was just

6    thinking that.  I mean, in software, typically, the marginal

7    costs are --

8        **DR. BURTIS:**  Yes.

9        **THE COURT:**  -- almost always getting close to zero

10   because --

11       **DR. BURTIS:**  That is correct.

12       **THE COURT:**  -- once you make it, you just copy it.

13       **DR. BURTIS:**  Exactly.  And once you have an app and a

14   consumer is clicking on that app, buying the sword or the jewel

15   or whatever it is, there's no marginal cost to the developer.

16       **THE COURT:**  But you're saying -- you're faulting

17   Dr. Singer for not looking at marginal cost when I think a fair

18   presumption is the marginal costs are fairly low and fairly

19   standardly low.

20       **DR. BURTIS:**  Well, the marginal costs are -- I would say

21   it is typical.  It is, I think -- I don't think that we can

22   assume everybody's marginal cost is zero; and I have some

23   examples of why you can't just assume everybody's marginal cost

24   is zero.

25       But if the marginal cost is zero, the pass-through rate is

 1 | zero.
 2 |      **THE COURT:**  They're going to have some cost.  It's not
 3 | entirely -- somebody still has to get paid to press the button
 4 | to copy the software, something.
 5 |      But my point is, it seems to me a fairly standard number,
 6 | in the 1 percent range -- I'm just making it up -- would not be
 7 | an unreasonable assumption, given the nature of the software
 8 | industry.  And I don't know why then you fault Dr. Singer for
 9 | not making an individualized inquiry when it is probably not
10 | entirely -- it's probably not implausible to assume that
11 | there's an industrywide marginal cost number of X.
12 |      **DR. BURTIS:**  Well, Your Honor, if that's true, if the
13 | marginal costs are very close to zero, and there's one
14 | more characteristic of this business --
15 |      **THE COURT:**  It's not zero --
16 |      **DR. BURTIS:**  -- that's important --
17 |      **THE COURT:**  -- but it's close to zero.
18 |      **DR. BURTIS:**  Okay.  And the second characteristic of this
19 | business -- and I think Dr. Singer agrees -- is that prices are
20 | sticky.  We see 90-some percent --
21 |      **THE COURT:**  Don't go to prices.  Let's just --
22 |      **DR. BURTIS:**  This all has to --
23 |      **THE COURT:**  Hold on.  Stop.  Stop.
24 |      **DR. BURTIS:**  Okay.
25 |      **THE COURT:**  Finish the marginal cost point.

1        **DR. BURTIS:**  Okay.

2        **THE COURT:**  Let's just say it's 1 percent for everybody.

3        **DR. BURTIS:**  Okay.

4        **THE COURT:**  Why is that a problem?

5        **DR. BURTIS:**  So the pass-through rate is going to be

6    proportional to marginal cost.  So if the marginal cost is

7    really low like that, the pass-through rate is going to be

8    really low.  Okay?  And that's just math.  That's just math.

9    That's not thinking about, really, the particular

10   characteristics of these products.

11       Now -- and I don't know that it's 1 percent for everybody.

12   Right?  Maybe it's 10 percent.

13       **THE COURT:**  We're just talking.

14       **DR. BURTIS:**  Okay.

15       **THE COURT:**  It's just my number.

16       **DR. BURTIS:**  Right, right.

17       But now the question is -- the ultimate question is:  Is

18   this developer going to pass through that service fee rate

19   reduction?  If the marginal cost is very low like that, they

20   are going to pass -- they're going to change their price just a

21   tiny bit.  Okay?

22       But the other thing that we know about this industry is

23   that a lot of developers in the actual world use these focal

24   point prices.  Their prices are sticky.  They don't change them

25   for every little change in cost.

1      So you put those two factors together, and now you're

2   talking about a large percentage of these developers are not

3   passing through the service fee rate reduction, which, again,

4   is consistent with what I found in my -- my analysis of the

5   actual data.

6          **DR. SINGER:**  Your Honor, can I get a word --

7          **DR. BURTIS:**  What that means --

8          **DR. SINGER:**  Can I get a word in?

9          **DR. BURTIS:**  I'm sorry.  Let me just finish.

10         **DR. SINGER:**  This is like a filibuster right now.

11         **THE COURT:**  All right.  Please, complete your --

12         **DR. BURTIS:**  The last point or the bottom line,

13   Your Honor, is that in order to know that, in order to know

14   what -- whether or not the developer is going to pass through

15   that service fee rate reduction, you've got to know what the

16   marginal cost is, and you've got to know whether the developer

17   is focal point pricing and would continue to focal point price

18   in the but-for world.

19         **THE COURT:**  And you're saying Dr. Singer did not have that

20   in the logit equation?

21         **DR. BURTIS:**  There's no marginal cost in his formula.

22   There is no adjustment for focal point pricing.

23         **THE COURT:**  All right.  Let's close it out, and then I'm

24   going to see if there are any questions.

25         **DR. SINGER:**  Okay.  That was a lot.

1     **THE COURT:**  Actually, I don't think it was.

2     **DR. SINGER:**  Well --

3     **THE COURT:**  She's faulting you for saying that your logit

4     equation --

5     **DR. SINGER:**  Yes.

6     **THE COURT:**  -- didn't include marginal cost or sticky

7     prices.

8     **DR. SINGER:**  Okay.  Let's start with the logit formulas.

9     Is it okay if I put up the exhibit of the Miller article where

10    the logit formula pass-through is derived?

11    **THE COURT:**  Which article?

12    **DR. SINGER:**  Miller, et al.

13    **THE COURT:**  You don't have to put it up.  I have it.

14    **DR. SINGER:**  Okay.  Fine.

15    I'd like to call your attention just to three equations in

16    that article.  And she also mischaracterized it to you.  So let

17    me just try to clear up a few things.

18    Can I get that up, please?

19    Do you have it in front of you, Your Honor?

20    **THE COURT:**  I do.

21    **DR. SINGER:**  Equation 1, to get the pass-through rate, you

22    need to go through a series of steps.  It actually takes three

23    steps.  The first step, Your Honor, Equation 1, is you have to

24    find out the profit-maximizing price for the firm in light of

25    the marginal cost that it's facing and the demand that it

1    faces.  That's what Equation 1 is showing you.

2         You cannot get the pass-through rate just with Equation 1.

3    You have to move to Equation 2.

4         Equation 2 tells you how the profit-maximizing price

5    changes in response to a change in the cost.  Right?  Only then

6    do you have something that approximates a pass-through.

7         So when Dr. Burtis asserted that I should have used what

8    was the Lerner index in paragraphs 224 to 225 of my report,

9    that is analogous to Equation 1 in Miller's paper.  You can't

10   do anything with Equation 1.  You have to take the derivative

11   of the profit-maximizing price with respect to a small change

12   in cost.

13        **THE COURT:**  I think this is a level of detail that's not

14   terribly helpful.

15        **DR. SINGER:**  But let me --

16        **THE COURT:**  Just tell me, why is it okay --

17        **DR. SINGER:**  But this is --

18        **THE COURT:**  -- for your logit formula to omit marginal

19   cost and --

20        **DR. SINGER:**  Right.

21        **THE COURT:**  -- sticky prices?

22        **DR. SINGER:**  It does not omit marginal costs because you

23   can see, Your Honor, in Equation 1 the marginal costs are

24   considered when solving for the profit-maximizing price.  When

25   you move to Step 2, you get the pass-through rate.  Then you

1  have to assume a certain demand structure.  And Miller does

2  several.

3       But when you do the logit, if you look at the math,

4  Your Honor, Equations 5 and 6, it's really, really complicated;

5  but all of a sudden comes out of the pass-through rate formula

6  a very simple equation where the pass-through rate is one minus

7  the firm's share.

8       Now, this is a standard pass-through model.  If you go

9  through all of his demand systems, none of them include the

10  marginal cost in the pass-through formula.  Right?  And that's

11  a good thing.  Imagine if you couldn't use a pass-through

12  formula unless you could observe the marginal cost of a firm.

13  That's very hard to do.

14       What the Miller article is giving you is a pass-through

15  formula that makes use of a change in the marginal cost.

16       **THE COURT:**  Oh.

17       **DR. SINGER:**  And that's easy to observe.

18       **THE COURT:**  Is your one minus the share in this Miller

19  article?

20       **DR. SINGER:**  Yes, Your Honor.  It's Equation 6.

21       If you look at Equation 6 in the top, you have to do two

22  things to it -- three things, in particular.  You see the

23  equation?  Equation 2 solves for the take rate.  But it gives

24  you the take rate as a negative of the inverse.  You have to

25  first multiply by minus one, take the inverse, then divide

1    through by total units, and you will get the very simple one

2    minus share formula.  And it's the same one minus share formula

3    that Werden and Froeb use in their merger article.

4        I don't think there's any dispute as to whether or not the

5    pass-through formula from logit is one minus the share.

6    I think we can agree on that.

7        What Dr. Burtis is asserting is that it's somehow infirm

8    because it doesn't include the term "marginal cost" in the

9    pass-through.  But neither did any of the pass-through

10   formulas, whether you go the linear model -- the linear model

11   predicts a pass-through rate of 50 percent, no matter what --

12   no matter what the parameters of the demand model is.  Always,

13   always 50 percent.  It is not a function of the marginal cost.

14       I'd like to clear up one other thing too about this

15   marginal cost being zero.  I will agree -- maybe we can find

16   some happiness here -- that the cost of replicating the sword

17   is zero.  Right?  But when Google focuses on replication costs,

18   they're playing games.  That's not the full marginal cost of

19   making and selling the app.

20       I cite an article in *Management Science* 2014 by Ghose and

21   Han that lists all of the marginal costs that app developers

22   face.  Okay?  And Dr. Burtis has never addressed that article

23   in anything that she's ever said or written.

24       Moreover, an app developer faces payment processing for

25   every sale that it makes.  Again, if you focus narrowly on the

1   replication cost, you're going to miss all these marginal costs

2   that have been identified in the literature.

3       So it's just wrong to assert that marginal costs are zero,

4   as Google and Dr. Burtis make.

5       I'd like to make --

6       **THE COURT:**  I hear what you're saying, is that in the real

7   world, it would never be zero?

8       **DR. SINGER:**  It's not zero.

9       **THE COURT:**  It's improbable.

10      **DR. SINGER:**  And the beauty of the logit model,

11  Your Honor, and the linear model and the AIDS model, you don't

12  need to recover the underlying marginal costs, which would be

13  almost impossible.  If I offered you up a pass-through formula

14  that was a function itself of the marginal cost, it would have

15  very limited applicability.  How are we ever going to go

16  observe a firm's marginal cost?  Right?  They don't record this

17  in their financials; right?

18      What we can observe is what the change in the marginal

19  cost would be in a but-for world.  If I go from 30 to

20  15 percent take rate and my app was at $10, I can figure out

21  right away what the change in the marginal cost is.

22      And a logit model gives us a way to map that change in the

23  marginal cost into a change in prices.

24      And I want to, if I could, on this meaningless of Google's

25  own categories -- is it okay if I can address that?

1      **THE COURT:**  I don't need it.

2      **DR. SINGER:**  Okay.  Good.

3      **THE COURT:**  Okay.

4      **DR. BURTIS:**  Can I just respond?  Sorry.

5      **THE COURT:**  Yes, you can have the closing word.  And then

6   I'm going to ask if there are any questions.

7      **DR. BURTIS:**  Okay.  So, first, Your Honor, I am not saying

8   that every developer has zero marginal cost.  I'm not saying

9   that.  All I'm saying is that we have to know what the marginal

10  cost is to know what the pass-through rate is.

11      This is not only in Dr. Singer's report in paragraph 225,

12  but he says those words in his deposition.  He says:  The

13  pass-through rate is proportional to the marginal cost other

14  than the processing rate.  I think that's the phrase he used,

15  "processing rate."  So he agrees with this.

16      You need to know the marginal costs.  If you have the

17  right formula, the marginal cost is in that formula.  Has

18  nothing to do with the processing costs.  Some of those costs

19  are likely to be very low, and that is going to cause a

20  developer not to reduce its price.

21      All of that is consistent -- and, by the way, the

22  Ghose and Han article, it's fine.  I agree, not all developers

23  are going to have zero marginal costs.  Some will; some will

24  not.  We need to do the analysis, the individualized analysis,

25  to figure that out.  Is it hard?  Yes.

1        **THE COURT:**  How could any developer have a zero marginal

2    cost?

3        **DR. BURTIS:**  Oh.  I'm not saying -- I mean, it could be

4    very, very small.  Right?  Small enough that it's not going to

5    matter in the math to --

6        **THE COURT:**  I'm asking a different question.  How could

7    any business have a zero marginal cost?

8        **DR. BURTIS:**  Okay.  So definitionally, what a marginal

9    cost is, is the incremental cost for an incremental sale.  So

10   you have ten consumers who --

11       **THE COURT:**  I know what it is.

12       **DR. BURTIS:**  Okay.

13       **THE COURT:**  How could you ever have a zero marginal

14   cost --

15       **DR. BURTIS:**  Because --

16       **THE COURT:**  -- and be an ongoing business?

17       **DR. BURTIS:**  Okay.  I think -- it's not their total costs.

18   It's not even their variable costs.  It's their marginal costs.

19       So, for example, some of the costs in Ghose and Han,

20   they're like:  Oh, well, they have to do -- they have to have,

21   you know, more cloud storage.

22       Well, the thing is, you know, for Consumers 1 through,

23   you know, 500,000, their storage is fine; but when they get to

24   a certain level of consumers, they need to buy some more.  So

25   their marginal costs goes shooting up for a few consumers, and

1   then it's going to be zero again because they don't need it;

2   they've purchased it.  There's no more incremental costs

3   associated with that.

4        And part of this is just the math.  You know, this is --

5   the math is driving our choice of how we think about these

6   costs.

7        But I want -- I just want to say that this is not -- I

8   don't think that -- we shouldn't be disagreeing about this

9   because this issue is in Dr. Singer's report and it is in his

10  deposition testimony.

11       **DR. SINGER:**  Can I clear that up, Your Honor?

12       **THE COURT:**  No.  That's it for today.

13       Let me ask you this.  Look, I have the reports.  I spent a

14  lot of time with them.

15       I want to close out.  Are there any questions from

16  attorneys, which I will screen, but you can certainly ask them?

17       One per side.  Who's going to do the plaintiffs?

18       **MS. GIULIANELLI:**  I will be asking the questions.

19       **THE COURT:**  Come on up.

20       And who's going to do the defendant?

21       **MR. RAPHAEL:**  I will, Your Honor.

22       **THE COURT:**  Okay.  Come on up.  You can make your

23  appearance.

24       **MS. GIULIANELLI:**  Good afternoon, Your Honor.  It's Karma

25  Giulianelli for the consumer plaintiffs.

1      **MR. RAPHAEL:**  Good afternoon, Your Honor.  Justin Raphael

2  from Munger, Tolles & Olson for Google.

3      **THE COURT:**  Okay.  Ms. Giulianelli, what would you like to

4  ask?

5      **MS. GIULIANELLI:**  Well, I suppose it depends on how much

6  time I have; so I'm going to be very selective here.

7      **THE COURT:**  All right.  What's the first topic?

8      **MS. GIULIANELLI:**  The first topic, very briefly because I

9  am not sure that we got there, but Dr. Burtis mentioned that

10  Dr. Singer did not -- his model did not take into account focal

11  point pricing.

12      So I would just like to give Dr. Singer the opportunity to

13  explain --

14      **THE COURT:**  You can ask your opponents, not your own

15  witness.

16      **MS. GIULIANELLI:**  Aah.  Okay.

17      **THE COURT:**  Do you have any questions for Dr. Burtis?

18      **MS. GIULIANELLI:**  In that case, I do.

19      **THE COURT:**  Yeah.  What's the first one?

20      **MS. GIULIANELLI:**  Dr. Burtis, we put up Slide -- let's go

21  back to -- I think it was your Slide 14, and this was your

22  analysis --

23      **THE COURT:**  14?

24      **MS. GIULIANELLI:**  I think it was Dr. Burtis's Slide 14.

25      **THE COURT:**  Okay.

1    **MS. GIULIANELLI:**  And it was --

2    **THE COURT:**  The 2 percent slide.

3    **MS. GIULIANELLI:**  Yes.  And it was Dr. Burtis's analysis

4    of the different take rates.

5         And we talked about iHeartRadio; right?  And I just want

6    to talk about a couple of things there.

7         Am I right that you looked at pricing from SKU data on the

8    apps?  Correct?

9    **DR. BURTIS:**  Yes.  I looked at a -- the price of a SKU.

10   **MS. GIULIANELLI:**  And am I right that a given developer

11   could have hundreds of SKUs, even though it might offer a much

12   smaller number of products?

13        So for Tinder, for example, you know, I think from

14   Dr. Singer's reply report that there are just three major

15   subscription categories, but Tinder can have over 500 SKUs.

16   Correct?

17   **DR. BURTIS:**  That is highly variable across these

18   developers.  Some have a single SKU.

19   **MS. GIULIANELLI:**  Okay.  So let's look at iHeartRadio.

20   So iHeartRadio, if you want to go to your Slide 16 and then

21   17, now, the reason you had 5.99 on Slide 16 and then 4.99 for

22   iHeartRadio on Slide 17 is because there were different SKUs

23   in the database for the iHeart Plus program; right?

24   **DR. BURTIS:**  That's correct.

25   **MS. GIULIANELLI:**  Correct.

1          And the way you looked at it, you couldn't tell if those

2     5.99 SKUs that remained there were SKUs for existing

3     subscribers to the Plus program before Google entered into the

4     agreement pursuant to a special program agreement, audio

5     developer program agreement with iHeartRadio in July of 2017;

6     correct?

7          **DR. BURTIS:** No. Actually, that's not correct.

8          **MS. GIULIANELLI:** Okay. So if you -- so do you know, did

9     you look at the iHeart Plus -- the line and how much was

10    iHeart Plus -- did you go and look at the Web or anything

11    like that from iHeartRadio in, let's say, 2019, what was the

12    price that was being offered as of that date? Do you know?

13         **DR. BURTIS:** I'm sorry. On the Web?

14         **MS. GIULIANELLI:** Yes, or anywhere. What was

15    iHeartRadio selling iHeart Plus for, if you know, in 2019?

16         **DR. BURTIS:** I don't know, as I stand here.

17         **MS. GIULIANELLI:** Okay. And you don't know because you

18    looked at it at an individual SKU level, and so you don't know

19    if the 5.99 SKUs in the transaction database were there from

20    existing subscribers -- correct? -- before the agreement with

21    Google? Am I right about that?

22         **DR. BURTIS:** No, you're wrong about that.

23         **MS. GIULIANELLI:** Okay. Could you explain that, please.

24         **DR. BURTIS:** Sure. So in the transactions data, for a

25    given transaction, there's information about the SKU, about the

1    price, and about the service fee rate.

2         So this is matching -- the graph, the line graph is

3    matching the consumers who are paying whatever that price is --

4    I'm sorry.  I can't see it from here -- and the service fee

5    rate associated with them.

6         **MS. GIULIANELLI:**  Okay.  So the line graph is matching

7    only those consumers who are paying 5.99, but that's for that

8    particular SKU, not for the entire iHeart Plus product;

9    correct?

10        **DR. BURTIS:**  I looked at it on a SKU-by-SKU basis so I

11   could isolate what happens to individual SKUs, you know, when

12   that SKU service fee rate changes.  That's true.

13        **MS. GIULIANELLI:**  Okay.  And if there were -- and this

14   would infect not just iHeartRadio but, for instance, Pandora

15   and other applications that you looked at too?

16        **DR. BURTIS:**  Well, I wouldn't say it infected anything.  I

17   mean, I'm matching the service fee rate to the price.  So

18   I think that's the right way to do it.

19        **MS. GIULIANELLI:**  And when you talk about the service fee

20   rate to the price, you did look at the websites, I think,

21   because you've got here Slide 17.  Did you put this together

22   yourself?  And did you look at these websites for Minecraft and

23   Pandora and all these things on Slide 17?

24        **DR. BURTIS:**  Some of them, I did.

25        **MS. GIULIANELLI:**  Okay.

1        **DR. BURTIS:**  Actually, some of them are taken from,

2    I think, Dr. Singer's report.  So...

3        **MS. GIULIANELLI:**  Yeah.  The ones on the --

4        **THE COURT:**  If I may, something a little bit more method

5    and reliability would be more useful to me.

6        **MS. GIULIANELLI:**  Okay.  And, Your Honor, I think the

7    reason that I'm asking about this is because:

8        Am I right, Dr. Burtis, that one of your critiques of

9    Dr. Singer's model is that it's not reliable because you say

10   that the analysis that you've done here of changes in SKUs in

11   the way you've looked at it shows that they're not passing on

12   cost savings?  That's one of the reasons that you say his

13   analysis is not reliable.  Am I right about that?

14       **DR. BURTIS:**  I think that my analysis -- I mean, I don't

15   know if I would say it that way.  It certainly confirms the

16   problems that I have found with the reliability of his model.

17       **MS. GIULIANELLI:**  And if there's a flaw -- and we've

18   already talked about, I think, somewhat the subscriptions,

19   which is that with the subscriptions, developers can't change

20   the pricing in the second year without also impacting the first

21   year.  So let's set that aside.

22       If there's a flaw in your analysis and you don't pick up

23   the pricing of the product over time because you've looked at

24   it at a SKU level, that would impact that critique that you

25   have of Dr. Singer's methodology; right?

1    **DR. BURTIS:**  I disagree.  I mean, over 400- -- I think

2    it's over 400,000 of the 450,000 SKUs are not subscriptions.

3        So basically, I'm not trying to prove there's no

4    pass-through for every single SKU.  I'm not trying to say that.

5    What I'm trying to say is that we have to look at them

6    individually, and that when you do that, when you look at all

7    of these individual products, you see many of them not

8    responding to service fee rate reductions.

9        **MS. GIULIANELLI:**  At least according to the way you look

10   at it at a SKU level.  You did not look at it at the product

11   level; right?

12       **DR. BURTIS:**  So I think you're confused about that.  I'm

13   not -- whatever.  I'm using --

14       **THE COURT:**  No one is taking you --

15       **MS. GIULIANELLI:**  I think one of us is confused about

16   that.

17       **THE COURT:**  Just tell us why.

18       **DR. BURTIS:**  For me, the SKU is an easy way to say

19   "product" instead of saying "paid app."

20       **THE COURT:**  Can I just -- so --

21       **MS. GIULIANELLI:**  Okay.  I think I've made my point.

22       **THE COURT:**  This Tinder thing with 450 SKUs but three

23   products, how does that work out for you?  Why are you looking

24   at 450 SKUs if the reality for a consumer is three products?

25       **DR. BURTIS:**  Well, I mean, the issue is, Your Honor, what

1   about those consumers who bought this particular SKU or this

2   product?  Did their price go down when the service fee rate

3   went down?  That's what I'm --

4        **THE COURT:**  Well, I know it's getting late.

5        The consumer is buying a product.  They're not buying a

6   SKU; they're buying a product.

7        **DR. BURTIS:**  No.  They are.  They're buying a SKU.

8        **THE COURT:**  I want a date in San Francisco.  That's the

9   product they're buying.  So how does the 450 SKUs factor into

10  that?

11       **DR. BURTIS:**  A SKU is a product.  That's the part I

12  thought that was getting confusing.  It is a product.  It is a

13  very -- it is a very particularly defined product.

14       I go in the database and I say --

15       **THE COURT:**  Can we just pause?

16       So, in your view, a SKU is actually something a consumer

17  is buying?

18       **DR. BURTIS:**  Oh, yes, absolutely.

19       **THE COURT:**  Okay.

20       **MS. GIULIANELLI:**  Do you know, Dr. Burtis, how an app --

21  if I'm, for example, Tinder, you know, iHeart or Pandora, how

22  it changes the price?  It's through the SKU.  But it doesn't

23  change the product, like iHeart Plus program.  It doesn't

24  change that product for consumers.  It's changing the price

25  through the SKU; is that right?

1    **DR. BURTIS:**  If I understand your question, I think

2    you're -- I think the answer is yes, if I understand you.

3    **MS. GIULIANELLI:**  Okay.

4    **THE COURT:**  All right.  How about just a couple more

5    questions, Ms. Giulianelli, and then see if Mr. Raphael -- is

6    that right? -- has questions.

7    **MS. GIULIANELLI:**  I just have only a couple of --

8    **THE COURT:**  Remember, your arguments are all -- is it

9    August 4th?

10   **MS. GIULIANELLI:**  Yes.

11   **THE COURT:**  So you don't have to make them now.

12   **MS. GIULIANELLI:**  I will not.  I will not.

13   **THE COURT:**  Okay.

14   **MS. GIULIANELLI:**  In that case, Your Honor, I've got a lot

15   of questions, but I know when to sit down, and I think it's

16   time.

17   **THE COURT:**  Well, there may be one or two large questions.

18   This is your chance to ask, because you'll never have

19   Ms. Burtis here, short of trial, again.  So is there a larger

20   question?  If there's not, that's okay.  But if there's a

21   larger question, I'd be happy to let you do it.

22   **MS. GIULIANELLI:**  I'm going to sit down.  Thank you.

23   **THE COURT:**  Okay.  All right.  Mr. Raphael?

24   **MR. RAPHAEL:**  Thank you, Your Honor.

25   Just let Dr. Singer find the mic.

1       **THE COURT:**  This is the big-picture portion of the day; so

2   keep to the big picture.  Okay?

3       **MR. RAPHAEL:**  I'll do that, Your Honor.

4       First of all, speaking of big picture, we spent, I think,

5   the first hour discussing the Rochet-Tirole model and the

6   Landes-Posner model.  Do you recall that?

7       **DR. SINGER:**  Yes.

8       **MR. RAPHAEL:**  Do either of those models tell you what the

9   pass-through rate for any consumer or any app is?

10      **DR. SINGER:**  No.  Those models tell you what the but-for

11  take rate would be in the app distribution market for

12  Rochet-Tirole and in the in-app services market for

13  Landes-Posner.

14      **MR. RAPHAEL:**  Right.  And so even if Dr. Burtis agreed

15  with you that the Rochet-Tirole model and Landes-Posner model

16  were done 100 percent correctly, that wouldn't tell you or

17  anyone else anything about whether there would be pass-through

18  for any consumer; correct?

19      **DR. SINGER:**  That is correct.  The pass-through is an

20  input that is required in Rochet-Tirole but only, Your Honor,

21  when we do that one path where we're solving for the but-for

22  take rate.

23      If we allow Google to respond to the advent of competition

24  by enhancing its subsidy, as it did in Korea and Japan, holding

25  the take rate constant, we don't even need pass-through to get

1  to consumer injury.

2    **MR. RAPHAEL:**  Now, Dr. Singer, in the real world, Google

3  reduced service fees for a number of developers on a number of

4  occasions during the class period; correct?

5    **DR. SINGER:**  I'll grant you a very limited number of

6  occasions.  There were 50 in the LRAP program that got a

7  special arrangement for LRAP.  And then, of course, we talked

8  about the subscription products in Year 2 and, of course, the

9  small developers for the first million dollars.  So those are

10  important deviations from the base -- from the headline

11  30 percent take rate, yes.

12    **MR. RAPHAEL:**  Well, in fact, there were -- I think

13  Dr. Burtis analyzed over 450,000 times in which a service fee

14  was reduced for something.  Is that right?

15    **DR. SINGER:**  Well, but that's a trivial percentage of the

16  total number of SKUs in the database.  Now, her flawed SKU

17  analysis is missing out on changes in prices when the app

18  introduces the new price through a new SKU.  Now, she's fixated

19  on the old SKU and she doesn't see the price changing of 5.99

20  when, in fact, there's a new price in town at 4.99 that just

21  got introduced through a new SKU.

22    **MR. RAPHAEL:**  Dr. Singer, for how many products did you

23  analyze, when the service fee went down, whether the price

24  changed in the way that Dr. Burtis did?

25    **DR. SINGER:**  I made the determination that, given the

1   limited variation in the take rates -- remember, 92.4 percent

2   of the transactions are always at 30; right? -- and then when I

3   learned about the impediments that Google threw up in terms of

4   subscription products not being able to drop their prices and I

5   learned that many -- and I was cognizant of the fact that many

6   of these drops occurred way late in the class period, some of

7   them in 2021, 2022, we're trying to simulate a world where we

8   have a permanently lower reduction in take rate from Day 1 back

9   in.  Right?

10      And so I looked at that and I made the determination that

11  that was the wrong path to go down.  I decided that I needed to

12  characterize the demand the developers faced, and I went out

13  and tested logit, linear --

14      **MR. RAPHAEL:**  Dr. Singer, I asked you how many times --

15  for how many products you analyzed when the service fee went

16  down, whether the price changed.  Is the answer to my question

17  zero?

18      **DR. SINGER:**  In my initial report, the answer is zero; but

19  because I wrote a reply report, I had to do an analysis of the

20  botched experiment in Dr. Burtis's report.

21      **MR. RAPHAEL:**  Thank you, Dr. Singer.

22      Now, Dr. Singer, your formula is based on a logit demand

23  model?

24      **DR. SINGER:**  My pass-through formula is based on the logit

25  demand model that I tested and confirmed best characterizes the

1  demand faced by apps.

2     **MR. RAPHAEL:**  Right.  And one feature of a logit demand

3  model is that all goods in the market where demand is being

4  measured are substitutes; is that right?

5     **DR. SINGER:**  I think that all goods have to be substitutes

6  to some extent.  And that could be a very light extent.  There

7  could be --

8     **MR. RAPHAEL:**  In fact, it's very particular, isn't it,

9  Dr. Singer?  In a logit model, all of the goods in the market

10 being studied have to be substitutes in proportion to their

11 shares of that market; isn't that correct?

12    **DR. SINGER:**  I think that's fair, yes.

13    **MR. RAPHAEL:**  And is it your opinion in this case that all

14 apps in every Google Play category are substitutes in perfect

15 proportion to their share?

16    **DR. SINGER:**  Not in perfect proportion.  But the P-values

17 on that coefficient that relates price or predicted price -- we

18 use tax rates, Your Honor, to predict a price in Stage I as an

19 instrument -- on the apps share, every one of them with the

20 exception of transportation was statistically significant at

21 the highest levels.  That's telling you that the prediction of

22 a logit is true in this case.  It didn't have to be true.  And

23 had I gotten the wrong sine or insignificant coefficients, I

24 would have gone looking for a different demand system.

25    **MR. RAPHAEL:**  Dr. Singer, is it your opinion that every

1   app in each Google Play category is a substitute?

2       **DR. SINGER:** I don't think that every one is a good

3   substitute necessarily.  I think Microsoft Excel and Microsoft

4   PowerPoint are in the productivity category.  Does that mean

5   the category is defined insanely?  No, because Microsoft has a

6   cluster or a package of productivity apps that goes up against

7   Google's package of productively apps.

8       So it doesn't surprise me that you can find some silly

9   examples -- Thomas the Train and Doom -- you can find some

10  silly examples that probably aren't close.  But if you're right

11  and that's what generally characterizes the data, that is, if

12  Google just willy-nilly slapped these categories together and

13  you just have a random collection of apps, then when I go to

14  estimate the logit model, Your Honor, the fit, the goodness of

15  fit would be zero.  The P-values -- right? -- wouldn't be as

16  good as they are.  They wouldn't be statistically significant.

17      That's confirmation that the categories, as designed by

18  Google in the ordinary course of business, which is also very

19  similar to what Apple's categories looked like, are meaningful.

20  They are a meaningful arena of competition around which one can

21  use for estimating shares for the logit model.

22      **MR. RAPHAEL:** But they're not substitutes, are they?

23      **THE COURT:** I don't have a problem with that.  I think

24  that's fine.

25      Okay.  One or two more questions, Mr. Raphael.

1      **MR. RAPHAEL:**  Sure, Your Honor.

2      I guess my last question to you, Dr. Singer, is -- I just

3 want to confirm this -- is that you've never used the formula

4 that you used in this case to calculate pass-through in any

5 other case.  That's correct?

6      **DR. SINGER:**  I think -- I think what I told you in my

7 deposition -- and same answer now -- is that I've been doing

8 mostly monopolization.  I've been blessed, including in the

9 pork case, to have variation in the wholesale rates so that I

10 could exploit that variation by going and looking at changes in

11 retail prices.

12      When you're confronted with a new empirical problem or

13 puzzle, you can't always go back to the thing that you've done

14 in the past.  Sometimes you have to have a new tool.  And

15 fortunately, economics has given us the perfect tool for this

16 kind of problem.

17      **THE COURT:**  Well, I think the point is, for me at least,

18 is total novelty is always -- judges don't like it.

19      **DR. SINGER:**  It's not total novelty, Your Honor.  The

20 logit is one of the most commonly used --

21      **THE COURT:**  I know the logit is, but not the way it's

22 being used here.  I'm not saying it's an indictment, but it

23 does require a little more explanation.

24      **DR. SINGER:**  I think that --

25      **THE COURT:**  Okay.  I'm going to have you all in -- I think

1    it's August 4th.

2        Let me just tell you a little tentative, non-binding

3    tentative, subject to considerably more thinking and, of

4    course, your presentations when you come back in August.

5        But I am not particularly concerned that this is

6    inadmissible -- all right? -- with one exception, and that is I

7    do want to hear a little bit more about logit and the inputs

8    and how it's working.  On the whole, though, I think the method

9    is -- right or wrong -- certainly sound enough for a trier of

10   fact to have a decision on whether they buy it or not.

11       I am much more interested in hearing -- so it's perfectly

12   fine, and I'll take any *Daubert* arguments you have, but I do

13   want to hear more about logit.  It gives me a little bit of

14   pause.

15       I do want to hear much more about the commonality issues

16   for Rule 23 purposes when we get back together.  On the

17   two-sided platform, I'm comfortable, I think, with the

18   developer side and the figures -- the unitary figure for that

19   side.  I think that makes sense based on the evidence that I've

20   seen.  Whether it's persuasive to a jury is a different matter,

21   or me later.  That's fine.  This is just getting through class

22   certification.

23       I am much less confident in the method for determining

24   what I'll call antitrust injury to the consumers.  I'm not sold

25   that this method is going to be sufficient on a class-wide

 1   basis for all of the millions of people, tens of millions of

 2   people that are going to be in these proposed classes.  So I

 3   would like to hear more about that.

 4        This is in addition to anything else you want to raise.

 5        I'm also looking at a couple of other issues.  This is a

 6   massively huge class, Ms. Giulianelli.  I mean, I think it's

 7   what?  Is it 90 million people possibly?  That would be a

 8   historically large class, and I need to understand how that

 9   fits into manageability and the core Rule 23 inquiry, which is:

10   Does this make sense to do in one case?  I'm not clear on why

11   that may be the right answer here.

12        I'm also -- I don't understand how this will translate

13   into a reasonable approximation of damages for all of the

14   disparately situated individual consumers.  It's one thing --

15   even if you get past the number, I don't know how you're going

16   to actually calculate the checks for people who may have

17   purchased one swim app, and that's it, versus someone who

18   spends 100, 200 dollars a year on a game app.  It's not clear

19   to me how that's going to work.  That all has to be taken into

20   account for manageability.

21        So those are the things that I'd like to hear more about

22   when we get to class certification.

23        I'm also a little bit unclear about this division with the

24   states.  I don't really understand what's happening and how

25   that's working out.  So you're going to have to walk me through

1    that, why that makes sense from a Rule 23 perspective.

2         And even if damages don't work, I mean, I think there's

3    clearly enough for an injunction case to go forward.   But

4    whether the right remedy is a check to 90 million Americans is

5    a little less clear to me.

6         Okay?   So that's just a little bit of a preview for

7    August 4th.

8         And anything else for today?

9         **MS. GIULIANELLI:**  No, thank you.

10        **THE COURT:**  Plaintiffs?

11        **MS. GIULIANELLI:**  We will be prepared to walk you through

12   every single one of those.

13        **THE COURT:**  Good.   Defendants?

14        **MR. RAPHAEL:**  No.

15        **THE COURT:**  All right.   Thank you.   It was quite useful.

16        **DR. SINGER:**  Thanks, Your Honor.

17        **THE COURT:**  Thanks for coming in.

18        Okay.   I'll see you then.

19                 (Proceedings adjourned at 4:48 p.m.)

20                         ---o0o---

21

22

23

24

25

1

2                    <u>**CERTIFICATE OF REPORTER**</u>

3          I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    DATE:  Thursday, July 21, 2022

7

8

9    _____

10   Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
                 Official United States Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# REDACTED VERSION

# Exhibit A61
# to
# C. Cramer Declaration

| | |
|---|---|
| Brian C. Rocca, S.B. #221576<br>brian.rocca@morganlewis.com<br>Sujal J. Shah, S.B. #215230<br>sujal.shah@morganlewis.com<br>Michelle Park Chiu, S.B. #248421<br>michelle.chiu@morganlewis.com<br>Minna Lo Naranjo, S.B. #259005<br>minna.naranjo@morganlewis.com<br>Rishi P. Satia, S.B. #301958<br>rishi.satia@morganlewis.com<br>**MORGAN, LEWIS & BOCKIUS LLP**<br>One Market, Spear Street Tower<br>San Francisco, CA 94105<br>Telephone: (415) 442-1000 | Glenn D. Pomerantz, S.B. #112503<br>glenn.pomerantz@mto.com<br>Kuruvilla Olasa, S.B. #281509<br>kuruvilla.olasa@mto.com<br>**MUNGER, TOLLES & OLSON LLP**<br>350 South Grand Avenue, Fiftieth Floor<br>Los Angeles, California 90071<br>Telephone: (213) 683-9100<br><br>Kyle W. Mach, S.B. #282090<br>kyle.mach@mto.com<br>Justin P. Raphael, S.B. #292380<br>justin.raphael@mto.com<br>Emily C. Curran-Huberty, S.B. #293065<br>emily.curran-huberty@mto.com |

Brian C. Rocca, S.B. #221576
brian.rocca@morganlewis.com
Sujal J. Shah, S.B. #215230
sujal.shah@morganlewis.com
Michelle Park Chiu, S.B. #248421
michelle.chiu@morganlewis.com
Minna Lo Naranjo, S.B. #259005
minna.naranjo@morganlewis.com
Rishi P. Satia, S.B. #301958
rishi.satia@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105
Telephone: (415) 442-1000

Richard S. Taffet, *pro hac vice*
richard.taffet@morganlewis.com
Ian Simmons, *pro hac vice*
isimmons@omm.com
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue, New York, NY 10178
Telephone: (212) 309-6000

Benjamin G. Bradshaw, S.B. #189925
bbradshaw@omm.com
**O'MELVENY & MYERS LLP**
1625 Eye Street, NW Washington, DC 20006
Telephone: (202) 383-5300

Daniel M. Petrocelli, S.B. #97802
dpetrocelli@omm.com
Stephen J. McIntyre, S.B. #274481
smcintyre@omm.com
**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: (310) 553-6700

Glenn D. Pomerantz, S.B. #112503
glenn.pomerantz@mto.com
Kuruvilla Olasa, S.B. #281509
kuruvilla.olasa@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 683-9100

Kyle W. Mach, S.B. #282090
kyle.mach@mto.com
Justin P. Raphael, S.B. #292380
justin.raphael@mto.com
Emily C. Curran-Huberty, S.B. #293065
emily.curran-huberty@mto.com
**MUNGER, TOLLES & OLSON LLP**
560 Mission Street, Twenty Seventh Floor
San Francisco, California 94105
Telephone: (415) 512-4000

Jonathan I. Kravis, *pro hac vice*
jonathan.kravis@mto.com
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Avenue NW, Suite 500E
Washington, D.C. 20001
Telephone: (202) 220-1100

*Counsel for Defendants*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE GOOGLE PLAY CONSUMER ANTITRUST LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br><br>*In re Google Play Consumer Antitrust Litigation*, Case No. 3:20-cv-05761-JD | Case No. 3:21-md-02981-JD<br><br>**FILED UNDER SEAL**<br>**DEFENDANTS' REPLY IN SUPPORT OF DAUBERT MOTION TO EXCLUDE TESTIMONY OF DR. HAL J. SINGER ON CLASS CERTIFICATION**<br>Date:   August 4, 2022<br>Time:   10:00 a.m.<br>Judge:  Hon. James Donato<br>Courtroom: 11, 19th Floor, 450 Golden Gate Ave, San Francisco, California, 94102 |

1    *Third*, Plaintiffs get nowhere by arguing that Dr. Singer has shown that sales taxes "are

2    typically passed on in full."  Opp. at 8.  This case is not about sales taxes, which are highly

3    regulated by state laws that, among other things, often require including sales taxes as a separate

4    line item on an invoice.  *See generally* Walter Hellerstein et al., *State and Local Taxation* 650

5    (10th ed. 2014).  Moreover, Dr. Singer's analysis of sales taxes and prices for transactions via

6    Google Play proves nothing about *developers*' pass-through because *Google* charges and collects

7    sales taxes on those transactions.  Mot. Ex. 12, Singer Rep. at n. 537.  Thus, Dr. Singer's evidence

8    is merely that *some* companies add sales tax to their customers' purchases.  That unremarkable

9    fact does not show that *all* developers would pass-through *service fees* or explain why the data

10   show that almost no developers did so when Dr. Singer predicted that all of them would.  Firms

11   may approach service fees differently than sales taxes, which are not at issue here.

12   Plaintiffs fall back on arguing that "broader real-world experiments are not possible

13   because of Google's continuous anticompetitive conduct."  Opp. at 11.  The only such conduct

14   they identify is supposed limitations on "steering" users to other platforms using in-app

15   communications.  *Id.*  This makes no sense.  Developers can and sometimes do charge different

16   prices in Play and on other platforms.  Plaintiffs do not explain why pass-through of lower service

17   fees on *Google Play* depends on in-app communications directing consumers to *other* platforms.

18   Dr. Singer thus testified that his pass-through formula does not depend on steering:  "Q. Okay. So

19   fair to say, then, that the [] logit model pass-through formula that you've used in your report

20   depends on steering?  A. No, I don't think it depends on steering because we can come up with []

21   with explanations for how pass-through would occur in the presence of the anti-steering restraint."

22   Mot. Ex. 1, Singer Dep. at 242:15–22.  Dr. Singer "would expect pass-through regardless of the

23   anti-steering restrictions," *id.* at 242:23–244:3, but that pass-through did not happen.  Plaintiffs do

24   not address that testimony or Dr. Singer's concession that he has not conducted any empirical

25   analysis of steering's effect on pass-through rates.  *Id.* at 239:2–13, 240:2–241:1, 246:3–12.

26   **D.    Dr. Singer's Pass-Through Formula Is Unreliable Because a Necessary Condition for the Formula is Concededly Missing.**

27

28   One reason why Dr. Singer's "logit model" makes dramatically wrong predictions is that a

1   fundamental condition for the model is concededly missing.  Dr. Singer testified that "one feature

2   of logit demand is that all goods in the market where demand is being measured are substitutes."

3   Mot. Ex. 1, Singer Dep. at 158:9–13.  As his own source explains, in a logit model, "each good is

4   a substitute for all others in the choice set."  Gregory J. Werden & Luke M. Froeb, *The Antitrust*

5   *Logit Model for Predicting Unilateral Competitive Effects*, 70 Antitrust L.J. 257 (2002).  Dr.

6   Singer treats "each of Google's 35 categories as a separate demand system," Opp. at 6, but

7   Plaintiffs do not argue that all apps in each category are substitutes—nor could they, as the

8   "Thomas" and "Doom" example illustrates.  Dr. Singer even admitted he is not opining that apps

9   in each category are substitutes.  Mot. Ex. 1, Singer Dep. at 158:14–159:18.  This is fatal to the

10   reliability of his "logit model."  If the prices of apps in a category are unrelated, then an app's

11   share in that category cannot inform what price the app's developer would charge.  Thus, Dr.

12   Singer's model predicts very different pass-through rates for the same app in different categories,

13   showing that the model's results are essentially arbitrary.  *See* Mot. Ex. 3, Burtis Rep. ¶¶ 310–312

14   & Exs. 54–55; Mot. Ex. 2, Singer Reply Rep. ¶ 79.

15       Plaintiffs' rejoinder is that "Google's app categories are economically reasonable

16   groupings of consumer preferences."  Opp. at 12.  But Plaintiffs do not define what that means or

17   why it is meaningful to predict developers' prices or pass-through.  Dr. Singer did not testify that

18   one feature of logit demand is that all products are "economically reasonable groupings of

19   consumer preferences," and Plaintiffs' own sources regarding logit models refer to "sets of

20   substitutes," Opp. Ex. 13, at 52–59, and "Substitution Patterns."  Opp. Ex. 8, at 45–49.  Plaintiffs

21   cite nothing for their assertion that evidence that "the logit model fits the data" is proof that the

22   categories "defined the scope of substitution patterns for app users," Opp. at 13.

23       Dr. Singer cannot reliably testify based on a logit model where an assumption necessary to

24   that model concededly does not hold.

25       **E.      Dr. Singer's Pass-Through Formula Does Not Account For Focal Point Pricing.**

26       Dr. Singer's pass-through formula also is unreliable because it "does not adequately

27   account for the effects of focal point pricing. . . ."  *In re Lithium Ion Batteries Antitrust Litig.*, No.

28   13-MD-2420 YGR, 2018 WL 1156797, at *3 (N.D. Cal. Mar. 5, 2018).  Dr. Singer testified, and

DEFENDANTS' REPLY IN SUPPORT OF DAUBERT MOTION TO EXCLUDE TESTIMONY OF DR. HAL J.
SINGER ON CLASS CERTIFICATION
**ER-165**

1   Plaintiffs do not dispute, that focal point pricing is a "well-established concept in economics,"

2   Mot. Ex. 1, Singer Dep. at 197:19–198:4, and "an important consideration here." *Id.* at 202:5–7.

3   Nor do Plaintiffs contest that many developers use focal point pricing.  Yet Plaintiffs do not point

4   to any term in Dr. Singer's formula that addresses focal point pricing or any analysis by Dr. Singer

5   showing that every developer would profit by breaking from focal point pricing.

6         Plaintiffs note that some developers do not use focal point pricing.  *See* Opp. at 11, 12.

7   That says nothing about whether developers who *do* use focal point pricing would stop doing so if

8   they paid lower service fees.  Dr. Singer has not analyzed that issue for any developer, let alone

9   shown that all developers would have done so.  As such, his pass-through "model does not provide

10  a reliable method for determining but-for pricing in the presence of focal pricing." *In re Apple*

11  *iPhone Antitrust Litig.*, No. 11-CV-6714-YGR, 2022 WL 1284104, at *8 (N.D. Cal. Mar. 29,

12  2022) (excluding expert testimony).

13  **II.**     **DR. SINGER'S SERVICE FEE FORMULA IS NOT RELIABLE.**

14        Plaintiffs concede that Dr. Singer's formula for calculating Google's but-for service fee

15  depends on his pass-through analysis.  Mot. at 13.  They argue that "pass-through is just one of

16  many inputs" into Dr. Singer's service fee formula.  Opp. at 14.  But Plaintiffs do not dispute that,

17  if a developer would not pass through a lower service fee, then Dr. Singer's service fee formula

18  indicates that Google's service fee is competitive.  Mot. at 4.  Thus, pass-through is not just a

19  variable: it drives Dr. Singer's result.  Because Dr. Singer's pass-through formula is unreliable, his

20  service fee formula is, too.[2]  The service fee formula also is unreliable because it uses average

21  inputs, including an average pass-through rate.  Plaintiffs' argument that this "reflects market

22  conditions," Opp. at 15, is a non-sequitur.  If anything, the fact that Google reduced service fees

23  for some developers and not others shows that individualized, not average, inputs are required.

24  **III.**    **DR. SINGER'S OPINIONS REGARDING PLAY POINTS ARE NOT RELIABLE.**

25        Plaintiffs have not shown that Dr. Singer has a reliable method to support his alternative

---

26  [2] Plaintiffs do not dispute that Dr. Singer predicts that Google would have charged service fee

27  rates for apps in the Entertainment and Music and Audio categories lower than his estimate of
    Google's costs.  Mot. at 12–14.  Plaintiffs point to a passing reference to costs ranging from ▮ to

28  ▮, Opp. at 14, but that range extends at least as high as the service fee rate estimates.

# REDACTED VERSION

# Exhibit A56
# to
# C. Cramer Declaration

# EXHIBIT 3

# FILED UNDER SEAL

Page 1

1   UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF CALIFORNIA
2   SAN FRANCISCO DIVISION
3   --------------------------------------X
    IN RE GOOGLE PLAY STORE
4   ANTITRUST LITIGATION
5   Case No.  3:21-md-02981-JD
6
    THIS DOCUMENT RELATES TO:
7   Epic Games Inc. v. Google LLC, et al.,
    Case No. 3:20-cv-05671-JD
8
    In Re Google Play Consumer
9   Antitrust Litigation
    Case No. 3:20-cv-05671-JD
10
    In Re Google Play Developer
11  Antitrust Litigation,
    Case No: 3:20-cv-05792-JD
12
    State of Utah, et al., v.
13  Google LLC, et al.,
    Case No: 3:21-cv-05227-JD
14  --------------------------------------X
15
16            VIDEOTAPE DEPOSITION
17              HAL SINGER, PH.D.
18            Thursday, May 12, 2022
19               9:07 a.m. (EST)
20
21
22
23
24  Reported by:
25  Ryan K. Black, RPR, CLR, Notary Public

Page 2

1

2

3

4                     Thursday, May 12, 2022

5

6          Video Deposition of HAL SINGER, PH.D.,

7    taken at the Law Offices of Munger, Tolles &

8    Olson, LLP, 601 Massachusetts Avenue NW

9    Washington, DC, beginning at 9:07 a.m.,

10   before Ryan K. Black, a Registered

11   Professional Reporter, Certified Livenote

12   Reporter and Notary Public and for the

13   District of Columbia.

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1   A P P E A R A N C E S:
 2     CRAVATH, SWAINE & MOORE, LLP
       BY:  ERIC J. ZEPP, ESQ. - Via Zoom
 3     825 8th Ave
       New York, New York  10019
 4     212.474.1000
       ezepp@cravath.com
 5     Representing - Epic Games, Inc. In Re:
                        Epic Games, Inc. V. Google
 6                      LLC, et al.
 7
       BARTLIT BECK LLP
 8     BY:  KARMA M. GIULIANELLI, ESQ.
       1801 Wewatta Street
 9     Suite 1200
       Denver, Colorado  80202
10     303.592.3100
       karma.giulianelli@bartlitbeck.com
11     Representing - Consumer Class Plaintiffs
12
       HAUSFELD LLP
13     BY:  AMY ERNST, ESQ. - Via Zoom
       325 Chestnut Street
14     Unit 900
       Philadelphia, Pennsylvania  19106
15     215.985.3270
       aernst@hausfeld.com
16     Representing - Plaintiff Developers
17
       MUNGER, TOLLES & OLSON LLP
18     BY:  JUSTIN R. RAPHAEL, ESQ.
       560 Mission Street
19     27th Floor
       San Francisco, California  94105
20     415.512.4000
       justin.raphael@mto.com
21     Representing - Defendants
22
23   ALSO PRESENT:
24     Emmanuel Pezoa - Legal Videographer
       Yajing Jiang, Ph.D - Charles River Associates
25     Kevin Caves, Ph.D - Econ One
```

Page 4

```
1                       I N D E X
2    TESTIMONY OF:  HAL SINGER, PH.D            PAGE
3    By Mr. Raphael.............................6, 391
4    By Mr. Giulianelli.........................389
5                     E X H I B I T S
6    EXHIBIT            DESCRIPTION             PAGE
7    Exhibit 333   Hal Singer Ph.D's Opening Expert
8                  Report...........................27
9    Exhibit 334   Hal Singer Ph.D's Reply Report...27
10   Exhibit 335   an article titled Digital Economics
11                 by Avi Goldfarb and
12                 Catherine Tucker.................96
13   Exhibit 336   a document titled Economics Letters
14                 - Using Cost Pass-through To
15                 Calibrate Demand, by Miller, Remer
16                 and Sheu........................117
17   Exhibit 337   an article titled The Antitrust
18                 Logit Model For Predicting
19                 Unilateral Competitive Effects,
20                 by Gregory J. Werden and
21                 Luke M. Froeb...................156
22   Exhibit 338   a document titled Expert Report of
23                 Michelle M. Burtis, Ph.D.......364
24
25
```

Page 5

1          THE VIDEOGRAPHER:  Good morning.  We are

2     on the record at 9:07 a.m. on May 12, 2022.  This

3     is the video-recorded deposition of Hal Singer

4     taken in the matter of In re:  Google Play Store

5     Antitrust Litigation, filed in the United States

6     District Court, Northern District of California,

7     San Francisco Division, Case No.

8     3:21-MD-02981-JD.

9          My name is Emmanuel Pezoa, from the firm

10    Veritext Legal Solutions.  The court reporter is

11    Ryan Black, from the firm Veritext Legal

12    Solutions.

13          Will the court re -- court reporter

14    please swear in the witness?

15                    *     *     *

16    Whereupon --

17              HAL JASON SINGER, PH.D.,

18    called to testify, having been first duly sworn

19    or affirmed, was examined and testified as

20    follows:

21                    *     *     *

22          THE REPORTER:  And, Counsel, if you want

23    to state your appearances for the record, that

24    would be great.

25          MR. RAPHAEL:  Sure.

1  different points in time.

2         I think it's much more sound, from an

3  economic perspective, to look at it over a longer

4  period of time.

5     Q.   So just if you applied your model on a,

6  say, daily or monthly basis for -- if you applied

7  your pass-through model on a daily or a monthly

8  basis, you would -- it would predict changes in

9  the price that developers charge that you don't

10 actually see in the real world.

11         MS. GIULIANELLI:  Objection to form.

12         THE WITNESS:  No, it would imply changes

13 in pass-through rates.

14         And it's important to note that I've now

15 tested, because Dr. Burtis found a few months,

16 you know, where somebody changes or someone goes

17 to a hundred, and I've now calculated that there

18 is very little variation across all apps as you

19 toggle through time.  She's not that sensitive to

20 doing it.  Of course, she can cherry-pick a

21 particular example that makes it look sensitive.

22         But we actually did the estimation,

23 and it turns out that the -- the app -- on -- on

24 average, a given app's implied pass rate is very

25 close to what it is across the entire damages

```
 1   period.
 2   BY MR. RAPHAEL:
 3       Q.   But the pass-through formula you have
 4   would predict changes in the pass-through rate
 5   from week to week or month to month if the share
 6   changes.  Fair?
 7       A.   If one were so inclined to measure it on
 8   -- on a monthly or nanosecond basis, yes, you
 9   could get very strange results.
10       Q.   Okay.  Could the formula you've got
11   here, the "M minus Q sub J divided by M," could
12   that be used to calculate pass-through rates in
13   any case where you know the unit market share of
14   an intermediary alleged to have passed on an
15   overcharge?
16       A.   I -- I -- I'd be reluctant to say that
17   the logit model could be applied to any case.
18   I'd want to confirm, first, as I did here, that
19   the logit model does a good job explaining the
20   relationship between prices and shares, as it
21   does here.
22            So I think you need some empirical
23   foundation before applying the logit model.
24   I think that would be a good -- good practice.
25       Q.   Okay.  Have you used the formula that
```

Page 135

1  you used to calculate pass-through in this case
2  to calculate pass-through in any other case?
3       A.   I do not believe I have.  In other
4  cases, what I'm typically doing is regressing
5  retail price changes on wholesale price changes.
6       Q.   Okay.
7       A.   And that -- that's just not available
8  here.
9       Q.   All right.  To your knowledge, has
10  any economist used the formula you've used to
11  calculate pass-through in this case to calculate
12  pass-through in some other case?
13       A.   I -- I don't -- I don't know enough -- I
14  can't follow how pass-through is calculated in
15  every antitrust case.  I can tell you that the
16  logit assumption is one of the most common
17  assumptions that's used in antitrust cases there
18  is.
19       Q.   But --
20       A.   All right?
21       Q.   But you're not aware of this formula
22  being used to calculate pass-through in another
23  case.
24       A.   Oh.  Pass-through?  Well, the formula
25  is used to calculate price effects from, say,

                                            Page 136

1   mergers.  It's one of the most common, you know,

2   formulas that are used.

3       Q.   Sure.  Well, --

4       A.   Cert --

5       Q.   -- ju -- just to be clear, the actual

6   formula that you used in this case in Paragraph

7   239, are you aware of that particular formula

8   being used for -- in any other case to calculate

9   pass-through?

10      A.   I -- I would -- I haven't seen -- I'm

11  only away of what's been used in cases that I've

12  calculated pass-through, --

13      Q.   Fair enough.

14      A.   -- all right?

15           And in those cases, I typically have the

16  luxury of having a database that I -- that allows

17  me to relate retail prices with wholesale prices.

18  That -- that didn't happen here.  That is kind of

19  my -- the standard way I -- I go about doing it.

20           Here, there was no analogous database.

21      Q.   Right.  So in the usual case, you look

22  at the actual pricing data to determine the

23  pass-through rate.

24      A.   Well, here I actually did look at the

25  actual pricing data, right?  I wanted to convince

1  myself that -- that prices -- movements in prices

2  could explain a given app's share within a

3  category.  It turns out it can.  It does it

4  really well.  I also wanted to convince myself

5  that changes in taxes did a good job explaining

6  prices.

7         So until I could -- I used that, as you

8  know, as my instrument in the first stage of my

9  -- of my regressions.  So I wanted to get my

10  hands dirty with the real data to get comfort in

11  knowing that the logit model did it -- did the

12  best job possible of explaining the variations in

13  the -- in the data that we see -- in the

14  transaction data.

15     Q.   Well, sir, did you do anything in this

16  case to measure a correlation between service

17  fees and actual prices that were charged for

18  transactions by developers?

19     A.   Yes.  Remember, there's a Table -- and I

20  think it's Table 9 -- in my initial report that

21  looks at how app developers have charged

22  differently for their -- for their apps --

23     Q.   But Table --

24     A.   -- when they -- can I just finish --

25     Q.   Sure.

                                      Page 138

1        A.    -- my answer?

2              -- when they -- when they're able to

3    avoid Google's, or in the case of YouTube, it was

4    Apple's take rate.

5        Q.    Well, Table 9's not a comprehensive

6    analysis of all developers, right?

7        A.    Well, it's not comprehensive because of

8    the challenged conduct here, right?  It -- the

9    -- we don't -- we don't get to see steering in --

10   in the real world because of the restraint,

11   right?  But the case in part, or in large part,

12   is about challenging that restraint.

13             So it is -- it is difficult to -- to

14   take advantage or exploit natural experiments

15   given Google's conduct here.

16       Q.    Right.  I'm -- I'm just asking.  You

17   didn't do any comprehensive analysis of any

18   relationship between service fees in the actual

19   world and developer's prices in the actual world.

20       A.    The -- the closest I did to that was I

21   did a comprehensive analysis of taxes at the

22   state level on prices -- app prices.  And I found

23   such a good relationship between those two that

24   it -- it is strongly indicative that to the

25   extent that the take rate works the same as an ad

Page 140

1    you did you do any analysis of the relationship

2    between service fees in the actual world and

3    developers' prices in the actual world using

4    actual data.

5        A.    I did for Table 9 in my report for that

6    handful of examples, but I -- the next best thing

7    that I could do -- because you need variation.

8        Q.    Sir, I'm going to -- I'm going to

9    interrupt you because you're not answering my

10   question.

11           My question is, Did you do any

12   comprehensive analysis using actual data of the

13   relationship between service fees and the prices

14   that developers actually charged?

15           MS. GIULIANELLI:  And I'm going to ask

16   you that you allow the witness to answer the

17   question because I believe he was answering it.

18           THE WITNESS:  I think I have done

19   comprehensive analysis.  As you know, your --

20   your experts put forward experiments where they

21   think they're exploiting changes in service fees

22   looking -- and going and looking for changes

23   in prices, so I -- I have.  I've looked at

24   everything possible that would allow to you do it

25   in light of the restraints that -- that Google

Page 141

1   has imposed throughout the class period.

2         This is why their examples are so

3   tortured.  They're looking at these slight little

4   variations that either barely applied to an app

5   or where prices couldn't change because of Google

6   restriction.  So I -- I did everything that I

7   could possible.  I'm telling you that the most

8   comprehensive thing that -- that relates would be

9   the relationship between ad valorem sales taxes

10  at -- at the state level and prices, which do

11  -- are -- there's a tight relationship between

12  those two, right?

13     Q.   Right.  But the analysis of ad valorem

14  sales taxes doesn't use actual data regarding

15  developers' service fees and prices in the actual

16  world, correct?

17     A.   That is correct.

18     Q.   Okay.  And so you haven't done any

19  analysis -- using actual data on prices and

20  service fees for the entire set of developers

21  that's at issue in this case, you haven't done

22  any comprehensive analysis regarding the

23  relationship between those things, correct?

24     A.   I told you I could not do it given the

25  nature of the lack of variation --

Page 158

1    they would land on Microsoft's productivity

2    package would be higher than if they were to land

3    on some obscure package within productivity apps.

4    I mean, it's -- it's very intuitive.  It's very

5    natural.

6        Q.   Now, your pass-through formula is based

7    on logit demand.

8        A.   Yes.

9        Q.   And one feature of logit demand is that

10   all goods in the market where demand is being

11   measured are substitutes.

12       A.   I think that's a general -- that is

13   generally the case.  That's fine.

14       Q.   Okay.  Is it your opinion that all apps

15   in each Google Play app category are substitutes?

16       A.   No.  And that's why I invoked this

17   concept of cluster markets.  Like, you could --

18   you could take Microsoft's Excel and Microsoft's

19   Word and ask me if they're substitutes, and I

20   would say at -- at that level, they're not.

21   But -- but when you think about the fact that

22   Microsoft and Google are actually competing with

23   a package of productivity apps, that -- that it

24   would make sense to think of that as something

25   more akin to a cluster market the way that we saw

1    in the Staples and Office Depot case, that paper

2    clips and a ruler aren't necessarily substitutes;

3    but if the people generally tend to buy those

4    things from the same place, they can belong in

5    the same product market.

6        Q.   So -- but -- but it's not your opinion

7    that all apps in each Google Play app category

8    are substitutes.

9        A.   I just gave an example of Excel and Word

10   as being more -- more of complements, right?  But

11   -- but when you think about the -- the cat -- the

12   productivity suite that Google is offering, that

13   -- that's clearly a substitute to what -- what

14   Microsoft is offering in its productivity suite.

15       Q.   Right.  So some of the apps in each

16   Google Play category could be complements,

17   correct?

18       A.   They could be.

19       Q.   And some could be substitutes.

20       A.   They could be, yes.

21       Q.   Right.  And you haven't put forth a

22   model in your report to determine which apps in

23   each category are complements and which are

24   substitutes?

25       A.   No.  And it's not necessary to get the

Page 160

1   implied pass-through rate.

2        Q.   Right.

3             Could you go to Paragraph 78 of your

4   reply report -- well, actually, let me ask you:

5   Are you opining that all apps in each category

6   are part of a cluster market?

7        A.   No.  You -- you saw in my report.  I'm

8   saying that they don't need to necessarily be a

9   market, a relevant market, for antitrust

10  purposes, and I give you a citation for that.

11            I think that if you -- if you really

12  wanted to -- if you forced it into that box,

13  which is unnecessary and unnatural, that you

14  could -- you could get there by -- by

15  understanding the categories functioning

16  more like a cluster market.

17       Q.   Right.  But you're not actually offering

18  the opinion that all of the apps in each category

19  are part of a cluster market.

20       A.   No.  I -- I'm offering the opinion that

21  -- that everything within the category -- that

22  the category definitions from Google define the

23  -- the contours or the arena of competition among

24  apps in that category.

25       Q.   Okay.  And, again, let's go to Paragraph

1   broke out among developers such that we had guys

2   who were otherwise going to be at 99, some would

3   go to 49, some would go to 79, that's less

4   revenue -- that's less revenue for Google.  So

5   Google had incentives to want to keep prices not

6   falling below a price floor.

7        Q.   So other than the -- the 99 cent price

8   floor that you're referring to, are you referring

9   to any or have you offered an opinion that any

10  other constraints by Google would affect a

11  developer's ability to depart from focal point

12  pricing?

13       A.   Absolutely.

14       Q.   Okay.

15       A.   The anti-steering rule, --

16       Q.   Okay.

17       A.   -- right?  So I go through kind of a

18  long example, but I thought it was important, of

19  -- of the developer who was at 1.99, and then

20  given the opportunity to steer finds that 1.79,

21  you know, under 50 percent steering the sharing

22  rule, would be profit maximizing, right?  So

23  Google did not present opportunities to steer.

24  And so then for your experts to say, Hey, there

25  isn't any steering here, well, I mean, they were

Page 201

1    constrained by Google.  Had they been given the
2    opportunity to deviate from the 99 and had it
3    been profit-maximizing to do so in order to --
4    you know, to save the delta between what Google's
5    take rate was and the rival's take rate, it would
6    have happened in spades, right, but it didn't,
7    and it didn't because of the constraints.
8        Q.   Sir, is it your opinion that no
9    developer in the actual world was committed to
10   focal point pricing?
11           MS. GIULIANELLI:  Objection.
12           THE WITNESS:  I don't think that people
13   commit to focal point pricing.  I think that
14   focal point pricing is -- is a function of what
15   your competitors are doing.  It's a function of
16   the rules of the road that you're operating
17   under.  It's a function of whether or not you
18   have steering opportunities.
19           So it's -- it's -- it's very
20   complicated.  But I will say that what Dr. Burtis
21   said on this point, which is that because we see
22   a lot of 99, we're necessarily going to see a lot
23   of 99 in the but-for world, I say not true.  It's
24   not true, because it itself is constrained by the
25   conduct -- by the challenged conduct.

1   BY MR. RAPHAEL:

2       Q.   I guess what I'm asking is, is it your

3   opinion that focal point pricing doesn't explain

4   any developers' pricing in the actual world?

5       A.   No, I think that's too harsh.  I think

6   that focal point pricing is an important

7   consideration here.

8       Q.   Okay.  Now, and -- and the price floor

9   you talked about of setting prices at 99 cents,

10  that wouldn't affect developers who set their

11  prices quite a bit above 99 cents?

12      A.   That's fair.  I think that, when we

13  looked at the data, it's about -- it's about 20

14  percent of developers were at that 99 cent, so I

15  agree with you that -- that those would be the

16  ones who were constrained from -- from moving

17  downward.

18      Q.   Okay.  So the other 80 percent of

19  developers wouldn't be affected by what you're

20  calling the price floor that Google had in place?

21      A.   Correct.

22      Q.   Okay.

23      A.   With one caveat in the sense that there

24  could be spillover effects from a floor being set

25  at 99 on what the next step up would be, but I

1    just wanted to put that out there that that's one

2    consideration.  But in general, if you're looking

3    for -- if you want to go looking for where the

4    constraint hit hardest, you would look at the

5    guys who were stuck at 99.

6         Q.    Okay.  Does your formula for calculating

7    pass-through rates account for focal point

8    pricing in any way?

9         A.    Well, it's solving for a percentage of

10   the cost savings that would be passed through to

11   end users, so I just think it's orthogonal.  It's

12   just not -- it's not that it accounts or doesn't

13   account, it's just it's telling us something

14   else.  It's telling us how a developer would

15   pass-through a save -- a reduction in marginal

16   costs to its end user.

17        Q.    Okay.  But you -- you say it's

18   orthogonal.  I just -- just want to make sure

19   we're clear.  Does your formula for calculating

20   pass-through rates account for focal point

21   pricing?

22        A.    I don't think the -- the -- the logit

23   model is -- is thinking about these rigidities

24   that we see in the actual world caused in part by

25   the challenged conduct.  But when you move to a

1   but-for world without these restraints, without

2   the price floor, without the anti-steering rules,

3   we're going to see a wider spread of prices for

4   sure.  And, again, the last thing I want to say

5   is that what the formula is giving us in the

6   aggregate for a category is the percentage of

7   share.  It's not telling us -- we're not asking

8   the model -- if you go to my final tables, which

9   breaks it out by -- by app category, we're trying

10   to use it to estimate damages in terms of

11   overcharges to the consumers.  We -- we're not

12   using the model to make a precise prediction of

13   what Tinder would charge its customers in the

14   but-for world in October of 2019.  That's not

15   what -- we're not asking that of the model, all

16   right?

17       Q.   So your model is not actually -- your

18   pass-through model is not trying to predict what

19   any developer would have charged its customers in

20   the but-for world during the class period?

21            MS. GIULIANELLI:  Objection.

22            THE WITNESS:  I don't think that we are

23   aiming for the price of a given app in a given

24   month on a given plan.  That's not what we're

25   trying to estimate.  What we're trying to figure

1    out, for the purposes of impact, is to say that
2    if all app developers within a category achieved
3    a certain cost reduction by virtue of enhanced
4    competition and, thereby, lower take rate, how
5    much of that would be shared with consumers in
6    the aggregate across the category.  And, you
7    know, what I'm hearing is, oh, my God, have you
8    ruled out 99-cent things or things that end in 9?
9    No, we haven't -- we haven't ruled that out.  But
10   we're talking about the share of the costs that
11   are being saved in the aggregate across a
12   category.  We can allow for 79-cent pricing, we
13   can allow for 99-cent pricing, 29-cent pricing in
14   the but-for world.  We're not putting any
15   restrictions on -- on what the price of a
16   particular app in a particular plan at a
17   particular point in time are.
18   BY MR. RAPHAEL:
19       Q.   Right.  So I just want to make sure I
20   get an answer to my question.  So your model for
21   a pass-through isn't trying to take account in
22   any specific way for the phenomenon of focal
23   point pricing?
24       A.   I -- I don't -- I don't think that the
25   mod -- that particular logit estimate of the 89

```
 1   percent is accounting or needs to take account.
 2   I think I need to account for it in my overall
 3   opinions about what the but-for world would look
 4   like.  But the logit model is just telling us
 5   what the implied pass-through rate is given a
 6   reduction in costs, given the concentration
 7   -- the typical concentration we see within
 8   categories in -- you know, in the app industry.
 9        Q.   Okay.  Your regressions regarding the
10   logit demand, did they have any fixed effect or
11   other mechanism to control for focal point
12   pricing?
13        A.   Well, they did use fixed effects.  I
14   don't know if you meant to say that, but they
15   don't have a separate control variable for focal
16   point.  But it is true, now that you brought this
17   up, we do have app fixed effects, right?  So to
18   the extent that an app stayed constant at a given
19   price over time or always ended at 99 -- let me
20   just say for the record what fixed effects is.
21   Quite literally, it's controlling for any of
22   these attributes of the app that are constant
23   over time.  And so if that tendency to want to
24   end in 99 or 79 or 69 is constant, then, yes, my
25   regressions control for it.
```

Page 397

1                    C E R T I F I C A T E
2
3          I do hereby certify that I am a Notary
4    Public in good standing, that the aforesaid
5    testimony was taken before me, pursuant to
6    notice, at the time and place indicated; that
7    said deponent was by me duly sworn to tell the
8    truth, the whole truth, and nothing but the
9    truth; that the testimony of said deponent was
10   correctly recorded in machine shorthand by me and
11   thereafter transcribed under my supervision with
12   computer-aided transcription; that the deposition
13   is a true and correct record of the testimony
14   given by the witness; and that I am neither of
15   counsel nor kin to any party in said action, nor
16   interested in the outcome thereof.
17
18         WITNESS my hand and official seal this
19   13th day of May, 2022.
20
21
22   _____
23              Notary Public
24
25

# REDACTED VERSION

# Exhibit A53
# to
# C. Cramer Declaration

1   Brian C. Rocca, S.B. #221576
    brian.rocca@morganlewis.com
2   Sujal J. Shah, S.B. #215230
    sujal.shah@morganlewis.com
3   Michelle Park Chiu, S.B. #248421
    michelle.chiu@morganlewis.com
4   Minna Lo Naranjo, S.B. #259005
    minna.naranjo@morganlewis.com
5   Rishi P. Satia, S.B. #301958
    rishi.satia@morganlewis.com
6   **MORGAN, LEWIS & BOCKIUS LLP**
    One Market, Spear Street Tower
7   San Francisco, CA 94105
    Telephone: (415) 442-1000
8   Richard S. Taffet, *pro hac vice*
    richard.taffet@morganlewis.com
9   Ian Simmons, *pro hac vice*
    isimmons@omm.com
10  **MORGAN, LEWIS & BOCKIUS LLP**
    101 Park Avenue
11  New York, NY 10178
    Telephone: (212) 309-6000
12  Benjamin G. Bradshaw, S.B. #189925
    bbradshaw@omm.com
13  **O'MELVENY & MYERS LLP**
14  1625 Eye Street, NW
    Washington, DC 20006
15  Telephone: (202) 383-5300
16  Daniel M. Petrocelli, S.B. #97802
    dpetrocelli@omm.com
17  Stephen J. McIntyre, S.B. #274481
    smcintyre@omm.com
18  **O'MELVENY & MYERS LLP**
    1999 Avenue of the Stars
19  Los Angeles, California 90067
    Telephone: (310) 553-6700

20  *Counsel for Defendants*

Glenn D. Pomerantz, S.B. #112503
glenn.pomerantz@mto.com
Kuruvilla Olasa, S.B. #281509
kuruvilla.olasa@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 683-9100

Kyle W. Mach, S.B. #282090
kyle.mach@mto.com
Justin P. Raphael, S.B. #292380
justin.raphael@mto.com
Emily C. Curran-Huberty, S.B. #293065
emily.curran-huberty@mto.com
**MUNGER, TOLLES & OLSON LLP**
560 Mission Street, Twenty Seventh Floor
San Francisco, California 94105
Telephone: (415) 512-4000

Jonathan I. Kravis, *pro hac vice*
jonathan.kravis@mto.com
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Avenue NW, Suite 500E
Washington, D.C. 20001
Telephone: (202) 220-1100

*Counsel for Defendants Google LLC et al. in In re Google Play Consumer Antitrust Litigation; In re Google Play Developer Antitrust Litigation; Epic Games, Inc. in Epic Games, Inc. v. Google LLC; State of Utah et al. v. Google LLC et al.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| 22  **IN RE GOOGLE PLAY CONSUMER ANTITRUST LITIGATION**<br><br>23  THIS DOCUMENT RELATES TO:<br><br>24<br><br>25  *In Re Google Play Consumer Antitrust Litigation*, Case No. 3:20-CV-05761-JD | Case No. 3:21-md-02981-JD<br><br>**FILED UNDER SEAL**<br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO EXCLUDE TESTIMONY OF DR. HAL J. SINGER ON CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br>Date:      August 4, 2022<br>Time:     10:00 a.m.<br>Judge:    Hon. James Donato<br>Courtroom: 11, 19th Floor, 450 Golden Gate Ave, San Francisco, California 94102 |

Case No. 3:20-CV-05761-JD

1   useful as a guide to interpreting market facts, but it is not a substitute for them." *Brooke Grp. Ltd.*

2   *v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993).

   **C.     Dr. Singer's Pass-Through Rate Formula Does Not Account for Focal Point
           Pricing.**

   A third reason why Dr. Singer's pass-through rate formula is not reliable is that it "does

   not adequately account for the effects of focal point pricing, and therefore fails to yield reliable

   conclusions." *In re Lithium Ion Batteries Antitrust Litig.*, 2018 WL 1156797 at *3.  Focal point

   pricing is a "well-established concept in economics" in which firms set prices ending in "99,"

   which consumers can perceive as significantly more attractive than prices just one cent higher.

   Ex. 1, Singer Dep. at 197:19–198:4; Ex. 3, Burtis Rep. ¶ 149.  Developers have widely adopted

   this strategy:  ▬  of U.S. consumers' retail app transactions involved prices ending in '99, Ex. 3,

   Burtis Rep. ¶ 149, and over  ▬  developers used prices ending in "99" during the class period.

   *Id.* at 111, Table 9.  *Cf. Apple iPhone Antitrust Litig.*, 2022 WL 1284104, at *8 ("with respect to

   focal-point pricing, overwhelming evidence suggests that developers would choose to price their

   apps at focal points ending in 99 cents.").

   Dr. Singer admits that "focal point pricing is an important consideration here."  Ex. 1,

   Singer Dep. at 202:2–7.  Indeed, focal point pricing is one reason why developers may not have

   reduced prices if they paid lower service fees.  Developers that rely on focal point pricing would

   not reduce prices in response to lower service fees "if the reduction from one" focal price point "to

   the next would be so large that the developer would lose profits."  Ex. 3, Burtis Rep. ¶ 150.

   Dr. Singer's pass-through formula does not account for focal-point pricing at all.  Ex. 1,

   Singer Dep. at 205:19–206:8.  Given this oversight, it is not surprising that Dr. Singer's model

   produces results that are flatly inconsistent with focal-point pricing.  According to Dr. Singer's

   model, developers that paid lower service fee rates would have reduced prices by less than a

   dollar, *i.e.*, above the next lowest focal point. Ex. 4, Singer Reply Rep. ¶ 28.  And according to the

   model, more than 99% of developers would have abandoned focal point pricing if they were

   subject to lower service fees.  *See* Ex. 3, Burtis Rep. ¶ 315, and Table 9.

   Judge Gonzales Rogers recently excluded testimony that Apple's allegedly

1  supracompetitive service fees for its App Store resulted in higher prices for all consumers of apps

2  in the Store because the expert's "model does not provide a reliable method for determining but-

3  for pricing in the presence of focal pricing." *Apple iPhone Antitrust Litig.*, 2022 WL 1284104, at

4  *8. Dr. Singer's pass-through rate model does not do so, either, and likewise is inadmissible.

### D.  Dr. Singer's Pass-Through Rate Formula Relies on the Unsubstantiated Assumption that All Apps in a Google Play Category Are Substitutes.

7  Dr. Singer's pass-through rate formula also is not reliable because he admits the premise it

8  depends on is not true. *E.g.*, *Boyar v. Korean Air Lines Co.*, 954 F. Supp. 4, 8–9 (D.D.C. 1996)

9  ("[A] number of [] cases exclude expert testimony because the factual assumption upon which it

10  was based was faulty and plainly contradicted by the evidence."). Dr. Singer's category-share

11  formula reflects a demand structure ("logit") whose fundamental feature is that "all goods in the

12  market where demand is being measured are substitutes." Ex. 1, Singer Dep. 158:6–13; Ex. 2,

13  Singer Rep. ¶ 224; Ex. 4, Singer Reply Rep. ¶¶ 75-77; *see also* Ex. 3, Burtis Rep. ¶ 308; *id.* at 107

14  n.363. But Dr. Singer disclaimed any opinion that "all apps in each Google Play app category are

15  substitutes," Ex. 1, Singer Dep. at 158:14–159:14; *see also id.* at 159:21–160:1. He testified that

16  some apps in each category could be complements rather than substitutes. *Id.* at 159:15–18.[2] Dr.

17  Singer's failure to opine that a necessary premise of his pass-through formula exists renders his

18  formula unreliable. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 &

19  n.19 (1986) (affirming exclusion of expert testimony based on assumptions that were "implausible

20  and inconsistent with record evidence").

### E.  Dr. Singer's Pass-Through Formula Reflects Undisclosed Analyses.

22  Finally, Dr. Singer's pass-through formula should be excluded because it is based on

---

[2] Indeed, it is obvious that not all apps in each category are substitutes. *See* Ex. 3, Burtis Rep. ¶¶ 158, 308. Because developers choose a category for their app when they list it in Google Play, Ex. 1, Singer Dep. at 90:3–6, the categories cannot reflect any relationship between prices and demand for apps in the category. As a result, the Business category includes both "package tracking" and "email management" apps; the Finance category includes "ATM finders" and apps related to insurance; and the Productivity category includes both calendar apps and calculator apps. *See* Google Play, "Choose a category and tags for your app or game," Google Support, https://support.google.com/googleplay/android-developer/answer/9859673.

Case No. 3:20-CV-05761-JD

1  undisclosed analyses.  Dr. Singer concedes that "the pass-through rate is going to depend on the

2  shape of the demand curve."  Ex. 1, Singer Dep. at 152:3–6.  Dr. Singer's pass-through formula

3  assumes a "logit" demand curve.  *See* Ex. 2, Singer Rep. ¶ 236.  Although the article on which Dr.

4  Singer relied includes formulas that assume other demand structures, Dr. Singer decided that logit

5  was the "best model" after testing two others.  Ex. 1, Singer Dep. at 152:7–153:6.  However, Dr.

6  Singer did not disclose those tests in his reports, *id.* at 152:24–153:12, 174:17–25, so Google has

7  no basis to assess whether his pass-through formula best reflects the structure of real-world

8  demand.  Consumer Plaintiffs' failure to disclose analyses necessary to test Dr. Singer's pass-

9  through formula requires excluding his testimony based on the formula.  *See* Standing Order for

10  Discovery in Civil Cases ¶ 17 ("FRCP 26(a)(2)(B) requires disclosure of all opinions, bases,

11  reasons and other information considered by an expert.")[3]

12  **II.      DR. SINGER'S FORMULA FOR CALCULATING COMPETITIVE SERVICE
          FEES IS NOT RELIABLE.**

13

14          Dr. Singer's model for showing that Google's service fees would have been lower for all

15  developers in the first place depends on using his unreliable pass-through rate formula as an input

16  in calculating service fee rates.  *See* Ex. 2, Singer Rep. ¶ 264 (explaining variables in but-for

17  service fee calculation, including pass-through).  Because Dr. Singer's pass-through rate formula

18  is unreliable, calculating service fees based on that formula will be unreliable as well.

19          Dr. Singer's formula for calculating service fee rates in a more competitive market also

20  yields absurd results.  *E.g.*, *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175 (JG)

21  (VVP), 2014 WL 7882100, at *57–59 (E.D.N.Y. Oct. 15, 2014), *report and recommendation*

22  *adopted*, 2015 WL 5093503 (E.D.N.Y. July 10, 2015) (excluding regression yielding "absurd"

23  results).  Dr. Singer predicts that, in the but-for world, Google would have charged service fees of

24  10% for apps in the Entertainment app category and 9.7% for apps in the Music and Audio

25  categories.  *See* Ex. 2, Singer Rep. at 134, Table 14.  However, Dr. Singer's own calculations

26  ───────────────

[3] Dr. Singer did not test the formula for AIDS demand to see if that structure of demand best fit the

27  demand for apps.  Ex. 1, Singer Dep. at 153:13–154:8.  That is problematic because Dr. Singer

28  does not know whether he would even be able to calculate any pass-through rates using the AIDS
formula if demand for apps reflected AIDS demand.  *Id.* at 154:9–21.

NOTICE OF MOTION AND MOTION TO EXCLUDE TESTIMONY OF DR. HAL J. SINGER ON CLASS
CERTIFICATION; MEMO OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

# REDACTED VERSION

# Exhibit A48
# to
# C. Cramer Declaration

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)

# EXHIBIT J

# CONFIDENTIAL-FILED UNDER SEAL

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)

HIGHLY CONFIDENTIAL

Page 1

1            UNITED STATES DISTRICT COURT

2       FOR THE NORTHERN DISTRICT OF CALIFORNIA

3             SAN FRANCISCO DIVISION

4    ---------------------------------------------x

5    IN RE GOOGLE PLAY STORE        Case No.

     ANTITRUST LITIGATION           3:21-md-02981-JD

6

7    THIS DOCUMENT RELATES TO:

8    Epic Games Inc. v. Google LLC, et al.,

     Case No: 3:20-cv-05671-JD

9

     In re Google Play Consumer

10   Antitrust Litigation,

     Case No: 3:20-cv-05761-JD

11

     In re Google Play Developer

12   Litigation,

     Case No: 3:20-cv-05792-JD

13

14   State of Utah, et al.,

     v. Google LLC, et al.,

15   Case No: 3:21-cv-05227-JD

16   ---------------------------------------------x

17

18     *HIGHLY CONFIDENTIAL - UNDER PROTECTIVE ORDER*

19      REMOTE VIDEOTAPED DEPOSITION BY VIRTUAL ZOOM OF

20                   RICHARD FENG

21             Friday, January 14, 2022

22              Volume 1 (Pages 1-396)

23

24   Reported By: Lynne Ledanois, CSR 6811

25

HIGHLY CONFIDENTIAL

Page 2

1                   UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                     SAN FRANCISCO DIVISION

4       ---------------------------------------------x

5       IN RE GOOGLE PLAY STORE         Case No.

        ANTITRUST LITIGATION            3:21-md-02981-JD

6

7       THIS DOCUMENT RELATES TO:

8       Epic Games Inc. v. Google LLC, et al.,

        Case No: 3:20-cv-05671-JD

9

        In re Google Play Consumer

10      Antitrust Litigation,

        Case No: 3:20-cv-05761-JD

11

        In re Google Play Developer

12      Litigation,

        Case No: 3:20-cv-05792-JD

13

14      State of Utah, et al.,

        v. Google LLC, et al.,

15      Case No: 3:21-cv-05227-JD

16      ---------------------------------------------x

17

18             Remote videotaped deposition of

19        RICHARD FENG, taken in Palo Alto, California,

20        commencing at 8:59 a.m., on Friday,

21        January 14, 2022 before Lynne Ledanois,

22        Certified Shorthand Reporter No. 6811

23

24

25

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)

HIGHLY CONFIDENTIAL

Page 3

```
 1                     REMOTE APPEARANCES
 2    Counsel for Plaintiff Epic Games, Inc. in:
 3    Epic Games, Inc. v Google LLC, et al:
 4                  CRAVATH, SWAINE & MOORE LLP
 5                  BY: BRENT BYARS
 6                      ZACHARY JARRETT
 7                      DANIEL OTTAUNICK
 8                      DANIEL KUMAGAI
 9                  Attorneys at Law
10                  825 Eighth Avenue
11                  New York, New York 10019
12                  bbyars@cravath.com
13
14    Counsel for Google LLC, et al:
15                  MORGAN LEWIS & BOCKIUS LLP
16                  BY: BRIAN ROCCA
17                      NICHOLAS PFEIFFER
18                  Attorneys at Law
19                  1 Market Plaza
20                  One Market Street
21                  San Francisco, California 94105
22                  brian.rocca@morganlewis.com
23
24
25    ///
```

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)
HIGHLY CONFIDENTIAL

Page 4

1                  REMOTE APPEARANCES

2

3    Counsel for the Proposed Class In re: Google

4    Play Developer Antitrust Litigation and Pure

5    Sweat Basketball, Inc:

6                   HAUSFELD LLP

7                   BY: KYLE BATES

8                        DANIEL KEES

9                   Attorneys at Law

10                  600 Montgomery Street

11                  Suite 3200

12                  San Francisco, California 94111

13                  kbates@hausfeld.com

14

15   Counsel for the Proposed Class In re: Google

16   Play Consumer Antitrust Litigation:

17                  BARTLIT BECK

18                  BY: GLEN E. SUMMERS

19                      KARMA GIULIANELLI

20                  Attorneys at Law

21                  1801 Wewetta Street

22                  Suite 1200

23                  Denver, Colorado 80202

24                  gsummers@bartlitbeck.com

25   ///

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)
HIGHLY CONFIDENTIAL

Page 5

1              REMOTE APPEARANCES

2

3    Counsel for Plaintiffs in Proposed Class:

4              KOREIN TILLERY LAW OFFICE

5              BY: RANDALL EWING

6              Attorney at Law

7              505 North 7th Street

8              Suite 3600

9              Saint Louis, Missouri 63101

10             rewing@koreintillery.com

11

12   Counsel for Plaintiff States:

13             NORTH CAROLINA DEPARTMENT OF JUSTICE

14             ATTORNEY GENERAL

15             BY: JONATHAN MARX

16                 RAVEN DeMONIA

17                 CAROLINE BROCK

18             Attorneys at Law

19             1 South Wilmington Street

20             Raleigh, North Carolina 27601

21             nmarx@ncdoj.gov

22

23

24

25   ///

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)
HIGHLY CONFIDENTIAL

Page 6

1            REMOTE APPEARANCES

2

3    Also Present:

4    Bret Hampton, Videographer

5    Timothy Tupiak, Veritext Tech

6    Ken Maikish, Google In-House Counsel

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 7

1          I N D E X   O F   E X A M I N A T I O N

2

3   Examination by:                          Page

4        Mr. Bates                              15

5        Mr. Byars                             252

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   ///

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)
HIGHLY CONFIDENTIAL

Page 12

1                    Friday, January 14, 2022

2                         8:59 a.m.

3       _____

4              VIDEOGRAPHER:  Good morning.

5         We're on the record at 8:59 a.m.

6         on January 14th, 2022.

7                Please note microphones are

8         sensitive and may pick up

9         whispering, private conversations

10        and cell interference.

11               Please turn off all cell

12        phones or place them away from the

13        microphones as they can interfere

14        with the deposition audio.

15               Audio and video recording

16        will continue to take place unless

17        all parties agree to go off the

18        record.

19               This is Media Unit Number 1

20        of the video-recorded deposition

21        of Paul Feng in the matter Re:

22        Google Play Store Antitrust

23        Litigation filed in the

24        U.S. District Court, Northern

25        District of California, San

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)

HIGHLY CONFIDENTIAL

Page 13

1           Francisco Division.  Case

2           number 3:21-md-02981-JD.

3                 This deposition is being

4           held virtually on Zoom.

5                 My name is Bret Hampton from

6           the firm Veritext; I'm the

7           videographer.  The court reporter

8           is Lynne Ledanois from Veritext.

9                 I'm not authorized to

10          administer an oath, I'm not

11          related to any party in this

12          action, nor am I financially

13          interested in the outcome.

14                Would counsel and everyone

15          present please identify who you

16          represent.  After that, the court

17          reporter may swear in the witness.

18          Thank you.

19                MR. BATES:  Good morning.

20          Kyle Bates from the firm of

21          Hausfeld for the developer

22          plaintiffs.  With me also is my

23          colleague Daniel Kees.

24                MR. BYARS:  This is Brent

25          Byars from Cravath Swaine & Moore

**Page 14**

```
 1        representing plaintiff and counter
 2        defendant Epic Games.  And with me
 3        is Daniel Ottaunick also from
 4        Cravath.
 5              MR. SUMMERS:  Glen Summers
 6        with Bartlit Beck LLP on behalf of
 7        the consumer class.  With me is
 8        Randall Ewing of the Korein
 9        Tillery firm.
10              MR. MARX:  Jonathan Marx
11        with the North Carolina Department
12        of Justice on behalf of the state
13        plaintiffs in the Google action.
14              MR. ROCCA:  Good morning.
15        This is Brian Rocca of Morgan
16        Lewis representing Google
17        defendants as well as the witness,
18        Mr. Feng.
19              I'm joined by my colleague
20        Cole Pfeiffer of Morgan Lewis and
21        in-house counsel for Google, Ken
22        Maikish.
23
24              PAUL FENG,
25    having been duly sworn, testified as follow
```

Page 15

1                    EXAMINATION

2    BY MR. BATES:

3         Q     Good morning, Mr. Feng.  How

4    are you?

5         A     I'm good.  How are you?

6         Q     Good.  Thank you.

7               We met off the record just a

8    moment ago.  But again, my name is

9    Kyle Bates.  I'm one of the attorneys

10   representing the developer plaintiffs

11   in this case.

12               Do you understand that?

13        A     I do.

14        Q     Okay.  Have you had your

15   deposition taken before, Mr. Feng?

16        A     Yes.

17        Q     How many times?

18        A     I believe once.

19        Q     And when was that?

20        A     I want to say it was around

21   2010, but it was a few years ago.

22        Q     Can you tell me generally

23   what kind of a case it was in which

24   you gave deposition testimony?

25        A     My recollection is that it

Page 62

1        Q     I see.  So Google Play
2    Billing is a framework of features
3    that allows developers to do the three
4    things that your team is responsible
5    for, selling paid apps, in-app
6    purchases and Play Pass; is that
7    correct?
8        A     Google Play Billing is
9    broader than just features for
10   developers.
11       Q     Can you describe what Google
12   Play Billing is for me?
13       A     As I noted, Google Play
14   Billing is an integral part of Play.
15   And it is the set of features that
16   allow, one, developers to build
17   premium paid features into their apps,
18   but also the features for users to
19   easily and seamlessly purchase those
20   items, consume those items and have a
21   good purchasing experience.
22       Q     What is your involvement in
23   the development and implementation of
24   Google Play Billing?
25       A     I lead the team that builds

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)

HIGHLY CONFIDENTIAL

Page 113

1          variety of different people.

2                Are there specific

3          conversations?  Do you want me to

4          list dozens of people?

5   BY MR. BATES:

6          Q     I don't.  Was Sameer Samat

7       involved in the conversations about

8       changing the service fee percentage

9       that you were involved in?

10         A     Yes.

11         Q     What is Mr. Samat's title?

12         A     Sameer is VP of product

13      management responsible for Play,

14      Android, Wear, something like that.

15         Q     I see.  He's your superior;

16      is that correct?

17         A     He is, yes.

18         Q     What is the basis for the

19      percentage of the service fee that's

20      charged to developers?

21         A     So as I noted earlier, our

22      service fee has -- there's not one

23      service fee.  Our service fee varies

24      and over the years, you know, the --

25      that we've added wrinkles and

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)
HIGHLY CONFIDENTIAL

Page 114

1      components to how the service fee is

2      charged.

3                  And so -- but at the end of

4      the day, the service fee is the fee we

5      charge for all of the services and

6      value that we believe we provide to

7      developers who use Google Play, right.

8                  So that includes -- it is

9      not a transaction fee.  It's a fee for

10     the access to all of the users who use

11     Play, it is a fee for all the services

12     and tools we provide to help you get

13     your app built.

14                  It's a fee for distribution.

15     It's a fee for -- yes, for

16     monetization capabilities that we

17     offer.

18                  And there's features that we

19     use -- we build that allow developers

20     to optimize and manage the lifetime

21     value of their users and also funds

22     Android.

23                  So that's the basis for the

24     service fee.

25          Q     I see.  So it's a trade;

# REDACTED VERSION

# Exhibit A47
# to
# C. Cramer Declaration

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)

# EXHIBIT G

# CONFIDENTIAL-FILED UNDER SEAL

Page 1

1   UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF CALIFORNIA
2   SAN FRANCISCO DIVISION
3   -------------------------------------X
    IN RE GOOGLE PLAY STORE
4   ANTITRUST LITIGATION
5   Case No.  3:21-md-02981-JD
6
    THIS DOCUMENT RELATES TO:
7   Epic Games Inc. v. Google LLC, et al.,
    Case No. 3:20-cv-05671-JD
8
    In Re Google Play Consumer
9   Antitrust Litigation
    Case No. 3:20-cv-05671-JD
10
    In Re Google Play Developer
11  Antitrust Litigation,
    Case No: 3:20-cv-05792-JD
12
    State of Utah, et al., v.
13  Google LLC, et al.,
    Case No: 3:21-cv-05227-JD
14  -------------------------------------X
15
16            VIDEOTAPE DEPOSITION
17              HAL SINGER, PH.D.
18           Thursday, May 12, 2022
19               9:07 a.m. (EST)
20
21
22
23
24  Reported by:
25  Ryan K. Black, RPR, CLR, Notary Public

Page 2

1

2

3

4                    Thursday, May 12, 2022

5

6          Video Deposition of HAL SINGER, PH.D.,

7     taken at the Law Offices of Munger, Tolles &

8     Olson, LLP, 601 Massachusetts Avenue NW

9     Washington, DC, beginning at 9:07 a.m.,

10    before Ryan K. Black, a Registered

11    Professional Reporter, Certified Livenote

12    Reporter and Notary Public and for the

13    District of Columbia.

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1    A P P E A R A N C E S:
 2      CRAVATH, SWAINE & MOORE, LLP
        BY:  ERIC J. ZEPP, ESQ. - Via Zoom
 3      825 8th Ave
        New York, New York  10019
 4      212.474.1000
        ezepp@cravath.com
 5      Representing - Epic Games, Inc. In Re:
                         Epic Games, Inc. V. Google
 6                       LLC, et al.
 7

        BARTLIT BECK LLP
 8      BY:  KARMA M. GIULIANELLI, ESQ.
        1801 Wewatta Street
 9      Suite 1200
        Denver, Colorado  80202
10      303.592.3100
        karma.giulianelli@bartlitbeck.com
11      Representing - Consumer Class Plaintiffs
12

        HAUSFELD LLP
13      BY:  AMY ERNST, ESQ. - Via Zoom
        325 Chestnut Street
14      Unit 900
        Philadelphia, Pennsylvania  19106
15      215.985.3270
        aernst@hausfeld.com
16      Representing - Plaintiff Developers
17

        MUNGER, TOLLES & OLSON LLP
18      BY:  JUSTIN R. RAPHAEL, ESQ.
        560 Mission Street
19      27th Floor
        San Francisco, California  94105
20      415.512.4000
        justin.raphael@mto.com
21      Representing - Defendants
22
23    ALSO PRESENT:
24      Emmanuel Pezoa - Legal Videographer
        Yajing Jiang, Ph.D - Charles River Associates
25      Kevin Caves, Ph.D - Econ One
```

Page 4

1                          I N D E X

2     TESTIMONY OF:  HAL SINGER, PH.D               PAGE

3     By Mr. Raphael.............................6, 391

4     By Mr. Giulianelli.........................389

5                       E X H I B I T S

6     EXHIBIT            DESCRIPTION               PAGE

7     Exhibit 333    Hal Singer Ph.D's Opening Expert

8                    Report...........................27

9     Exhibit 334    Hal Singer Ph.D's Reply Report...27

10    Exhibit 335    an article titled Digital Economics

11                   by Avi Goldfarb and

12                   Catherine Tucker.................96

13    Exhibit 336    a document titled Economics Letters

14                   - Using Cost Pass-through To

15                   Calibrate Demand, by Miller, Remer

16                   and Sheu........................117

17    Exhibit 337    an article titled The Antitrust

18                   Logit Model For Predicting

19                   Unilateral Competitive Effects,

20                   by Gregory J. Werden and

21                   Luke M. Froeb...................156

22    Exhibit 338    a document titled Expert Report of

23                   Michelle M. Burtis, Ph.D.......364

24

25

Page 5

```
 1              THE VIDEOGRAPHER:  Good morning.  We are
 2    on the record at 9:07 a.m. on May 12, 2022.  This
 3    is the video-recorded deposition of Hal Singer
 4    taken in the matter of In re:  Google Play Store
 5    Antitrust Litigation, filed in the United States
 6    District Court, Northern District of California,
 7    San Francisco Division, Case No.
 8    3:21-MD-02981-JD.
 9              My name is Emmanuel Pezoa, from the firm
10    Veritext Legal Solutions.  The court reporter is
11    Ryan Black, from the firm Veritext Legal
12    Solutions.
13              Will the court re -- court reporter
14    please swear in the witness?
15                     *     *     *
16    Whereupon --
17              HAL JASON SINGER, PH.D.,
18    called to testify, having been first duly sworn
19    or affirmed, was examined and testified as
20    follows:
21                     *     *     *
22              THE REPORTER:  And, Counsel, if you want
23    to state your appearances for the record, that
24    would be great.
25              MR. RAPHAEL:  Sure.
```

```
                                          Page 6

 1             Justin Raphael, Munger Tolles & Olson,

 2   for the defendants.

 3             MS. GIULIANELLI:  Karma Giulianelli,

 4   from Bartlit Beck, for the consumer class.

 5             MS. JIANG:  Yajing Jiang from Charles

 6   River Associates.

 7             MR. RAPHAEL:  Is there anyone on the

 8   line who wants to introduce themselves?

 9             MS. ERNST:  This is Amy Ernst.  I'm here

10   with Hausfeld for the plaintiff developers.

11             THE VIDEOGRAPHER:  Thank you.  You may

12   proceed.

13             MR. ZEPP:  Eric Zepp here, from Cravath

14   Swaine & Moore, on behalf of Epic Games.

15             MR. CAVES:  I'm Kevin Caves, with Econ

16   One on behalf of the Commercial developers.

17                     EXAMINATION

18   BY MR. RAPHAEL:

19       Q.   All right.  Dr. Singer, will you just

20   state your name for the record?

21       A.   Hal Jason Singer.

22       Q.   And, Dr. Singer, you've been deposed

23   many times; is that right?

24       A.   Yes.

25       Q.   How many times would you say you've been
```

Page 134

1   period.

2   BY MR. RAPHAEL:

3       Q.   But the pass-through formula you have

4   would predict changes in the pass-through rate

5   from week to week or month to month if the share

6   changes.  Fair?

7       A.   If one were so inclined to measure it on

8   -- on a monthly or nanosecond basis, yes, you

9   could get very strange results.

10      Q.   Okay.  Could the formula you've got

11  here, the "M minus Q sub J divided by M," could

12  that be used to calculate pass-through rates in

13  any case where you know the unit market share of

14  an intermediary alleged to have passed on an

15  overcharge?

16      A.   I -- I -- I'd be reluctant to say that

17  the logit model could be applied to any case.

18  I'd want to confirm, first, as I did here, that

19  the logit model does a good job explaining the

20  relationship between prices and shares, as it

21  does here.

22          So I think you need some empirical

23  foundation before applying the logit model.

24  I think that would be a good -- good practice.

25      Q.   Okay.  Have you used the formula that

Page 135

1  you used to calculate pass-through in this case

2  to calculate pass-through in any other case?

3       A.   I do not believe I have.  In other

4  cases, what I'm typically doing is regressing

5  retail price changes on wholesale price changes.

6       Q.   Okay.

7       A.   And that -- that's just not available

8  here.

9       Q.   All right.  To your knowledge, has

10  any economist used the formula you've used to

11  calculate pass-through in this case to calculate

12  pass-through in some other case?

13       A.   I -- I don't -- I don't know enough -- I

14  can't follow how pass-through is calculated in

15  every antitrust case.  I can tell you that the

16  logit assumption is one of the most common

17  assumptions that's used in antitrust cases there

18  is.

19       Q.   But --

20       A.   All right?

21       Q.   But you're not aware of this formula

22  being used to calculate pass-through in another

23  case.

24       A.   Oh.  Pass-through?  Well, the formula

25  is used to calculate price effects from, say,

1    has imposed throughout the class period.

2          This is why their examples are so

3    tortured.  They're looking at these slight little

4    variations that either barely applied to an app

5    or where prices couldn't change because of Google

6    restriction.  So I -- I did everything that I

7    could possible.  I'm telling you that the most

8    comprehensive thing that -- that relates would be

9    the relationship between ad valorem sales taxes

10   at -- at the state level and prices, which do

11   -- are -- there's a tight relationship between

12   those two, right?

13        Q.   Right.  But the analysis of ad valorem

14   sales taxes doesn't use actual data regarding

15   developers' service fees and prices in the actual

16   world, correct?

17        A.   That is correct.

18        Q.   Okay.  And so you haven't done any

19   analysis -- using actual data on prices and

20   service fees for the entire set of developers

21   that's at issue in this case, you haven't done

22   any comprehensive analysis regarding the

23   relationship between those things, correct?

24        A.   I told you I could not do it given the

25   nature of the lack of variation --

Page 142

1      Q.   And because --

2      A.   -- in Google's --

3      Q.   -- you couldn't --

4      A.   Almost every transaction.

5           MS. GIULIANELLI:  Hey, hey.  Let --

6  let --

7           THE WITNESS:  Almost every transaction

8  is occurring at 30 percent.  You -- you need

9  variation in the treatment variable in order to

10  tease out the relationship.  And if Google

11  doesn't do it because of its restraints

12  preventing competition, I can't -- I can't run a

13  test of what you're asking for.

14  BY MR. RAPHAEL:

15      Q.   Right.  And because you feel like you

16  couldn't do it, you didn't do it?

17      A.   Correct.

18      Q.   Okay.  Now, the Miller -- let's go back

19  to the exhibit, I think it was 336, which was the

20  Miller article?

21      A.   Yes.

22      Q.   Now, if you'll to go to the top of Page

23  452, we were talking earlier about Expression 2

24  which refers to the per-unit tax.  Do you recall

25  that?

Page 159

1  in the Staples and Office Depot case, that paper

2  clips and a ruler aren't necessarily substitutes;

3  but if the people generally tend to buy those

4  things from the same place, they can belong in

5  the same product market.

6      Q.   So -- but -- but it's not your opinion

7  that all apps in each Google Play app category

8  are substitutes.

9      A.   I just gave an example of Excel and Word

10 as being more -- more of complements, right?  But

11 -- but when you think about the -- the cat -- the

12 productivity suite that Google is offering, that

13 -- that's clearly a substitute to what -- what

14 Microsoft is offering in its productivity suite.

15     Q.   Right.  So some of the apps in each

16 Google Play category could be complements,

17 correct?

18     A.   They could be.

19     Q.   And some could be substitutes.

20     A.   They could be, yes.

21     Q.   Right.  And you haven't put forth a

22 model in your report to determine which apps in

23 each category are complements and which are

24 substitutes?

25     A.   No.  And it's not necessary to get the

Page 181

1    that uses a dollar amount of sales tax?

2         A.   Well, in the field -- it's one of the

3    fields in the transaction data that says "taxes",

4    and it -- it is -- it is stated in dollars, I

5    believe, not as percentage.  So we get to see

6    what the relationship is between those changes,

7    right, as -- as predictive -- how predictive they

8    are to changes in prices.  The fact that they may

9    be denominated in dollars doesn't mean they don't

10   come from ad valorem.  I'm pretty confident that

11   they are always -- or that generally -- just to

12   be safe, they're generally set as a percentage of

13   revenues.

14        Q.   Understood.  But as you input them into

15   your model regarding the relationship between the

16   sales taxes and the prices, they were in dollar

17   terms and not percentage terms?

18        A.   I believe that's the case.  I can -- I

19   can check that out for you in a break, but I

20   believe that the way that it's entered into the

21   database is as dollars.

22        Q.   Got it.

23             Now, going back to your formula for

24   pass-through, which, again, is essentially a

25   hundred minus the quantity share of the apps

Page 182

1    transactions in its category, right?

2        A.   That's for the app developer, but I

3    don't present it that way in the report.  I

4    present it, as you know, at the category level.

5        Q.   Understood.

6        A.   Okay.

7        Q.   But that's the general math of the

8    formula?

9        A.   That's the math.

10       Q.   Right.  Fair to say that that math will

11   always produce a pass-through rate, unless the

12   app developer or -- has a hundred percent of a

13   Google Play category?

14       A.   I think it's fair that -- that you'll

15   get a positive pass-through rate.  You won't

16   necessarily get a big one, but you'll get a

17   positive pass-through rate with the exception

18   of the guy who dominates the field.  And, you

19   know, again, this is -- hopefully this is

20   intuitive to the non-economist in that -- in that

21   your share is capturing your dominance in this

22   arena of competition.  And so what the logit

23   model is telling us is that the more dominant you

24   are, the less -- the smaller percentage of the

25   pass -- of a cost saving you share with your --

Page 183

1    with your client.

2        Q.    Right.  But just so we're clear, unless

3    the app has a hundred percent quantity share in

4    the category, your formula will predict a

5    positive pass-through rate?

6        A.    For a given app developer, that -- that

7    is correct, yes.

8        Q.    Okay.  Now, you talked earlier about

9    the pass-through formula you have, potentially

10   predicting different rates from month to month or

11   week to week.  We talked about that a little bit.

12       A.    Yeah.  If you were to measure it on a

13   monthly basis, there would be some variation that

14   you wouldn't get if you were to measure it across

15   the -- the class period.  That is correct.

16       Q.    Right.  And your opinion is that it's

17   not appropriate to measure it on that short of a

18   time scale, correct?

19       A.    Correct.

20       Q.    Right.  And what's the economic basis

21   for why it's inappropriate to measure it on that

22   week to week or month to month or those sorts of

23   time frames?

24       A.    I don't think that an app developer

25   is going to revisit its pricing on a -- on a

Page 197

1   apply to a model of logit demand if the -- if the

2   model in Paragraph 104 is a generic model?

3       A.   Well, because the logit pass-through

4   rule states pass-through as a function of

5   industry concentration and not of cost, and so

6   when you asked me why doesn't -- you're asking me

7   basically why isn't the pass-through rate under

8   logit changing with the change in costs.  It

9   doesn't.  It's just a property of the logit

10  demand.  It doesn't make the math on 104 wrong.

11  It doesn't make the logit wrong.  It just -- it's

12  no longer a function of cost.

13      Q.   So the property of the logit demand

14  model that you used for your pass-through is that

15  the price is a function of the concentration and

16  not of the cost?

17      A.   The pass-through is a function of the

18  concentration, not of the cost, correct.

19      Q.   All right.  What is focal point pricing?

20      A.   Focal point pricing is the notion that a

21  consumer might focus on the -- on the first digit

22  before the decimal, as opposed to the last two.

23  So it explains why a lot of firms end -- end

24  their prices in 99 cents, or other -- or other

25  combinations.  Just a greater focus on the first

Page 198

1  -- on the stuff before the decimal place than --

2  than after the decimal place.

3      Q.  Okay.  And do you -- focal point pricing

4  is a well-established concept in economics?

5      A.  Sure.

6      Q.  And in the real world, many developers

7  price transactions only at certain focal points?

8          MS. GIULIANELLI:  Objection.

9          THE WITNESS:  We -- we've -- I've given

10  you all the stats that I think you could ever

11  want to see and more, but, you know, we know that

12  a lot do but a lot don't.  You know, 20 percent

13  of the top 200 don't end in 99 cents, right,

14  which is a big number.

15  BY MR. RAPHAEL:

16      Q.  So fair to say, though, that in the real

17  world some developers price in way that seems

18  like they're focal point pricing and some

19  developers don't?

20      A.  Given -- given the constraints that

21  Google imposed on some developers, yes, they

22  -- you know, they did price at 99 cents.

23      Q.  Well, what analysis have you done, sir,

24  in your reports to determine what effect Google

25  -- any constraints that Google imposed on

Page 202

1   BY MR. RAPHAEL:

2       Q.   I guess what I'm asking is, is it your

3   opinion that focal point pricing doesn't explain

4   any developers' pricing in the actual world?

5       A.   No, I think that's too harsh.  I think

6   that focal point pricing is an important

7   consideration here.

8       Q.   Okay.  Now, and -- and the price floor

9   you talked about of setting prices at 99 cents,

10  that wouldn't affect developers who set their

11  prices quite a bit above 99 cents?

12      A.   That's fair.  I think that, when we

13  looked at the data, it's about -- it's about 20

14  percent of developers were at that 99 cent, so I

15  agree with you that -- that those would be the

16  ones who were constrained from -- from moving

17  downward.

18      Q.   Okay.  So the other 80 percent of

19  developers wouldn't be affected by what you're

20  calling the price floor that Google had in place?

21      A.   Correct.

22      Q.   Okay.

23      A.   With one caveat in the sense that there

24  could be spillover effects from a floor being set

25  at 99 on what the next step up would be, but I

Page 205

1    out, for the purposes of impact, is to say that

2    if all app developers within a category achieved

3    a certain cost reduction by virtue of enhanced

4    competition and, thereby, lower take rate, how

5    much of that would be shared with consumers in

6    the aggregate across the category.  And, you

7    know, what I'm hearing is, oh, my God, have you

8    ruled out 99-cent things or things that end in 9?

9    No, we haven't -- we haven't ruled that out.  But

10   we're talking about the share of the costs that

11   are being saved in the aggregate across a

12   category.  We can allow for 79-cent pricing, we

13   can allow for 99-cent pricing, 29-cent pricing in

14   the but-for world.  We're not putting any

15   restrictions on -- on what the price of a

16   particular app in a particular plan at a

17   particular point in time are.

18   BY MR. RAPHAEL:

19       Q.   Right.  So I just want to make sure I

20   get an answer to my question.  So your model for

21   a pass-through isn't trying to take account in

22   any specific way for the phenomenon of focal

23   point pricing?

24       A.   I -- I don't -- I don't think that the

25   mod -- that particular logit estimate of the 89

1   percent is accounting or needs to take account.

2   I think I need to account for it in my overall

3   opinions about what the but-for world would look

4   like.  But the logit model is just telling us

5   what the implied pass-through rate is given a

6   reduction in costs, given the concentration

7   -- the typical concentration we see within

8   categories in -- you know, in the app industry.

9        Q.   Okay.  Your regressions regarding the

10  logit demand, did they have any fixed effect or

11  other mechanism to control for focal point

12  pricing?

13       A.   Well, they did use fixed effects.  I

14  don't know if you meant to say that, but they

15  don't have a separate control variable for focal

16  point.  But it is true, now that you brought this

17  up, we do have app fixed effects, right?  So to

18  the extent that an app stayed constant at a given

19  price over time or always ended at 99 -- let me

20  just say for the record what fixed effects is.

21  Quite literally, it's controlling for any of

22  these attributes of the app that are constant

23  over time.  And so if that tendency to want to

24  end in 99 or 79 or 69 is constant, then, yes, my

25  regressions control for it.

# REDACTED VERSION

# Exhibit A45
# to
# C. Cramer Declaration

| | |
|---|---|
| 1 | Brian C. Rocca, Bar No. 221576 |
| | brian.rocca@morganlewis.com |
| 2 | Sujal J. Shah, Bar No. 215230 |
| | sujal.shah@morganlewis.com |

Brian C. Rocca, Bar No. 221576
brian.rocca@morganlewis.com
Sujal J. Shah, Bar No. 215230
sujal.shah@morganlewis.com
Michelle Park Chiu, Bar No. 248421
michelle.chiu@morganlewis.com
Minna Lo Naranjo, Bar No. 259005
minna.naranjo@morganlewis.com
Rishi P. Satia, Bar No. 301958
rishi.satia@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
One Market, Spear Street Tower
San Francisco, CA 94105-1596
Telephone: (415) 442-1000
Facsimile:  (415) 442-1001

Richard S. Taffet, *pro hac vice*
richard.taffet@morganlewis.com
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY  10178-0060
Telephone: (212) 309-6000
Facsimile: (212) 309-6001

Daniel M. Petrocelli, Bar No. 97802
dpetrocelli@omm.com
Stephen J. McIntyre, Bar No. 274481
smcintyre@omm.com
**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars, 7th Fl.
Los Angeles, CA 90067-6035
Telephone: (310) 553-6700

Ian Simmons, *pro hac vice*
isimmons@omm.com
Benjamin G. Bradshaw, Bar No. 189925
bbradshaw@omm.com
**O'MELVENY & MYERS LLP**
1625 Eye Street, NW
Washington, DC 20006-4001
Telephone: (202) 383-5106
Facsimile: (202) 383-5414

*Counsel for Defendants*

Glenn D. Pomerantz, Bar No. 112503
glenn.pomerantz@mto.com
Kuruvilla Olasa, Bar No. 281509
kuruvilla.olasa@mto.com
**MUNGER, TOLLES & OLSON LLP**
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 683-9100

Kyle W. Mach, Bar No. 282090
kyle.mach@mto.com
Justin P. Raphael, Bar No. 292380
justin.raphael@mto.com
Emily C. Curran-Huberty, Bar No. 293065
emily.curran-huberty@mto.com
**MUNGER, TOLLES & OLSON LLP**
560 Mission Street, Twenty Seventh Fl.
San Francisco, California 94105
Telephone: (415) 512-4000

Jonathan I. Kravis, pro hac vice
jonathan.kravis@mto.com
**MUNGER, TOLLES & OLSON LLP**
601 Massachusetts Ave. NW, Ste 500E
Washington, D.C. 20001
Telephone: (202) 220-1100

*Counsel for Defendants Google LLC et al.
in In re Google Play Consumer Antitrust
Litigation; In re Google Play Developer
Antitrust Litigation; Epic Games, Inc. in
Epic Games, Inc. v. Google LLC; State of
Utah et al. v. Google LLC et al.*

Neal Kumar Katyal, *pro hac vice*
neal.katyal@hoganlovells.com
Jessica L. Ellsworth, *pro hac vice*
jessica.ellsworth@hoganlovells.com
**HOGAN LOVELLS US LLP**
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600

*Counsel for Defendants*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

**IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION**

THIS DOCUMENT RELATES TO:

*In re Google Play Consumer Antitrust Litigation*, Case No. 3:20-cv-05761-JD

Case No. 3:21-md-02981-JD

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' CLASS CERTIFICATION MOTION**

Judge James Donato

1

## BACKGROUND

2

## I.     FACTS RELEVANT TO CLASS CERTIFICATION

3

### A.     Google Play

4

Play is a platform that facilitates transactions between consumers and developers.

5 Declaration of Sujal Shah, Ex. A (Expert Report of Dr. Michelle Burtis ("Burtis")) ¶ 59.

6 Developers offer, and consumers find and download, apps for Android devices through Play.  *Id.*

7 As of May 5, 2021, there were over 4 million apps listed in Play with widely differentiated

8 functions, from games to productivity to entertainment to dating to tools.  Games are also highly

9 differentiated, ranging from casual puzzle games to complex role-playing games that demand

10 considerable memory and graphics capabilities.  *Id.* ¶ 157.  Developers choose the category in

11 which to list their apps on Play, and apps in each category are highly varied.  *Id.* ¶ 158.

12

Developers have many options for monetizing apps distributed on Play, including selling

13 the app ("paid app"), selling a subscription to access content in the app ("subscription app"),

14 selling digital content in the app ("IAP app"), or showing ads in the app.  *Id.* ¶ 53.  Roughly 90%

15 of apps are completely free, meaning they are free to download and do not offer IAP or

16 subscriptions (though they may display ads).  *Id.* Ex. 1.  Free apps accounted for 36% to 79% of

17 the apps installed by the proposed class representatives.  *Id.* Ex. 22.  Most developers that offer

18 IAPs or subscriptions adopt a "freemium" model in which consumers can download and use an

19 app for free, with the option to purchase a subscription or IAP for additional functionality.  *Id.*

20 ¶¶ 54–56.  During the class period, the class representatives only made a purchase from 4% to

21 12% of the apps they installed on their devices, meaning they enjoyed 88% to 96% of the apps

22 they installed without buying anything using Google Play's billing system.  *See id.* Ex. 22.

23

### B.     Google Play's Business Model

24

Besides a one-time $25 fee, which Plaintiffs do not challenge, Google does not charge

25 developers anything to list or distribute apps on Play.  *Id.* ¶ 60 & n.39.  Instead, Google monetizes

26 Play in part by charging a service fee on sales of paid apps, subscriptions, and IAPs.  Google does

27 not charge the developer a service fee unless the developer makes money; Google's service fee is

28 a percentage of the revenue ("consumer spend") generated by these sales.  *Id.* ¶ 62.  This is a

1    digital goods is zero." Singer Dep. at 95:22–98:19.[6]  And Dr. Singer testified that the "150th

2    sword" purchased in a videogame "doesn't cost any more to replicate." Singer Dep. at 98:10–19.

3         Thus, under Dr. Singer's economic model, pass-through depends on marginal costs, but

4    Plaintiffs have no common proof of each developer's marginal costs for each app.  As Dr. Singer

5    testified, "the marginal cost to a developer of supplying an additional in-app purchase could vary

6    from developer to developer." Singer Dep. at 95:15–18.  Dr. Singer did not try to estimate any

7    developer's marginal costs, *id.* at 90:20–91:2, 91:22–92:7, or use the standard economic model

8    that depends on them.  *Id.* at 382:6–15.  Instead, he used a simple ratio that "doesn't actually

9    depend on what the marginal cost of the developer is": the quantity of an app's transactions

10   divided by the quantity of transactions in the category in which the developer lists the app in Play.

11   *Id.* at 91:3–8; *see id.* at 190:20–192:3 (testifying that the "beauty" of this formula is that "we

12   don't need to estimate the marginal costs").  Dr. Singer's model simply ignores the individualized

13   issues specific to marginal costs that must be examined to determine whether a developer would

14   have raised prices and thus whether a consumer who purchased from that developer was injured.

15        **Focal point pricing.**  Proof of pass-through also requires an inquiry into whether the

16   developer of each app uses "focal point pricing," a "well-established concept in economics" in

17   which firms set prices ending in "99" cents.  *Id.* at 197:19–198:4; Burtis ¶ 149.  The prices for

18   some ***97%*** of U.S. consumers' retail app transactions ended in "99," and over 80,000 developers

19   used prices ending in "99" during the class period.  Burtis ¶ 149, Fig. 7; *id.* at Table 9; *cf. In re*

20   *Apple iPhone Antitrust Litig.*, 2022 WL 1284104, at *8 (N.D. Cal. 2022) ("overwhelming

21   evidence suggests that developers would choose to price their apps at focal points ending in 99

22   cents").  Pass-through is unprofitable where "the reduction from one" focal price point "to the

23   next would be so large that the developer would lose profits."  Burtis ¶ 150.

24        Dr. Singer's formula does not account for focal point pricing.  Singer Dep. at 205:19–

25   206:8.  This alone is grounds for denying certification.  *In re Lithium Ion Batteries Antitrust*

26   *Litig.*, 2018 WL 1156797, at *3 (N.D. Cal. 2018) (denying certification where expert failed to

27

28   ─────────────
     [6] Shah Decl., Ex. E (Avi Goldfarb & Catherine Tucker, *Digital Economics*, 57 J. Econ. Lit. 3, 12
     (2019) (DX 335)).

"adequately account for the effects of focal point pricing"); *In re Optical Disk Drive Antitrust Litig.* ("*ODD*"), 303 F.R.D. 311, 325 (N.D. Cal. 2014) (same where expert did not address "the common practice in the industry of selling products costing in the hundreds of dollars at prices just under the next $100 mark"); *Apple iPhone*, 2022 WL 1284104, at *8 (same in part because "focal pricing" showed that expert's model did not reliably "determin[e] but-for pricing").

Plaintiffs claim to "have established a record demonstrating that focal-point pricing is not integral to developers' pricing in a but-for world" and "is unnecessary to include in a pricing model." Mot. at 23 n.16 (citing Shah Decl., Ex. I (Expert Reply Report of Dr. Hal Singer ("Singer Reply")) ¶¶ 26–30). But Dr. Singer admitted the opposite—that "focal point pricing is an important consideration here," Singer Dep. at 202:2–7, and the portion of Dr. Singer's Reply Report cited by Plaintiffs only underscores the need for an app-by-app inquiry. There, Dr. Singer speculates that developers "*could*" end their prices in "9" rather than "99", and hypothesizes how departing from focal point pricing *could* be profitable under certain assumptions. Singer Reply ¶¶ 29–30 (emphasis added). But, yet again, determining whether any developer *would* do so in the but-for world requires data about each app.[7]

**Competitive conditions.** A developer's price also may depend on the competition it faces, which varies from app to app. Burtis ¶ 155–60. Dr. Singer agrees that "competition among developers makes their pricing interdependent" and that "the prices that developers charge in the but-for world could depend on what their competitors charge." Singer Reply ¶ 118; Singer Dep. at 167:3–6; *see also* Scalise Dep. at 212:9–19 (Rescue Pets CEO testifying he considered prices of similar apps when setting prices for Rescue Pets to ensure its prices "aren't out of the realm of reasonability and they are not too low either"). Yet Plaintiffs have no common method to account for how the varied competition faced by hundreds of thousands of different apps affects how developers set prices for those apps. Given Dr. Singer's admitted failure to "put forth a model . . . to determine which apps in each category are complements and which are substitutes," Singer Dep. 159:15–25, Dr. Singer's method cannot account for variations in

---

[7] Google required developers to charge at least $.99, Mot. at 22, but that restriction applies to 17% of U.S. consumer transactions, not the 80% of other transactions that also ended in "99."

1   averages to calculate a "headline" rate for Google, and claims that Google's individual

2   negotiations would mechanically occur off of that rate.  Singer ¶¶ 258–59; Mot. at 11, 21.  Courts

3   have rejected that approach as an improper attempt to mask individualized issues.  *See Flash*

4   *Memory*, 2010 WL 2332081, at *12 (predominance not satisfied where expert's model failed to

5   take into account "individual variations" and looked only "at an average price trend").[12]

6   **C.   Plaintiffs' Play Points Model Is Not Common Proof Of Impact.**

7   In one paragraph, Plaintiffs posit an alternative theory of impact: consumers allegedly

8   were injured not because they paid too much but because Google paid them too little.  Without

9   the challenged conduct, Plaintiffs say, more competition would have led Google to "increase[e]

10   its Google Play Points loyalty program."  Mot. at 13.  Plaintiffs still have no common method of

11   "identify[ing] uninjured class members" because they cannot show which apps and consumers

12   would have joined the Play Points program in the but-for world.  *Olean*, 31 F.3d at 669 n.13.

13   ▮▮▮▮▮▮▮▮▮▮ of U.S. consumers enrolled in Play Points and ▮▮▮▮ redeemed

14   Play Points.  Burtis Rep. ¶ 358; Singer Reply ¶ 98; Singer Dep. at 288:11–16, 289:17–23.  The

15   millions of consumers who did not enroll were not injured by any reduced Play Points offerings

16   unless, in the but-for world, they would have signed up and redeemed Points.  Plaintiffs have no

17   method short of mini-trials to prove which consumers would have done so.  Importantly, Dr.

18   Singer has not "identified any model to determine which users would have signed up for [P]lay

19   [P]oints in the but-for world," Singer Dep. at 295:5–20, or that can determine which of the

20   putative class members "would have signed up for [P]lay [P]oints and who would have used

21   them."  *Id.* at 297:8–21; *see id.* at 296:6–19.  When asked whether "every member of the putative

22   class would have signed up for the [P]lay [P]oints program and used [P]lay [P]oints," Dr. Singer

23   said that was a "fair assumption."  *Id.* at 298:22–299:10.  But assumptions are not common proof.

24   Dr. Singer claims that if Google had offered Play Points equivalent on average to about

25

26   ---
    [12] Plaintiffs argue that courts have accepted experts' reliance on averages, Mot. at 23, but the

27   experts in the cases they cite applied a regression model to actual data to model impact on
    consumer prices.  *See D&M Farms v. Birdsong Corp.*, 2020 WL 7074140, at *8 (E.D. Va. 2020);
    *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 613 (N.D. Cal.

28   2009).  It is one thing to use a regression to show an average effect on prices as experts in these
    cases did.  It is another to assume an average effect as Dr. Singer does in this case.

1    eight percent of a consumer's transaction, then all members of the class would have signed up for

2    them.  *Id.* at 296:6–19, 297:8–21.  This just assumes away the need to determine the amount of

3    Play Points each consumer would have earned, and whether that amount would have motivated

4    them to sign up.  Different consumers might value the same amount of Play Points differently—

5    just as, according to Dr. Singer, "[a] $10 gift card for Chick-Fil-A" or "a jar of change

6    accumulating in the closet might be worth more to some consumers than others."  Singer Reply at

7    ¶ 99.  Over 3.1 million class members (15%) spent less than $5 on Play.  Burtis Decl., Ex. C

8    (Burtis Rev. Ex. 23).  Dr. Singer has not even tried to show that points equal to 8.7% of that

9    consumer spend—less than ███—would have been sufficient to motivate *all* of these millions

10   of consumers to sign up for Play Points when only a fraction did so in the real world.[13]

11          **D.      Many Class Members May Be Worse Off In Plaintiffs' But-For World.**

12          A class also cannot be certified where many members of the putative class benefited from

13   the challenged conduct such that plaintiffs' but-for world would have created "winners and

14   losers."  If a plaintiff cannot "account[] or control[] for the benefits that many class members

15   receive from the exclusionary conduct on a class-wide basis," then "the Court cannot conclude

16   that Plaintiffs have shown that common evidence is available to show class-wide impact."  *Allied*

17   *Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 169 (C.D. Cal. 2007).

18          Consumers have access to millions of apps that are completely free and can enjoy

19   "freemium" apps without any upfront payment (or any payment at all).  They pay nothing to

20   download, for example, Facebook, Uber, Airbnb, banking apps, or government agency apps.

21   Rather than charge for these apps, and many other free apps, Google primarily supports Play with

22   service fees on IAP and subscriptions, which account for 99% of Play's fees for the valuable

23   services that Play provides.  Burtis ¶ 57.  According to Plaintiffs, however, in the but-for world,

24   developers would pay none of this revenue because they would use their own billing systems.  *Id.*

25   ¶ 269; Singer Dep. at 309:4–310:7.  In other words, Plaintiffs' but-for world would put nearly all

26   of Google's revenue from Play "at risk."  Shah Decl., Ex. F ("Burtis Dep.") at 307:6–17.

27

28   _____
     [13] The 8.7% figure is also irrelevant because it reflects an estimate that Dr. Singer derived using
     "the sum of all promotions," not just Play Points.  Singer ¶ 253.

# REDACTED VERSION

# Exhibit A5
# to
# C. Cramer Declaration

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br><br>*In re Google Play Consumer Antitrust Litigation*, Case No. 3:20-cv-05761-JD<br><br>*In re Google Play Developer Antitrust Litigation*, Case No. 3:20-cv-05792-JD | Case No. 3:21-md-02981-JD |

EXPERT REPORT OF DR. MICHELLE M. BURTIS

March 31, 2022

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

TABLE OF CONTENTS

I.     Introduction and Assignment .................................................................................... 7

II.    Summary of Opinions ............................................................................................... 8

   A.  Developer Plaintiffs' and Consumer Plaintiffs' Claims of Classwide Antitrust Impact Depend on Showing the Service Fee Rates for All Developers and Apps Would be Lower in the But-For World ............................................................................................................... 9

   B.  Developer Plaintiffs' Claims Conflict with Consumer Plaintiffs' Claims of Antitrust Impact on Retail App, Subscription, and IAP Prices ............................................... 11

   C.  Developer Plaintiffs' Focus on Claimed Overcharges Ignores Critical Factors That Must Be Analyzed to Determine Antitrust Impact ................................................................ 13

   D.  Additional Reasons Consumer Plaintiffs Cannot Show Common Proof of Classwide Antitrust Impact .................................................................................................................... 14

III.   Assumptions Used to Consider Developer Plaintiffs' and Consumer Plaintiffs' Claims of Common Impact ........................................................................................................................ 14

IV.   The Proposed Classes and Products Involved Are Highly Differentiated ........................ 16

   A.  Apps and IAPs ..................................................................................................... 16

      1.  Apps are numerous and highly differentiated ................................................. 16

      2.  Google Play ..................................................................................................... 20

   B.  The Proposed Classes .......................................................................................... 24

      1.  The Proposed Developer Class Definition Includes Over 49,000 Diverse Developers . 24

      2.  The Proposed Consumer Class Definition Includes Over 90 Million Distinct Consumer IDs  33

V.    Economic Framework for Analyzing Common Proof of Classwide Impact .................... 36

   A.  Antitrust Impact Relative to A But-for World ..................................................... 36

   B.  Common Proof of Classwide Antitrust Impact and Damages ............................. 36

   C.  Plaintiffs' Theories of Antitrust Impact Depend on Proof of Service Fee Rates and Prices in a But-For World ............................................................................................................... 37

VI.   Neither Set of Plaintiffs Can Establish Classwide Antitrust Impact with Common Proof 39

   A.  No Common Proof of Uniform Lower Service Fees in the But-for World ....................... 39

      1.  No Basis for Assuming a Uniform But-For Service Fee or a Uniform Service Fee Reduction ........................................................................................................................ 40

      2.  Not All Developers Would Pay Less If Developers Could Separately Contract with Payment Processors .......................................................................................................... 46

   B.  No Common Proof of Lower Prices for Apps, Subscriptions, and IAPs in the But-For World ................................................................................................................................... 50

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1.    Developers' Marginal Costs ......................................................................... 51

2.    Developers' Strategy of Setting Prices ....................................................... 53

   i.   Prices that end in "99" ......................................................................... 53

   ii.   Developers' Other Price Setting Strategies ......................................... 55

3.    Competitive Conditions Across Apps ........................................................ 56

C.   Economic Reasons Some Members of the Putative Consumer Class Would Not Be Better Off in the But-For World ..................................................................................... 58

   1.   Some Consumers Would Not Have Lower Retail Prices for Apps, Subscriptions, and IAPs in a But-For World ............................................................................... 59

   2.   Some Consumers Who Transact at Low Price Points Would Not Be Better Off in the But-For World ................................................................................................. 64

   3.   Consumers Who Use Direct Carrier Billing Likely Would Not Be Better Off in the But-For World ..................................................................................................... 65

   4.   Increased Prices For Free Apps Would Make Some Consumers Worse Off in the But-For World ................................................................................................. 66

   5.   Higher Security Costs For Some Consumers in the But-For World ............................. 67

D.   Different Members of the Putative Developer Class Likely Would Be Better Off Or Worse Off in a But-For World Depending on How Google Play Changes its Monetization Strategy ....................................................................................................................... 69

   1.   Fee Per Download ...................................................................................... 70

   2.   App or Developer "Listing Fees" ............................................................. 71

   3.   "Tiered" Rate Structures Imply Not All Service Fee Rates Would Have Been Lower in the But-For World ................................................................................................... 73

   4.   Lower Service Fee Rates Accompanied by Increases in Google Play "Ad-Load" ........ 75

E.   Additional Economic Reasons Some Members of the Putative Developer Class Would Not Be Better Off in the But-For World ......................................................................... 76

   1.   Some Developers Would Have Incurred Higher App Distribution Costs in the But-For World ............................................................................................................... 76

   2.   Some Developers Likely Would Have Obtained Fewer App Distribution Services in the But-For World ........................................................................................................ 79

VII.   Developer Plaintiffs' Experts Have No Basis For Their Claim that All Developers Would Have Been Subject To A Lower Service Fee Rate In The But-For World .................................. 81

A.   Developer Plaintiffs' Experts Concede that Certain Developers were Not Impacted Because They Were Able To Obtain the Alleged "Competitive" Service Fee rate .................. 82

B.   Developer Plaintiffs' Expert's Opinions Regarding Common Impact Are Not Supported By Economic Theory or the Evidence ......................................................................... 83

3

1.   Dr. Sibley's Claim that Competition Would Have Been More Robust for All Developers Ignore Facts of the Case ................................................................................. 83

2.   Dr. Sibley's Claim that All Developers in the But-For World Have a Better "Best Option" Is Without Basis ................................................................................. 85

3.   Dr. Sibley's Claim Regarding Competition in PC App Stores Contradicts His Conclusion of Classwide Impact ................................................................................. 86

4.   Dr. Sibley's Claim that Google Documents Support the Conclusion that All Developers Would Have a Lower Service Fee Is Not Accurate ...................................................... 88

5.   Dr. Sibley's Claim that Google Would Not "Price Discriminate" and Set Different Service Fee Rates for Different Developers Is Inaccurate .................................. 88

C.   Developer Plaintiffs' Expert's Opinion Related to Lost Profits Is Flawed Because It Ignores Many Individualized Factors ................................................................... 90

VIII.   Consumer Plaintiffs' Expert's Claims of Impact are Based on Flawed Economic Reasoning and Do Not Consider Actual App, SubscripTion, and IAP Pricing ........................... 95

D.   Consumer Plaintiffs' Expert's Opinion Regarding Pass-Through Is Flawed and Inaccurate 96

1.   Dr. Singer's Pass-Through Methodology is Based on an Overly Simplistic Formula That Produces Inaccurate Results ............................................................................. 97

2.   Pricing Data Show that Dr. Singer's Predicted Pass-Through Rates Are Wrong .......... 99

3.   Dr. Singer's Pass-Through Method and Formula Are Not Consistent with Economics 104

4.   The Basis For Dr. Singer's Pass-Through Formula is Fundamentally Flawed ............ 107

5.   Dr. Singer's Predicted Pass-Through Rates Are Based on Assumptions that Are Not Reliable ............................................................................................................... 110

6.   Given the Circumstances of this Case, Economics and Empirical Data Consistently Show that Determining Pass-Through Rates Requires an Individualized Analysis ............ 112

E.   Consumer Plaintiffs' Expert's Claim that All Service Fees Would Have Been Lower Only Assumes Classwide Impact ..................................................................................... 115

1.   Dr. Singer's Calculated But-For Rates Assume Classwide Impact ............................ 117

2.   Dr. Singer's Calculations Rely on Inputs That Are Either Averages or Unsubstantiated Estimates Assumed to Apply to All Developers ............................................................... 118

3.   Dr. Singer's Models Find Any Change in Competition Leads to Lower Rates for All Developers ........................................................................................................... 120

4.   Dr. Singer's Profit-Maximization Models Do Not Consider That Google Can Utilize Alternative Monetization Strategies ................................................................... 121

IX.   Plaintiffs' Experts' Opinions Regarding Google Play Points Do Not Show Classwide Impact ................................................................................................................... 121

4

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

F.    Google Play Points Program ........................................................................ 121

G.    Plaintiffs' Experts' Claims Related to Play Points Do Not Show Classwide Impact ...... 122

X.    Conclusion ................................................................................................ 124

**List of Tables**

Table 1.    Number of Putative Developer Class Members by App Monetization Type, August 2016 - December 2021 ................................................................................................ 29

Table 2.    Number of Apps from which U.S. Consumers Purchase during August 2016 – July 3, 2021       34

Table 3.    Distribution of Dollars Spent Across U.S. Consumers during August 2016 – July 3, 2021       35

Table 4.    Fees for Payment Processing Service Providers, 2021 ............................... 47

Table 5.    Summary of Pass-Through Rates Found by Dr. Burtis ............................... 64

Table 6.    Counts of U.S. Consumers in the Putative Class, By Maximum Price Point of Transactions ........................................................................................................ 65

Table 7.    Putative Developer Class Members' Apps with Lifespan of 12 Months or Less ....... 74

Table 8.    Comparison of Dr. Singer's "Implied Pass-Through Rates" and His Predicted Pass-Through Rates ................................................................................................ 104

Table 9.    Share of Developers Abandoning the "99" Pricing Strategy in But-For World, August 2016 – December 2020 ................................................................................. 111

**List of Figures**

Figure 1.    Percentage of Putative Developer Class Members Offering Different Numbers of Paid Apps, Subscription Apps, or IAP Apps, August 2016 – December 2021 ......................... 27

Figure 2.    Top 30 Putative Developer Class Parents Accounting for 75% of Consumer Spend, 2021       28

Figure 3.    Monthly Consumer Spend in Google Play for Washington Post App ....................... 44

Figure 4.    Share of Putative Developer Class Members by Service Fee Rate Category Among Developers with Google Play Sales in Each Year from 2017-2021 ............................................ 45

Figure 5.    Effective Payment Processing Rates of Alternative Processors at Low Price Points  48

Figure 6.    Percentage of Putative Developer Class Members Offering Apps, Subscriptions, and IAPs at Low Price Points, August 2016 – July 3, 2021 ................................................ 49

Figure 7.    Prices that End in "99" as a Percentage of U.S. Consumer Transactions ................. 54

Figure 8.    Percent Reductions from Price Point to Price Point ................................................ 55

Figure 9.    Putative Developer Class Members with Annual Service Fees of less than $99 during August 2016 – December 2021 ................................................................................ 73

Figure 10.    Megafauna's Brain Yoga App Subscription Price and Service Fee Rate Contradicts Dr. Singer's Results of Nearly Complete Pass-Through .......................................... 98

Figure 11.    Scribd Inc.'s Monthly Subscription Price and Service Fee Rate Contradicts Dr. Singer's Results of Nearly Complete Pass-Through ................................................ 100

5

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Figure 12.    BaseKamp's Monthly Subscription Price and Service Fee Rate Contradicts Dr.
Singer's Results of Nearly Complete Pass-Through ................................................................. 101
Figure 13.    Summary of Pass-Through Rates Found by Dr. Williams, Dr. Singer, and Dr.
Burtis – Share of Positive Pass-Through Rates ....................................................................... 103
Figure 14.    Pass-Through Rates for Three Developers, Based on Dr. Singer's Calculations,
August 2016 – December 2020................................................................................................. 112
Figure 15.    Shares of Positive Pass-Through Rates Found by Dr. Singer and Dr. Williams Are
Nearly Opposite of Each Other ............................................................................................... 113

6

ER-249

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## I.   INTRODUCTION AND ASSIGNMENT

1.  I am a Senior Consultant at Charles River Associates, an economic and finance consulting firm with offices in the United States as well as internationally. I have a Ph.D. in Economics from the University of Texas at Austin and have published in the field of economics.

2.  In my work, I have studied and analyzed various forms of business conduct and how that conduct may affect the performance of markets and individual firms. I have analyzed such business conduct in antitrust cases, in other forms of commercial litigation, and in government regulatory proceedings. My analyses have included instances of conduct related to conspiracies, such as price fixing and bid-rigging, tying, monopolization, and monopsonization. I have also analyzed issues related to whether certain antitrust allegations, such as price-fixing and tying, can be addressed with common evidence or must be addressed through individualized inquiry and have published articles related to those issues. I have submitted testimony in the courts and in private arbitrations. I have taught undergraduate microeconomics at the University of Texas and graduate economics at George Mason University. A copy of my curriculum vitae, including a list of matters in which I have testified as an expert in the past five years, is included as Appendix A. My normal and customary billing rate is $900 per hour. My compensation is not contingent or based on the content of my opinions or the outcome of this matter.

3.  I have been asked by counsel for the Defendants Google LLC, Google Ireland Ltd., Google Commerce Ltd., Google Asia Pacific Pte. Ltd and Google Payment Corp. (collectively, "Google") to review and respond to the opinions offered in the expert reports of Dr. David S. Sibley,[1] Dr. Michael A. Williams,[2] and Dr. Hal Singer,[3] in which they assert that Plaintiffs can determine the fact of antitrust injury and measure alleged damages using common evidence and common methodology for all proposed class members, as well as to address economic considerations regarding whether doing so is possible.

4.  To prepare this report I have relied on the materials and sources listed in the Appendix B.

5.  The remainder of this report is organized as follows. Section II includes a summary of my opinions regarding Developer Plaintiffs' and Consumer Plaintiffs' claims of class wide impact. Section III summarizes assumptions. Section IV provides background information about the products at issue (e.g., apps, subscriptions, and IAPs), Google Play, and proposed class members. Section V describes the economic framework I used to analyze Plaintiffs' claims of classwide antitrust impact. Section VI describes the economic reasons and evidence contradicting Consumer Plaintiffs' and Developer Plaintiffs' claims of classwide impact. Section VII discusses the Developer Plaintiffs' experts' opinions and analyses and describes why they fail to prove classwide impact using common evidence. Section VIII discusses the Consumer Plaintiffs' expert's opinions and analyses and describes why they fail

---

[1]   Expert Report of Dr. David. S. Sibley, February 28, 2022, *In Re Google Play Developer Antitrust Litigation*, Case No. 3:20-cv-05792-JD ("Sibley Report").

[2]   Expert Report of Dr. Michael A. Williams, February 28, 2022, *In Re Google Play Developer Antitrust Litigation*, Case No. 3:20-cv-05792-JD ("Williams Report").

[3]   Expert Report of Dr. Hal J. Singer, February 28, 2022, *In Re Google Play Consumer Antitrust Litigation*, Case No. 3:20-cv-05761-JD and Case No. 3:21-md-02981-JD ("Singer Report").

7

to prove classwide impact using common evidence.  Section IX discusses Plaintiffs' experts' opinions regarding Google Play Points.  Section X concludes.

## II.   SUMMARY OF OPINIONS

6.  Two proposed classes – a proposed developer class and a proposed consumer class –allege that they were impacted by Google Play's alleged anticompetitive conduct in certain alleged relevant antitrust markets.

7.  The primary issue addressed in this report is whether all members of each of the two proposed classes were negatively impacted by Google's alleged conduct ("classwide impact") and whether classwide impact can be proven with common evidence.  For the reasons explained below, classwide impact cannot be established using predominantly common evidence for either the proposed class of developers or the proposed class of consumers.

8.  Developer Plaintiffs claim to represent a class of U.S. Developers that paid a service fee of greater than 15% on the sale of apps, subscriptions, or in-app products ("IAPs")  in the Google Play store ("Google Play").[4]  Developer Plaintiffs claim that absent the alleged conduct, Google Play's service fees would have been lower and that developer class members' injury is equal to the difference between the service fees they paid in the actual world and the allegedly lower service fees they would have paid in the "but-for" world.

9.  Consumer Plaintiffs claim to represent a class of consumers in the U.S. who made purchases of apps, subscriptions, and IAPs in Google Play.  Consumer Plaintiffs claim that the alleged anticompetitive conduct led to higher service fees and that those higher fees were largely passed through to them in higher prices for app, subscription, and IAPs.  Consumer Plaintiffs' experts alternatively assert that, in a world where Google faced more competition, Google would have provided consumers with more "loyalty points" in Google's Play Points program.

10.  As an initial matter, individualized analysis is needed to identify members of the putative developer class.  Developer Plaintiffs define a class of "U.S." developers (including additional criteria such having apps with payments, rather than free apps), but have not stated what constitutes a "U.S." developer in their proposed class definition.  Developer Plaintiffs' expert identifies members of the proposed developer class using a "country-code" in a certain Google dataset.  But the country codes in that Google dataset are not always consistent with other Google datasets.  Moreover, the use of the country-code in the dataset indicates some developers are "U.S." developers when the developers appear to be foreign companies.[5]  Developer Plaintiffs have no way, without engaging in an individualized inquiry into the circumstances of each developer in the database, to identify which members of their proposed class are "U.S." developers.

---

[4]      Second Amended Consolidated Class Action Complaint for Violation of the Sherman and Clayton Acts (15 U.S.C. ¶¶ 1, 2, 3, 15, 26), Cartwright Act (Cal. Bus. & Prof. Code ¶¶ 16700 et seq.) and Unfair Competition Law (Cal. Bus. & Prof. Code ¶¶17200 et seq.), January 21, 2022 ("Developer Complaint") at ¶244.

[5]      See Appendix C for details.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

also requires individualized analysis.  Those assumptions do not hold for all developers but vary from developer to developer.

25. Developers' price-setting strategies are also highly relevant to the issue of pass-through. Many app developers set prices to end in "99" (e.g., $0.99, $1.99).  Even if such a developer sets prices to maximize short-term profits, it does so subject to the constraint that it will change a price only if the change from one price that ends in "99" is more profitable than another price that ends in "99."  This factor limits the extent to which developers will be inclined to reduce prices in the but-for world even if they obtain a lower service fee rate ("sticky prices").

26. The relevance of these economic factors to pass-through is confirmed by empirical evidence. The data produced by Google show that prices changed only for some of the apps, subscriptions, and IAPs that had a service fee rate change.  Indeed, many of these apps, subscription, and IAP prices never change throughout the period for which they appear in the transaction data.  That empirical evidence is consistent with the factors described above. Many apps are likely to have low (or close to zero) marginal costs and many developers' pricing strategies have an inherent stickiness.

27. Developer Plaintiffs' expert, Dr. Williams, analyzes some of the available Google data and similarly finds that few prices fall after a service fee rate change.  But Dr. Williams' conclusion based on that data – that "pass-through of lower service fees is minimal in this market" – is overly broad, and he does not consider any of the economic factors that inform whether prices would be lower with lower service fee rates.  Dr. Williams does not attempt to analyze the marginal costs of any app, the demand elasticity of any app, or the pricing strategy of any developer.

28. Consumer Plaintiffs' expert, Dr. Singer, adopts a different method for evaluating pass-through – one that generates demonstrably false results.  Dr. Singer does not consider whether actual service fee rate changes have led to price changes in the actual world. Instead, he calculates a pass-through rate based on a simplistic formula derived from a certain model of demand: one minus the developer's share of sales of an app category.  For example, if Dr. Singer identified a developer that offered an app in Google Play's Games category and calculated its share of Game sales as 1%, Dr. Singer would conclude that the pass-through rate for that game was 99% (i.e., (1- 0.01 = 0.99) or 99%).  This calculation does not include service fees or prices for this app.  Whether service fees fell for this app and led to lower prices – or did not – is not part of Dr. Singer's calculation.  In this way, Dr. Singer finds about 95% of his pass-through rates are close to 100%; that is, nearly complete pass-through.  Indeed, Dr. Singer's "method" would find pass-through for every developer unless that developer had a 100% share in its app category.  Given that Dr. Singer used very broad app categories, with thousands of apps in many categories, where a single app does not have a 100% share, his method *guarantees* nearly universal positive pass-through rather than proves that it would occur for all apps.

29. Dr. Singer's method produces results that are verifiably wrong.  Dr. Singer's method "finds" nearly complete pass-through for apps, subscriptions, and IAPs that had a service fee rate change in the actual world but whose prices did not change *at all*.  Dr. Singer could have calculated pass-through rates from the actual data to determine whether his formula-based method produced reliable results to be used for a but-for world, but he did not.

12

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

54. Free apps – that is, apps that are free to download and include no subscriptions or IAPs – account for about ███ of the apps in Google Play as of May 2021.[23]  Some developers may be able to reach more users when they distribute apps as free to download, but then monetize such freely distributed apps by converting some of the users into paid users through the sale of IAPs or subscriptions.[24]  Other free apps monetize through advertising or through the sale of physical products.

55. Each developer may choose whether to offer its app as a free download with no advertisements (e.g., banking apps, government apps), as a free download with paid advertising (e.g., Facebook), as a paid download (e.g., Minecraft), or as a subscription-based app (e.g., the New York Times app) or as an app with IAPs (e.g., Candy Crush).[25]

56. Currently, most of the money consumers spend (on digital content) in mobile apps ("consumer spend") is in the form of subscriptions and IAPs.[26]  Subscriptions and IAPs provide consumers with recurring access to content, extra digital content and features (e.g., premium content, digital goods, digital currency) or the ability to proceed faster through a game.[27]

57. During the class period, August 2016 – December 2021, out of all apps with sales to U.S. consumers on Google Play, ███ offer subscriptions or IAPs.  Those apps account for ███ of all U.S. consumers' spend on Google Play.[28]  Similarly among the putative developer class,[29] subscriptions and IAPs account for ███ of consumer spend on Google Play during the class

---

[23]   Exhibit 1.

[24]   ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████

[25]   See BARD Mobile app, https://play.google.com/store/apps/details?id=gov.loc.nls.dtb, accessed March 25, 2022; Bank of America app, https://play.google.com/store/apps/details?id=com.infonow.bofa, accessed March 25, 2022; Facebook app, https://play.google.com/store/apps/details?id=com.facebook.katana, accessed March 21, 2022; Minecraft app, https://play.google.com/store/apps/details?id=com.mojang.minecraftpe, accessed March 9, 2022; New York Times app, https://play.google.com/store/apps/details?id=com.nytimes.android, accessed March 21, 2022; Candy Crush app, https://play.google.com/store/apps/details?id=com.king.candycrushsaga, accessed March 9, 2022.

[26]   Exhibit 4.

[27]   See https://developer.amazon.com/docs/in-app-purchasing/iap-overview.html#what-is-in-app-purchasing-iap, accessed March 22, 2022.

[28]   Exhibit 4.

[29]   The Developer Plaintiffs define their proposed class as "U.S. developers," without describing how such developers can be identified.  The problems associated with the class definition are discussed in Appendix C.  For the purposes of this report, "putative developer class members" are identified based on Google's App-level spend data for Developers, GOOG-PLAY-005535885 and GOOG-PLAY-010801689.

18

ER-253

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

period.[30]  Examples of subscriptions include access to digital content in apps such as Disney+ or the *New York Times*.  Examples of IAPs include digital currency like "VBucks" in the Fortnite game app or "Robux" in the Roblox game app,[31] and points that allow the player to increase the chance of success of winning the game such as "COD Points" in the Call of Duty mobile game app.[32]

58.  Developers set prices of apps, subscriptions and IAPs.  On Google Play, prices set by developers selling to U.S. consumers varied from $0.01 to $1,341.90 between August 2016 and July 2021.[33]  Developers (and, at times, Google) offer consumers price discounts, which range from less than 1% to 100%[34] and tend to be of relatively short frequency.  During the class period, 60% of promotions applied to prices for one month or less.[35]

---

[30]  Exhibit 4.

[31]  Fortnite's VBucks can be purchased on multiple platforms and can be purchased on one platform, such as Android, and spent on another platform, such as Microsoft's Xbox – a gaming console platform. See https://www.epicgames.com/fortnite/en-US/vbuckscard, accessed March 21, 2022.  The Roblox app is a game creation system, or game platform, as well as a social platform.  Users purchase Robux and spend Robux to enhance their avatar identities or in-game play.  Roblox developers earn Robux through their games, where the exchange rate is 100 Robux for 35 cents.  See Roblox Corp. Form 10-Q, September 30, 2021, at pp. 10, 12-13, https://d18rn0p25nwr6d.cloudfront.net/CIK-0001315098/ad69fbb0-a7b7-465b-942f-53206ff42303.pdf (see sections on "Description of Business," "Roblox Platform," and "Principal Agent Considerations"); "Developer Economics," Roblox, https://developer.roblox.com/en-us/articles/developer-economics (explaining to Roblox developers that "Roblox currently uses an exchange rate of ~.0035 USD per Robux earned to calculate the amount of real currency you receive.").

[32]  Call of Duty is a multiplayer "shooter game," categorized as an "Action" game app in Google Play.  IAPs can be used to obtain "COD Points," the game's digital currency, and for "battle passes" that reward the player as they move up through more difficult levels of the game.  COD Points are exchanged for weapons and other game features.  IAP prices in Call of Duty range from $0.99 to $99.99.  See https://play.google.com/store/apps/details?id=com.activision.callofduty.shooter, accessed March 21, 2022 (showing Call of Duty's IAP price range on mobile and "Action" category on Google Play); https://activision.helpshift.com/a/cod-mobile/?p=all&s=cod-points-credits-and-battle-pass&f=what-is-battle-pass&l=en; https://activision.helpshift.com/a/cod-mobile/?p=all&s=cod-points-credits-and-battle-pass&f=what-are-cod-points&l=en.

[33]  See this report's production, which shows prices in Google's U.S. consumer transaction data; Google Transactions Data, GOOG-PLAY-007203251. See also https://support.google.com/googleplay/android-developer/answer/10532353, accessed January 5, 2022 (stating a price range of $0.99 to $400.00 for the United States). https://support.google.com/googleplay/android-developer/answer/10532353, accessed March 14, 2022 (stating a price range of $0.05 to $400.00 for the United States).

[34]  Exhibit 5.

[35]  Exhibit 6.  Dr. Singer finds that promotions are small. See, e.g., Singer Table 3 (calculating an App Product Price of $3.99 and App Product Price Net of Promotions of $3.97) and Singer Report Appendix 4.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## 2.  Google Play

59. Google Play is a two-sided platform on which developers can offer Android OS apps to consumers, and consumers can find apps offered by those developers that choose to make their apps available on Google Play.[36]  Google Play was introduced in 2008 as Android Market and rebranded as Google Play in 2012.[37]  As a two-sided transactional platform, Google Play provides benefits to, and facilitates interactions between, consumers and developers.[38]

60. Google Play offers services to developers regardless of whether the developer uses other app stores or platforms, and regardless of whether the developer has apps that generate consumer spend or the amount of consumer spend.[39]  For instance, Google Play's discovery services, which help developers find an audience for their apps, are available to all developers, regardless of whether and how they choose to monetize their apps.[40]  Developers of free apps and monetized apps also can rely on various other Google tools for developing, testing, marketing, and updating apps.[41]

---

[36]      See https://play.google.com/about/howplayworks/.

[37]      See https://www.androidauthority.com/android-market-google-play-history-754989/.

[38]      See https://play.google.com/about/howplayworks/.

[39]      Requirements to become a Google Play Developer are modest; developers are required to pay a one-time $25 fee, obtain a Google email account, and adhere to the Developer Distribution Agreement ("DDA"). https://play.google.com/developer-distribution-agreement.html.

[40]      In general, developers obtain discovery through app stores, such as Google Play, or by purchasing advertising.  Google Play services are especially important to developers that do not have a recognized reputation or brand and that do not have the resources necessary to invest in advertising and marketing themselves to promote their apps.  There are several "discovery" features in Google Play including "Top Charts," "Recommended for You," "New Apps We Love," "Recently Updated," "Popular Apps and Games," "Editors' Choice," and "Trending."  On a page for an individual app, Google Play highlights "similar" or related apps, as well as other apps published by the same developer.  Consumers can pre-register for some apps prior to their launch and receive notification when it is available. (Android, "Pre-registration," available at https://developer.android.com/distribute/best-practices/launch/pre-registration, accessed January 17, 2021.  Google Play Instant and the Try Now feature allows consumers to try an app without having to install or pay for it. (Android, "Google Play Store," available at https://developer.android.com/distribute/google-play, accessed January 17, 2021.

[41]      For example, tools developers use prior to the release of the app to test the app by a small group of trusted users or by a larger group, to reduce the size of the app to save storage space on a consumer device and reduce latency that may lead to lower spend on an app, and to access and incorporate app bundles that contain the elements an app needs to install correctly on mobile devices.  See https://play.google.com/console/about/closed-testing/; https://play.google.com/console/about/internal-testing/;  https://play.google.com/console/about/opentesting/;  https://play.google.com/console/about/app-bundle-explorer/;  https://play.google.com/console/about/internalappsharing/.  Google offers many other publishing tools and services to developers through Google Play.  One of the services provided by Google Play is processing payments if a developer offers a paid app or IAPs in Google Play.  See Appendix D for a description of other tools and features provided by Google Play to developers.

20

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

61. Consumer Plaintiffs' and Developer Plaintiffs' experts opine that Google Play is a two-sided platform that exhibits indirect network effects.[42]  Indirect network effects exist where the value of the two-sided platform to users on each side of the platform increases when the number of users on the other side of the platform grows.[43]  For purposes of this report, I assume that Plaintiffs' experts are correct with respect to their opinions about Google Play as a two-sided transaction platform that exhibits indirect network effects.  I note that Plaintiffs' experts do not properly account for the dynamics of two-sided platforms that they identify, including positive feedback effects that flow from one side to the other, dynamically in and over time.  They do not simultaneously analyze the effect of any response by Google with respect to developers and any response by Google with respect to consumers.  Instead, in attempting to analyze the effects of Google's response with respect to one side of Google Play, they hold constant any response from the other side.

62. Google charges for the services Google Play provides through a service fee.  Google collects a service fee on each transaction for a paid app download, subscription purchase, or IAP purchase from an app distributed on Google Play.  Google Play's service fee is assessed as a percentage of the transaction amount.  Google does not collect a service fee from apps that do not offer paid downloads, subscriptions, or IAPs.  Google also does not collect a service fee from subscriptions or other purchases made outside of the app, such as through the developer's website, even if the digital content made available by the purchase is consumed within an app distributed through Google Play.  In Google Play's App Catalog 87% of global developers offered only free apps – that is, apps that require no payment to download and do not include any type of subscriptions or IAPs – as of May 2021.[44]  There are no Google Play service fees associated with those developers' apps.

63. During the class period, Google Play service fee rates varied across developers and have changed over time.

64. For example, Google's Living Room Accelerator Program ("LRAP") was introduced in 2016 for developers of subscription video apps – such as ███████████ and ██████.[45]  The LRAP program apps have had a service fee rate of 15% since they began participating in the program.  In 2021, Google introduced the Transactional Video Accelerator Program ("TVAP"), which expanded LRAP to on-demand television apps and has a service fee rate of 15%.  The Books and Comics Accelerator Program ("BCAP"), which was also introduced in 2021, offers a 15% service fee rate to developers with books and comics apps.[46]

---

[42]     Singer Report at ¶19; Sibley Report at ¶¶32 – 33; Williams Report at ¶95.

[43]     Evans, David S., "The Antitrust Economics of Multi-Sided Platform Markets," *Yale Journal of Regulation*, Vol. 20, 2003, pp. 325-381 at 332; Singer Report at ¶19; Sibley Report at ¶114.

[44]     Exhibit 7.

[45]     GOOG-PLAY-001291192. Exhibit 8 provides a list of the developers associated with five of these programs.  In 2020, Google proposed to expand the LRAP program to live TV app developers with its Living Room Accelerator Program++ ("LRAP++"). LRAP++ was designed for Live TV developers, such as ██████.  The service rate for developers through this program is ████. See GOOG-PLAY-000236162.

[46]     See GOOG-PLAY-006817773.R.

21

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

65. ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████[47]

66. The Subscribe with Google ("SwG") program reduced the service fee rate for news app developers to 15%.[48]  For example, the service fee rate for ████████████ app fell to 15% as part of the SwG program.[49]

67. The App Velocity Program ("AVP") is a program directed at certain app developers.  As part of the program, Google provides services that effectively reduce participating developers' service fee rate by as much as ████.[50]  For example, one developer Google analyzed for the program had consumer spend of ████████ on Google Play.  Google planned to provide marketing and promotions, ads credit, and cloud credits worth ████.  That would reduce the service fees associated with that developer's apps from ████████ (based on a 30% service fee rate) to ████████ – effectively reducing the service fee rate from 30% to ████.[51]

68. Project Hug/Games Velocity Program ("GVP") similarly provides expanded services to particular developers. These additional services, which can vary across developers, effectively reduced service fees.  By 2021, Project Hug included ██ particular developers, accounting for about ████ of Google Play consumer spend worldwide.[52]  ████████████ and ████ are among the developers that participated in Project Hug.[53]  From an economic perspective, the value of the services provided to Project Hug developers results in effective service fee rates that are lower than the "nominal" rates applied to those developers' transactions.[54]

69. The "Google Play Partner Program for Games" is another program directed to certain top game app developers for access to additional growth tools and services tailored to the

---

[47]    See this report's production.

[48]    GOOG-PLAY-000604733; GOOG-PLAY-003335786.R; GOOG-PLAY-003331764 at -767 (list of LRAP (Living Room Accelerator Program) video app members as of July 2020).

[49]    See Figure 3.

[50]    GOOG-PLAY-003333689

[51]    GOOG-PLAY-003333689

[52]    GOOG-PLAY-001291192; GOOG-PLAY-006998204R at 206.R (2021 deck showing that Hug apps accounted for ████ of Play spend); GOOG-PLAY-000236162.

[53]    See Exhibit 8 for a list of developers that participated in Project Hug.

[54]    See GOOG-PLAY-000237766 showing that services provided to the Project Hug developers varied across developers and that the value of the services accounted for millions of dollars.  For example, services described as "community development" were the primary type of services provided to ████████ ████, "user acquisition" services were the primary type provided to ████████; and "move to mobile" services were the primary type provided to ████████████.

22

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

developers' particular needs.[55]  Eligible developers, which would include about 800 developer accounts, are those with game apps that have at least $5 million in consumer spend per year.[56]  Services include a priority publishing queue, insights into device attributes across the Google Play device ecosystem, enhanced pre-launch tools, pre-enrollment of top eligible apps into Google Play Points, as well as other features that are important to and work well for game app developers.[57]  From an economic perspective, these enhanced and expanded services provided to this set of developers would effectively reduce their service fee rates.

70. Google offered other sets of developers services and features tailored to them.  Google offered "AAA developers" – developers with successful apps on PCs and consoles but new to mobile platforms – dedicated engineering and technical support for pre-launch and accelerated launches.[58]  Google offered marketing and business growth services to ▇ to "Core developers" with more than ▇▇▇ in monthly consumer spend and "strong revenue growth potential.[59]  And Google offered "Funded strategy developers" – developers with operations funded (by venture capital or other sources) and led by "top talent" – with support early in their product life cycles.[60]  These programs for particular developers reflect the diversity of app developers and the varying attractiveness they have to app stores.

71. Google also implemented service fee rate changes at various points in the class period.  In 2018, for instance, Google reduced the service fee rate for subscriptions to 15% beyond the first year of a subscription.  Effective January 1, 2022, the 15% rate applies to all subscriptions.[61]  And in 2021, Google announced that starting on July 1, 2021, for those

---

[55]     The program had been considered as early as 2019 and is currently scheduled to launch in 2022. Deposition of Kobi Glick, December 15 and 16, 2021 ("Glick Dep.") at pp. 310-311, 329-330, 338; GOOG-PLAY-000560397 ("There are two key catalysts for the recent developer Challenges. First, while 30% rev share is the industry standard across digital stores (Steam, PSN, Xbox Live, iOS etc.), new stores start offering lower rev share structures.")

[56]     Glick Dep. at p. 317.

[57]     https://play.google.com/console/about/partnerprogram/.  See also Glick Dep. at pp. 311-315.

[58]     GOOG-PLAY-000271389 ("Develop a global AAA strategy working group to surface, track, and share best practices across regions and xPAs + xFNs, Co-create playbook to accelerate PC-to-mobile launches, Dedicated NA Play Eng prelaunch / testing support; Need enhanced device coverage insights for new PC entrants, FTE in MTV to support prelaunch activations (e.g., exclusive access testing, closed alpha, closed beta, open / pre-reg, etc.").

[59]     GOOG-PLAY-000271389 ("Deliver YY scalable consultations for portfolio developers to help them grow beyond their key markets and demographics; Build a new developer onboarding process on Play with Dev Marketing, Product Specialist teams").

[60]     GOOG-PLAY-000271389.

[61]     See e.g., "[Update: Now in effect] Google raises subscription revenue for providers from 70% to 85%, but only for users retained after 12 months," Android Police, January 2, 2018, https://www.androidpolice.com/2018/01/02/google-raises-subscription-revenue-providers-70-85-users-retained-12-months/, accessed November 10, 2021; "Google Play is lowering its developer fees for app subscriptions," XDA Developers, October 21, 2021, https://www.xda-developers.com/google-play-is-lowering-its-developer-fees-for-app-subscriptions/, accessed March 25, 2022.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

developers that enroll in Google's program,[62] "the service fee Google Play receives when a developer sells digital goods or services" would change to "15% for the first $1 million (USD) of revenue every developer earns each year."[63]  Over 98% of putative developer class members earned $1 million or less over the class period; therefore, this change lowered the service fee rate to 15% for nearly all developers including all of the named Developer Plaintiffs, once they enrolled in the program.[64]

### B. THE PROPOSED CLASSES

72. In separate matters, two proposed classes – a proposed class of U.S. app developers ("Developer Plaintiffs") and a proposed class of U.S. app consumers ("Consumer Plaintiffs") – allege that certain Google policies and agreements violate federal and state antitrust laws. Both sets of Plaintiffs claim that (1) certain agreements between Google and mobile device original equipment manufacturers ("OEMs"), mobile network operators, and developers, (2) Android's security warnings to consumers and other alleged technical restrictions, and (3) Google's requirement that developers use Google Play Billing for IAPs and subscriptions in apps distributed through Google Play, enabled Google to obtain and maintain monopoly power within and cause competitive harm to alleged relevant markets.[65]  Consumer Plaintiffs claim that the alleged conduct caused competitive harm during the class period from August 16, 2016 to the present.[66]  Developer Plaintiffs' expert states that the relevant class period for those Plaintiffs is August 17, 2016 to the present.[67]

73. For purposes of my analysis, I assess whether it can be proved, with the same evidence for all members of each proposed class, that all or nearly all proposed class members were impacted by Google's allegedly anticompetitive conduct.  I also assess whether individual damages can be determined through common proof.

### 1. The Proposed Developer Class Definition Includes Over 49,000 Diverse Developers

74. The proposed developer class consists of at least 49,000 U.S. developers.  Developer Plaintiffs describe their proposed class as:

---

[62]     https://support.google.com/googleplay/android-developer/answer/10632485, accessed January 5, 2022.

[63]     "Boosting developer success on Google Play," Android Developers Blog, March 16, 2021, https://android-developers.googleblog.com/2021/03/boosting-dev-success.html.

[64]     Exhibit 9; see this report's production for the 2021 consumer spend of the named Developer Plaintiffs.

[65]     Developer Complaint at ¶¶8, 122; Consolidated Second Amended Class Action Complaint, December 3, 2021 ("Consumer Complaint") at ¶¶5-15.

[66]     Consumer Complaint at ¶213.

[67]     Sibley Report at fn. 1.

24

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

consumers made purchases of or from only one app and over two-thirds of U.S. consumers made purchases of or from three apps or less.  On the other side of the spectrum, over 89,000 U.S. consumers have made purchases from more than 100 apps.

94. As I describe below, whether a developer would be subject to a lower service fee and whether that developer would pass on such a lower service fee in the form of a lower price are both individual questions not subject to common proof.  For any putative consumer class member that is part of the 41% of U.S. consumers that made purchases of or from only one app,  if the developer of the app would not be subject to a lower service fee or would not lower the price of the app, subscription, or IAPs in the but-for world, that class member has not been impacted by Google's alleged conduct.  But the only way to make that determination is to examine the particular app for that individual.

| Table 2.  Number of Apps from which U.S. Consumers Purchase during August 2016 – July 3, 2021 | | | |
|---|---|---|---|
| **Number of Apps** | **Number of Consumers** | **Percent of Consumers** | **Cumulative Percent of Consumers** |
| Only 1 App | 37,690,509 | 41% | 41% |
| 2 Apps | 15,369,289 | 17% | 57% |
| 3 Apps | 8,932,225 | 10% | 67% |
| 4 Apps | 5,921,644 | 6% | 74% |
| 5 Apps | 4,240,558 | 5% | 78% |
| 6 Apps | 3,177,880 | 3% | 82% |
| 7 Apps | 2,468,276 | 3% | 84% |
| 8 Apps | 1,962,423 | 2% | 86% |
| 9 Apps | 1,594,409 | 2% | 88% |
| 10 Apps | 1,313,045 | 1% | 90% |
| >10 to 50 Apps | 9,101,126 | 10% | 99% |
| >50 to 100 Apps | 468,283 | 0.5% | 99.9% |
| More than 100 Apps | 89,601 | 0.1% | 100% |
| **Total** | **92,329,268** | **100%** | **100%** |

Source:

Exhibit 21.

95. In addition to using apps with paid downloads, subscriptions, or IAPs, members of the proposed consumer class also download apps that are free, including apps that include advertising.  The class representatives for Consumer Plaintiffs installed numerous free apps on their devices.  For example, ███████████ installed ██ free apps across ██ devices out of a total ██ installed apps, and ███████████ installed ██ free apps out of a total of ██ installed apps.[106]

96. The amount of consumer spend varies substantially across U.S. consumers.  Table 3 below shows that ███ of putative consumer class members spent less than $5 during the class

---

[106]   Exhibit 22 (The free app counts exclude pre-installed apps by carriers, OEMs, and Google).

the relative volumes of sales at the lower price points and the higher price points.  For example, in the actual world, a developer that sold 800 IAPs at $0.99 and 200 IAPs at $3.99 would have higher payment processing costs if PayPal processed the developer's payments as compared to Google Play.  The developer's payment processing costs would have been the total of its costs of processing the 800 transactions at the $0.99 price and the costs of processing the 200 transactions at the $3.99 price ($531.18) divided the developer's revenue from all of transactions ($1590) – or 33%.[147]  Therefore, for developers that sell apps, subscriptions, or IAPs at price points both below and above $1.99, determining antitrust impact would require an individualized analysis for each developer to determine if the developer would have been better or worse off in a but-for world.

### B. No Common Proof of Lower Prices for Apps, Subscriptions, and IAPs in the But-For World

138.    Whether any individual consumer or developer experienced antitrust impact depends on the prices of apps, subscriptions, and/or IAPs in the but-for world.

139.    For consumers, a service fee rate reduction must lead to price reductions to them, otherwise there is no antitrust impact. But even if all service fee rates were lower in the but-for world, it is not the case that all app, subscription, and IAP prices would have been lower. Differences in cost conditions for different apps, differences in the demand elasticities for different apps, and differences in app developers' pricing strategies indicate that many developers would not charge lower retail prices for apps, subscriptions, and IAPs in a but-for world with uniformly lower service fees.

140.    If a service fee rate reduction led to lower prices, one must assess the consequences of that lower price for the developer's profits to determine whether the developer experienced an antitrust impact.  A developer could reduce its prices in response to a service fee rate reduction or in response to a price reduction by a substitute app.  In either case, to determine impact, the effects of the lower retail prices on the developer's profits must be considered.

141.    A developer's decision to reduce retail prices when the service fee rate is lower depends on at least three factors: (i) the marginal costs of distributing the developer's apps, (ii) the developer's pricing strategy, and (iii) the developer's price elasticity of demand.  Because these factors vary by developer and by app, determining whether a retail price is lower in the but-for world necessarily requires individualized inquiry.[148]

---

[147]    PayPal's payment processing costs under this scenario would be about 33% of the developer's gross revenue. See Table 4 for PayPal's costs. Applying PayPal's base rate for online credit and debit card transactions, the developer's gross revenue is $1590.00 (= 800 * $0.99 + 200 * $3.99). The payment processing costs are $531.18 = (2.59%*$0.99 + $0.49) * 800 + (2.59% * $3.99 + $0.49) * 200, which is about 33% of gross revenues.

[148]    See Deposition of Adam Sussman, January 7, 2022, ("Sussman Dep.") at pp. 263-265 ███████



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

147.    Identifying which apps' marginal costs are positive (and not close to zero) requires information about each app; one cannot assume that all apps have zero marginal cost or that all apps have positive marginal cost.  Moreover, identifying the marginal costs associated with an app is not always straightforward.  Even developers that evaluate costs associated with their own businesses sometimes have difficulty in separating costs that are fixed from those that vary with output.[158]  Individualized information and analysis are required to determine whether even a developer that sets prices based on short-term profit-maximization would reduce prices given the claimed lower service fee rate.  This requires an app-by-app analysis to determine whether any individual developer or consumer suffered antitrust impact or injury.

### 2.   Developers' Strategy of Setting Prices

#### i.   *Prices that end in "99"*

148.    Another factor that explains why determining prices in the but-for world requires an app-by-app inquiry is that developers employ different pricing strategies, including the strategy of setting retail prices that end in "99."

149.    Many app, subscription, and IAP prices are set to end in "99," such as $0.99, $1.99, and $2.99.  These price points may influence consumers' perceptions of price and thus affect sales.[159]  Academic studies suggest that some consumers may pay less attention to the rightmost two digits of a price, so that a price of $0.99 is perceived to be significantly more attractive than $1, even though it is only one cent lower.[160]  As shown in Figure 7 over the period from August 2016 to July 3, 2021, 97% of U.S. consumers' retail app transactions were set such that the retail prices ended in "99."

---

[158]  ███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
██████████████████████████

[159]    See, for example, Stiving, Mark and Russell S. Winer, "An Empirical Analysis of Price Endings with Scanner Data," *Journal of Consumer Research*, Vol. 24, No. 1, 1997, pp. 57-67 at 57 ("Managers apparently set prices in a manner consistent with the premise that the last digit of a price has a significant impact on sales. Several surveys on what price endings managers actually use have been conducted, and all of these surveys support the premise that firms set prices to appear that they are just below a round number."). See also Schindler, Robert M. and Patrick N. Kirby, "Patterns of Rightmost Digits Used in Advertised Prices: Implications for Nine-Ending Effects," *Journal of Consumer Research*, Vol. 24, No. 2, 1997, pp.192-201 at 193-194; Anderson, Eric and Duncan Simester, "The Role of Price Endings: Why Stores May Sell More at $49 than $44," 2000, at http://ssrn.com/abstract=232542.

[160]    Bizer, George Y. and Robert M. Schindler, "Direct Evidence of Ending-Digit Drop-Off in Price Information Processing," *Psychology & Marketing,* Vol. 22, No. 10, 2005, pp. 771-783 at 771-772.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 7.**          **Prices that End in "99" as a Percentage of U.S. Consumer Transactions**



Source:

   Exhibit 32.

150.    Developers that rely on this strategy to set prices would not reduce prices in response to lower service fee rates if the reduction from one price point to the next would be so large that the developer would lose profits.  For example, if a developer's price is initially set at $1.99 and a change in some supply or demand factor would lead to a new profit-maximizing price of $1.63, a developer that sets prices to end in "99" may elect to keep the price at $1.99 instead of reducing the price to $0.99 because profits at $1.99 are higher than profits at $0.99 (and the developer would not want to abandon its pricing strategy and set the price at $1.63). Figure 8 below shows the implied percentage reductions from one price point to another for prices that range from $5.99 to $0.99.  A developer with a price of $5.99 would have to reduce prices by 17% to get to the next price point price of $4.99; a developer with a price of $1.99 would have to reduce prices by over 50% to get to the next price point of $0.99. Absent other competitive pressures, a profit-maximizing developer that found it would be worse off by reducing prices from one price point to another would choose not to reduce prices at all.

54

**ER-263**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



**Figure 8.**          **Percent Reductions from Price Point to Price Point**

Source:
   Exhibit 33.

151.    Many app, subscriptions, and IAP prices exhibit the "stickiness" associated with this strategy.  Across all three of these types of transactions, the prices of 73% of apps, subscriptions, and IAPs that appear in the Google Play transactions data for at least one year do not *ever* change.[161]  This confirms that developers' reliance on this type of pricing strategy would inhibit price changes in response to service fee rate changes.

152.    Given the prevalence and effect of setting prices to end in "99," an individualized assessment of each developer's pricing decisions would be required to understand the actual and but-for prices to determine if prices would have been different in the but-for world and if a consumer was, in fact, injured.

ii.   *Developers' Other Price Setting Strategies*

153.    Developers use other price-setting strategies, besides short-term profit maximization.  For example, Pure Sweat Basketball's decision to lower its monthly subscription price in 2015 from $29.99 to $9.99 was driven by an attempt ██████████████████████████████████ ██████████████[162]  Little Hoots selected its price ██████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████[163]  Rescue Pets sets prices to ███████████████████████ ████████████████████████████████████████████████████████████████████████

---

161        See this report's production.

162        

163        ████████████████████████

██████████████████████████████[164]  Other developers clearly do not operate
based on a short-term profit maximization strategy.  From the time it initially launched as an
app, in 2010, until 2013, Instagram generated no revenue from any source.  It was only a year
after it was purchased by Facebook that it began to generate any revenue, which it did
primarily through advertising.[165]

154.    Developers' decisions regarding price changes in the but-for world depend on their
pricing strategies.  Given that these strategies vary across developers, an individualized
analysis of developers is required in order to determine whether a price would have been
lower in the but-for world and consumers who purchased those developers apps,
subscriptions, or IAPs were impacted.

### 3.    Competitive Conditions Across Apps

155.    Another important factor that affects changes in retail prices due to changes in service fee
rates is the economic relationships between and among apps.  Apps are highly differentiated
products and have complex economic interrelationships.  Some apps are substitutes and
others are complements.  If, in response to a service fee rate reduction, some price falls, the
demand for competing apps would tend to fall, which would put downward pressure on the
prices of those substitute apps.  Developers that face more competition will face more
pressure to lower prices in response to service fee reductions.  Developers that face less
competition (from substitute apps) will face less pressure to reduce prices.  The extent of
competition can be measured by the price elasticity of demand for the app.  An app that faces
competition from many substitutes will have a more elastic demand than an app without such
competition.[166]

156.    Determining the price elasticity of demand for an app can be highly complex and
individualized because apps are highly differentiated products and there can be many
potential substitutes.  U.S. consumers made app, subscription, or IAP purchases from
465,245 different apps during the class period.[167]  Moreover, consumers download and use
many other apps that are free as well as apps that are paid or have subscriptions and IAPs.
For example, among six of the consumer class representatives (those that have produced

---

[164]     ██████████████████████████████████████████████████.

[165]     https://www.investopedia.com/articles/investing/102615/story-instagram-rise-1-photo0sharing-
app.asp (Instagram launched in 2010, purchased by Facebook in 2012 for $1 billion in cash and stock);
https://www.nytimes.com/2015/06/03/technology/instagram-to-announce-plans-to-expand-
advertising.html (first used ads in 2013).  Even developers who rely on a profit-maximizing price-setting
strategy are different from one another because they rely on different and sometimes multiple sources of
revenue. Many developers generate revenue from advertising as well as paid installations, subscriptions,
and IAPs.  If those developers set prices to maximize short-term profits and generate revenue from
advertising as well as paid transactions, a reduced service fee rate may lead to higher retail prices, not
lower retail prices.

[166]     As Mr. Adam Sussman, at Epic, described, ████████████████████████████████
██████████████████████████████████████████████████████████████████████
██████████████████████████████████████.

[167]     See this report's production; App-level Spend Data, Consumers, GOOG-PLAY-005535886 and
GOOG-PLAY-010801688.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

information), the total number of apps installed or updated between August 2016 to October 2021 ranged from 103 to 297.[168]

157.   App differentiation can be observed by the numerous categories of apps. Google Play has 35 categories for non-game apps and 17 different game app subcategories.[169]  The categories vary widely; for example, non-game apps include apps for education (over 400,000 apps), business (over 300,000 apps), shopping (over 180,000 apps), and other categories.[170]

158.   Within each of the numerous app categories, there are many apps that may be substitutes to varying degrees and apps that may not be substitutes at all.  For example, in the Arts & Design app category (which includes over 29,000 apps),[171] Sketchbook, My Drawing, and Tayasui Sketches are all drawing apps, with different features.[172]  Those apps, based on their product characteristics, may be potential substitutes for one another.  On the other hand, Pixel Studio and U Launcher are two apps also categorized as Arts & Design apps.[173]  Pixel Studio, is a pixel art editor for artists and game developers.  It has numerous features, including tools that allow the user to create animations, custom brushes, and symmetry drawing.  U Launcher, on the other hand, provides customizable home screens for Android phones with various backgrounds, as well as the ability to hide/unhide apps and search apps.  Even though these two apps are included in the same category – Arts & Design – they have different purposes and functionality and are directed toward different sets of consumers.  As such, Pixel Studio and U Launcher are likely poor substitutes for one another.  Google's "Games" category is also broad and includes games for toddlers such as "Thomas and Friends" (described as a "fun, safe & interactive game play for children aged 2-7"),[174] action

---

[168]   These counts include free apps, paid apps, subscription apps, and apps with IAPs.  The counts exclude apps by OEMs and carriers that may have been pre-installed by them and also exclude Google apps.  See Exhibit 22.

[169]   See Exhibit 2 for the list of non-game categories and the percentage of apps in each of the categories. See Exhibit 3 for the list of game categories and the percentage of apps in each of the categories.

[170]   Exhibit 2.

[171]   Exhibit 2.

[172]   Sketchbook, https://play.google.com/store/apps/details?id=com.adsk.sketchbook, accessed March 22, 2022. My Drawing, https://play.google.com/store/apps/details?id=com.raed.sketchbook, accessed March 22, 2022. Tayasui Sketches, https://play.google.com/store/apps/details?id=com.tayasui.sketches, accessed March 22, 2022.

[173]   Pixel Studio, https://play.google.com/store/apps/details?id=com.PixelStudio, accessed March 22, 2022. U Launcher, https://play.google.com/store/apps/details?id=com.phone.launcher.android, accessed March 22, 2022.

[174]   Thomas & Friends: Magic Tracks, https://play.google.com/store/apps/details?id=com.budgestudios.googleplay.ThomasAndFriendsMagicalTracks, accessed March 28, 2022.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

game "Doom" (described as "Violence, Blood and Gore" for ages 17+),[175] Zynga's card game "Poker – Texas Hold'em,"[176] and home design game "Redecor."[177]

159.    Paid apps, subscription apps, and apps with IAPs can be substitutes for free apps.  Free apps account for a substantial percentage of apps in all categories.[178]  Determining whether the prices of paid apps, subscription apps, or IAPs would have been lower in the but-for world requires analyzing the economic relationships between those apps and the free apps that they compete with, if any.

160.    Since different apps face different competitive conditions, an individualized analysis of the competitive pressures on each app is required to assess whether there would have been any changes in the app, subscription, or IAP prices in the but-for world.

### C.  ECONOMIC REASONS SOME MEMBERS OF THE PUTATIVE CONSUMER CLASS WOULD NOT BE BETTER OFF IN THE BUT-FOR WORLD

161.    As described above, the proposed class of consumers includes over 92 million U.S. consumer IDs with varying purchase characteristics including, for example, the number of apps purchased (or made purchases from), the number of free apps downloaded, the types of apps purchased and downloaded, the amount of money spent, the prices paid, and the forms of payment used to make purchases, as well as others.  Consumer Plaintiffs claim that they would have been better off in the but-for world because the prices they paid for apps, subscriptions, and IAPs would have been lower.  However, whether prices would have been lower in the but-for world requires an app-by-app inquiry into (1) whether that developer's service fee rate would have been lower in the but-for world, and (2), if so, whether the developer would pass through that reduction in the service fee rate, to the consumer.

162.    There are additional factors that must be considered to determine whether a consumer would have been better off in the but-for world.  These factors likewise involve an app-by-app analysis of each consumer's purchases and downloads.  As further explained in the sections below, several categories of consumers likely would not be better off in the but-for world, and thus likely would not have experienced antitrust impact.

163.    First, some consumers make purchases from developers that set low prices such as $1.99 or less.  As discussed above, because those developers likely would not have lower cost options for payment processing in a but-for world, they likely would not have lower service fees for these low-price transactions.  Under Consumer Plaintiffs' theory of impact – which posits that developers would respond to lower service fees by reducing retail prices for apps subscriptions, and IAPs – developers that set low prices would have the same service fee rate

---

[175]    DOOM, https://play.google.com/store/apps/details?id=com.bethsoft.DOOM, accessed March 28, 2022.

[176]    Zynga Poker- Texas Holdem Game, https://play.google.com/store/apps/details?id=com.zynga.livepoker, accessed March 28, 2022.

[177]    Redecor - Home Design Game, https://play.google.com/store/apps/details?id=fi.reworks.redecor, accessed March 28, 2022.

[178]    See Exhibit 2 and Exhibit 3.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

173.    I further analyzed price changes in the actual world for apps, subscriptions, and IAPs (collectively, I refer to these as stock-keeping units, or "SKUs"[192]) in Google Play following changes in service fee rates.  I found that, among those SKUs, many prices did not change after service fee rate changes took effect.

174.    Service fee rate changes during the class period occurred for certain developers and apps due to programs such as LRAP, ADAP, and others; Google Play's 2018 service fee reduction for certain subscriptions;[193] and Google Play's July 2021 service fee reduction pursuant to the Small Developer Program.[194]  These service fee reductions applied to 22,995 developers worldwide, to 51,847 apps, and to 467,660 SKUs.  These SKUs involved transactions by about 53% of U.S. consumers and accounted for 11% of their consumer spend.[195]

175.    While service fees changed for the SKUs in my studies, the prices for many SKUs did not change at all during the class period.[196]  Over the three sets of SKUs with service fee

---

[192]    Google's transactions data store IAP and app prices by "product ID," which I will refer to as "SKU."

[193]    In 2018, Google reduced the service fee rate on subscription IAPs when the consumer's subscription extended beyond a year. See "Google Play Lowers App Subscription Fee to 15 Percent, Matches Apple's Offering," Gadgets 360, October 20, 2017, https://gadgets.ndtv.com/apps/news/google-play-app-subscription-fee-30-percent-to-15-1764923, accessed November 8, 2021. Since different developers and SKUs (e.g., different types of subscriptions) can have a different mix of consumers, the service fee rate associated with a SKU can vary from 30% (no consumer has a subscription more than a year) to 15% (all consumers have subscriptions more than one year).  To test whether retail prices would respond to a service fee rate subscription, I look only at SKUs for which the monthly service fee rate for that SKU fell to 20% or lower and remained at that level for at least three consecutive months.

[194]    The July 2021 service fee rate reduction applied to a developer's first $1 million in consumer spend.  I look at SKUs for which the monthly service fee rate for the corresponding app and purchase type (i.e. paid app downloads and non-subscription IAPs) fell to 20% or lower in at least one month on or after July 2021.  See "Changes to Google Play's service fee in 2021," Google, https://support.google.com/googleplay/android-developer/answer/10632485, accessed January 5, 2022.

[195]    Exhibit 34.

[196]    I used prices net of promotions and discounts in Google Play transaction data from the beginning of the class period to July 3, 2021.  See GOOG-PLAY-007203251. Since the transaction data is available for only two days following the July 1, 2021 reduction in service fee rates on the first $1 million of consumer spend, I also used monthly average prices for paid downloads from the App-level spend data for U.S. consumers (GOOG-PLAY-005535886 and GOOG-PLAY-010801688) through December 2021, which correspond with paid download SKUs.  A third dataset ("scraped data") was used to analyze paid app download SKU prices following the July 2021 service fee rate reduction.  That dataset was created by electronically collecting data for a sample of apps from Google Play once a month, for the paid download prices for those apps.  The scrapes were conducted from the U.S., at the beginning of the month starting in April 2021 and collected various attributes of the apps from their publicly available Google Play pages, including their paid download prices.  The apps sampled included (1) the top 20 apps in each app category and monetization type based on their 2020 consumer spend; (2) the apps of the top 20 putative developer class members or developers selling to U.S. consumers based on their 2020 spend; (3) the six top 200 charts on Google Play for "free," "grossing," and "paid" apps and for games vs. non-games; and

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

reductions, 93% exhibited no change in price at all during the class period.[197]  That is, among these SKUs, at most 7% responded to the service fee rate change in the actual world. Moreover, among this 7%, some retail prices could have increased rather than decreased and some retail prices likely would have decreased at times that are not relevant to the service fee rate reduction (for example, several months before the rate reduction).  However, if the price of SKU associated with a service fee rate reduction is constant throughout the class period – as 93% of these prices are – then these is no reason to assume that the price of that SKU would have responded to a service fee rate change in a but-for world either.

176.   I also considered prices of the SKUs one month before and one month after the service fee rate change.  I compared prices for paid app downloads, subscriptions, and IAPs before and after the service fee rate change for each SKU.[198]  Table 5 shows these results.  For subscriptions and IAPs, less than 2% of prices changed after a service fee rate decline.  That would imply lack of impact on consumers for many apps.  For paid app downloads, between 1% and 13% of prices changed following a reduction in service fee rates.  That also suggests limited impact on consumers for many apps.  Given how few prices declined following reduction in service fee rates, individualized analysis would be needed to identify which apps, subscriptions, and IAPs prices would have been lower and which consumers would have paid lower prices in a but-for world.

---

(4) the top 100 free apps in each app category on Sensor Tower that ranks by a combination of factors including active users, downloads, and revenue. The top 100 free app charts by category are from Sensor Tower, https://app.sensortower.com/android/rankings/top/mobile/us/overall.  A fourth dataset provided to me by Google showing prices on June 21, 2021, October 16, 2021, and February 6, 2022 ("IAP snapshot data," GOOG-PLAY2-000483364), was used to analyze non-subscription IAP prices following the July 2021 service fee reduction.

[197]   Exhibit 35.

[198]   For paid app downloads and subscriptions IAPs I compare prices on June 21, 2021 and October 16, 2021.  For non-subscription IAPs, I compare prices on June 21, 2021 and February, 6, 2022.  These are prices on these specific days, a snapshot.

63

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Table 5. Summary of Pass-Through Rates Found by Dr. Burtis**

| Purchase Type | SKUs | |
|---|---|---|
| | Total | Share w/Positive Pass-Through |
| Paid App Downloads | | |
| *Scraped Data* | 1,557 | 1% |
| *App-Level Spend Data* | 8,991 | 13% |
| Subscriptions | | |
| *Deal Developers* | 706 | 2% |
| *Subscription Developers* | 16,307 | 1% |
| IAPs | 441,383 | 2% |

**Source:**

Exhibit 36.

177.   The analysis described above suggests that while some retail prices could be lower if service fee rates were lower, other prices would not change.  The analysis finds the percentage of SKUs with price reductions following a service fee rate change but does not include a study of the economic factors that would explain whether an observed price change was caused by a service fee rate reduction.  As described above, those factors include, at least, the marginal cost of an app, the demand elasticity of the app, and the pricing strategy of the app developer – all of which require an individualized analysis of the app and the app developer.  That is, determining which prices would have been lower and which consumers were impacted requires an individualized analysis of those factors and how they affect prices of particular apps, subscriptions, and IAPs.   That individualized, app-by-app analysis is necessarily to determine whether a consumer who made purchases of that app was impacted.

178.   This analysis indicates that Consumer Plaintiffs cannot show injury to all or nearly consumers through common proof, because Consumer Plaintiffs cannot establish through common proof that all consumers would pay a lower price if service fee rates for developers were lower.

### 2.   Some Consumers Who Transact at Low Price Points Would Not Be Better Off in the But-For World

179.   Table 6 shows that 5% of U.S. consumers in the putative consumer class pay only prices of $0.99 and 9% of U.S. consumers pay only prices of $1.99 or lower.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

The method is overly simplistic, depends on unsupported assumptions, and includes no analysis of any service fee rate change or any cost change at all. Moreover, the method produces false results – that is, the method predicts pass-through rates of near 100% for many prices that did not change at all when the service fee rate changed.

278.    Below, I first describe Dr. Singer's formula for finding pass-through rates and then show that the predicted pass-through rates based on the formula are contradicted by the empirical evidence in this case.

### 1. Dr. Singer's Pass-Through Methodology is Based on an Overly Simplistic Formula That Produces Inaccurate Results

279.    Every pass-through rate calculated by Dr. Singer is calculated with a formula that depends solely on the share of a developer's sales within a "category." The "categories" used by Dr. Singer, which are integral to the results, are not based on any economic analysis or reasoning but are simply the categories used in Google Play. The method is unrealistic and produces pass-through rates that are demonstrably wrong.

280.    An example demonstrates that Dr. Singer's method is based on overly simplistic and unrealistic assumptions. Dr. Singer finds that the pass-through rate for the developer ███████████████████████ for subscription transactions in January 2019 is nearly 100%.[333] To find this pass-through rate, Dr. Singer calculated the ratio of ███████ unit sales of its subscriptions transactions in that month – 2 transactions – and the total number of subscription transactions in the "Game" category in that month – 935,919 transactions. This ratio is ███████████ share of transactions (or unit sales) in that month in that category, which is 0.0002%.[334] According to Dr. Singer's method, the pass-through rate for ████████ subscription transactions in that month is calculated as one minus the share, which is 99.9998%.[335] Dr. Singer performed similar calculations for other months and found ███████████ had a pass-through rate of 99.98% to 99.9999% throughout the class period.[336]

281.    Dr. Singer's pass-through results are demonstrably wrong. Some developers, including ███████████, experienced service fee rate reductions in the real world, so data are available to test whether developers passed through service fee rate reductions consistent with Dr. Singer's predictions.

282.    ███████████ service fee rate in Google Play fell from 30% to 15% in January 2018.[337] ███████████ service fee rates and its subscription prices are shown in Figure 10 below. The



---

[333] ███████████ app is ███████████ identified as app package name ███████████ in the data.

[334]    That is, 2/935,919 = 0.0002%

[335]    See Exhibit 44.

[336]    See Exhibit 45.

[337]    This rate reduction was pursuant to Google Play's policy change in 2018 for subscriptions for consumers that were more than one-year in length. When Google initiated the program and throughout the period ███████ sold subscriptions in its ███████ app, its consumer subscriptions apparently are annual renewals. Thus, its service fee rate dropped from 30% to 15% immediately after Google made the

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

graph shows that ▮▮▮▮▮ did not change its retail price after its service fee rate reduction – its pass-through rate was zero. Dr. Singer finds the pass-through rate was nearly 100%. ▮▮▮▮▮ did not pass on any of its service fee rate reduction, much less pass through nearly 100% of the reduction, as Dr. Singer's pass-through method predicts.[338]



**Figure 10.** ▮▮▮▮▮ **App Subscription Price and Service Fee Rate Contradicts Dr. Singer's Results of Nearly Complete Pass-Through**

Source:

Exhibit 46.

283.    Dr. Singer uses the same method to find pass-through rates for each developer in each app category and each month and for each of the three types of transactions – paid downloads, subscriptions, and IAPs. Each pass-through rate is calculated the same way – one minus the developer's share of unit sales in the category. The pass-through rates he reports for categories of apps[339] are weighted averages of these share-based pass-through rates.[340]

284.    Across all developers, transaction types and months, 95% of pass-through rates calculated by Dr. Singer are over 99.5%.[341] Given that Dr. Singer's pass-through rates are

---

service fee rate reduction and continued to be 15% throughout the time it sold subscriptions. See this report's production.

[338]    Dr. Williams also found that ▮▮▮▮▮ prices did not change after a service fee rate reduction. See Dr. Williams' backup for Williams Report Figure 3.

[339]    Singer Report Table 8.

[340]    The weights used in the category-weighted average are based on units sold. So, for example, for a category, there may be thousands of different pass-through rates calculated since Dr. Singer calculates a pass-through rate for three types of transactions, many months, and many developers. Each of those pass-through rates is weighted by its share of total units sold in the category, for each type of transaction in the month to find the category-weighted average pass-through rate.

[341]    See Exhibit 47.

98

**ER-272**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

determined solely with shares and that in his (overly broad) categories, there can be hundreds or even thousands of different apps and developers,[342] it is not surprising that many shares are very small and, consequently, when a pass-through rate is calculated as one minus the share, the resulting pass-through rates are very close to 100%.

285.    The only way that Dr. Singer would conclude that some consumer was not impacted – because some amount of a service fee rate reduction was not passed through to the consumer – is if the consumer solely made purchases from developers that had 100% shares of their respective category sales.

### 2. Pricing Data Show that Dr. Singer's Predicted Pass-Through Rates Are Wrong

286.    Dr. Singer's mistaken claim about ▮▮▮▮▮ pass-through rate, described above, is not an isolated example.  There are other examples of developers that Dr. Singer claims have pass-through rates of nearly 100% but in fact have had service fee rate reductions and have not passed through any part of the reduction in lower service fee rate reductions.[343]

287.    Similar to ▮▮▮▮, two other putative developer class members, ▮▮▮▮ and ▮▮▮▮, had service fee rate reductions from 30% to 15% in January 2018.  As shown in Figures 11 and 12 below, these developers' retail prices remained constant after the service fee rate reduction, indicating a zero pass-through rate.  Yet, Dr. Singer finds nearly 100% pass-through rates for both ▮▮▮▮ and ▮▮▮▮, for most months of the class period.  Dr. Singer's pass-through rate formula produces inaccurate results for paid downloads and IAPs, as well.[344]

---

[342]    In the Games category used by Dr. Singer, there are 198,452 apps.  See this report's production.

[343]    Dr. Singer's pass-through rates are also contradicted by testimony.  He found a pass-through rate of nearly 100% for the developer class representative, Rescue Pets.  But according to Mr. Scalise, of Rescue Pets, when it experienced a lower service fee rate, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

[344]    Most SKU prices did not change following a service fee rate reduction. See Figure 13 and Exhibit 52. These SKUs include not only subscriptions but also paid downloads and IAPs, such as the paid download app ▮▮▮▮▮▮▮▮ (app package name ▮▮▮▮▮▮▮▮ ) and IAPs in ▮▮▮▮▮▮▮▮ (app package name ▮▮▮▮▮▮▮▮ ). That is, ▮▮▮▮ and ▮▮▮▮ demonstrate zero pass-through even though Dr. Singer's method predicts a pass-through rate ranging from 99.98% to 99.996% for the former and 99.8% to 99.99% for the latter. See this report's production.  Additional examples of prices that do not change after a service fee rate reduction are shown in Exhibits 63 and 64.  Exhibit 63 shows the price and service fee rate for a subscription SKU, ▮▮▮▮▮▮▮▮  The service fee rate for that SKU fell from 30% to 15% between July and September 2017, but the price remained constant from December 2016 through July 2021 – indicating no pass-through of the service fee rate reduction.  Dr. Singer predicts pass-through rates applicable to this SKU that range from 81% to 100% (varying across months), based on his "one-minus-the-share" formula.  Exhibit 64 shows the price and service fee rate for the ▮▮▮▮▮▮▮▮ subscription SKU.  The service fee for this SKU fell from 30% to 15% over the period December 2017 to December 2018; but the price of the SKU remained constant – indicating no pass-

99

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

marginal cost. Of course, had Dr. Singer utilized a formula that includes a developer's marginal cost, determining a pass-through rate would depend on measuring the developer's marginal cost, which is a highly individualized analysis. Additionally, even that formula depends on certain assumptions that may or may not hold for all developers, including for example that they set prices to maximize profits and that their price-setting does not involve prices that end in "99."

### 4.   The Basis For Dr. Singer's Pass-Through Formula is Fundamentally Flawed

306.   Dr. Singer's basis for his "one-minus-the-share" formula is an overly simplified version of a highly restrictive demand system which, for the purposes here, produces unrealistic results. Dr. Singer's method uses "one minus the share" as the pass-through formula because, according to him, app demand can be described by a particular type of demand system – a simplified logit demand version of a "logit demand system" – and a pass-through rate in such a simplified logit demand system is equal to one minus the share.[363] The "logit" demand model, while frequently used in economics for its relative simplicity, is not appropriate for determining pass-through rates for apps because the model imposes restrictions that are not realistic for an app demand system.

307.   There are thousands of apps and there can be thousands of apps even in a single category. Apps are highly differentiated from one another.[364] Because demand for any app depends on its characteristics, as well as the characteristics and prices of related apps, and characteristics of consumers, specifying a reliable demand model would require estimating many thousands of elasticities. Despite these complexities, Dr. Singer chose a relatively simple demand system – the logit system. The restrictions imposed by that relatively simple system when

---

[363]      Singer Report at ¶236. Dr. Singer uses regression analysis to estimate a logit demand system for apps. The regression is overly simplified in that there is no explicit consideration of app characteristics or consumers attributes or the interaction of the two, for example. Instead, Dr. Singer simply included "fixed effects unique to a given App and purchase type." Singer Report at ¶236. He claims that he has validated the use of his logit demand system, and by extension, the pass-through rate formula by observing for nearly all app categories, "a statistically significant relationship between demand and price" and so, concludes that the regression model is consistent with "economic expectations." (Singer Report at ¶237). He then uses the "one-minus-the-share" formula for pass-through derived from the logit model of demand for all pass-through rates. Singer Report at ¶239. To be clear, Dr. Singer's pass-through rates are not calculated with any of the regression "output." All pass-through rates depend only on the share of unit sales within a category. His formulas do not include any own-price elasticity of demand for any app or any cross-price elasticity of demand for any app generated from Dr. Singer's logit demand regressions. Moreover, Dr. Singer's observation that the price coefficients in the logit regressions are negative is not sufficient to infer that the results are "consistent with economic expectations" and that the formula for pass-through based on the logit model is a proper way to determine pass-through. For example, the logit model of demand used by Dr. Singer assumes that all products within a category are substitutes and that cross-price elasticities (e.g., the magnitude of substitution) depend on the products' shares, so that the best substitute for all products in a category is the product with the highest share. If those assumptions do not hold, then the logit model and the logit model's pass-through rate formula would not apply. See, for example, Train, Kenneth E., "Logit," in *Discrete Choice Methods with Simulation*, Cambridge University Press, 2009, pp. 34-75.

[364]      See Section IV.A .

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

applied to this case produce results that conflict with common sense (such that a pass-through rate can be determined solely with the share of the app's unit sales).[365]

308.    One of the underlying assumptions of Dr. Singer's demand model and pass-through rates is that all products within a Google Play category are substitutes. There is no economic basis for this assumption and the assumption does not reflect realistic substitution patterns across apps. It is clearly not true for all apps within the categories used by Dr. Singer.[366] For example, his model requires that all apps within the category "Games" are substitutes. But the "Games" category combines games for toddlers such as "Thomas and Friends" (described as a "fun, safe & interactive game play for children aged 2-7"),[367] the action game "Doom" (described as "Violence, Blood and Gore" for ages 17+),[368] Zynga's card game "Poker – Texas Hold'em,"[369] and home design game "Redecor."[370] Dr. Singer's category of Games clearly does not satisfy the underlying assumption of the logit model.

309.    The arbitrary nature of Dr. Singer's categories affects the pass-through rates because the pass-through rate formula (flawed as it is) depends on the definition of the categories. If the categories are wrong, the pass-through rates are wrong because the formula depends on the categories.[371]

---

[365]    See Berry, Steven T. and Phillip A. Haile, "Foundations of Demand Estimation," in *Handbook of Industrial Organization*, Vol. 4, No. 1, Elsevier, 2021, pp. 1-62 ("Although demand presents challenges that are absent in many empirical settings, all the "usual" challenges remain. One such challenge is finding empirical specifications that are both (a) sufficiently flexible to avoid strong a priori restrictions on the results and (b) sufficiently parsimonious to permit practical application. In some markets the number of closely related goods can be large; consider, for example, the set of all new automobile models, all computer models, all mutual funds, or all residential neighborhoods in a given city. Because the demand for a given good depends on the characteristics and prices of related goods, a demand system with J goods has J2 price elasticities at each point. In many contexts, this will rule out even a linear specification of the demand equation. Thus, even in cases where nonparametric estimation would be possible in principle, in practice it will often be necessary to impose restrictions in order to obtain an empirical model that is practical for the data available. Unsurprisingly, one can go too far in the pursuit of parsimony. Some of the simplest demand specifications (e.g., the CES, multinomial logit, multinomial probit) impose strong a priori restrictions on demand elasticities, and, therefore, on markups, pass-through, and other key quantities of interest that are at odds with common sense and standard economic models." Emphasis added).

[366]    Singer Report Table 8. The only apparent basis for Dr. Singer's use of the categories is that they are used by Google "to track user purchase activity." Singer Report at ¶34.

[367]    https://play.google.com/store/apps/details?id=com.budgestudios.googleplay.ThomasAndFriends MagicalTracks

[368]    https://play.google.com/store/apps/details?id=com.bethsoft.DOOM

[369]    https://play.google.com/store/apps/details?id=com.zynga.livepoker

[370]    https://play.google.com/store/apps/details?id=fi.reworks.redecor

[371]    App categories are chosen by developers. See e.g., https://www.storemaven.com/academy/how-to-choose-an-app-category/ ("The category you choose needs to be relevant to your app, of course. But it

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

310.    This problem can be illustrated by showing that pass-through rates change when the category definitions change.  In Google Play, there are 17 sub-categories within the Games category and assigning apps to different sub-categories would lead to different results in Dr. Singer's model.[372]  For example, ████ belongs to the Adventure Game subcategory.  Dr. Singer's formula finds an average pass-through rate of 98% for ████ (across all purchase types and months) because ████'s share of the Game category is 2%.  ████ share of the Adventure Game subcategory is 33% and so Dr. Singer's formula would find an average pass-through rate of 67%.  Similarly, Dr. Singer finds that the pass-through rate for ████ ████ is 57% because its share of all Games is 43%.  ████ belongs to the Casual Game subcategory.  Its share of Casual Games is 74% and so would have a 26% pass-through rate based on its share of its subcategory.[373]  Dr. Singer's results are based on arbitrary category assignments, and his results change dramatically if different category assignments are used.

311.    Even if Dr. Singer's "one-minus-the-share" formula could find reliable pass-through rates (which it cannot), the diversity among apps and complex substitution patterns means that identifying more appropriate categories would require analysis of many apps and would likely find more narrowly defined categories than those used by Dr. Singer.  Such an analysis would be required to ensure that substitutes are properly grouped together.[374]  As categories narrow, pass-through rates calculated based on Dr. Singer's method would decline.  This follows from the formula itself.  For example, say an app has a 1% share of the Games category.  Dr. Singer's formula produces a pass-through rate of 99%.  But if that app is relatively unique and has only a single other app that is a close substitute, and if each of those apps have a 50% share of its "category," the pass-through rate (based on Dr. Singer's formula) would decline to 50%.  If the app was substantially more successful than its close

---

should also enable your app to rank well in category charts. Users often discover new apps to download by perusing the charts. This means that high-ranking apps generally receive a lot of traffic and are able to generate more organic downloads...The category you choose for your app can affect its discoverability and conversion rates in both the Apple App and Google Play stores. The trick to choosing the right category for your unique app is balancing relevance with your competition."); see also https://support.google.com/googleplay/android-developer/answer/9859673 ("You can choose a category and add tags to your app or game in Play Console. Categories and tags help users to search for and discover the most relevant apps in the Play Store.").

[372]    See Exhibit 3 for a list of the sub-categories within Games.  Sub-categories are for example, Action Games, Card Games, and Sports Games, as well as others.  Even within a sub-category, apps can be quite differentiated.  For example, two Adventure Games are Stormfall: Saga of Survival, which describes itself as "survive, explore, and master crafting and sorcery in this free-to-play survival MMORPG set in the high-fantasy Stormfall world," and Sonic-Forces: Running Battle, which describes itself as "Sonic the Hedgehog is back and running in this fast and cool multiplayer racing & battle game." https://play.google.com/store/apps/details?id=com.pacific.wildlands; https://play.google.com/store/apps/details?id=com.sega.sprint.

[373]    See Exhibit 54.

[374]    Determining how one should allow for demand substitution to "outside products" (that is, in this context, outside of the category) is important, can affect results, and requires analysis.  See e.g., Sheu, Gloria and Charles Taragin, "Calibrating the AIDS and Multinomial Logit Models with Observed Margins," U.S. Department of Justice, Economic Analysis Group Discussion Paper, 2012.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

rival, and its share of the "category" grew to 99%, the pass-through rate (based on Dr. Singer's formula) would decline to 1%. As the example demonstrates, the formula depends critically on finding the "right categories," but the only way to find such categories would be to investigate each app and to determine its close substitutes. That involves a highly complicated and individualized analysis.[375] Dr. Singer has performed no such analysis – instead, even though the most critical part of the formula is the definition of the categories, he performed no analysis at all and simply used the categories in Google Play, even though those categories have little to do with the relevant substitution patterns across apps.

312.   Dr. Singer's use of an average pass-through rate for each category, and his overall pass-through rate for all categories mask the variation in pass-through rates – even using Dr. Singer's arbitrary method. For example, he reports a pass-through rate for the category of "Games" is 92.3%.[376] But weighted average pass-through rates, like those reported by Dr. Singer, for sub-categories of Games show that pass-through rates vary across sub-categories. For example, the average pass-through rate for Casual Games would be 52% and for Trivia Games it would be 58%, both much lower than the 92.3% pass-through rate Dr. Singer calculates for "Games" as a single category.[377] Of course, these sub-categories similarly mask variation. Dr. Singer's overall pass-through rate, which he uses as an input into his but-for service fee models, is a weighted average of all pass-through rates, for all sub-categories and all categories.

### 5.   Dr. Singer's Predicted Pass-Through Rates Are Based on Assumptions that Are Not Reliable

313.   The pass-through rates found by Dr. Singer do not reflect the reality that many developers use a pricing strategy to set prices that end in "99." As described above, developers use such price points to influence consumers' perceptions of price and thus affect sales.[378] When supply or demand conditions change, developers may not respond to those changes because they do not want to change their price to the next price that ends in "99."

---

[375]   Dr. Singer's pass-through rates are calculated at the app developer GAIA ID, app category (pooling all games to one category), and purchase type level in each month, but the logic still applies at the app level. Such an analysis is further complicated by the fact that some of the apps at issue in this case have substitution relationships with free apps, which are pooled into the "outside products" category by Dr. Singer but ignored in his pass-through rate calculation. To determine "true" substitution relationships free apps must be considered. Moreover, any econometric model designed to identify substitution relationships (and thus identify reliable categories) must contend with the fact that developers frequently set prices that end in "99," and infrequently change prices. That feature of this marketplace will require more careful analysis for the estimation of demand relationships and determining any reliable categories.

[376]   Singer Report Table 8.

[377]   See Exhibit 55; Singer Report Table 8.

[378]   See, for example, Stiving, Mark and Russell S. Winer, "An Empirical Analysis of Price Endings with Scanner Data," *Journal of Consumer Research*, Vol. 24, No. 1, 1997, pp. 57-67 at 57 ("Managers apparently set prices in a manner consistent with the premise that the last digit of a price has a significant impact on sales. Several surveys on what price endings managers actually use have been conducted, and all of these surveys support the premise that firms set prices to appear that they are just below a round number.") See also Schindler, Robert M. and Patrick N. Kirby, "Patterns of Rightmost Digits Used in

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

314.   Dr. Singer's calculations do not consider this marketplace reality and instead imply that developers would change prices – penny by penny – in response to service fee rate changes. In fact, Dr. Singer's pass-through rates imply that nearly all developers that use this strategy would abandon it in the but-for world.  For example, the developer ███████ subscription price in the actual world was $4.99 as of June 2017.[379]  Dr. Singer's method predicts that if ██████████ service fee rate fell from 30% to █████ in June 2017 and had a pass-through rate of █████ (as he claims), ████████ would change its price to █████ and change its pricing strategy.[380]

315.   Table 9 below shows that Dr. Singer's calculations imply that among the over 80,000 developers that use focal point pricing, nearly all of them would abandon that strategy for at least one of their paid apps, subscriptions, or IAPs in the but-for world.[381]

| Table 9. Share of Developers Abandoning the "99" Pricing Strategy in But-For World, August 2016 – December 2020 | |
| --- | --- |
| **Developers** | |
| Count of Developers Using ".99" Pricing in Actual World | 80,103 |
| Count of Developers Abandoning ".99" Pricing in But-For World | 79,984 |
| Share of Developers Abandoning ".99" Pricing in But-For World | 99.9% |

Source:
   Exhibit 56.

316.   Dr. Singer's pass-through rates are also not credible because, in some instances, the rates change month to month as shares change month to month.  Figure 14 shows Dr. Singer's pass-through rates for three developers with dramatic changes in pass-through rates over time.[382]  Figure 14 shows that Dr. Singer's pass-through rates for ███████████████ a

---

Advertised Prices: Implications for Nine-Ending Effects," *Journal of Consumer Research,* Vol. 24, No. 2, 1997, pp.192-201 at 193-194; and Anderson, Eric and Duncan Simester, "The Role of Price Endings: Why Stores May Sell More at $49 than $44," May 2000, at http://ssrn.com/abstract=232542.

[379]   The developer only sold subscriptions through one app, com.ionicframework.oddhunter938355, that belongs to the Lifestyle category, in the class period.

[380]   See Exhibit 57.

[381]   Table 9 includes developers for whom Dr. Singer calculated a pass-through rate that could be matched to the transactions data and who sold apps, subscriptions, or IAPs to US consumers only at list prices ending in "99."

[382]   Share changes of this magnitude are not common in Dr. Singer's calculations, although they do exist.  The graph and discussion demonstrate the nonsensical nature of Dr. Singer's pass-through rate formula.

111

developer with IAP transactions apps in the Entertainment category, ranged from 44.8% to 99.98% over the period from October 2017 to December 2020. ███████████████, another developer with subscriptions in the Travel & Local category, had pass-through rates that ranged between 43.8% and 96.1% over this period, and ███████████████, an app with paid downloads in the Transportation category had pass-through rates of 17.8% to 96.9%, based on Dr. Singer's calculations.[383]  The pass-through rates in Figure 14 fluctuate simply because the share of unit sales for these apps within their respective app category happen to change from month to month.  If Dr. Singer's pass-through rates were accurate (which they are not), and if costs were constant over time, the prices of the apps, subscriptions, or IAPs would change dramatically month to month as the developer passed through different percentages of cost in its prices.  In fact, however, there are no observed changes in prices in these apps over time.[384]



**Figure 14.**      **Pass-Through Rates for Three Developers, Based on Dr. Singer's Calculations, August 2016 – December 2020**



**Source:**

   Exhibit 58.

### 6.  Given the Circumstances of this Case, Economics and Empirical Data Consistently Show that Determining Pass-Through Rates Requires an Individualized Analysis

---

[383]      See this report's production.

[384]      IAPs offered by ███████████████. have list prices ranging from $0.99 to $299.50 and have service fee rates ranging from ███████████ all remaining constant in the class period.  The paid download of ███████████████ has a list price of $1.51 and a service fee rate of ███████, both remaining constant in the class period.  Finally, the subscriptions offered by ███████████ have list prices ranging from $4.99 to $19.99 with no changes in the class period.  As is the case for all subscriptions whose customers have been subscribed for at least one year, the service fee rate was reduced from 30% to 15% starting in 2018.  See this report's production.

112

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

317.    The economic factors that determine pass-through and the empirical data in this matter consistently show that determination of pass-through requires an individualized analysis.

318.    Two of Plaintiffs' experts attempted to estimate "common" pass-through rates: Dr. Singer and Dr. Williams.  They employed different approaches, but both attempted to show that the pass-through rate can be estimated using evidence common to all developers.  However, they came to opposite conclusions with regard to the magnitude of a common pass-through rate.

319.    According to Dr. Singer, 95% of pass-through rates are greater than 99.5%, indicating nearly complete pass-through.  Dr. Singer finds that 99.99% of pass-through rates are positive, indicating that virtually every developer passed through at least some service fee rate increases to consumers, and therefore nearly all consumers were impacted.[385]

320.    In contrast, according to Dr. Williams, 92% of the pass-through rates he considered are zero or negative, implying that 92% of developers did not pass through any of the price increases to consumers.[386]

321.    Figure 15 below illustrates the two sets of results found by Consumer Plaintiffs' and Developer Plaintiffs' experts – which are nearly opposite of one another.



Figure 15.        **Shares of Positive Pass-Through Rates Found by Dr. Singer and Dr. Williams Are Nearly Opposite of Each Other**

Source:

Exhibit 59.

322.    Obviously, both experts' analyses cannot be true.  Based on the economic principles and the empirical evidence in this case, neither Dr. Singer's nor Dr. Williams' analysis is accurate because determining pass-through rates for apps, subscriptions, and IAPs requires an individualized analysis into the relevant supply and demand conditions as well as into the pricing strategies used by developers.

323.    As discussed above, a variety of economic factors determine how service fee changes (in particular the fact that the service fee is assessed as a percentage of price) will be passed

---

[385]    See Exhibit 47.

[386]    Williams Report at ¶80.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

through in retail app, subscription, and IAP prices, and those characteristics vary across apps and developers.

324.    For those developers that set prices to maximize profits, a service fee change (where the service fee is assessed as a percentage of price) will be more likely to affect price if the marginal cost of the app is high.[387]  With marginal cost equal to zero, Dr. Singer's own model shows that a change in the service fee rate will have no impact on price.

325.    Some apps have a positive marginal cost.  For example, apps that pay royalties based on usage of the apps, such as some music streaming apps and other apps that play music within the app are likely to have positive marginal costs.  Apps that provide ongoing customer support such as some multi-player games that incur processing costs for communications across users, are likely to have positive marginal costs.[388]  Other apps are likely to have marginal cost near zero.  This is a well-recognized feature of this industry as well as other industries where the product can be created once and sold multiple times.  If developers of those apps obtained a lower service fee rate in the but-for world, and if they set prices to maximize profits, there is a high likelihood that consumers that purchase their apps and IAPs would not have paid lower prices.

326.    Determining which apps are in which group requires individualized analysis of the cost conditions of those apps.

327.    Furthermore, service fee rate changes are also less likely to be passed through in retail prices if developers set prices to end in "99."  That pricing strategy is highly prevalent in this case; 97% of transaction prices of apps, subscriptions and IAPs end in "99."[389]  The strategy leads to a "stickiness" in retail prices and therefore even if a developer obtained a lower service fee rate in the but-for world, set prices to maximize profits, and had positive marginal cost, it may not have changed prices when the service fee rate changed.

328.    Whether app and IAP prices respond to service fee rate changes will also depend on the competitive conditions faced by a developer and whether a developer's rivals change their app and IAP prices.  Apps are highly differentiated products, and any one app may have few or many rivals.[390]  Determining the competitive conditions for any app requires individualized analysis.

329.    Determining whether a developer would reduce prices in response to a service fee rate change requires some understanding of the developer's price-setting strategy.  Not all

---

[387]    Singer Report at ¶225.  In particular, the equations $(P-C^*)/P = 1/E\_D$ and $C^* = C/(1-t)$ indicate that the change in price P in response to the change in service fee rate, t, depends on the level of C that captures marginal costs other than the service fee.  This also assumes that either developers do not set prices to end in "99," or that if they do, a price change to a price that ends in "99" satisfies the profit-maximizing conditions.

[388]    It is possible that marginal costs could be negative, in the sense that some apps generate revenue through additional users from, for example, advertising.  In a model where a developer maximizes profits and marginal cost is negative, a reduced service fee rate would lead to higher app, subscription or IAP prices.

[389]    See Exhibit 32.

[390]    See Section IV.A.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

developers set prices to maximize profits and therefore the economic models and results that depend on profit-maximization are not relevant to all developers. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓[392] Given that developers have different strategies, and do not all set prices to maximize profits, inquiry into the strategies and what those strategies imply for price reductions in response to service fee rate changes is necessary to understand pass-through.  That is an individualized inquiry.

330.    While the Plaintiffs' experts for the two proposed classes reach conclusions that either nearly all pass-through rates are positive, or nearly all pass-through rates are zero, economic models and evidence regarding the marketplace indicate that determining a pass-through rate requires individualized analysis – including analysis about the marginal cost of the app, the available and closeness of substitutes for the app, whether the app developer follows a focal point pricing strategy, and the overall strategy of price-setting used by the app developer. Plaintiffs' experts do not account for any of these factors.  Moreover, determination of damages for the two proposed classes is further complicated by their sizes as well as the numerous factors that would affect damages and vary across proposed class members. Plaintiffs' experts have not even attempted to account for such factors.

### E. CONSUMER PLAINTIFFS' EXPERT'S CLAIM THAT ALL SERVICE FEES WOULD HAVE BEEN LOWER ONLY ASSUMES CLASSWIDE IMPACT

331.    Dr. Singer has three different but-for service fee models.[393]  He has one model for paid downloads – the Android App Distribution model,[394] another for subscriptions and IAPs –



---

[391]    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓

[392]    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓

[393]    Singer Report at ¶167.

[394]    Singer Report Table 3.

115

# Exhibit 2

## Number and Percent of Non-Game Apps that are Free, by Category

*Published Apps as of May 5, 2021*

| App Category | Number of Free Apps | Total Number of Apps | Percent of Apps that are Free |
|---|---|---|---|
| Education | 359,156 | 400,091 | 90% |
| Business | 306,157 | 313,756 | 98% |
| Tools | 240,341 | 268,208 | 90% |
| Music & Audio | 242,974 | 253,109 | 96% |
| Entertainment | 225,678 | 244,563 | 92% |
| Lifestyle | 176,847 | 189,543 | 93% |
| Food & Drink | 181,857 | 185,315 | 98% |
| Shopping | 181,168 | 183,074 | 99% |
| Productivity | 162,096 | 175,171 | 93% |
| Books & Reference | 150,059 | 171,172 | 88% |
| Health & Fitness | 131,016 | 143,879 | 91% |
| Personalization | 106,530 | 128,598 | 83% |
| Finance | 116,763 | 122,555 | 95% |
| Travel & Local | 100,256 | 109,492 | 92% |
| Communication | 91,872 | 96,794 | 95% |
| Social | 79,261 | 86,183 | 92% |
| News & Magazines | 60,091 | 66,765 | 90% |
| Sports | 57,907 | 66,434 | 87% |
| Medical | 55,244 | 60,954 | 91% |
| Maps & Navigation | 46,975 | 50,733 | 93% |
| Photography | 45,140 | 49,376 | 91% |
| Auto & Vehicles | 41,256 | 43,501 | 95% |
| House & Home | 28,404 | 29,286 | 97% |
| Art & Design | 26,773 | 29,049 | 92% |
| Beauty | 25,655 | 26,195 | 98% |
| Events | 24,544 | 25,030 | 98% |
| Video Players | 18,752 | 21,014 | 89% |
| Dating | 8,522 | 11,834 | 72% |
| Libraries & Demo | 10,039 | 10,789 | 93% |
| Weather | 7,771 | 10,069 | 77% |
| Parenting | 5,638 | 6,847 | 82% |
| Comics | 5,110 | 6,041 | 85% |
| Transportation | 44 | 46 | 96% |
| Media & Video | 23 | 24 | 96% |
| Travel | 2 | 2 | 100% |
| **Total Non-Game** | **3,319,921** | **3,585,492** | **93%** |

**Notes:**
[1] The table includes only active apps. "Free apps" have no paid downloads, no IAPs, and no subscriptions.
[2] "Free apps" may include apps with advertising.
[3] Percentages are with respect to the total count of apps in each category.
[4] Apps with unknown categories are excluded from analysis.

**Source:**
[1] Play App Catalog, GOOG-PLAY-001507601 and GOOG-PLAY-001507602

Highly Confidential – Attorneys' Eyes Only

# Exhibit 3

## Number and Percent of Game Apps that are Free, by Category

*Published Apps as of May 5, 2021*

| App Category | Number of Free Apps | Total Number of Apps | Percent of Apps that are Free |
|---|---|---|---|
| Arcade | 66,403 | 84,198 | 79% |
| Casual | 63,865 | 81,400 | 78% |
| Puzzle | 57,968 | 78,987 | 73% |
| Action | 29,608 | 42,179 | 70% |
| Educational | 29,252 | 38,306 | 76% |
| Adventure | 26,768 | 35,845 | 75% |
| Simulation | 21,083 | 31,843 | 66% |
| Trivia | 16,874 | 20,909 | 81% |
| Board | 12,091 | 16,316 | 74% |
| Role Playing | 7,131 | 15,978 | 45% |
| Word | 9,836 | 14,539 | 68% |
| Racing | 10,121 | 14,415 | 70% |
| Strategy | 8,635 | 14,403 | 60% |
| Card | 8,108 | 12,820 | 63% |
| Sports | 8,550 | 12,157 | 70% |
| Casino | 5,153 | 9,224 | 56% |
| Music | 4,807 | 6,078 | 79% |
| **Total Game** | **386,253** | **529,597** | **73%** |

**Notes:**

[1] The table includes only active apps. "Free apps" have no paid downloads, no IAPs, and no subscriptions.

[2] "Free apps" may include apps with advertising.

[3] Percentages are with respect to the total count of apps in each category.

[4] Apps with unknown categories are excluded from analysis.

**Source:**

[1] Play App Catalog, GOOG-PLAY-001507601 and GOOG-PLAY-001507602

Highly Confidential – Attorneys' Eyes Only

# Exhibit 4

**Percent of Apps and Consumer Spend with Subscriptions or IAPs**

*August 2016 - December 2021*

| | Percentage of Apps With Subscriptions or IAPs | Subscriptions and IAPs as a Percentage of Consumer Spend | Subscriptions and IAPs as a Percentage of Google Play Service Fees |
|---|---|---|---|
| Proposed Developer Class Members | 43% | 99% | 99% |
| Proposed Consumer Class Members | 54% | 99% | N/A |

**Sources:**
[1]  App-level Spend Data, Developers, GOOG-PLAY-005535885 and GOOG-PLAY-010801689
[2]  App-level Spend Data, Consumers, GOOG-PLAY-005535886 and GOOG-PLAY-010801688

Highly Confidential – Attorneys' Eyes Only

# REDACTED VERSION

# Exhibit A3
# to
# C. Cramer Declaration

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION**<br><br>THIS DOCUMENT RELATES TO:<br><br>*In re Google Play Consumer Antitrust Litigation*, Case No. 3:20-cv-05761-JD | No. 3:21-md-02981-JD<br><br>**CLASS CERTIFICATION REPLY REPORT OF HAL J. SINGER, PH.D.**<br><br>Judge: Hon. James Donato |

HIGHLY CONFIDENTIAL UNDER PROTECTIVE ORDER

### Introduction and Assignment

1.      I have been asked by counsel for Consumer Plaintiffs to respond to the expert report of Dr. Michelle Burtis ("Burtis Report").[1] As detailed below, the Burtis Report does not cause me to alter any of the opinions expressed in my class certification report ("Singer Report").[2]

2.      In the Singer Report, I concluded that common methods and evidence demonstrate that, in the absence of Google's anticompetitive conduct, all or almost all Consumer Class members would have paid lower prices for Apps and In-App Content.[3] I demonstrated that Google has monopoly power in the Android App Distribution Market, gained and maintained through exclusionary contracting practices and artificial technological barriers.[4] I further demonstrated that Google has extended its power into the In-App Aftermarket by tying it to the Android App Distribution Market using the Aftermarket Restrictions.[5]

3.      In the Singer Report, I used standard economic methods, data, and evidence common to the Class to show that the Challenged Conduct resulted in antitrust injury to all or almost all Class members, with aggregate damages of up to $4.73 billion for consumers nationwide across the two separate product markets.[6] I also presented an alternative model of impact and damages that can be applied to a single, combined antitrust product market, including one variation that does not calculate a take-rate reduction, but instead finds common impact through direct consumer subsidies.[7] Dr. Burtis is therefore mistaken when she claims that "Consumer Plaintiffs' claims of classwide antitrust impact depend on showing that there would be a reduction in service fees..."[8]

4.      I have also been asked to respond to both Dr. Burtis's and Dr. Michael Williams's analysis of pass-through.[9] The pass-through analyses of Drs. Burtis and Williams are unreliable and biased, and they are virtually guaranteed to underestimate pass-through in a competitive but-for world with steering and discounting—conditions that were absent in their "natural experiments." Although their pass-through analyses suffer from numerous methodological flaws that render both of their analyses unreliable and uninformative, it bears emphasis that no "corrections" to their methods could produce reliable pass-through estimates, given (1) the limitations that Google placed on a developer adjusting its prices, (2) the lack of any incentive to rebate prices to renewing

---

1.  Expert Report of Dr. Michelle M. Burtis (March 31, 2022) [hereafter, Burtis Report].
2.  Expert Report of Hal J. Singer, Ph.D. (February 28, 2022) [hereafter, Singer Report]. Unless otherwise defined, capitalized terms herein are defined the same as they are in the Singer Report. The materials I relied upon in forming my opinions are noted in the footnotes throughout this report or otherwise listed in Appendix 1, or in the Singer Report. I reserve the right to supplement, expand, or amend my opinions.
3.  *Id.* ¶2. I also concluded that Consumer Plaintiffs would also have benefitted from enhancements to output, quality, and consumer choice in a more competitive but-for world. *Id.*
4.  *Id.* Dr. Burtis accepts for purposes of her analysis that "the alleged relevant antitrust markets are properly defined," that "Google Play had market power in the[] claimed relevant markets," and that "in the but-for world, Google Play would face more competition." Burtis Report ¶¶42-44.
5.  Singer Report ¶2.
6.  *Id.* ¶274.
7.  *Id.* ¶¶245-256.
8.  Burtis Report ¶11.
9.  *Id.* ¶¶173-178; ¶¶280-295; Expert Report of Michael Williams (February 28, 2022) [hereafter, Williams Report] ¶¶76-88; ¶¶111-124. Dr. Williams is one of the economic experts for the Developer Class.

fixing crashes or errors reported by users of the app, 2) adding features requested by users after release, 3) user support … and 4) scaling costs."[49]

23.    Dr. Burtis claims that "if an app has zero (or close to zero) marginal cost, a reduction in the service fee rate will be less likely to lead to a change in the retail price of the app."[50] Ignoring the evidence of positive marginal costs above, if what Dr. Burtis was proposing were true, then imposing a percentage sales tax on an App should have little or no effect on its pricing. But, as explained in the Singer Report, when a digital product is subject to a sales tax, this burden is typically passed through in full to the customer.[51] More generally, Google's own data shows a positive and highly statistically significant relationship between taxes and the price of Apps and In-App Content.[52] In addition, according to Dr. Burtis's logic, developers would not charge a higher price in the Play Store than on their websites. That some do, as shown in Table 9 of the Singer Report, implies that (despite the Challenged Conduct), lower take rates have led to lower prices for these developers.

24.    More fundamentally, Dr. Burtis ignores that the competitive but-for world is a long-run equilibrium, in which Google's take rate is substantially and permanently lower for all or almost all developers. Standard economics shows that a developer's decision to enter and remain in the market depends on its ability both to cover its explicit costs and to earn a competitive rate of return. A developer obligated to pay 30 percent of its revenue to Google in perpetuity needs to charge a higher price to consumers than a developer facing a substantially and permanently lower take rate; the greater the take rate, the higher the developer's price will need to be for the developer to earn a competitive rate of return.[53]

25.    In summary, demonstrating classwide impact does not require individualized analysis of developer costs; what matters is that developers with substantially and permanently lower costs in the but-for world would charge lower prices to all or almost all Class members.[54] As explained in Part II.A.1 below, I have employed standard economic models that fit the data and facts of this case to quantify this pass-through.

### 2.    Individualized Analysis of Developer Pricing Strategies Is Not Necessary to Demonstrate Classwide Impact

26.    In Part VI.B.2 of the Burtis Report, Dr. Burtis claims that individualized inquiry would be necessary because many developers use a "strategy of setting retail prices that end in '99.'"[55] According to Dr. Burtis, developers would be reluctant to reduce prices to a number not

---

49.  *Id.* at 1477.
50.  Burtis Report ¶142.
51.  Singer Report ¶244.
52.  In the Singer Report, I performed instrumental variable ("IV") regressions using Google's app revenue metrics data. Singer Report ¶¶237-238. In the first stage of the IV regressions, taxes are used as an exogenous instrument that shifts price independently of other demand drivers. According to those first-stage regressions, there is a positive and highly statistically significant relationship between taxes and App prices, even after controlling for more than 200,000 App-level fixed effects.
53.  Singer Report ¶227.
54.  *Id.* Part V.D.
55.  Burtis Report ¶148.

ending in $0.99. Dr. Burtis presents statistics suggesting that 97 percent of transactions in the Play Store are at prices ending in "99,"[56] but (as before) fails to disclose that more than 20 percent of the top paid Apps in the Play Store have initial download prices that *do not* end in "99,"[57] indicating that developers are willing to prominently display such prices to consumers. More broadly, Google's transaction data records at least 130,869,000 U.S. transactions at prices that do not end in "99." This is inconsistent with Dr. Burtis's claim that developers would somehow feel compelled to charge prices ending only in "99" in the but-for world.

27.      According to Dr. Burtis's logic, developers would not charge a price ending with any digits other than 99 for downloading an App on their websites. That they do, as shown in Table 9 of the Singer Report, implies that developers are willing to charge prices that violate the "99 rule" when passing on the marginal cost savings from lower take rates to their customers.

28.      To illustrate, suppose that a developer has consistently charged $1.99 for In-App Content in the actual world due, in part, to focal-point pricing. Google would have kept $0.597 per transaction (equal to 30 percent of $1.99), remitting the remainder to the developer. Steering is prohibited for this developer in the actual world. The gross margin on each in-app transaction (before considering other marginal costs) is $1.39 (equal to $1.99 less $0.597). In a but-for world, a new payment processor (such as Paddle) emerges due to the elimination of the Aftermarket Restrictions and charges a ten percent take rate, which for this developer, would be $0.199 at the original price of $1.99. With steering permitted, the developer can realize cost savings of $0.398 per transaction (equal to approximately $0.597 less $0.199), but only if the developer can induce its customers to use the new payment processor rather than Google Play Billing. At this point, it is now profit-maximizing for the developer to deviate from focal-point pricing and share a portion of the savings with its customer via a lower price for in-app purchases. For example, the developer could drop its price for In-App Content made via the new processor to (say) $1.79, effectively splitting the savings with the customer for making the right choice. The developer's fee to the third-party payment processor falls to $0.179 per transaction (equal to 10 percent of $1.79). The developer's new gross margin (before considering other marginal costs) on transactions processed via the third-party processor is $1.61 (equal to $1.79 less $0.179), which exceeds the prior gross margin of $1.39. It no longer pays to abide by focal-point pricing. A key reason we do not see such deviations from focal-point pricing in the actual world is that developers are not afforded the opportunity to steer due to the Aftermarket Restrictions. Moreover, in the few episodes where we do observe steering in the actual world, developers have been observed to deviate from 99-cent pricing increments, as shown in Table 9 of the Singer Report.

29.      Dr. Burtis also ignores that Google *required* developers, until very recently, to charge at least 99 cents. Thus, for a large number of developers, the observed prices in the actual world could be the result of a restraint that Google imposed on their pricing. Record evidence indicates

---

56.  *Id*. Figure 7.

57.  Of the 200 "Top paid apps" in the Play Store, 43 of them (or 21.5 percent) have initial download prices that do not end in "99." *See* backup materials to this report. *See also* Top Paid Apps, Google Play, *available at* https://play.google.com/store/apps/collection/cluster?clp=0g4jCiEKG3RvcHNlbGxpbmdfcGFpZF9BUFBMSUNBVE lPThAHGAM%3D:S:ANO1ljLdnoU&gsr=CibSDiMKIQobdG9wc2VsbGluZ19wYWlkX0FQUExJQ0FUSU9OEAc YAw%3D%3D:S:ANO1ljIKVpg.

that developers requested (and ultimately received) increased pricing flexibility, eventually persuading Google to abandon its $0.99 pricing floor, so that they could deviate from $.99.[58] That Google imposed a 99-cent restriction on developers implies that Google believed developers would deviate from such pricing; if focal-point pricing was as powerful as Dr. Burtis claims, Google's restraint would have been unnecessary. I understand that Plaintiffs challenged Google's 99-cent restriction in the Complaint,[59] as undermining price competition among developers, which implies that such a restriction would be absent in the but-for world.

30.     To the extent developers would prefer to maintain "supermarket-style" pricing in the but-for world, they could do so simply by ending their prices in "9," instead of "99" (e.g., $2.49), or in or in "5" (e.g. $4.95) as many do today.[60] (Thus, the solution above to my hypothetical example of steering was $1.79, twenty cents below $1.99, but still ending in a nine.) Sellers' strategy of ending prices in "9" or "5", such as $2.99 or $2.95" is commonly known as "odd pricing," "psychological pricing," or "charm pricing." The strategic reasoning that underlies this practice rests on the belief that consumers will focus on the numbers to the left of the decimal, thus demonstrating higher demand for a good priced at $2.99 than $3.00, despite the negligible price difference of one cent. The economic literature has classified odd prices to include those within 5 cents of the nearest highest dollar (.95 to .99) or one cent below the next highest ten cents (.19, .29, etc.).[61] Market practitioners sometimes apply the same heuristic, underscoring the fact that odd pricing does not limit itself only to prices ending in "99."[62] Thus, Dr. Burtis errs in her attempt to cabin this strategy to such prices. Nothing would prevent developers from setting prices at $1.79 versus $1.99, for

---

58.  See GOOG-PLAY-000355570.R at GOOG-PLAY-000355597.R ("From the developers perspective, they want more flexibility around their pricing. Many Developers that tested sub dollar pricing find this strategy effective, and they have asked us to expand the sub dollar capability to more markets."). The Play Store ultimately removed its $0.99 minimum pricing rule in our around early 2022. Archived web pages show that the Play Store had a U.S. minimum price of $0.99 as of late 2021. Play Console Help, Supported Locations for Distribution to Google Play Users, accessed Dec. 27, 2021, available at https://web.archive.org/web/20211227224037/https://support.google.com/googleplay/android-developer/answer/10532353?visit_id=637762416354084080-1400722469&rd=1. As of mid-February 2022, the minimum price is listed at $0.05. Play Console Help, Supported Locations for Distribution to Google Play Users, accessed Feb. 18, 2022, available at
https://web.archive.org/web/20220218131358/https://support.google.com/googleplay/android-developer/answer/10532353?visit_id=637807868385671271-2942202130&rd=1.

59.  Complaint at ¶¶18, 173, In re Google Play Consumer Antitrust Litigation, No. 3:20-CV-05761-JD (Dec. 20, 2021).

60.  See, e.g., Top Paid Apps, Google Play , available at
https://play.google.com/store/apps/collection/cluster?clp=0g4jCiEKG3RvcHNlbGxpbmdfcGFpZF9BUFBMSUNBVElPThAHGAM%3D:S:ANO1ljLdnoU&gsr=CibSDiMKIQobdG9wc2VsbGluZ19wYWlkX0FQUExJQ0FUSU9OEAcYAw%3D%3D:S:ANO1ljIKVpg. (showing various "Top paid apps" with prices that do not end in "99." For example, as of April 21, 2022, the third most-popular paid App was "Torque Pro (OBD 2 & Car)," priced at $4.95 per download on the Play Store. Another paid App in the Top 20 was "Tasker," priced at $3.49 per download on the Play Store).

61.  Judith Holdershaw, Philip Gendall and Ron Garland, The Widespread Use of Odd Pricing in the Retail Sector, MARKETING BULLETIN, 8, 1997, 53-58, Research Note 1, available at http://marketing-bulletin massey.ac nz/V8/MB_V8_N1_Holdershaw.pdf.

62.  See PriceIntelligently, Odd-Even Pricing, available at https://www.priceintelligently.com/odd-even-pricing# ("Odd pricing refers to a price ending in 1,3,5,7,9 just under a round number, such as $0.19, $2.47, or $64.93"). See also, Shopify, Odd-Even Pricing, available at https://www.shopify.com/encyclopedia/odd-even-pricing ("Odd-even pricing is a pricing strategy involving the last digit of a product or service price. Prices ending in an odd number, such as $1.99 or $78.25, use an odd pricing strategy, whereas prices ending in an even number, such as $200.00 or 18.50, use an even strategy").

-14-

example, as a result of a decrease in the take rate. As illustrated in Figure 3 below, "supermarket pricing" is already observed in the Play Store, with prices at regular, ten-cent intervals.

FIGURE 3: PLAY STORE TRANSACTION PRICES AT TEN-CENT INTERVALS ($0.09 - $4.49)



*Source*: Google Transaction Data (GOOG-PLAY-007203251). Note: Prices are also observed at one-cent intervals (not shown here).

This pattern of ten-cent (or smaller) pricing increments remains consistent until price points above $100 are reached.[63]

31.     In Part VI.B.2 of the Burtis Report, Dr. Burtis also claims that individualized inquiry would be necessary because "[d]evelopers use other price-setting strategies, besides short-term profit maximization."[64] Dr. Burtis ignores that the basic economic logic of pass-through applies both to short-run and long-run profit maximization. In the short run, positive marginal costs are sufficient to generate pass-through given a change in the take rate (and Dr. Burtis has not shown that any developer faces zero marginal costs). Moreover, to remain in business over the long run, a firm must recover not just its marginal costs, but its recurring fixed costs, in addition to covering its cost of capital.[65] All else equal, developers facing higher take rates must charge higher prices to remain in business. Consumers will therefore pay lower prices in a more competitive but-for world, regardless of whether one assumes that developers are maximizing profit over the short run or the long run.

---

63.  Google Transaction Data (GOOG-PLAY-007203251).
64.  Burtis Report ¶¶153-154.
65.  Singer Report ¶¶223-226; *see also* Part I.B.1 above.

## II.  DR. BURTIS'S REBUTTALS TO MY ECONOMIC ANALYSIS OF PASS-THROUGH AND BUT-FOR TAKE RATES ARE WITHOUT MERIT

67.    In this Section, I respond to Part VIII of the Burtis Report.

### A.    Dr. Burtis's Rebuttals to My Economic Analysis of Pass-Through Are Without Merit

68.    In Part VIII.D of the Burtis Report,[122] Dr. Burtis argues incorrectly that my pass-through analysis "depends on unsupported assumptions, and includes no analysis of any service fee rate change or any cost change at all."[123] As detailed below, this is false: My pass-through analysis relies on standard economic methods showing how developers selling differentiated Apps would optimally adjust prices downward, according to the degree of concentration in their App category, in response to a decrease in marginal costs due to substantially and permanently lower take rates in the competitive but-for world. Dr. Burtis does not dispute that my pass-through calculations are based on standard economic models, nor does she dispute that I used standard econometric techniques to establish their applicability to the transactional data produced by Google. Instead, Dr. Burtis misleadingly criticizes the standard pass-through formulae derived from these standard economic models for their (relative) simplicity, ignoring all the calculations that work in the background to produce a deceptively straightforward result.

69.    Dr. Burtis also claims incorrectly that my pass-through analysis "produces false results" based on pass-through analyses she performs purporting to demonstrate that various Apps' prices were unchanged after the developers experienced a decrease in the take rate.[124] As detailed in Part IV below, Dr. Burtis's pass-through analysis is fatally flawed. None of Dr. Burtis's pass-through analysis is capable of reliably measuring the effects of the substantially and permanently lower take rates for all or almost all developers that would have prevailed in a more competitive but-for world where Google's anticompetitive restraints were absent.

### 1.    My Pass-Through Methodology Relies on Standard Economic Models That Fit the Data and Facts of This Case

70.    This section responds to Part VIII.D.1 of the Burtis Report. In the Singer Report, I explained that all or almost all developers would pass through to consumers at least a portion of any savings from a substantially and permanently lower take rate in a more competitive but-for world.[125] This conclusion flows from the elementary economic principle that prices depend on costs and do not depend on the specific assumptions of any particular economic model.[126] To calculate the extent

---

122.    Part VIII of the Burtis Report begins with VIII.D. (There are no sections titled VIII.A., VIII.B, or VIII.C).
123.    Burtis Report ¶277.
124.    *Id.*
125.    Singer Report Part V.D.
126.    *Id. See also* Jerry Hausman & Greg Leonard, *Efficiencies from the Consumer Viewpoint,* 17(3) GEORGE MASON LAW REVIEW 707, 708 (1999) ("What would be the effect on prices to consumers from the cost reduction? Economic theory makes a straightforward prediction: The decrease in cost will lead to a decrease in price, with the relationship between the decreases in cost and price depending on the shape of the demand curve.").

of pass-through, I used standard logit demand systems.[127] I did so only after confirming econometrically that the logit demand model fits the data well for the Play Store's various App categories: The price coefficients have the expected (negative) sign and are highly statistically significant; the logit demand model explains the vast majority (more than 85 percent) of the variation in the price of Apps and In-App Content.[128] My logit regressions control for extensive app-level variation, including over 200,000 App-level fixed effects.[129]

71.    Dr. Burtis claims that my pass-through analysis "does not include service fees or prices,"[130] and that it "includes no analysis of any service fee rate change or any cost change[.]"[131] This is false. The pass-through rate calculation proceeds in two steps. Step one solves for the profit-maximizing *price* for a firm facing consumer demand characterized by the logit specification, taking into consideration the developers' marginal costs, including but not limited to *service fees*. In step two, the model solves for the pass-through rate, by calculating how much the profit-maximizing price will change in response to a change in marginal cost. It is therefore false for Dr. Burtis to claim that the logit demand model fails to account for developers' prices or marginal costs, both of which are incorporated in the analysis. My analysis relies on standard economic calculations showing how developers selling differentiated Apps would optimally adjust prices downward in response to a decrease in marginal costs brought about by substantially and permanently lower take rates in the competitive but-for world.[132]

72.    Dr. Burtis faults the standard logit pass-through formula for its (relative) simplicity,[133] ignoring all the calculations of the optimal price and pass-through rate that underly

---

127.    Dr. Burtis concedes that logit demand is "frequently used in economics[.]" Burtis Report ¶306. *See also* Singer Report ¶236, n. 507; Nathan Miller, Conor Ryan, Marc Remer, & Gloria Sheu, *Approximating the Price Effects of Mergers: Numerical Evidence and an Empirical Application* DOJ Economic Analysis Group Discussion Paper 12-8 (2012), at 2 (explaining logit is one of the demand systems "that commonly are employed in antitrust analysis.") Dr. Burtis cites to a very recent (2021) publication to suggest that some academics advocate alternatives to the logit model and other standard demand systems. Burtis Report ¶307, n. 365, (citing Steven Berry & Phillip Haile, "Foundations of Demand Estimation," *in* 4(1) *Handbook of Industrial Organization* (Elsevier 2021). But even that source explains that the logit demand model is a "common parametric demand specification," and reviews the logit demand model in detail. *Id.* at 8, and at 33-35. Moreover, the "random coefficient" demand estimation methods touted by academics such as Berry & Haile (2021), *supra*, as a possible alternative to standard demand systems such as logit, suffer from well-known computational problems, which can severely limit their applicability and accuracy when applied to real-world data sets. *See, e.g.* Christopher Knittel & Konstantinos Metaxoglou, *Estimation Of Random-Coefficient Demand Models: Two Empiricists' Perspective* 96(1) REVIEW OF ECONOMICS AND STATISTICS 34 (2014) ("We document the numerical challenges we experienced estimating random-coefficient demand models as in Berry, Levinsohn, and Pakes (1995) using two well-known data sets and a thorough optimization design. The optimization algorithms often converge at points where the first-and second-order optimality conditions fail. There are also cases of convergence at local optima. On convergence, the variation in the values of the parameter estimates translates into variation in the models' economic predictions. Price elasticities and changes in consumer and producer welfare following hypothetical merger exercises vary at least by a factor of 2 and up to a factor of 5.")

128.    Singer Report ¶¶234-240. The only exception is the "Transportation" category, which accounts for less than percent of consumer expenditures.

129.    *Id.* Table 7.

130.    Burtis Report ¶28.

131.    *Id.* ¶277.

132.    Singer Report ¶239, n. 516 (citing Nathan Miller, Marc Remer, & Gloria Sheu, *Using cost pass-through to calibrate demand*, 118 ECONOMICS LETTERS 451, 452-453 (2013)).

133.    Burtis Report ¶280.

and produce a deceptively straightforward result. These calculations begin with the standard economic principle that firms set their prices to maximize profit—that is, by setting marginal revenue equal to marginal cost.[134] When marginal cost falls—due, in this case, to a substantial and permanent reduction in the take rate—developers will find that their prior prices are no longer profit-maximizing. Standard economics prescribes that developers will therefore decrease their prices until marginal revenue once again equals marginal cost.[135] When one solves for the extent of this price decrease in relation to the change in marginal costs, the result obtained from the logit demand model is that each developer will optimally decrease its price by an amount proportional to its share of revenues within the product category.[136]

73.     This yields the economically intuitive result that developers with a lower market share (and thus less pricing power) will be inclined to pass through a larger proportion of a given cost decrease to consumers. For example, under the logit demand model, a developer with a market share of ten percent in a given product category has a pass-through rate of 90 percent: If marginal costs fall by $1 per transaction, the profit-maximizing response would be to lower its prices by $0.90. By aggregating across the market shares for all developers within a product category, I calculate the aggregate decrease in prices flowing from the decreased take rate that would have prevailed in the competitive but-for world.[137]

74.     In faulting the standard logit pass-through formula for its (relative) simplicity, Dr. Burtis also ignores that there is nothing unusual in standard economics about pass-through calculations that boil down to (relatively) simple formulae. For example, as pointed out in the Singer Report, whenever the demand curve is assumed to be linear, the pass-through rate is always exactly 50 percent, regardless of how steep or flat the curve is.[138] For an assumed constant elasticity demand curve, the pass-through rate can also be calculated using a (relatively) simple formula.[139] As explained above, I selected the logit demand model because my econometric analysis confirms that it fits the data well.[140]

---

134.   Miller, Remer, & Sheu, *supra*, at 452.

135.   *Id.* at 452.

136.   *Id.* at 453 (Equation 6 provides the formula for inverse of the pass-through rate, multiplied by negative one, which is: $-M/[M - Q_j]$, where $M$ is the market size and $Q_j$ is the quantity of product j. The pass-through rate is obtained by multiplying the expression by negative one and inverting it, which yields $[M - Q_j]/M$)). Dr. Burtis concedes that the logit pass-through rates are derived, not assumed. Burtis Report ¶28.

137.   For example, Table 5 of the Singer Report shows that developer savings per transaction in the In-App Aftermarket would be $1.49. Because the pass-through rate is 89.9 percent, consumer prices would decline by $1.34 per transaction.

138.   Singer Report ¶223.

139.   Miller, Remer, & Sheu, *supra*, at 452-453 (showing that constant-elasticity or "log-linear" demand curves have a pass-through rate equal to $E/(E - 1)$, where $E$ is the demand elasticity).

140.   Singer Report ¶¶234-240 (standard logit regressions show that the price coefficients have the expected (negative) sign and are highly statistically significant; the logit demand model explains the vast majority (more than 85 percent) of the variation in the price of Apps and In-App Content). In any event, no matter what demand specification one chooses—logit, linear, constant-elasticity—it would follow that all or almost all consumers would have been better off in a competitive world. The elementary economic principle that prices depend on costs does not depend on the specific assumptions of any particular economic model. Singer Report Part V.D.

75.     Dr. Burtis argues incorrectly that the Play Store categories employed in my pass-through analysis, which have been used consistently by the Play Store throughout the Class Period, "are not based on any economic analysis or reasoning[.]"[141] The Play Store's categories make economic sense because they reflect economically reasonable groupings of consumer tastes for different varieties of Apps, as recognized by a range of industry participants, including Google. According to Google, "Categories and tags help users to search for and discover the most relevant apps in the Play Store."[142] Record evidence indicates that Google uses App categories to conduct consumer research by application type. For example, a July 2017 consumer survey was designed "[t]o provide an understanding of how *within each category* users discover apps, the triggers and barriers that lead to a subscription."[143] A 2014 App Annie study commissioned by Google tracked download and revenue growth based on Google's categories.[144] An October 2015 Google study on differences in consumer spend between iOS and Android also used app categories to segment its analysis.[145] Google recognized in its 2016 Plan for "Google Play Developer Marketing" that "developers engage more with category-specific content" and planned for "category expertise, [to] drive actionable insights."[146]

76.     The Play Store's categories are also used by industry analysts.[147] Developers, who presumably know their customers best, use Google's categories to sell their Apps in competition with other developers; they have clear incentives to select a meaningful category to maximize the value of their Apps.[148] If the developer of a "Parenting" App misclassified their App into the "Auto & Vehicles" category, that developer's ability to compete would likely be compromised. The evidence also shows that the Play Store's categories are economically meaningful to consumers, given their prominent display within the Play Store, and given that consumers can filter the Apps

---

141.   Burtis Report ¶279.

142.   Play Console Help, *Choose a category and tags for your app or game, available at* https://support.google.com/googleplay/android-developer/answer/9859673?hl=en#zippy=%2Capps%2Cgames (listing each of the Play Store's categories, with a description of each).

143.   GOOG-PLAY-000294117.R at GOOG-PLAY-000294118.R (emphasis added). The survey, of users in Japan, targeted users of apps "in seven categories: Dating, Entertainment, Music, Health & Fitness, News, Education, Manga/Webtoon & Family."

144.   GOOG-PLAY-000076773 at GOOG-PLAY-000076785 ("Although Games dominate revenue gains, growth is almost universal across categories."); GOOG-PLAY-000076766 (cover email noting that "we worked with App Annie on the attached report that was released this morning.").

145.   GOOG-PLAY-000579868.R at GOOG-PLAY-000579870.R, GOOG-PLAY-000579878.R.

146.   GOOG-PLAY-000303918.R at GOOG-PLAY-000303926.R, GOOG-PLAY-000303930.R.

147.   *See, e.g.,* David Curry, *App Data Report,* BUSINESS OF APPS (2022) at 10 (chart showing Google Play categories by volume); *see also* SENSOR TOWER, *2021 – 2025 Mobile Market Forecast,* (2021) at 39, *available at* go.sensortower.com/rs/351-RWH-315/images/Sensor-Tower-2021-2025-Market-Forecast.pdf (showing projected consumer spending for top categories, including Games, Social, Entertainment, Comics, Productivity, and Health & Fitness); STATISTA, *Most popular Google Play app categories as of 1st quarter 2021, by share of available apps, available at* https://www.statista.com/statistics/279286/google-play-android-app-categories.

148.    Play Console Help, Choose a category and tags for your app or game, *supra* ("**Choose a category and tags for your app or game** You can choose a category and add tags to your app or game in Play Console. Categories and tags help users to search for and discover the most relevant apps in the Play Store. Users can view apps by using a browser and the Google Play app.") (emphasis in original).

-30-

displayed to them based on the Play Store categories.[149] Apple's App Store uses a similar set of categories, as seen below:

---

149.   *See*  Google Play Store, *Apps, available at* https://play.google.com/store/apps  (click on drop-down menu).

TABLE 2: COMPARISON OF PLAY STORE AND APP STORE CATEGORIES

| Play Store Category Name | App Store Category Name |
| --- | --- |
| Art and Design | Graphics and Design |
| Auto & Vehicles | N/A |
| Beauty | Lifestyle |
| Books & Reference | Books/Reference |
| Business | Business |
| Comics | Books |
| Communications | Social Networking |
| Dating | Social Networking |
| Education | Education |
| Entertainment | Entertainment |
| Events | Entertainment |
| Finance | Finance |
| Food and Drink | Food and Drink |
| Games | Games |
| Health and Fitness | Health and Fitness |
| House & Home | Lifestyle |
| Lifestyle | Lifestyle |
| Maps & Navigation | Navigation |
| Media & Video | Photo and Video |
| Medical | Medical |
| Music and Audio | Music |
| News and Magazines | Magazines and Newspapers/News |
| Parenting | Lifestyle |
| Personalization | Graphics and Design/Utilities |
| Photography | Photo and Video |
| Productivity | Productivity |
| Shopping | Shopping |
| Social | Social Networking |
| Sports | Sports |
| Tools | Utilities/Developer Tools |
| Transportation | Navigation/Travel |
| Travel & Local | Travel |
| Video Players & Editors | Photo and Video |
| Weather | Weather |

*Note:* Separation of category name by "/" implies that the Play Store category could encompass multiple App Store categories.
*Sources:* https://developer.apple.com/app-store/categories/ ; Singer Report Table 7.

77.    Although the logit demand system incorporates market shares, it bears emphasis that this need not be shares of a relevant antitrust product market. As DOJ economist Gregory Werden has observed, the market used in a logit demand system "may be more or less inclusive than a

relevant antitrust market."[150] The logit demand model also does not imply that all products in the market are interchangeable, but instead allows for product differentiation.[151] Products that are more attractive to most consumers (and thus have higher market shares) command more pricing power than less-attractive products with lower market shares.[152] What the logit demand system does imply is that developers in a given category pass through cost savings according to their dominance (or lack thereof) in the category, as measured by their market share within that category. For example, if Microsoft, which sells both Word and Excel, dominates the productivity category with its Microsoft 365 package (formerly known as Office, a bundle of Word, Excel, and PowerPoint), Microsoft is predicted to pass through a smaller portion of any cost reduction, all things equal. It is reasonable to assume that Microsoft 365 is a substitute for Google's bundle of productivity apps called Google Workspace. Both Microsoft 365 and Google Workspace are included in Google's "Productivity" category.

78.     Although there is no requirement that the market share for the logit demand model be computed in a relevant antitrust market, it bears noting that antitrust has recognized "cluster markets," in which the market is comprised of items that are not always substitutes. As antitrust scholar Herbert Hovenkamp has noted, cluster markets have aggregated products as diverse as office supplies.[153] In a cluster market, a hypothetical monopolist over (say) paperclips, staples, paper, and other office supplies can profitably raise prices above competitive levels, given that many customers are likely to purchase many or all of their office supplies from the same source. By the same logic, a hypothetical monopolist over games ranging from "Thomas and Friends" to "Poker – Texas Hold'em" could also likely wield monopoly power, given that many households likely "need or at least prefer the convenience of"[154] purchasing games for all members of the family from the same source.

79.     Even if one assumes that the "Games" category is overly broad, the same common methodology from the logit model can be used to calculate pass-through based on Google's seventeen subcategories of Games,[155] as Dr. Burtis concedes by performing the calculation

150.   Gregory Werden & Luke Froeb, *The Antitrust Logit Model For Predicting Unilateral Competitive Effects* 70 ANTITRUST LAW JOURNAL 257 (2002). Economists make use of market shares in industries that may not perfectly correspond to an antitrust product market. *See, e.g.*, José Azar, Ioana Marinescu & Marshall Steinbaum, *Labor Market Concentration*, 57(3) JOURNAL OF HUMAN RESOURCES (2020) (finding that variation in wages could be explained by measures of labor market concentration within an occupational code using vacancy shares from CareerBuilder.com).

151.   Gregory Werden & Luke Froeb, *The Effects of Mergers in Differentiated Products Industries: Logit Demand and Merger Policy* 10(2) JOURNAL OF LAW, ECONOMICS, & ORGANIZATION 407, 408 (1994) ("the logit model has direct policy relevance, since the 1992 Horizontal Merger Guidelines use it as the base case for the analysis of mergers in differentiated products industries.").

152.   *Id.* at 410 (equation (3) shows that the own price elasticity for a given product ($\varepsilon_j$) decreases with the market share ($\pi_j$)).

153.   Herbert Hovenkamp, *Digital Cluster Markets,* COLUMBIA BUSINESS LAW REVIEW at 31 (forthcoming 2022), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3820062 ("In the *Staples* merger case, the court defined a cluster market…The expert concluded 'that a *monopoly* provider of consumable office supplies would charge significantly more to large customers than Staples and Office Depot today charge these same customers.'").

154.   *Id.* at 7.

155.   The seventeen subcategories are Action, Adventure, Arcade, Board, Card, Casino, Casual, Educational, Music, Puzzle, Racing, Role Playing, Simulation, Sports, Strategy, Trivia, and Word. *See* Google Play Store, Choose a category and tags for your app or game, *available at* https://support.google.com/googleplay/android-developer/answer/9859673?hl=en.

herself.[156] This approach is overly granular, as it assumes (for example) that action games are not substitutes for adventure games, that card games are not substitutes for board games, and so on. In any case, this approach would yield an overall weighted average pass-through rate of 77 percent across all categories, compared with an 89.9 percent pass-through rate in the Singer Report.[157] If this alternative pass-through rate of 77 percent is used, my economic models would continue to show classwide impact and damages, with only minor differences in the but-for take rates.[158]

### 2. Dr. Burtis's Pass-Through Analysis Is  Incapable Of Reliably Measuring Pass-Through In A But-For World In Which All Or Almost All Developers Enjoy Permanently And Substantially Lower Take Rates

80.    In Part VIII.D.1 of the Burtis Report, Dr. Burtis asserts that the pass-through rates from my standard economic models are incorrect based on her flawed "pass-through" analysis, to which I respond in Part IV below. Dr. Burtis also presents examples of Apps that charge the same price when purchased through the App website or through the Play Store.[159] As explained in Part I.C.1 above, this ignores the anti-steering restrictions that explicitly prevent developers from directing customers inside the Play Store to lower-cost options outside the Play Store. An App that charges the same price within the Play Store and on its website has simply not adopted a steering strategy in the actual world.

### 3. Dr. Burtis's Claim That My Pass-Through Analysis Is "Not Consistent With Economics" Is Without Merit

81.    In Part VIII.D.3 of the Burtis Report, Dr. Burtis repeats the incorrect claims that my pass-through analysis does not account for marginal cost and that some (unspecified) developers might have zero marginal costs. I have responded to these claims in Parts I.B.1 and II.A.1 above. Dr. Burtis also argues that a calculation I provided to illustrate the economics of pass-through is inconsistent with the standard logit demand model that I employed to quantify pass-through in the but-for world.[160] Dr. Burtis is wrong. The calculation in question is based on the elementary economic principle that a profit-maximizing firm selling a single product will set its price based on the inverse of the elasticity of demand for that product.[161] That same principle of profit-maximization applies (albeit in a multi-product setting involving tens thousands of developers making

---

156.    Burtis Report ¶312; Exhibit 55.
157.    Within the Games category, the weighted average pass-through rate declines from 92 percent to 77 percent.
158.    Using a 77 percent pass-through rate, the but-for take rate in the Android App Distribution Market is 23.5 percent, which differs by only one tenth of a percentage point from the but-for take rate of 23.4 percent calculated in Table 3 of the Singer Report. Using a 77 percent pass-through rate, the but-for take rate in the In-App Aftermarket is 14.5 percent, which differs by only three tenths of a percentage point from the but-for take rate of 14.8 percent reported in Table 5 of the Singer Report. Aggregate damages in the Android App Distribution Market using a 77 percent pass-through rate come to $15.2 million, compared with $18.8 million calculated in Table 3 of the Singer Report. Aggregate damages in the In-App Aftermarket using a 77 percent pass-through rate come to $4.03 billion, compared with $4.71 billion calculated in Table 5 of the Singer Report.
159.    Burtis Report ¶297; Table 8.
160.    Burtis Report ¶¶299-305.
161.    Singer Report ¶224. *See also* William Landes & Richard Posner, *Market Power in Antitrust Cases,* 94(5) HARVARD LAW REVIEW 937 (1981).

## CERTIFICATE OF SERVICE

I certify that on June 8, 2023, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

/s/ Neal Kumar Katyal
Neal Kumar Katyal