# No. 23-15285

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

—————————

## IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION

—————————

On Appeal from the United States District
Court for the Northern District of California
(Case No. 21-md-2981) (District Judge James Donato)

—————————

## BRIEF OF WASHINGTON LEGAL FOUNDATION AS AMICUS CURIAE SUPPORTING APPELLANTS AND REVERSAL

—————————

John M. Masslon II
Cory L. Andrews
WASHINGTON LEGAL FOUNDATION
2009 Massachusetts Ave. NW
Washington, DC 20036
(202) 588-0302
jmasslon@wlf.org

June 15, 2023

# DISCLOSURE STATEMENT

Washington Legal Foundation has no parent company, issues no stock, and no publicly held company owns a ten percent or greater interest in it.

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ....................................................................i

TABLE OF AUTHORITIES...................................................................iii

INTEREST OF AMICUS CURIAE ........................................................ 1

INTRODUCTION.................................................................................. 1

STATEMENT ........................................................................................ 2

SUMMARY OF ARGUMENT ................................................................ 4

ARGUMENT ......................................................................................... 6

I.   THE DISTRICT COURT LACKED SUBJECT-MATTER JURISDICTION
     TO CERTIFY THE CLASS ............................................................... 6

     A.   All Named And Unnamed Plaintiffs Must Have Article
          III Standing For A District Court To Have Jurisdiction
          To Certify A Class ................................................................ 6

     B.   Plaintiffs Failed To Show That All Class Members
          Suffered An Injury In Fact ................................................... 9

II.  GOOGLE'S CONDUCT HELPS COMPETITION ................................. 15

CONCLUSION .................................................................................... 22

CERTIFICATE OF COMPLIANCE........................................................ 23

APPENDIX OF RECORD CITATIONS

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alig v. Rocket Mortg., LLC,*
52 F.4th 167 (4th Cir. 2022) ............................................................. 7

*Ariz. Christian Sch. Tuition Org. v. Winn,*
563 U.S. 125 (2011) .......................................................................... 6

*In re Asacol Antitrust Litig.,*
907 F.3d 42 (1st Cir. 2018) ............................................................. 14

*AT&T Mobility LLC v. Concepcion,*
563 U.S. 333 (2011) .......................................................................... 2

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.,*
9 F.4th 1102 (9th Cir. 2021) ..................................................... 15, 16

*Bilski v. Kappos,*
561 U.S. 593 (2010) ........................................................................ 17

*Blair v. Equifax Check Servs., Inc.,*
181 F.3d 832 (7th Cir. 1999) ............................................................ 1

*Blue Chip Stamps v. Manor Drug Stores,*
421 U.S. 723 (1975) .......................................................................... 2

*Bridge v. Phx. Bond & Indem. Co.,*
553 U.S. 639 (2008) ........................................................................ 14

*California v. Texas,*
141 S. Ct. 2104 (2021) ...................................................................... 6

*Comcast Corp. v. Behrend,*
569 U.S. 27 (2013) .......................................................................... 14

*Cordoba v. DIRECTV, LLC,*
942 F.3d 1259 (11th Cir. 2019) ........................................................ 8

# TABLE OF AUTHORITIES

*(continued)*

**Page(s)**

*Epic Games, Inc. v. Apple Inc.*,
    559 F. Supp. 3d 898 (N.D. Cal. 2021) ......................................... 19, 21

*Epic Games, Inc. v. Apple, Inc.*,
    67 F.4th 946 (9th Cir. 2023) ...................................................... 19, 21

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) .............................................................. 16

*FW/PBS, Inc. v. Dallas*,
    493 U.S. 215 (1990) ............................................................................. 6

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
    141 S. Ct. 1951 (2021) ........................................................................ 1

*Halvorson v. Auto-Owners Ins. Co.*,
    718 F.3d 773 (8th Cir. 2013) ............................................................... 7

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) ........................................................... 16

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ......................................................................... 6, 7

*Mazza v. Am. Honda Motor Co.*,
    666 F.3d 581 (9th Cir. 2012) ............................................................... 8

*McLaughlin v. Am. Tobacco Co.*,
    522 F.3d 215 (2d Cir. 2008) .............................................................. 14

*Messner v. Northshore Univ. HealthSystem*,
    669 F.3d 802 (7th Cir. 2012) ............................................................... 8

*Moser v. Benefytt, Inc.*,
    8 F.4th 872 (9th Cir. 2021) ................................................................. 4

*New York v. Meta Platforms, Inc.*,
    66 F.4th 288 (D.C. Cir. 2023) ...................................................... 21, 22

iv

# TABLE OF AUTHORITIES
(*continued*)

**Page(s)**

*Olean Wholesale Grocery Coop., Inc. v.*
*Bumble Bee Foods LLC,*
31 F.4th 651 (9th Cir. 2022) ..................................................... 8

*In re Rail Freight Fuel Surcharge Antitrust Litig.,*
725 F.3d 244 (D.C. Cir. 2013) .............................................. 14

*SmileDirectClub, LLC v. Tippins,*
31 F.4th 1110 (9th Cir. 2022) ............................................... 15

*Spokeo v. Robins,*
578 U.S. 330 (2016) .................................................................. 6

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta,*
552 U.S. 148 (2008) .................................................................. 2

*TransUnion LLC v. Ramirez,*
141 S. Ct. 2190 (2021) ...................................... 1, 6, 7, 8, 9

*Van v. LLR, Inc.,*
61 F.4th 1053 (9th Cir. 2023) ............................................... 9

*Wal-Mart Stores, Inc. v. Dukes,*
564 U.S. 338 (2011) ............................................................ 9, 13

*In re Zurn Pex Plumbing Prod. Liab. Litig.,*
644 F.3d 604 (8th Cir. 2011) ................................................. 7

## Constitutional Provisions

U.S. Const. art. I, § 8, cl. 8 ...................................................... 16

U.S. Const. art. III, § 2 ............................................................... 6

## TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

**Statutes**

15 U.S.C. § 1 ........................................................................... 15

35 U.S.C. § 101 ....................................................................... 17

35 U.S.C. § 154(a)(2) .............................................................. 17

**Rule**

Federal Rule of Civil Procedure 23(f) ....................................... 4

**Other Authorities**

*About Spotify*, Spotify ............................................................. 18

Andrew McAfee & Erik Brynjolfsson, *Machine, Platform,
    Crowd: Harnessing Our Digital Future* (2017) .................... 18

Dan L. Burk & Mark A. Lemley,
    *Policy Levers in Patent Law*,
    89 Va. L. Rev. 1575 (2003) ................................................. 17

David Curry, *Android Statistics (2023)*,
    Business of Apps (Feb. 27, 2023) ......................................... 2

David L. Wallace, *A Litigator's Guide to the 'Siren
    Song' of 'Consumer Law' Class Actions*,
    LJN's Prod. Liab. L. & Strategy 10 (Feb. 2009) ................... 1

Dean Takahashi, *Google launches in-app purchases
    that will make mobile apps more money*,
    Venture Beat (Mar. 29, 2011) ............................................... 3

Ibrahim Elbouchikhi, *Helping You Go Global with More
    Seamless Google Play Payments* (May 25, 2014) ............... 20

vi

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

L. Ceci, *Distribution of free and paid Android apps in the
Google Play Store from June 2019 to March 2023*,
Statista (Mar. 7, 2023) .............................................................. 3

Louis Bader & James D. Weinland,
*Do Odd Prices Earn Money?*,
8 J. Retailing 102 (1932) ........................................................ 11

Lydia Saad, *Americans Have Close but Wary Bond
With Their Smartphone*, Gallup (June 20, 2022) ................................. 2

Megan Jones, *The Real Reason Most Prices End in .99*,
Reader's Digest (June 3, 2022) ...................................................... 11, 12

*Protect Your Computer From Viruses,
Hackers, and Spies*, Cal. Att'y Gen. ................................................ 3

Richard A. Nagareda, *Class Certification
in the Age of Aggregate Proof*,
84 N.Y.U. L. Rev. 97 (2009) .................................................... 1

Sergiu Getlan, *Google banned 173K developer
accounts to block malware, fraud rings*,
Bleeping Computer (Apr. 27, 2023) ............................................ 19, 20

*Understanding Google Play's Service Fee*, Google .................................... 3

*What is Google Play Protect and what makes it the
most important part of your Android phone*,
Times of India (Dec. 29, 2021) ............................................ 19

William Landes & Richard Posner, *The Economic
Structure of Intellectual Property Law* (2003) ................................... 17

16 Wright & Miller, *Federal Practice and Procedure*
(3d ed. Apr. 2021 update) .................................................... 4

vii

## INTEREST OF AMICUS CURIAE[1]

Washington Legal Foundation is a nonprofit, public-interest law firm and policy center with supporters nationwide. WLF promotes free enterprise, individual rights, limited government, and the rule of law. It often appears as amicus in cases to oppose improper class-certification orders. *See, e.g.*, *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021); *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951 (2021).

## INTRODUCTION

Class certification is often "the whole shooting match." David L. Wallace, *A Litigator's Guide to the 'Siren Song' of 'Consumer Law' Class Actions*, LJN's Prod. Liab. L. & Strategy 10 (Feb. 2009); *see Blair v. Equifax Check Servs., Inc.*, 181 F.3d 832, 834 (7th Cir. 1999). "With vanishingly rare exception, class certification sets the litigation on a path toward resolution by way of settlement, not full-fledged testing of the plaintiffs' case by trial." Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 99 (2009). As the Supreme Court has recognized, "extensive discovery and the potential for

---

[1] No party's counsel authored any part of this brief. No one, apart from WLF and its counsel, contributed money intended to fund the brief's preparation or submission. All parties consented to WLF's filing this brief.

uncertainty and disruption in a lawsuit allow plaintiffs with weak claims to extort settlements from innocent companies." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 163 (2008) (citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 740-41 (1975)).

Given the importance of class certification in multi-district litigation, it is imperative that district courts properly apply Rule 23's requirements. Blindly certifying a class merely on the plaintiffs' say-so is a recipe for *in terrorem* settlements. *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 350 (2011). This case thus has far-reaching implications beyond this MDL. Reversal is necessary to stop district courts from certifying classes without each class member having Article III standing.

## STATEMENT

Almost every American over the age of ten has a smartphone. *See* Lydia Saad, *Americans Have Close but Wary Bond With Their Smartphone*, Gallup (June 20, 2022), https://tinyurl.com/2xv7hv64. About 45% of the phones in the United States run the Android operating system with most of the rest running Apple's iOS. David Curry, *Android Statistics (2023)*, Business of Apps (Feb. 27, 2023), https://tinyurl.com/4fx2mdrw. Both major operating systems have a store where consumers can

download applications for their phones, music, videos, and other digital content. On iOS, this store is called the "App Store," while on Android it is called "Google Play." *See Protect Your Computer From Viruses, Hackers, and Spies*, Cal. Att'y Gen., https://tinyurl.com/ys6xvy49 (last visited June 13, 2023).

About 97% of apps on Play are free. *See* L. Ceci, *Distribution of free and paid Android apps in the Google Play Store from June 2019 to March 2023*, Statista (Mar. 7, 2023), https://tinyurl.com/35z2twe7. Some of those apps make money with advertising, some build brand loyalty, and others are public services. The other 3% cost money. Google collects a fee when developers sell apps on Play. *See Understanding Google Play's Service Fee*, Google, https://tinyurl.com/yc7v3wjy (last visited June 13, 2023).

Apps can also allow in-app purchases. *See* Dean Takahashi, *Google launches in-app purchases that will make mobile apps more money*, Venture Beat (Mar. 29, 2011), https://tinyurl.com/4xf6fz9s. For example, a game may allow you to buy a special weapon that helps you defeat opponents. Or you can subscribe to a website, like The Athletic, which covers sports. Google also collects a fee when consumers make in-app purchases. Google's fees for Play purchases and in-app purchases vary by developer.

Over the past five years, Google decreased Play fees for some developers. *See* 1-ER-23 (citation omitted). But the developers have not passed along those savings to consumers. ECF 273 at 9.[2] Rather, they pocketed the extra revenue that they received from the reduced Play fees.

As part of a two-prong attack, three groups sued Google alleging that its Play policies are anti-competitive. App developers settled their claims with Google. Some States and consumers in seventeen States did not settle their claims. The District Court certified a multi-million-member class of consumers that have purchased apps on Play or made in-app purchases. This Court then granted Google's petition to appeal under Federal Rule of Civil Procedure 23(f). This Court can now review all aspects of the District Court's class-certification order. *See Moser v. Benefytt, Inc.*, 8 F.4th 872, 875 (9th Cir. 2021) (citing 16 Wright & Miller, *Federal Practice and Procedure* § 3931.1 (3d ed. Apr. 2021 update)).

## SUMMARY OF ARGUMENT

**I.A.** For a long time, this Court blessed district courts' certifying classes that included many uninjured plaintiffs. But the Supreme Court recently rejected this Court's precedent and held that district courts lack

---

[2] ECF citations are to the docket for 3:21-md-02981-JD (N.D. Cal.).

subject-matter jurisdiction to certify a class that includes uninjured class members. Such class-certification orders improperly allow federal courts to hear disputes outside Article III's case-or-controversy requirement.

**B.** Plaintiffs failed to satisfy their burden of showing that all named and unnamed class members suffered an injury in fact. Plaintiffs' expert overlooked major differences between class members and used an averaging method when concluding that damages could be calculated on a class-wide basis. This continued his pattern of overlooking differences between class members. The evidence shows that when Google reduced Play service fees most consumers did not see their apps' prices drop; developers pocketed the money. Because Plaintiffs failed to satisfy their burden of showing that all class members suffered an Article III injury, the District Court lacked subject-matter jurisdiction to certify the class.

**II.** Plaintiffs' underlying allegations are that consumers (and developers) are injured by Google's policies. This, however, is simply untrue. The evidence shows that Play policies help competition. This competition benefits Google, developers, and consumers. It (1) helps Google protect its brand, (2) ensures that developers have a reliable avenue to sell their goods with knowledge that they will get paid, and (3) gives consumers a "one-stop shop" for safe apps to use on their phones and

5

tablets. The pro-competitive benefits of Google's policies thus vastly outweigh any anti-competitive effects.

## ARGUMENT

## I. THE DISTRICT COURT LACKED SUBJECT-MATTER JURISDICTION TO CERTIFY THE CLASS.

### A. All Named And Unnamed Plaintiffs Must Have Article III Standing For A District Court To Have Jurisdiction To Certify A Class.

Federal courts' jurisdiction is limited to "'Cases' and 'Controversies.'" *California v. Texas*, 141 S. Ct. 2104, 2113 (2021) (quoting U.S. Const. art. III, § 2). For a case or controversy to exist, plaintiffs must have standing. *See Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 133 (2011) (citation omitted). Plaintiffs bore the burden of establishing standing. *See FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990). They failed to meet that burden.

"[T]he irreducible constitutional minimum of standing consists of three elements." *Spokeo v. Robins*, 578 U.S. 330, 338 (2016) (citations omitted). A plaintiff must show "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion*, 141 S. Ct. at 2203 (citing *Lujan*

*v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). Plaintiffs failed to satisfy the first element because Google's policies did not harm many of the class members.

Because the "constitutional requirement of standing is equally applicable to class actions," "each [class] member must have standing." *Halvorson v. Auto-Owners Ins. Co.*, 718 F.3d 773, 778-79 (8th Cir. 2013) (citations omitted); *see Alig v. Rocket Mortg., LLC*, 52 F.4th 167, 168 (4th Cir. 2022) (per curiam) (citation omitted). In other words, "a named plaintiff cannot represent a class of persons who lack the ability to bring suit themselves." *In re Zurn Pex Plumbing Prod. Liab. Litig.*, 644 F.3d 604, 620 (8th Cir. 2011) (quotation omitted). So all absent class members must have Article III standing.

The Supreme Court's *TransUnion* decision highlights this requirement. There, the Court held that every member of a class must have standing to assert claims against a defendant. *See TransUnion*, 141 S. Ct. at 2203-07. *TransUnion* shows that, to sustain class-certification, all absent class members must have standing to sue. Although the Court held that over 1,800 absent class members had standing to assert one claim, it held that those same absent class members lacked standing to assert two other claims.

7

True, the Court reserved the issue of whether every class member must show standing before a court certifies a class. *TransUnion*, 141 S. Ct. at 2190 n.4 (citing *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1277 (11th Cir. 2019)). But *Cordoba* shows which way the Court will go once it definitively decides the issue. The Eleventh Circuit held that class certification is improper when many proposed class members suffered no injury. *See* 942 F.3d at 1277. So even if the Court might one day tolerate a stray uninjured class member at the class-certification stage, *TransUnion* recognizes that class-certification is improper when many class members suffered no injury.

This Court correctly understands *TransUnion* to bar classes with many uninjured class members. In *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, this Court reiterated that proposed class members must demonstrate standing before certifying a damages class. 31 F.4th 651, 682 n.32 (9th Cir. 2022) (en banc). At a bare minimum, a class cannot be certified when "a great number of members . . . could not have been harmed." *Id.* at 669 n.14 (quoting *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 824 (7th Cir. 2012)); *see Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 596 (9th Cir. 2012).

8

This case is easier than *TransUnion*, *Cordoba*, and *Olean*. Even though some class members may have suffered an injury in fact, there was evidence showing that many class members suffered no harm. Plaintiffs thus failed to satisfy their burden of showing that all class members suffered an injury in fact. This failure should have doomed their class-certification motion. The District Court erred by granting it.

## B. Plaintiffs Failed To Show That All Class Members Suffered An Injury In Fact.

Plaintiffs allege that Google's policies injured them only because they had to pay more for apps and in-app purchases. *See* 1-ER-5. If true, this type of injury would certainly satisfy Article III's requirements. *See Van v. LLR, Inc.*, 61 F.4th 1053, 1064 (9th Cir. 2023) (citing *TransUnion*, 141 S. Ct. at 2204). But it's not true. Even at this early stage of litigation, Plaintiffs failed to carry their burden of showing that all class members suffered an Article III injury by paying more for apps and in-app purchases because of Google's policies.

To satisfy Rule 23, a class-action plaintiff must prove each element of the class-action inquiry. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The only way to "prove" these "facts," of course, is with admissible evidence. It follows that a district court may consider expert

evidence at the class-certification stage only if it meets Rule 702's rigorous standard for admissibility. The expert's opinion must be (1) relevant; (2) based on sufficient facts or data; (3) the product of reliable principles and methods; and (4) reliably applied to the facts of the case.

Dr. Hal Singer is a well-known expert witness. But he sometimes overlooks differences between consumers when calculating damages. The plaintiffs' bar hires him to testify that large groups of consumers suffered the same injury despite immense differences between their claims. District courts then rubber-stamp his analysis, certify classes, and force blameless defendants to settle or risk trying cases that pose existential threats to their enterprises.

Imagine a complaint that alleges four distinct periods of misconduct by the defendants: 2015-2017, 2017-2018, 2018-2020, and after 2020. Each period involved vastly different facts for the plaintiffs and the defendants. The same complaint alleges that the defendants violated the Racketeering Influenced and Corrupt Organizations Act, California statutory law, and California common law. Any reasonable person would deduce that there are 12 distinct classes. Each class would require calculating a different damages amount. It makes no sense to say that the RICO damages

incurred from 2015 to 2017 were the same as the common-law damages from 2020 onwards.

Yet Dr. Singer thought it appropriate to use the same model to spit out one result for all twelve classes. *See* 6-ER-1559–64, *In re JUUL Labs, Inc. Mktg. Sales Practices and Prods. Liab. Litig.*, No. 22-16693 (9th Cir. Feb. 1, 2023). That of course makes no sense. There are two simple ways to calculate the price effect of a given illegal action during a specific period. If there is enough data, the analyses could be completed separately for each class. Or indicator variables could be used to differentiate price effects based on class. He did neither.

His analysis here suffers from similar problems. Walk into any store, and you will notice that most things have a price ending in .99. *See, e.g.*, Megan Jones, *The Real Reason Most Prices End in .99*, Reader's Digest (June 3, 2022), https://tinyurl.com/462k7cjb. This phenomenon is not new. *See* Louis Bader & James D. Weinland, *Do Odd Prices Earn Money?*, 8 J. Retailing 102, 102-04 (1932). The same holds true for Play apps. Over 97% of paid apps on Play end with .99. ECF 325-1 at 505. Many of those cost only $0.99.

Developers would not have passed on any cost savings from lower Play service fees for apps that cost $0.99, $1.99, or $2.99. Search Play for

11

an app that costs 84 cents. They are nearly non-existent. The same goes for an app that costs $1.68. Developers want to keep the price ending in .99. The reason is again psychological. When someone sees the $0.99 price, they put it in the bucket of apps costing between $0 and $0.99. *See* Jones, *supra*. An app costing $0.84 falls in the same bucket. So almost no sales are gained by passing on savings to consumers, but the developer makes less on each sale. Thus, it makes no sense for developers to pass on the savings to consumers for most apps.

That is why the natural experiment of lowering Play service fees for some developers did not lead to prices falling for over 90% of apps. ECF 325-1 at 515. Rather than pass their savings on to consumers, the app developers pocketed the savings. This means that for most app sales the developers were the only ones "injured" by Play's service fees. But Google has settled the case with the developers, and this appeal concerns only the consumers.

True, some consumers may have paid more for apps than they would have if Play's service fees were lower. Specifically, some consumers who bought more expensive apps may have been injured. The developer of the Atlas of Internal Medicine might have charged less than $99.99 if service fees were lower. But the percentage of consumers who purchased high-

priced apps is low. Most only bought low-cost apps whose price was not affected by Play's service fees.

The District Court dodged this problem by relying on Dr. Singer's "averag[ing]" of the overcharge to consumers. 1-ER-20, *see* 1-ER-24. In other words, Dr. Singer's conclusion that all class members suffered an Article III injury was based on assuming that damages were equally distributed across the class. That analysis falls well short of what Rule 23 requires. Dr. Singer's testimony therefore was not the product of reliable principles and methods being applied to the facts of the case. This made his testimony an improper basis to certify the class.

This case resembles *Dukes*, in which this Court blessed a class of employees subjected to Wal-Mart's policy of delegating pay and promotion decisions to site managers. The Supreme Court reversed because a "trial by formula" could not support an inference that all the class members were injured. 564 U.S. at 358. Here, a "trial by formula" using an averaging method would create only the illusion of Article III injury, by concealing uninjured class members behind one class-wide average.

*Dukes* confirms, in short, that class certification under Rule 23 may not stand on a device that masks some class members' lack of injury. *See* 564 U.S. at 367. Other decisions show that an averaging method is just

such a masking device. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013); *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53-54 (1st Cir. 2018); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252-53 (D.C. Cir. 2013); *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 231 (2d Cir. 2008) (plaintiffs cannot use an "estimate of the average loss for each plaintiff"), *abrogated on other grounds*, *Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008).

Averaging distorts the class-action process by welcoming uninjured parties into the lawsuit, which creates conflicts of interest within the class. After all, an award to uninjured class members costs the class members who suffered an above-average injury. Averaging also inflates the size of the class, thereby increasing leverage over the defendant. Finally, averaging tries to hide the ball. It is generally for the judge to evaluate the statistics involved. Yet if a plaintiffs' lawyer can create complexity and get the trial judge to punt the issues to the jury, he transforms the case from a dispute over law, data, and competing analyses into a dispute over optics, emotions, and competing narratives. From there the case turns less on the merits than on the defendant's willingness to risk financial ruin.

\* \* \*

14

The Supreme Court's *TransUnion* decision outlined why this Court's approach to the injury-in-fact inquiry in class actions was grievously wrong. The District Court defied *TransUnion* here. That error caused the District Court to improperly certify a class of uninjured plaintiffs. This Court should reverse the class-certification decision because the District Court lacked subject-matter jurisdiction to enter the order.

## II. GOOGLE'S CONDUCT HELPS COMPETITION.

"Because the Supreme Court has interpreted [15 U.S.C.] § 1 to outlaw only unreasonable restraints on trade, courts must consider whether a restraint falls into the small group of restraints that are unreasonable per se or is otherwise unreasonable." *SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110, 1120 (9th Cir. 2022) (cleaned up). Plaintiffs do not allege that there is a per se § 1 violation here. Thus, they must show that Google's conduct is unreasonable.

To meet this burden, Plaintiffs must show that Google's conduct has "a substantial anticompetitive effect that harms" consumers. *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1111 (9th Cir. 2021) (quotation omitted). Even if they could meet this burden, Google can "show a procompetitive rationale for the restraint" that cannot "be

reasonably achieved through less anticompetitive means." *Id.* (quotations omitted).

Although Plaintiffs cannot meet their prima facie burden of showing anti-competitive effects, this brief focuses on the pro-competitive rationales for Google's policies, which dwarf any alleged anti-competitive effects. For example, Google's "desire to profit from its intellectual property rights" is presumptively pro-competitive. *See Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1219 (9th Cir. 1997). Higher quality goods and increased output are also pro-competitive effects. *See FTC v. Qualcomm Inc.*, 969 F.3d 974, 989 (9th Cir. 2020) (citation omitted). Google's policies have these—and other—pro-competitive effects.

The Framers knew how important intellectual property is to innovation. The Constitution grants Congress authority "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8. Without incentives, companies will not innovate.

Patents are one incentive to innovate. "[S]cholars generally agree that when innovation is expensive, risky, and easily copied, inventors are

less likely to undertake the guaranteed costs of innovation in order to obtain the mere possibility of an invention that others can copy." *Bilski v. Kappos*, 561 U.S. 593, 650 (2010) (Stevens, J., concurring) (citing William Landes & Richard Posner, *The Economic Structure of Intellectual Property Law* 13-15 (2003)). So there is a tradeoff for a patent. In exchange for publishing technical details about an innovation, a firm receives a monopoly on the invention for 20 years. *See* 35 U.S.C. § 154(a)(2).

Of course, not all innovations are patent eligible. *Cf.* 35 U.S.C. § 101 (defining what is patent eligible). Yet businesses still have incentive to innovate "because the competitive marketplace rewards companies that use more efficient business methods." *Bilski*, 561 U.S. at 651 (Stevens, J., concurring) (quoting Dan L. Burk & Mark A. Lemley, *Policy Levers in Patent Law*, 89 Va. L. Rev. 1575, 1618 (2003)).

Google believed that the benefits of Android ecosystem innovations were worth the risk. Thus, over the past decade Google has spent billions of dollars ensuring an experience that benefits all involved. Plaintiffs want a rule ensuring that despite large, risky investments in technology, innovative companies cannot use normal contractual provisions to protect their inventions.

17

The Play policies also directly benefit consumers. Google has been so successful because it recognizes that consumers' app preferences vary. "Some want games, some want business tools, some want to stream music while others want to make music, some want to use social media, some want to use their phones as small scientific instruments, and so on." Andrew McAfee & Erik Brynjolfsson, *Machine, Platform, Crowd: Harnessing Our Digital Future* 157 (2017). An increase in cheap apps helps Google. *Id.* at 161. That is why Google has encouraged continued Play growth. It also explains why Google has lowered the service fee for some app developers.

Only 15 years ago, having turn-by-turn directions on your cellphone with traffic updates and speed-trap alerts belonged in The Jetsons—not reality. Yet today many high school and college students do not go anywhere without directions from Waze, which Google owns. The same goes for streaming music. It was also inconceivable that over 100 million tracks could be streamed with a single Android app. Now, that is reality. *See About Spotify*, Spotify, https://tinyurl.com/ukzhx6sd (last visited June 13, 2023).

These third-party apps make consumers' lives better. Yet consumers would not download or use the apps if the apps posed a security risk.

Luckily, when consumers download apps from Play they need not worry about viruses or other malware infecting their phones. They can rest assured that the apps are safe. *See What is Google Play Protect and what makes it the most important part of your Android phone*, Times of India (Dec. 29, 2021), https://tinyurl.com/y329mc2e. This is thanks to Google's significant expenditures to review apps and ensure their safety.

As a member of the Northern District of California has explained, encouraging consumers to download apps from one source "increases security" by helping to "thwart[] social engineering attacks." *Epic Games, Inc. v. Apple Inc.* ("*Epic I*"), 559 F. Supp. 3d 898, 1005 (N.D. Cal. 2021). "A 2020 PurpleSec report confirms that '98% of cyberattacks rely on social engineering.'" *Id.* at 1004 (citations omitted).

This Court affirmed *Epic I* and held that ensuring that consumers have secure apps is a pro-competitive benefit of restrictions like those here. *See Epic Games, Inc. v. Apple, Inc.* ("*Epic II*"), 67 F.4th 946, 987 (9th Cir. 2023). There is no meaningful distinction between *Epic II* and this case.

Google's app-review process detects and prevents fraud, theft, and other nefarious conduct. *See* Sergiu Getlan, *Google banned 173K developer accounts to block malware, fraud rings*, Bleeping Computer (Apr. 27,

2023), https://tinyurl.com/363taedu. In short, Google's safety review is a major pro-competitive benefit of its policy requiring distribution and promotion of Play. There may be disputes about how much security Google provides through Play. But the fact is that the security provided is a pro-competitive benefit. Without Google's policies, it would be open season for bad actors to prey on consumers. Google spent billions of dollars developing a secure way to get safe apps to consumers and ensuring that consumers get what they pay for. Plaintiffs, however, want to send a strong message to businesses: Don't invest in protecting your customers from potential threats. You'll be exposing yourself to massive antitrust liability.

Next are the app developers. Distributing apps through Play helps eliminate counterfeit and copycat apps. This ensures that firms do not suffer a damaged reputation from a counterfeit or copycat app and ensures that profits go to the rightful developer. Having consumers use Play's in-app purchase system also ensures that developers receive their funds. *See* Ibrahim Elbouchikhi, *Helping You Go Global with More Seamless Google Play Payments*, Android Developers Blog (May 25, 2014), https://tinyurl.com/5n7tt7uu. Although it may not be the method that every app developer prefers, that does not mean it doesn't benefit them.

20

Again, Plaintiffs seek to decrease incentives for companies to invest in their products.

App developers work "symbiotic[ally]" with companies like Google. *Epic II*, 67 F.4th at 966. Google "gives developers an audience" while developers make Android "more attractive." *Epic I*, 559 F. Supp. 3d at 1013. Although many app developers also sell their goods on Apple's App Store, Android is still more popular worldwide. *See* Curry, *supra*. So without the Android ecosystem app developers would see significantly reduced revenues. Thus, app developers also benefit from Google's policies.

In short, Google's policies are pro-competitive because they benefit all parties. This includes consumers who buy apps and the developers that make them. All this is possible because of Google's investment in the Android ecosystem. If Google cannot recover those costs, and pay for failed research and development projects, it—and other companies—will quit investing in products that make our lives better.

\*    \*    \*

"[C]ourts should proceed cautiously when asked to deem novel products or practices anti-competitive. Many innovations may seem anti-competitive at first but turn out to be the opposite, and the market often corrects even those that are anti-competitive." *New York v. Meta*

21

*Platforms, Inc.*, 66 F.4th 288, 305 (D.C. Cir. 2023). The District Court avoided that warning and certified a class in a lawsuit that is "odd" because it "concerns an industry" that "has had rapid growth and innovation with no end in sight." *Id.* at 295 (cleaned up). This Court should not contribute to the attack on the innovation economy. Rather, it should apply well-settled Supreme Court precedent and hold that the District Court erred by certifying the class.

## CONCLUSION

This Court should reverse.

Respectfully submitted,

/s/ John M. Masslon II
John M. Masslon II
Cory L. Andrews
WASHINGTON LEGAL FOUNDATION
2009 Massachusetts Ave. NW
Washington, DC 20036
(202) 588-0302
jmasslon@wlf.org

June 15, 2023

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limits of Federal Rule of Appellate Procedure 29(a)(5) because it contains 4,390 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f).

I also certify that this brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5) and (6) because it uses 14-point Century Schoolbook font.

/s/ John M. Masslon II
JOHN M. MASSLON II
*Counsel for Amicus Curiae*
*Washington Legal Foundation*

June 15, 2023

## APPENDIX OF RECORD CITATIONS

Defendants' Opposition to Plaintiffs' Class Certification Motion Pages 9-10

Expert Report of Dr. Michelle M. Burtis Pages 53-54, 62-64

**A.      Plaintiffs Have No Common Proof of Pass-Through.**

**1.      Individual Issues Predominate Because Pass-Through Requires An App-By-App Analysis Not Susceptible To Common Proof.**

Plaintiffs' main theory of antitrust impact depends on "pass-through from developers." Mot. at 12.  As the Supreme Court has explained, if the developer of an app did not pass on service fees by raising prices, then a consumer of that app was not injured.  *See Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1523 (2019) (no damages where "consumers would pay the same retail price regardless of whether Apple's commission was 10 percent or 30 percent").  Approximately ████████ consumers—███ of the proposed class—made purchases involving one app.  Burtis Decl., Ex. B (Burtis Rev. Ex. 23).  These consumers were not injured if the developer of the app did not pass-through any allegedly inflated service fees through higher prices.  Plaintiffs lack common proof of pass-through needed "to identify uninjured class members."  *Olean*, 31 F.3d at 669 n.13.  Plaintiffs' proof of impact consists entirely of expert testimony from Dr. Singer, Mot. at 12–13, which is unreliable and inadmissible for the reasons explained in Google's *Daubert* motion, ECF No. 282.

Regardless, unlike *Olean*, this is not a case where a defendant merely disputes whether the factfinder should find a plaintiffs' expert "persuasive[]" or "unpersuasive."  31 F.4th at 667, 678. The problem here is that Plaintiffs' expert evidence is not "capable of resolving a class-wide question in one stroke," an issue that *Olean* directs district courts to resolve.  *Id.* at 666.  Dr. Singer's opinion is based on a theoretical model that contradicts real-world data that pass-through was rare.  The only analysis of actual service fee and price data in the record (by Google's expert Dr. Burtis) shows that when Google reduced service fees for many transactions in 2018, 2021, and 2022, ██████████████████████████████████████████████████████ ████████████████████  *See* Burtis ¶ 103, Fig. 13.  An analysis of more limited data by the Developer Plaintiffs' expert puts the percentage of apps that pass through any amount of lower costs to consumers at ██████.  *Id.* at 291 n.348.

Evidence that pass-through was ██████ shows that pass-through must be ***proven*** for each app, not assumed for all apps.  Proof of pass-through is "more complex" because it "must account

for the actions of innocent intermediaries who allegedly passed on the overcharge." *In re Graphics Processing Units Antitrust Litig.* ("*GPU*"), 253 F.R.D. 478, 499 (N.D. Cal. 2008). This can make "the predominance standard more difficult to meet." 6 Newberg on Class Actions § 20:53 (5th ed.); *cf. Illinois Brick Co. v. Illinois*, 431 U.S. 720, 742 (1977) (noting "difficulties that have been encountered" with "statistical techniques used to estimate" pass-through). The sheer number of unique app transactions involved here amplifies the challenge. Whether a developer would have passed through a lower service fee to consumers in the but-for world requires analyzing pass-through for each of the roughly ███████ unique apps involved in purchases by putative class members. Thus, in order "to identify uninjured class members" without "render[ing] an adjudication unmanageable," *Olean*, 31 F.4th at 669 n.13, the factfinder must have a method of proving pass-through for every one of the hundreds of thousands of apps involved in transactions by putative class members.

Plaintiffs have no such model. As the real-world data confirms, whether a developer would pass through a lower service fee depends on multiple variables—marginal costs, focal point pricing, competitive conditions, and other idiosyncratic factors—that defy common proof. That app-by-app analysis of pass-through is not "susceptible to generalized, class-wide proof" because Plaintiffs "will need to present evidence that varies from member to member." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). Thus, "the only way to fully assess pass-through in this action would be" through "thousands of mini-trials, rendering this case unmanageable and unsuitable for class action treatment." *GPU*, 253 F.R.D. at 505.

**Marginal costs.** In the standard economic model that Dr. Singer identifies for how an increase in service fees would affect a developer's price, any effect depends on the developer's marginal cost. Shah Decl., Ex. G ("Singer Dep.") at 105:8–106:3, 107:23–109:14; *id.*, Ex. H (Expert Report of Dr. Hal Singer ("Singer")) ¶ 225 & n.495. Thus, if a developer's marginal cost of producing an additional IAP is zero, then according to Dr. Singer, "prices would not adjust" and there would be no pass-through—even if a developer paid a lower service fee. Singer Dep. at 109:15–110:3. Economic literature recognizes that many digital goods have zero marginal costs. Burtis ¶¶ 142–43. Dr. Singer's report relies on an article stating that the "replication cost of

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

147.    Identifying which apps' marginal costs are positive (and not close to zero) requires information about each app; one cannot assume that all apps have zero marginal cost or that all apps have positive marginal cost.  Moreover, identifying the marginal costs associated with an app is not always straightforward.  Even developers that evaluate costs associated with their own businesses sometimes have difficulty in separating costs that are fixed from those that vary with output.[158]  Individualized information and analysis are required to determine whether even a developer that sets prices based on short-term profit-maximization would reduce prices given the claimed lower service fee rate.  This requires an app-by-app analysis to determine whether any individual developer or consumer suffered antitrust impact or injury.

## 2.  Developers' Strategy of Setting Prices

### i.  *Prices that end in "99"*

148.    Another factor that explains why determining prices in the but-for world requires an app-by-app inquiry is that developers employ different pricing strategies, including the strategy of setting retail prices that end in "99."

149.    Many app, subscription, and IAP prices are set to end in "99," such as $0.99, $1.99, and $2.99.  These price points may influence consumers' perceptions of price and thus affect sales.[159]  Academic studies suggest that some consumers may pay less attention to the rightmost two digits of a price, so that a price of $0.99 is perceived to be significantly more attractive than $1, even though it is only one cent lower.[160]  As shown in Figure 7 over the period from August 2016 to July 3, 2021, 97% of U.S. consumers' retail app transactions were set such that the retail prices ended in "99."

---

[158]    ███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
████████████████████████████

[159]    See, for example, Stiving, Mark and Russell S. Winer, "An Empirical Analysis of Price Endings with Scanner Data," *Journal of Consumer Research*, Vol. 24, No. 1, 1997, pp. 57-67 at 57 ("Managers apparently set prices in a manner consistent with the premise that the last digit of a price has a significant impact on sales. Several surveys on what price endings managers actually use have been conducted, and all of these surveys support the premise that firms set prices to appear that they are just below a round number.").  See also Schindler, Robert M. and Patrick N. Kirby, "Patterns of Rightmost Digits Used in Advertised Prices: Implications for Nine-Ending Effects," *Journal of Consumer Research*, Vol. 24, No. 2, 1997, pp.192-201 at 193-194; Anderson, Eric and Duncan Simester, "The Role of Price Endings: Why Stores May Sell More at $49 than $44," 2000, at http://ssrn.com/abstract=232542.

[160]    Bizer, George Y. and Robert M. Schindler, "Direct Evidence of Ending-Digit Drop-Off in Price Information Processing," *Psychology & Marketing,* Vol. 22, No. 10, 2005, pp. 771-783 at 771-772.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 7.**      **Prices that End in "99" as a Percentage of U.S. Consumer Transactions**



Source:

Exhibit 32.

150.   Developers that rely on this strategy to set prices would not reduce prices in response to lower service fee rates if the reduction from one price point to the next would be so large that the developer would lose profits. For example, if a developer's price is initially set at $1.99 and a change in some supply or demand factor would lead to a new profit-maximizing price of $1.63, a developer that sets prices to end in "99" may elect to keep the price at $1.99 instead of reducing the price to $0.99 because profits at $1.99 are higher than profits at $0.99 (and the developer would not want to abandon its pricing strategy and set the price at $1.63). Figure 8 below shows the implied percentage reductions from one price point to another for prices that range from $5.99 to $0.99. A developer with a price of $5.99 would have to reduce prices by 17% to get to the next price point price of $4.99; a developer with a price of $1.99 would have to reduce prices by over 50% to get to the next price point of $0.99. Absent other competitive pressures, a profit-maximizing developer that found it would be worse off by reducing prices from one price point to another would choose not to reduce prices at all.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

173.    I further analyzed price changes in the actual world for apps, subscriptions, and IAPs (collectively, I refer to these as stock-keeping units, or "SKUs"[192]) in Google Play following changes in service fee rates.  I found that, among those SKUs, many prices did not change after service fee rate changes took effect.

174.    Service fee rate changes during the class period occurred for certain developers and apps due to programs such as LRAP, ADAP, and others; Google Play's 2018 service fee reduction for certain subscriptions;[193] and Google Play's July 2021 service fee reduction pursuant to the Small Developer Program.[194]  These service fee reductions applied to 22,995 developers worldwide, to 51,847 apps, and to 467,660 SKUs.  These SKUs involved transactions by about 53% of U.S. consumers and accounted for 11% of their consumer spend.[195]

175.    While service fees changed for the SKUs in my studies, the prices for many SKUs did not change at all during the class period.[196]  Over the three sets of SKUs with service fee

---

[192]    Google's transactions data store IAP and app prices by "product ID," which I will refer to as "SKU."

[193]    In 2018, Google reduced the service fee rate on subscription IAPs when the consumer's subscription extended beyond a year. See "Google Play Lowers App Subscription Fee to 15 Percent, Matches Apple's Offering," Gadgets 360, October 20, 2017, https://gadgets.ndtv.com/apps/news/google-play-app-subscription-fee-30-percent-to-15-1764923, accessed November 8, 2021. Since different developers and SKUs (e.g., different types of subscriptions) can have a different mix of consumers, the service fee rate associated with a SKU can vary from 30% (no consumer has a subscription more than a year) to 15% (all consumers have subscriptions more than one year).  To test whether retail prices would respond to a service fee rate subscription, I look only at SKUs for which the monthly service fee rate for that SKU fell to 20% or lower and remained at that level for at least three consecutive months.

[194]    The July 2021 service fee rate reduction applied to a developer's first $1 million in consumer spend.  I look at SKUs for which the monthly service fee rate for the corresponding app and purchase type (i.e. paid app downloads and non-subscription IAPs) fell to 20% or lower in at least one month on or after July 2021.  See "Changes to Google Play's service fee in 2021," Google, https://support.google.com/googleplay/android-developer/answer/10632485, accessed January 5, 2022.

[195]    Exhibit 34.

[196]    I used prices net of promotions and discounts in Google Play transaction data from the beginning of the class period to July 3, 2021.  See GOOG-PLAY-007203251. Since the transaction data is available for only two days following the July 1, 2021 reduction in service fee rates on the first $1 million of consumer spend, I also used monthly average prices for paid downloads from the App-level spend data for U.S. consumers (GOOG-PLAY-005535886 and GOOG-PLAY-010801688) through December 2021, which correspond with paid download SKUs.  A third dataset ("scraped data") was used to analyze paid app download SKU prices following the July 2021 service fee rate reduction.  That dataset was created by electronically collecting data for a sample of apps from Google Play once a month, for the paid download prices for those apps.  The scrapes were conducted from the U.S., at the beginning of the month starting in April 2021 and collected various attributes of the apps from their publicly available Google Play pages, including their paid download prices.  The apps sampled included (1) the top 20 apps in each app category and monetization type based on their 2020 consumer spend; (2) the apps of the top 20 putative developer class members or developers selling to U.S. consumers based on their 2020 spend; (3) the six top 200 charts on Google Play for "free," "grossing," and "paid" apps and for games vs. non-games; and

reductions, 93% exhibited no change in price at all during the class period.[197]  That is, among these SKUs, at most 7% responded to the service fee rate change in the actual world.  Moreover, among this 7%, some retail prices could have increased rather than decreased and some retail prices likely would have decreased at times that are not relevant to the service fee rate reduction (for example, several months before the rate reduction).  However, if the price of SKU associated with a service fee rate reduction is constant throughout the class period – as 93% of these prices are – then these is no reason to assume that the price of that SKU would have responded to a service fee rate change in a but-for world either.

176.    I also considered prices of the SKUs one month before and one month after the service fee rate change.  I compared prices for paid app downloads, subscriptions, and IAPs before and after the service fee rate change for each SKU.[198]  Table 5 shows these results.  For subscriptions and IAPs, less than 2% of prices changed after a service fee rate decline.  That would imply lack of impact on consumers for many apps.  For paid app downloads, between 1% and 13% of prices changed following a reduction in service fee rates.  That also suggests limited impact on consumers for many apps.  Given how few prices declined following reduction in service fee rates, individualized analysis would be needed to identify which apps, subscriptions, and IAPs prices would have been lower and which consumers would have paid lower prices in a but-for world.

---

(4) the top 100 free apps in each app category on Sensor Tower that ranks by a combination of factors including active users, downloads, and revenue. The top 100 free app charts by category are from Sensor Tower, https://app.sensortower.com/android/rankings/top/mobile/us/overall.  A fourth dataset provided to me by Google showing prices on June 21, 2021, October 16, 2021, and February 6, 2022 ("IAP snapshot data," GOOG-PLAY2-000483364), was used to analyze non-subscription IAP prices following the July 2021 service fee reduction.

[197]      Exhibit 35.

[198]      For paid app downloads and subscriptions IAPs I compare prices on June 21, 2021 and October 16, 2021.  For non-subscription IAPs, I compare prices on June 21, 2021 and February, 6, 2022.  These are prices on these specific days, a snapshot.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Table 5. Summary of Pass-Through Rates Found by Dr. Burtis**

| Purchase Type | SKUs | |
|---|---|---|
| | Total | Share w/Positive Pass-Through |
| Paid App Downloads | | |
| *Scraped Data* | 1,557 | 1% |
| *App-Level Spend Data* | 8,991 | 13% |
| Subscriptions | | |
| *Deal Developers* | 706 | 2% |
| *Subscription Developers* | 16,307 | 1% |
| IAPs | 441,383 | 2% |

Source:
Exhibit 36.

177. The analysis described above suggests that while some retail prices could be lower if service fee rates were lower, other prices would not change. The analysis finds the percentage of SKUs with price reductions following a service fee rate change but does not include a study of the economic factors that would explain whether an observed price change was caused by a service fee rate reduction. As described above, those factors include, at least, the marginal cost of an app, the demand elasticity of the app, and the pricing strategy of the app developer – all of which require an individualized analysis of the app and the app developer. That is, determining which prices would have been lower and which consumers were impacted requires an individualized analysis of those factors and how they affect prices of particular apps, subscriptions, and IAPs. That individualized, app-by-app analysis is necessarily to determine whether a consumer who made purchases of that app was impacted.

178. This analysis indicates that Consumer Plaintiffs cannot show injury to all or nearly consumers through common proof, because Consumer Plaintiffs cannot establish through common proof that all consumers would pay a lower price if service fee rates for developers were lower.

### 2. Some Consumers Who Transact at Low Price Points Would Not Be Better Off in the But-For World

179. Table 6 shows that 5% of U.S. consumers in the putative consumer class pay only prices of $0.99 and 9% of U.S. consumers pay only prices of $1.99 or lower.