No. 23-15285

IN THE

# United States Court of Appeals
# for the Ninth Circuit

---

IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION

---

MARY CARR, INDIVIDUALLY AND ON BEHALF OF
ALL OTHERS SIMILARLY SITUATED; ET AL.,

*Plaintiffs-Appellees,*

v.

GOOGLE LLC; ET AL.,

*Defendants-Appellants.*

---

On Interlocutory Appeal from the United States District Court
for the Northern District of California,
No. 21-md-2981; No. 20-cv-5761

---

## BRIEF FOR DEFENDANTS-APPELLANTS
### (Provisionally-Sealed)

---

Katherine B. Wellington
HOGAN LOVELLS US LLP
125 High St., Suite 2010
Boston, MA 02110

Neal Kumar Katyal
Jessica L. Ellsworth
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
neal.katyal@hoganlovells.com

June 8, 2023

*Counsel for Defendants-Appellants*

---

*(Additional Counsel Listed on Inside Cover)*

Brian C. Rocca
Sujal J. Shah
Michelle Park Chiu
Minna Lo Naranjo
Rishi P. Satia
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, CA 94105
Telephone: (415) 442-1000
Facsimile: (415) 422-1001
brian.rocca@morganlewis.com

Richard S. Taffet
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
Telephone: (212) 309-6000
Facsimile: (212) 309-6001
richard.taffet@morganlewis.com

Kyle W. Mach
Justin P. Raphael
Emily C. Curran-Huberty
MUNGER, TOLLES, & OLSON LLP
560 Mission Street
Twenty Seventh Floor
San Francisco, CA 94105
Telephone: (415) 512-4000
Facsimile: (415) 512-4077
kyle.mach@mto.com

Glenn D. Pomerantz
Kuruvilla Olasa
MUNGER, TOLLES, & OLSON LLP
350 South Grand Avenue
Fiftieth Floor
Los Angeles, CA 90071
Telephone: (213) 683-9100
Facsimile: (415) 512-4077
glenn.pomerantz@mto.com

*Counsel for Defendants-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Defendants-Appellants state as follows:

Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., a publicly traded company; no publicly traded company holds more than 10% of Alphabet Inc.'s stock.

Google Payment Corp. is a subsidiary of Google LLC.  Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., a publicly traded company; no publicly traded company holds more than 10% of Alphabet Inc.'s stock.

Google Commerce Ltd. is an indirect subsidiary of Google LLC.  Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., a publicly traded company; no publicly traded company owns more than 10% of Alphabet Inc.'s stock.

Google Ireland Limited is an indirect subsidiary of Google LLC.  Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., a publicly traded company; no publicly traded company owns more than 10% of Alphabet Inc.'s stock.

Google Asia Pacific Pte. Ltd. is an indirect subsidiary of Google LLC.  Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc.,

a publicly traded company; no publicly traded company owns more than 10% of Alphabet Inc.'s stock.

/s/ Neal Kumar Katyal
Neal Kumar Katyal

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES .................................................................v

JURISDICTIONAL STATEMENT ........................................................1

INTRODUCTION .................................................................2

ISSUES FOR REVIEW ........................................................6

RULE 23 .................................................................6

STATEMENT OF THE CASE........................................................6

    A.    Google Play .................................................................6

    B.    Procedural History ........................................................9

SUMMARY OF ARGUMENT ........................................................17

STANDARD OF REVIEW ........................................................22

ARGUMENT .................................................................23

    I.    CLASS CERTIFICATION WAS IMPROPER BECAUSE
        THERE ARE INDIVIDUALIZED ISSUES OF INJURY
        FOR MILLIONS OF CLASS MEMBERS ...........................................23

        A.    District Courts Must Rigorously Analyze Whether
            There Are Uninjured Class Members Before
            Certifying Rule 23(b)(3) Classes ....................................24

        B.    Google Presented Evidence That A Great Many Class
            Members Are Uninjured, Requiring Individual
            Inquiry .................................................................28

        C.    The District Court Failed To Conduct The Rigorous
            Analysis Of Uninjured Class Members Required By
            This Court's Precedent ..............................................32

iii

**TABLE OF CONTENTS—Continued**

Page

    D.    This Court Should Reject Plaintiffs' Attempts To Rehabilitate The District Court's Decision ...................................36

II.    THE DISTRICT COURT ERRED IN CONCLUDING THAT PLAINTIFFS' MODEL ESTABLISHES COMMON PROOF OF INJURY AND DAMAGES ...................................38

    A.    Dr. Singer's Model Fails To Account For Key Independent Variables ...................................39

    B.    The District Court Failed To Rigorously Analyze Dr. Singer's Model ...................................49

    C.    Dr. Singer's Model Should Never Have Been Admitted ...................................52

III.    THE DISTRICT COURT ERRED IN CONCLUDING THAT INDIVIDUALIZED DAMAGES ISSUES CANNOT DEFEAT PREDOMINANCE ...................................55

CONCLUSION ...................................61

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

CASES:

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591 (1997).......................................................................24

*Apple Inc. v. Pepper,*
139 S. Ct. 1514 (2019)...................................................................35

*Bell Atl. Corp. v. AT&T Corp.,*
339 F.3d 294 (5th Cir. 2003) .........................................................39

*B.K. ex rel. Tinsley v. Snyder,*
922 F.3d 957 (9th Cir. 2019) .........................................................36

*Blackie v. Barrack,*
524 F.2d 891 (9th Cir. 1975) .........................................................58

*Blades v. Monsanto Co.,*
400 F.3d 562 (8th Cir. 2005) ....................................................25, 39

*Bowerman v. Field Asset Servs., Inc.,*
60 F.4th 459 (9th Cir. 2023) ....................................................57, 59

*Comcast Corp. v. Behrend,*
569 U.S. 27 (2013)....................................................21, 22, 23, 56

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
509 U.S. 579 (1993)...............................................................15, 16

*Doyle v. Chrysler Grp., LLC,*
663 F. App'x 576 (9th Cir. 2016) ...................................................57

*Ellis v. Costco Wholesale Corp.,*
657 F.3d 970 (9th Cir. 2011) ....................................................49, 51

*Elosu v. Middlefork Ranch Inc.,*
26 F.4th 1017 (9th Cir. 2022) ........................................................52

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)........................................................................53

*Gonzalez v. United States Immigr. & Customs Enf't*,
  975 F.3d 788 (9th Cir. 2020) ..........................................................22

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977)........................................................................35

*In re Apple iPhone Antitrust Litig.*,
  No. 11-CV-6714-YGR, 2022 WL 1284104
  (N.D. Cal. Mar. 29, 2022)........................................................*passim*

*In re Asacol Antitrust Litig.*,
  907 F.3d 42 (1st Cir. 2018).......................................................26, 27

*In re Hydrogen Peroxide Antitrust Litig.*,
  552 F.3d 305 (3d Cir. 2008) ...........................................................25

*In re Lithium Ion Batteries Antitrust Litig.*,
  No. 13-MD-2420 YGR, 2017 WL 1391491
  (N.D. Cal. Apr. 12, 2017) ...............................................................48

*In re Lithium Ion Batteries Antitrust Litig.*,
  No. 13-MD-2420 YGR, 2018 WL 1156797
  (N.D. Cal. Mar. 5, 2018)...................................................45, 48, 53

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
  522 F.3d 6 (1st Cir. 2008)...........................................................39, 49

*In re Processed Egg Prods. Antitrust Litig.*,
  312 F.R.D. 124 (E.D. Pa. 2015).......................................................44

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  725 F.3d 244 (D.C. Cir. 2013)...........................................25, 27, 28

*Lambert v. Nutraceutical Corp.*,
  870 F.3d 1170 (9th Cir. 2017) ........................................................57

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Leyva v. Medline Indus. Inc.*,
  716 F.3d 510 (9th Cir. 2013) .........................................................55, 56, 57, 58

*Lust ex rel. Lust v. Merrell Dow Pharms., Inc.*,
  89 F.3d 594 (9th Cir. 1996) .........................................................................53, 55

*Kohen v. Pac. Inv. Mgmt. Co.*,
  571 F.3d 672 (7th Cir. 2009) ...............................................................................26

*Narouz v. Charter Commc'ns, LLC*,
  591 F.3d 1261 (9th Cir. 2010) .............................................................................22

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022) (en banc) ........................................................*passim*

*Parko v. Shell Oil Co.*,
  739 F.3d 1083 (7th Cir. 2014) .......................................................................39, 49

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021).....................................................................................24, 25

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016).............................................................................24, 39, 53

*United States v. Hermanek*,
  289 F.3d 1076 (9th Cir. 2002) .............................................................................53

*United States v. Hinkson*,
  585 F.3d 1247 (9th Cir. 2009) (en banc) ............................................................22

*United States v. Ruvalcaba-Garcia*,
  923 F.3d 1183 (9th Cir. 2019) .............................................................................55

*Valentino v. Carter-Wallace, Inc.*,
  97 F.3d 1227 (9th Cir. 1996) ...............................................................................52

*Van v. LLR, Inc.*,
  61 F.4th 1053 (9th Cir. 2023) ....................................................................*passim*

# TABLE OF AUTHORITIES—Continued

**Page(s)**

*Walker v. Life Ins. Co. of the Sw.*,
953 F.3d 624 (9th Cir. 2020) ............................................................22

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)............................................................................25

*Yokoyama v. Midland Nat'l Life Ins. Co.*,
594 F.3d 1087 (9th Cir. 2010) ....................................................57, 58

**STATUTES:**

15 U.S.C. § 26 ........................................................................................1

28 U.S.C. § 1292(e) ...............................................................................2

28 U.S.C. § 1331 ....................................................................................1

28 U.S.C. § 1337 ....................................................................................1

28 U.S.C. § 1367 ....................................................................................1

**RULES:**

Fed. R. Civ. P. 23(b) .............................................................................6

Fed. R. Civ. P. 23(b)(3).................................................................*passim*

Fed. R. Civ. P. 23(f) ..............................................................................2

Fed. R. Evid. 702 ..................................................................15, 52, 55

Fed. R. Evid. 702(b)............................................................................52

Fed. R. Evid. 702(c)............................................................................52

**OTHER AUTHORITIES:**

*Home Improvement*, Walmart, https://www.walmart.com/cp/home-
improvement/1072864 (last visited June 8, 2022).........................7, 44

1 McLaughlin on Class Actions § 5:45 (19th ed. 2022 update) ..............59

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Patio & Garden*, Walmart, https://www.walmart.com/cp/patio-garden/5428 (last visited June 8, 2022) ................................................................7

Kenneth E. Train, *Discrete Choice Methods with Simulation* (2d ed. 2009) ...........................................................................................................11, 12

IN THE

# United States Court of Appeals
# for the Ninth Circuit

No. 23-15285

IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION

MARY CARR, INDIVIDUALLY AND ON BEHALF OF
ALL OTHERS SIMILARLY SITUATED; ET AL.,

*Plaintiffs-Appellees,*

v.

GOOGLE LLC; ET AL.,

*Defendants-Appellants.*

On Interlocutory Appeal from the United States District Court for the Northern
District of California, No. 21-md-2981; No. 20-cv-5761

## BRIEF FOR DEFENDANTS-APPELLANTS

## JURISDICTIONAL STATEMENT

The District Court has subject-matter jurisdiction over Plaintiffs' federal
claims under 15 U.S.C. § 26 and 28 U.S.C. §§ 1331 and 1337, and supplemental
jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367. The District
Court granted class certification on November 28, 2022. 1-ER-29. This Court
granted Appellants' timely petition for permission to appeal, filed on December 9,

2022, under Federal Rule of Civil Procedure 23(f). 2-ER-33. This Court has jurisdiction under 28 U.S.C. § 1292(e) and Federal Rule of Civil Procedure 23(f).

## INTRODUCTION

The District Court certified a massive class of 21 million consumers who made purchases involving nearly 300,000 apps available through the Google Play Store. The price for each purchase was set by the app's developer, who paid Google a service fee equal to a percentage of the price. Plaintiffs' theory is that Google's service fee was supracompetitive and that had Google charged *developers* a lower fee, the developers would have set lower prices for *consumers* and passed through the savings from the lower service fee. Injury, under this theory, turns on individualized questions about each developer's pricing strategies and competitors, and the effect on each consumer. Plaintiffs' simplistic injury and damages model assumed away these individualized questions by skipping over them, as did the District Court.

Under Federal Rule of Civil Procedure 23(b)(3), these individualized questions should have precluded class certification. Rule 23(b)(3) requires class-action plaintiffs to prove that common issues will predominate over individualized ones, and it requires courts to conduct a *rigorous analysis* of the evidence to ensure that plaintiffs have *proven* predominance before a class is certified. The District Court did not conduct that rigorous analysis, nor could it have certified a class had

it done so.  Indeed, the District Court's certification order was the product of multiple legal errors that are similar to—and more glaring than—errors this Court and the Supreme Court have repeatedly corrected.  For three reasons, this Court should reverse.

*First*, the District Court failed to engage with the magnitude of uninjured class members in the 21-million-plus member class it certified.  Plaintiffs must prove that common questions about Article III standing will predominate over individualized questions at trial before a class can be certified.  *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 668 n.12 (9th Cir. 2022) (en banc); *Van v. LLR, Inc.*, 61 F.4th 1053, 1069 (9th Cir. 2023).  Plaintiffs' asserted Article III injury here is that consumers overpaid for apps and related content. Developers, not Google, set the prices for those products.  Each consumer's standing therefore turns on whether the specific developers from which he or she made purchases would, *in fact*, have charged lower prices for those purchases in a but-for world where Google charged the developers lower service fees.

Real-world data cuts against the notion that lowering service fees would have led developers to reduce prices.  When Google lowered service fees during the class period, the overwhelming majority of developers did not lower their prices.  If the overwhelming majority of developers would not have lowered their prices in the but-for world, the *overwhelming majority of 21 million consumers in the class* are

uninjured. At a minimum, this real-world evidence shows that individualized mini-trials are required to assess whether the developers of hundreds of thousands of apps would have passed their cost savings from a lower service fee through to millions of consumers, or kept it for themselves. This process would be extravagantly burdensome, yet the District Court did not attempt to explain how certification was nonetheless appropriate.

*Second*, even if the District Court had conducted the required rigorous analysis, Plaintiffs failed to demonstrate that injury and damages could be established through common proof. The District Court certified the class by relying exclusively on a statistical model offered by Plaintiffs' expert. But this kind of model has never before been used to establish class-wide injury, and it rests on crude assumptions that fail to account for obvious factors that would affect developers' pricing and thus the extent of any consumer injury.

The model's accuracy depends on every app in each of 35 broad Google Play categories being a substitute for every other app in the same category. But that is self-evidently wrong. *Elmo Loves 123s*, *Backgammon Pro*, and the first-person-shooter app *Doom* are all in the Games category but are plainly not substitutes; nor are the smoking-cessation, insulin-tracking, and marathon-training apps in the Health & Fitness category. The model further assumes that *every* developer would have reduced its pricing in direct proportion to any lower Google service fee. But

real-world data again shows that is untrue; almost all developers purposefully price their apps to end in 99-cent increments and do not alter that focal-point pricing regardless of whether Google's fee is a few cents lower. They just keep the change.

Even after Plaintiffs' expert conceded that not all apps in each category are substitutes and that focal-point pricing is an important real-world consideration, the District Court failed to rigorously analyze these flaws in Plaintiffs' model. It instead certified a class based on a model that fails to account for these obvious and important variables. That error is all the more glaring given that this Court has held class certification improper where plaintiffs seek to rely on precisely this kind of "unsupported assumption[]." *Olean*, 31 F.4th at 666 n.9.

*Third*, the District Court acknowledged the existence of "individualized questions" on "damages," but held that the presence of such questions can never defeat class certification in this Circuit. But Rule 23(b)(3) makes clear that common questions must "predominate over *any* questions affecting only individual members." Fed. R. Civ. P. 23(b)(3) (emphasis added). That unambiguous language precludes class certification where individualized damages issues would predominate, as both the Supreme Court and this Court have held. The District Court's contrary conclusion was clear error and an independent ground for reversal.

5

## ISSUES FOR REVIEW

1.      Must a district court conduct a rigorous analysis of the extent to which the proposed class contains uninjured class members before it can certify the class?

2.      Can a district court certify a class based on an injury model that does not account for variables that yield individualized differences among class members?

3.      Must a district court actually analyze whether individualized issues with respect to damages calculations predominate?

## RULE 23

Federal Rule of Civil Procedure 23(b) provides, in pertinent part:

A class action may be maintained if Rule 23(a) is satisfied and if: … (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members ….

## STATEMENT OF THE CASE

### A.      Google Play

Google Play is Google's Android app store, where developers offer apps and consumers download them.  There are over four million apps on Play, in 35 categories ranging from Health & Fitness to Games to Music.  These categories "are not based on any economic analysis or reasoning."  2-ER-271; *see* 2-ER-296-297. The categories instead organize apps for consumers, much like Walmart's Home Improvement department sells a wide variety of products ranging from ceiling fans

6

to duct tape, while the Patio & Garden department sells products ranging from lawn mowers to outdoor rugs to bird feeders.[1]  There are a wide variety of apps in each Google Play category, and developers, not Google, choose the category in which they want to offer each app.  The Games category, for instance, includes everything from the children's game *Daniel Tiger's Grr-ific Feelings* to the mature-rated *Grand Theft Auto: Vice City* to *Mahjong Treasure Quest* to *Scrabble*.  The Health & Fitness category includes apps for sleep tracking, swimming, yoga, tinnitus therapy, marathon training, insulin tracking, and smoking cessation.

Roughly 90% of apps are completely free and can be played without spending any money, but may display ads.  *See* 2-ER-238; 2-ER-283-284.  For the remaining 10%, developers make money in different ways.  *See* 1-ER-10.  Some developers charge an initial download fee, whereas others sell subscriptions.  Still others charge for in-app purchases (IAPs), such as digital currency for use in a video game, or an avatar or speed boost for your Roblox character.  *See* 2-ER-238; 2-ER-253-254.  Consumers spend by far the most money on subscriptions and IAPs.  2-ER-253; 2-ER-285.  Many consumers spend a small amount of money on Google Play.  During

---

[1]  *See Home Improvement*, Walmart, https://www.walmart.com/cp/home-improvement/1072864 (last visited June 8, 2022); *Patio & Garden*, Walmart, https://www.walmart.com/cp/patio-garden/5428 (last visited June 8, 2022).

the class period, roughly 40% of consumers made purchases from a single app. *See* 2-ER-260 tbl. 2.

Consumers make payments for apps and IAPs to Google, which remits the payment to developers minus a service fee. *See* 2-ER-256. The fee is a percentage of the purchase price (and, again, the purchase price is set by the developer). *See id.* Different developers pay different fees, which can differ based on the type of content. *See* 2-ER-256-259. These fees enable Google to support billions of users, protect against malware, and offer tools to developers. *See* 2-ER-211-213. The fees also enable users to access services, such as parental controls. *See id.* Google requires developers to use Play's billing system, which protects consumer security and allows for efficient fee collection. *See* 2-ER-211.

Developers—and not Google—decide what each user pays for each app, subscription, and IAP, and developers set their prices based on individualized factors. *See* 2-ER-261. A key factor for many developers is focal-point pricing, the strategy of setting prices ending in $.99. 2-ER-262. In approximately 97% of U.S. consumers' app transactions, the price ended in $.99. 2-ER-262-263 & fig. 7.

Google lowered its service fees for certain developers three times between 2018 and 2021. 2-ER-268-269. In each instance, the vast majority of those developers did not reduce prices for consumers. *Id.* For at least 87% of paid apps and 98% of IAPs and subscriptions, developers kept their prices exactly the same

despite paying a lower fee to Google. 2-ER-269. This means that in the real world, almost no developers pass a lower service fee through to consumers in the form of lower prices. Instead, developers pocket those savings. *See, e.g.*, 4-ER-638-639 (developer testifying that lower fee "would not have affected my decision to set the prices the way we did").

### B. Procedural History

***The putative class complaint.*** A putative consumer class, putative developer class, two individual developers, and a group of States sued Google, alleging anticompetitive conduct related to the Play Store. The cases are proceeding as a coordinated multi-district litigation. *See* 3-ER-541. Google and the putative developer class—*i.e.*, the entities that actually paid the service fee to Google—have reached a proposed settlement that the District Court has preliminarily approved. *See* Order, *In re Google Play Developer Antitrust Litig.*, No. 20-cv-05792 (N.D. Cal. Dec. 1, 2022), ECF No. 233. Consumer plaintiffs ("Plaintiffs"), appellees in this appeal, requested certification of a class of over 21 million consumers who made over a billion purchases involving 272,500 apps during the class period. *See* 1-ER-5-6. They asserted, by relying on a "pass-through" theory, that the consumers in the putative class were injured as follows: In a "but-for" world in which Google had not engaged in the alleged anticompetitive conduct, Google would have charged developers a lower percentage of the purchase price as a service fee, which would

have resulted in developers charging lower prices to consumers for apps and app-related purchases.  1-ER-5; 1-ER-18-19.

***Dr. Singer's unprecedented model.***  At class certification, Plaintiffs attempted to show that they could demonstrate injury through common proof, and thus meet Rule 23's predominance requirement.  To make that showing, Plaintiffs hired Dr. Hal Singer, who opined that *all* developers would have lowered their prices if Google had lowered its service fees.  *See* 3-ER-337.  On that theory, he maintained that every consumer in the class who purchased an app or related content—21 million in total—was injured.

Dr. Singer's analysis involves using three economic models.  He uses two of them to opine that Google would have charged a lower service fee in the but-for world.  Based on an adaptation of the Rochet-Tirole model, Dr. Singer calculated that the "but-for" service fee Google would have charged developers for initial app downloads is 23.4% (instead of approximately 30%).  *See* 3-ER-310-327; 5-ER-721-738; 2-ER-48-49; 2-ER-152.  Based on an adaptation of the Landes-Posner model, Dr. Singer calculated that the "but-for" service fee Google would have charged developers for IAPs and subscriptions is 14.8% (instead of approximately 30%).  *See* 3-ER-328-337; 5-ER-739-748; 2-ER-79-81; 2-ER-152; 3-ER-351; 5-ER-762.

Neither of these models predicts whether developers would have actually charged consumers lower prices if Google's service fee had been lower.  *See* 2-ER-

152 (neither model "tell[s] you what the pass-through rate for any consumer or any app is"). To analyze this pass-through of cost savings, Dr. Singer relied on a third model, known as a "logit" model. No one has ever used a logit model to calculate pass-through and show individual injury before. *See* 2-ER-274-275; 2-ER-175-177; 2-ER-90; 2-ER-94; 2-ER-96-97. Logit models are typically used to analyze the effect that a merger will have on products in the same market. *See* 2-ER-99-101; 2-ER-139; 2-ER-176-177. To be accurate, a logit model must analyze products that are substitutes. That is because the premise of a logit model is that when the price of one product changes, consumers will switch to a different product the consumer views as a substitute, and will do so in proportion to each product's share of the market, independent of other considerations. *See* 2-ER-274 n.363; 2-ER-120-121; 2-ER-127. Indeed, both sides' experts agreed that a logit model only works if all the products in a category are "substitutes." 2-ER-127; *see* 2-ER-274 n.363; 2-ER-120-121; 2-ER-155; 2-ER-182.

Dr. Singer's use of a logit model therefore depended on showing that consumers view every app within each of the 35 Play categories—such as Games or Health & Fitness—as a substitute for every other app in that category. 2-ER-120-121; *accord, e.g.*, 2-ER-274-275; 2-ER-155; 1-ER-12 & n.5; *see* Kenneth E. Train, *Discrete Choice Methods with Simulation* 42 (2d ed. 2009) ("The logit model implies proportional substitution across alternatives.") (cited at 2-ER-274). Logit

models are inappropriate when products are not substitutes. *See* Train, *supra*, at 48 ("Proportionate substitution can be realistic for some situations, in which case the logit model is appropriate" but in "many settings … imposing proportionate substitution through the logit model can lead to unrealistic forecasts.").

To show that consumers in the proposed class were actually overcharged, Dr. Singer proceeded as follows. First, he calculated each app's share of its Play category—for example, what percentage of consumer purchases in the Games category are from the children's *Elmo Loves 123s* app. Then, he subtracted that percentage from 100%—referred to as a "one-minus share" calculation—and declared that the resulting number reveals what percentage of a lower service fee the developer would have passed through to consumers to avoid losing those purchases. *See* 3-ER-341-342; 2-ER-227-228. Because every app's share of a broad Play Store category is inevitably small, practically speaking, Dr. Singer's model predicts that every single app developer would be economically compelled to pass on almost the entire amount of any lower service fee to consumers. For example, the model assumes that if the *Elmo Loves 123s* app failed to set lower prices in response to a lower service fee, consumers would shift their purchases to *Doom* or *Backgammon Pro* instead; it likewise assumes that if a smoking-cessation app chose not to set lower prices based on a lower service fee, consumers would purchase a swimming

12

app, tinnitus therapy app, or insulin-tracking app also found in the Health & Fitness category instead.

Applying this model, Dr. Singer claimed that "all or almost all class members" are injured. 3-ER-337; 3-ER-350 (capitalization altered). Dr. Singer did not attempt to explain what "almost all" meant, how to isolate the percentage of developers that might not pass savings through to consumers, or what percentage of consumers are uninjured. He simply concluded that his models and formulas "are common to the Class." 3-ER-350.

Dr. Singer then combined the results of his three models to estimate an aggregate damages calculation. His logit model calculated an average pass-through rate of 89.9% across all Play Store categories, meaning that if Google had charged a reduced service fee, developers assertedly would have passed through 89.9% of the cost savings to consumers in the form of lower prices. 3-ER-342-343; 3-ER-318-320; 5-ER-729-731. Dr. Singer used that average pass-through rate as an input for his adapted Rochet-Tirole and Landes-Posner models when calculating what he says is the but-for service fee. And by combining his but-for service fees and the pass-through rate for each category, he calculated billions of dollars in consumer damages. 3-ER-342-343; 3-ER-318-320; 5-ER-729-731; 2-ER-288.

***Dr. Burtis's opinion.*** Google offered extensive testimony from its expert, Dr. Burtis, in opposing class certification. Dr. Burtis examined data involving over

465,000 discrete offerings in the Play Store for which Google charged developers a reduced service fee during the class period. Contrary to Dr. Singer's assumption, in the real world, the overwhelming majority of developers did not lower prices for consumers even when Google charged a lower service fee. 2-ER-268-270. Even when the service fee was cut in half, these developers did not change their prices—in conflict with Dr. Singer's model, which predicted these developers would pass through nearly 100% of any service-fee reduction. *See* 2-ER-271-273.

Dr. Burtis highlighted several problems with Dr. Singer's pass-through model. First, she explained that Dr. Singer's logit model is an "overly simplistic" approach that ignores the numerous competitive conditions affecting app pricing and therefore is "not appropriate for determining pass-through rates for apps." 2-ER-271; 2-ER-274. "One of the underlying assumptions of Dr. Singer's demand model and pass-through rates is that all products within a Google Play category are substitutes." 2-ER-275; *see* 2-ER-182. But as Dr. Burtis explained, "[t]here is no economic basis for this assumption." 2-ER-275. Google's categories are expansive and apps within them "vary widely." 2-ER-266. For example, the Education category includes over 400,000 apps—from foreign languages to plant care to star gazing—whereas the Business category includes over 300,000—addressing everything from mobile payment systems to creating PDFs to job searches. *Id.* And because there is no factual basis to assume that all apps within a Play Store category

14

are substitutes, any predictions about price reductions in these circumstances were flawed and inaccurate. 2-ER-265-267; 2-ER-281.

Dr. Burtis explained that Dr. Singer's model also depends on the "unsupported assumption[]" that developers will pass through nearly all cost savings to consumers in proportion to a service fee reduction. 2-ER-271. In the real world, the vast majority of developers and app transactions employ focal-point pricing by charging, for example, $0.99 or $1.99. *See* 2-ER-278-279. Dr. Singer's model offered no factual basis to assume that every single developer would abandon such a proven pricing strategy in American marketing in favor of a strategy that is less lucrative for the developer and would look strange to consumers used to prices like $0.99 or $1.99. *See* 2-ER-263. There was no basis to assume, for example, that a developer who set the price for an app at $1.99 would reduce that price to $1.93 or $1.87 or $1.72 or any other pennies-smaller number in response to a lower service fee.

As a result of these flaws, Dr. Burtis explained that Dr. Singer's model could not reliably "show injury to all or nearly [all] consumers though common proof, because Consumer Plaintiffs cannot establish through common proof that all consumers would pay a lower price if service fee rates for developers were lower." 2-ER-270.

**Google moves to exclude Dr. Singer's model**. Google moved to exclude Dr. Singer's model under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). 2-ER-194-197. Google explained that the model relies on the unjustified assumption that all apps in each Play Store category are substitutes. 2-ER-196. Google also explained that Dr. Singer's model is unreliable because it fails to account for focal-point pricing—which Dr. Singer agreed was an "important consideration." 2-ER-195 (quoting 2-ER-187).

The District Court denied Google's *Daubert* motion. It did not engage with any of the problems Google identified, instead dismissing Google's arguments about competitive conditions and focal-point pricing as bearing only on the Rule 23 certification inquiry and not on the *Daubert* analysis. 1-ER-14. The court also deemed it irrelevant that Dr. Singer's pass-through model was not peer-reviewed and was developed solely for this litigation. 1-ER-13. The court concluded that Dr. Singer's model was a reliable method of calculating pass-through because Google had not proved otherwise—even though Plaintiffs bore the burden of proving admissibility. 1-ER-14.

**The District Court grants certification.** Plaintiffs moved for class certification, relying on Dr. Singer's model to show common proof of injury and damages. 3-ER-361-364.[2] The District Court granted the motion. 1-ER-29. The

---

[2] At class certification, Plaintiffs proposed an alternative theory of injury based on Google's Play Points program. But not all consumers sign up for Play Points, and those who sign up may not redeem points. *See* 2-ER-241-242. The District Court did not rely on this theory in its certification order. 1-ER-24.

court acknowledged that the class presented "individualized questions on impact and damages." 1-ER-28. Yet the court did not identify what those questions were. The court instead put the burden on *Google* to show that there are a large number of uninjured class members. 1-ER-23. As for Google's real-world data demonstrating that only a very small number of consumers could have been injured because almost no developers reduced prices in response to service fee decreases, the court stated that "Dr. Singer raised several serious questions about" some of this data, but declined to engage with or resolve any of those questions, and did not address direct testimony and other evidence from developers showing the same result. *See id.* The court did not analyze whether individualized damages issues prevented certification; instead, the District Court concluded that "it is well-established circuit law that damages calculations alone cannot defeat certification." 1-ER-25 (quotation marks omitted).[3]

The Court granted Google's Rule 23(f) petition, and this appeal follows.

## SUMMARY OF ARGUMENT

**I.** The District Court failed to rigorously analyze whether the class contains a large number of uninjured members, including failing to account for real-world evidence that most developers did not pass cost savings from a reduced service fee

---

[3] The District Court certified Plaintiffs' federal antitrust and parallel state-law claims based on the same reasoning. *See* 1-ER-26-27. Google's arguments on appeal therefore apply to all claims.

through to consumers in the form of lower prices. Absent developer price cuts to consumers, however, members of the proposed class suffered no injury at all. Had the court conducted the required analysis, it would have recognized that the individualized inquiries needed to identify uninjured class members preclude certification.

District courts "must consider whether the possible presence of uninjured class members means that the class definition is fatally overbroad." *Olean*, 31 F.4th at 699 n.14. This Court has reversed class certification where "an inquiry into … circumstances and motivations" raises "the spectre of class-member-by-class-member adjudication" to determine whether class members actually suffered injury. *Van*, 61 F.4th at 1058, 1069. When presented with evidence of uninjured class members, a district court must rigorously analyze "whether a class-member-by-class-member assessment of the individualized issue" would be "prohibitively cumbersome." *Id.* at 1068-69 (quotation marks omitted).

Here, Google presented evidence that orders-of-magnitude more consumers suffered no injury from allegedly supracompetitive service charges. Because developers—and not Google—set the prices consumers pay, consumers can show injury *only if* they can prove that developers would have passed lower costs through to consumers had Google lowered its service charges. Google introduced data involving over 465,000 discrete offerings in the Play Store for which Google

18

reduced the service fee during the class period. The data showed that, at *most*, just 7% of developers lowered their prices—meaning that at least 93% did not. 2-ER-268-269. And, for IAPs and subscriptions—which together formed more than 97% of the affected offerings—"less than 2% of prices changed," meaning that more than 98% of prices *did not change.* 2-ER-269. The data was corroborated by developers who testified that service-fee reductions comparable to those proposed by Plaintiffs would not have led them to reduce their prices. *See infra* pp. 30-31.

The District Court's analysis of this evidence—which constituted the *only* real-world evidence of developer behavior in the record—was anything but rigorous. It waved away this evidence based on supposed "serious questions" about the data, 1-ER-23, but it never identified any serious questions. Plaintiffs' expert had raised a question about a *single one* of more than 465,000 data points in the study, which surely does not rise to the level of such a serious question that it merits ignoring the other 464,999 data points. And even as to the issue with this single data point, the District Court did not attempt to weigh the "conflicting expert testimony" and resolve the "expert dispute[]" as Rule 23 requires. *Olean*, 31 F.4th at 666 (quotation marks omitted).

At the petition stage, Plaintiffs attempted to rehabilitate the District Court's analysis with a host of additional issues that they pressed below. Their arguments are uniformly meritless, but they are also beside the point: It is the District Court's

responsibility to conduct a rigorous analysis, and this Court cannot affirm by substituting its own views of the record.

**II.** The District Court also erred in accepting Plaintiffs' entirely unprecedented attempt to prove a pass-through injury using Dr. Singer's logit model. The model assumes that every developer would have passed through at least some portion of reduced service fees to consumers without attempting to account for multiple obvious reasons that they would not have done so.

*First*, the model fails to satisfy an undisputed baseline requirement for a logit model. Dr. Singer agrees that, for a logit model to work, products must be substitutes. That is because a logit model is built on the assumption that, as prices increase, consumers will switch to another substitute product in the relevant market. Here, however, it is undisputed that not all of the apps in the Play Store categories are substitutes for one another.

*Second*, Dr. Singer's model fails to account for a pervasive pricing practice in the Play Store: setting prices that end in $.99, known as focal-point pricing. The overwhelming majority of transactions during the class period within the Play Store—97%—exhibited focal-point pricing. The savings associated with the reduced service charges hypothesized by Dr. Singer would be a matter of cents for most offerings in the Play Store. Under these circumstances, developers are unlikely to abandon focal-point pricing so that they can pass a few cents of savings through

to consumers. Dr. Singer admitted that his model contains no control for this dominant practice. And his primary justification for refusing to account for it—that developers might choose any price ending in a 9, rather than $.99—finds no support in the data. Other district courts within this Circuit have rightly refused to certify classes based on models that do not satisfactorily account for focal-point pricing. *See, e.g.*, *In re Apple iPhone Antitrust Litig.*, No. 11-CV-6714-YGR, 2022 WL 1284104, at *8, *12, *14-17 (N.D. Cal. Mar. 29, 2022). The District Court here should have done the same.

At minimum, the District Court's shallow discussion of these issues failed to satisfy the requirement to rigorously analyze Plaintiffs' proposed evidence of injury and damages. Indeed, the flaws in Dr. Singer's model are so significant that the District Court should have excluded the model under *Daubert*. Dr. Singer's methodology, developed specifically for this litigation, has never before been used for this purpose. The court failed to perform its gatekeeping function.

**III.** The District Court legally erred when it adopted a bright-line rule that the presence of individualized damages issues "cannot, by itself, defeat class certification." 1-ER-25 (quotation marks omitted). Such a rule cannot be squared with the text of Rule 23, the Supreme Court's decision in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), or this Court's precedents. The Court should take this opportunity to clarify that there is no such bright-line rule, and that when—as here—

21

"[q]uestions of individual damage calculations" would "inevitably overwhelm questions common to the class," a court should deny certification in accord with Rule 23's plain text. *Comcast*, 569 U.S. at 34.

## STANDARD OF REVIEW

This Court reviews class certification for abuse of discretion. *Van*, 61 F.4th at 1062. The Court accords "no deference to the district court's legal conclusions," which it reviews *de novo*. *Walker v. Life Ins. Co. of the Sw.*, 953 F.3d 624, 629 (9th Cir. 2020). An error of law, including the application of the wrong legal standard, is a *per se* abuse of discretion. *See Van*, 61 F.4th at 1062; *United States v. Hinkson*, 585 F.3d 1247, 1259 (9th Cir. 2009) (en banc).

A court's determination regarding whether a statistical model is capable of proving class-wide impact "is not a question of fact, even though there may be disputed issues of fact." *Olean*, 31 F.4th at 661. This Court reviews such mixed questions of law and fact *de novo*. *Gonzalez v. United States Immigr. & Customs Enf't*, 975 F.3d 788, 802 (9th Cir. 2020). The Court reviews any genuine findings of fact for clear error, *Van*, 61 F.4th at 1062, but "where the district court fails to make sufficient findings to support its application of the Rule 23 criteria," its determination "is not entitled to the traditional deference given to such a determination," *Narouz v. Charter Commc'ns, LLC*, 591 F.3d 1261, 1266 (9th Cir. 2010) (quotation marks omitted).

## ARGUMENT

Class actions are a carefully crafted "exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast*, 569 U.S. at 33 (quotation marks omitted). A party seeking certification under Rule 23(b)(3) "must affirmatively demonstrate his compliance" with Rule 23's requirements, *id.* (quotation marks omitted), including the requirement that "questions of law or fact common to class members predominate," Fed. R. Civ. P. 23(b)(3). The District Court in this case failed to conduct the rigorous analysis this Court and the Supreme Court require, and it therefore failed to credit the overwhelming evidence that individualized questions with respect to injury and damages predominate. Each of these individualized issues would require class-member-by-class-member adjudication for millions of plaintiffs and hundreds of thousands of apps. This is exactly the sort of case that Congress designed Rule 23(b)(3) to preclude.

## I.   CLASS CERTIFICATION WAS IMPROPER BECAUSE THERE ARE INDIVIDUALIZED ISSUES OF INJURY FOR MILLIONS OF CLASS MEMBERS.

There are 21 million plaintiffs in the certified class, who conducted billions of transactions on the Play Store. Before certifying a class, the District Court was required to determine "whether the possible presence of uninjured class members" means that Plaintiffs failed to meet Rule 23's predominance requirement. *Olean*, 31

F.4th at 669 n.14; *see id.* at 668 n.12 (citing *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021)).  But injury in this case is highly individualized, because it requires each individual consumer to demonstrate that each individual developer would have charged them less in the but-for world.  *See* 1-ER-11.  As Google's evidence demonstrated, most developers *do not* pass through lower service fees to consumers—which means that the pass-through theory on which consumer injury depends must be proven for each developer.  Such individualized inquiries will predominate over common questions.  The District Court did not conduct a rigorous analysis of this issue, and as a result it erroneously certified the class.

### A. District Courts Must Rigorously Analyze Whether There Are Uninjured Class Members Before Certifying Rule 23(b)(3) Classes.

The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  The inquiry "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues."  *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quotation marks omitted).  Where there is evidence that "individualized issues" would "bar recovery on at least some claims," then the district court must determine "whether individualized questions will

overwhelm common ones and render class certification inappropriate under Rule 23(b)." *Van*, 61 F.4th at 1067 (cleaned up).

"[T]he plaintiff bears the burden of proving that class issues predominate," *id.* at 1067 n.11, and the district court must conduct a "rigorous analysis" to determine whether the plaintiff proved that common issues "*in fact*" predominate before certifying a class, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-351 (2011) (emphasis in original; quotation marks omitted). Plaintiffs "wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies" the predominance requirement. *Olean*, 31 F.4th at 664 (emphasis in original; quotation marks omitted).

Plaintiffs must prove at trial that "[e]very class member" has Article III standing in order to recover damages. *TransUnion*, 141 S. Ct. at 2208. Each plaintiff's obligation to prove standing in turn requires district courts at class certification to "consider whether the possible presence of uninjured class members means that the class definition is fatally overbroad." *Olean*, 31 F.4th at 669 n.14. Certification is impermissible when "a great number of members" were not "harmed by the defendant's allegedly unlawful conduct." *Id.* (quotation marks omitted).[4]

---

[4] The circuits are split on how uninjured class members affect certification. *See Olean*, 31 F.4th at 692 (Lee, J., dissenting). Some hold that "all class members" must establish injury, *see In re Rail Freight Fuel Surcharge Antitrust Litig*., 725 F.3d 244, 252 (D.C. Cir. 2013); *accord In re Hydrogen Peroxide Antitrust Litig*., 552 F.3d 305, 311 (3d Cir. 2008); *Blades v. Monsanto Co.*, 400 F.3d 562, 571 (8th Cir. 2005),

Earlier this year, this Court vacated a class certification order where the district court skipped over the required rigorous analysis of an individualized issue after the defendant "invoked" the issue and "provided evidence" to support it. *Van*, 61 F.4th at 1068-69. In *Van*, the district court had certified a class of over 10,000 consumers who made approximately 72,000 purchases from a retailer that allegedly collected unnecessary sales tax. *Id.* at 1059. In opposing class certification, the retailer submitted evidence showing that, in "at least eighteen" transactions, the salesperson had given the customer a discount to offset the erroneous tax collection—thus showing those class members "lack a meritorious claim" of injury. *Id.* at 1068 & n.13. The district court certified a class notwithstanding this evidence of uninjured class members.

This Court vacated for failure to conduct a sufficiently rigorous analysis. *Id.* at 1069. Because the defendant had "invoked an individualized issue" and "provided evidence that at least some class members lack[ed] meritorious claims because of this issue," class certification was inappropriate without addressing "whether a class-

_____

while another holds that the presence of more than a "de minimis" number of uninjured class members requires a "manageable" process to identify and remove them, *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53-54 (1st Cir. 2018). And others hold certification improper if "a great number" of uninjured members are present. *Olean*, 31 F.4th at 669 n.14; *see Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677-678 (7th Cir. 2009). Google asserts that certification is improper if there are more than a de minimis number of uninjured class members. But because Plaintiffs failed to show injury for the majority of the class here, certification is improper under any standard.

member-by-class-member assessment of the individualized issue will be unnecessary or workable." *Id.* The evidence of a discount in 18 transactions demonstrated that "an inquiry into the circumstances and motivations behind each of the 13,680 discounts might be necessary," potentially requiring "months of trial." *Id.* Because that evidence summoned "the spectre of class-member-by-class-member adjudication," this Court held that "the district court clearly erred in its assessment of whether the individualized issues generated by the retailer discounts" defeated predominance. *Id.* at 1058, 1069. This Court remanded for the district court to evaluate whether individualized inquiries would be "workable." *Id.* at 1069.

*Van* is consistent with other courts' approaches. In *In re Asacol Antitrust Litigation*, for example, the First Circuit reversed certification where the plaintiffs alleged a generic drug should have entered the market earlier, lowering prices for consumers, but the defendants cited evidence that certain consumers would have paid the same amount even if the generic had done so. *See* 907 F.3d at 51-54. The presence of these uninjured consumers raised an individualized inquiry and predominance problem that foreclosed certification. *Id.* at 54-58; *see Olean*, 31 F.4th at 669 n.13 (citing this holding from *Asacol*). Likewise, in *In re Rail Freight Fuel Surcharge Antitrust Litigation*, the D.C. Circuit rejected certification where the plaintiffs alleged that shipping prices should have been lower for the class, and the defendants cited evidence that thousands of class members were uninjured. 934 F.3d

619, 623-624 (D.C. Cir. 2019). There was no way, "short of full-blown, individual trials," to "segregate the uninjured from the truly injured." *Id.* at 625 (quotation marks omitted). And in *In re Apple iPhone Antitrust Litigation*—a closely analogous case involving Apple's app store—the district court denied class certification, citing evidence that individual plaintiffs may be uninjured under plaintiffs' theory due to individualized issues with respect to app pricing. *See* 2022 WL 1284104, at *8, *16.

As all of these cases demonstrate, where a defendant invokes an individualized issue and provides evidence that some class members are uninjured as a result, the district court must rigorously analyze whether this individualized issue indicates a predominance problem. As described below, the District Court here failed to conduct the required analysis.

### B. Google Presented Evidence That A Great Many Class Members Are Uninjured, Requiring Individual Inquiry.

There can be no dispute that Google invoked an individualized issue—the presence of class members who were uninjured because the price a developer charged for an app would not have been lower in the but-for world. Google also presented evidence that this issue will require class-member-by-class-member adjudication, because almost all developers would not have charged consumers less if the service fee had been lower. Google's evidence included real-world data, expert testimony from Dr. Burtis, and direct testimony from three developers.

28

Dr. Burtis's analysis was extensive. She reviewed data over the entire class period to determine what happened in the real world when Google lowered its service fees. That data included prices for over 465,000 discrete offerings in the Play Store, which she referred to as "SKUs," short for "stock-keeping units." 2-ER-268. The vast majority of these SKUs (more than 441,000) were IAPs; the remainder included more than 16,000 subscriptions and 10,000 paid app downloads. *See* 2-ER-270 tbl. 5.

Remarkably, when Google lowered its service fees—from 30% to below 20%—there was "no change in price at all during the class period" for *93% of SKUs*. 2-ER-268-269 & nn.193-194. Thus, "among these SKUs, at most 7% responded to the service fee rate change in the actual world." 2-ER-269. And even there, because Dr. Burtis looked for *any* change in prices, this subset of 7% includes developers who "increased rather than decreased" their prices after Google reduced its fee, as well as developers who reduced their prices for reasons other than the decreased fee. *Id.* In other words, Google's fee reduction led to lower prices for less than 7% of SKUs.

After examining data during the entire class period, Dr. Burtis then examined the period immediately before and after Google decreased its service fees. The results were even starker. For IAPs and subscriptions—together more than 97% of transactions—"less than 2% of prices changed after a service fee rate decline." 2-

ER-269; *see* 2-ER-270 tbl. 5.  For paid app downloads, only 13% of prices changed. *See* 2-ER-269; 2-ER-270 tbl. 5.  In other words, when Google decreased its service fees, almost no developers changed the price of IAPs or subscriptions, and only a small number changed app prices.

Google also deposed three developers who were plaintiffs in the separate developer class action about their pricing decisions.  Google asked whether these developers would have decreased their products' prices had Google reduced its service fees in the but-for world.  These developers confirmed that if Google had reduced its service fees, they *would not have* passed cost savings through to consumers.  *See, e.g.*, 4-ER-638-639 (developer for Little Hoots app agreeing "[i]t would have been wonderful" if the service fee were "a 15 percent service fee versus a 30 percent service fee" but that "it would not have affected my decision to set the prices the way we did"); 4-ER-620 (developer for Rescue Pets app agreeing that if its costs went down, the developer would "take those savings" rather than lower prices for consumers); 4-ER-606 (developer for Pure Sweat Basketball app agreeing that he did not consider consumers' price elasticity when setting prices or attempt to calculate what price would maximize profits).

Google also asked these developers what happened in the real world when Google reduced its service fees to rates comparable to the but-for rate proposed by Plaintiffs' expert.  Again, developers confirmed that they did not pass cost savings

through to consumers.  *See* 4-ER-623 (confirming that "when Google reduced those commissions from 30 percent to 15 percent" developer did not "reduce digital pricing within Rescue Pets"); 4-ER-607 (confirming that "[w]hen Google changed the service fee … from a default of 30 percent to a 15 percent fee, Pure Sweat [Basketball] itself did not change its prices").

Thus, the large dataset analyzed by Dr. Burtis, as corroborated by direct evidence from app developers, demonstrated that when Google decreases its service fees, most app developers do not pass the service-fee reduction through to consumers.  To put it more simply, Dr. Burtis's testimony and the testimony of developers plainly established that there are significant numbers of uninjured class members.

The evidence of uninjured plaintiffs that Google presented in this case is orders of magnitude more substantial than in *Van*.  In *Van*, there was evidence that at least 18 discounts were provided to class members that negated those consumers' injury.  Here, at least *93% of transactions* involved potentially uninjured plaintiffs.  And while *Van* involved a putative class of just over 10,000 consumers and 72,000 purchases from the defendant, this case involves over *21 million* consumers and over a billion purchases from *270,000* discrete apps—raising the prospect that the parties would have to engage in class-member-by-class member and app-by-app proofs at

31

trial "to identify which apps, subscriptions, and IAPs prices would have been lower and which consumers would have paid lower prices in a but-for world." 2-ER-269.

### C. The District Court Failed To Conduct The Rigorous Analysis Of Uninjured Class Members Required By This Court's Precedent.

Given the significant evidence of uninjured class members, the District Court was required to conduct a rigorous analysis to determine whether the presence of uninjured plaintiffs in the class prevented certification. It did not do so. Instead, it concluded that "*Google* has not shown" that the class "would be so overinclusive that substantial numbers of uninjured people would populate it." 1-ER-23 (emphasis added). And, although the court noted that Dr. Singer had raised questions about *some* of Google's evidence, it conducted no analysis to answer those questions—nor did it evaluate *other* evidence (including direct testimony by developers) substantiating Google's argument that the putative class includes uninjured plaintiffs. *Id.* The District Court's many errors require reversal.

*First*, the District Court discounted Google's evidence of real-world data showing developers reduced prices on less than 2% of SKUs in response to three service-fee reductions. The court's entire analysis consisted of saying this evidence was "of minimal value," because Dr. Singer questioned whether some of the 465,000 SKUs were different listings for the same products. *Id.* The court did nothing to evaluate any question Dr. Singer raised; it simply reasoned that because of Dr.

Singer's questions, "Dr. Burtis's 2% conclusion is [not] enough to deny certification." *Id.*

No analysis could have justified ignoring Dr. Burtis's data. Dr. Singer identified exactly *one* app where there were two different SKUs for the same subscription. *See* 2-ER-111-112. For that subscription, some people continued purchasing one SKU at a higher price, whereas others began purchasing the other SKU at a lower price. *See* 2-ER-115. Neither Plaintiffs nor the District Court offered any reason to suppose that this lone subscription example—out of over *460,000 SKUs in the dataset, including over 440,000 non-subscription IAPs—* altered in any way Dr. Burtis's 2% conclusion. Dr. Singer's example merely highlighted the individualized nature of the inquiry.

The predominance analysis required the District Court to "weigh" the "conflicting expert testimony" and resolv[e]" the dispute over the evidence. *Olean*, 31 F.4th at 666 (quotation marks and alterations omitted). But the District Court entirely failed to do so. The court did not consider whether Dr. Singer's sole example of a subscription with multiple SKUs was representative or an outlier. The court did not address whether or why this sole example could be extrapolated to other subscriptions, let alone other paid apps or IAPs. The court did not explain how a lone example could conceivably outweigh Dr. Burtis's data, which was the *only* empirical evidence addressing whether app developers in fact pass decreased service

fees through to consumers. And the court did not even mention the testimony from developers confirming what the data show—that developers did not lower their prices when Google lowered its services fees.

*Second*, the District Court claimed that a class could be certified because this case was "not unlike a price-fixing case," where Google allegedly "inflated the 'headline rate' that was used as the basis for all developers' negotiations with Google" and which "affected all of the prices set by the developers and paid by consumers to Google." 1-ER-23. But that assertion assumes the answer to the key question for analyzing consumer injury: Does the "headline" rate set by Google *in fact affect* the prices paid by consumers? The record evidence demonstrates that the answer is no. As Dr. Burtis showed, when Google charged developers a lower service fee, developers did not reduce consumer prices. Testimony from developers confirmed this conclusion.

The District Court was thus wrong to analogize to a price-fixing case. 1-ER-24. Unlike a price-fixing case, the question of *how* developers set prices for consumers must be answered to determine whether any consumer in fact suffered injury. Indeed, the District Court recognized at the class certification hearing that this case involves a "more complicated" and "more dynamic" inquiry than a price-fixing case—which is why the District Court should have rigorously analyzed the issue of uninjured class members, rather than analogizing to price-fixing precedent.

*See* 2-ER-39; *cf. Illinois Brick Co. v. Illinois*, 431 U.S. 720, 741-744 (1977) (recognizing the "difficulties and uncertainties" of determining how an overcharge will be passed through and criticizing economic models with "drastic simplifications").

*Third*, the District Court asserted that calculating pass-through rates would impose "no barrier to certification" because consumers are "direct purchasers" from the Play Store under the Supreme Court's decision in *Apple Inc. v. Pepper*, 139 S. Ct. 1514 (2019). 1-ER-19. This is a red herring. Even if consumers are "direct purchasers" under *Pepper*, they must show that individual consumers suffered an Article III injury. Plaintiffs allege that in the but-for world, app developers would have passed lower costs through to consumers. Plaintiffs thus *must show passthrough* to establish Article III standing—a point Plaintiffs do not dispute. The District Court missed this crucial point.

*Fourth*, the District Court compounded these errors by misallocating the burden of proof at class certification, concluding that "Google has not shown" that the possibility of "substantial numbers of uninjured" class members was "a concern here." 1-ER-23. But it was not Google's burden to prove that uninjured members made up a "substantial" percentage of the class. In *Van*, the Court reaffirmed the longstanding rule that "[i]t is the plaintiff's burden to prove that class issues predominate," not the other way around. 61 F.4th at 1066. While plaintiffs need

35

not proactively "rebut every individualized issue that could possibly be raised," where a defendant has "invoke[d]" specific "individualized issues" and "provide[d] sufficient evidence that the individualized issues bar recovery," the burden returns to the plaintiff to prove that "class issues predominate." *Id.* at 1066-67 & n.11. Here, much like in *Van*, Google provided data undermining Plaintiffs' case, corroborated by real-world direct evidence. Given this evidence, the District Court was obligated to determine whether Plaintiffs had proved that they could nevertheless establish injury on a class-wide basis—not duck the question by shifting the burden to Google.

### D. This Court Should Reject Plaintiffs' Attempts To Rehabilitate The District Court's Decision.

At the petition stage, Plaintiffs barely attempted to defend the District Court's reasoning. Instead, Plaintiffs advanced arguments that the District Court neither cited nor adopted. *See* Answer in Opposition at 19-22, *In re Google Play Store Antitrust Litig.*, No. 22-80140 (9th Cir. Dec. 19, 2022) ("Answer in Opp."). These arguments underscore the District Court's failure to conduct the necessary rigorous analysis. Plaintiffs' briefing to this Court cannot stand in for the District Court's obligations under Rule 23. *See B.K. ex rel. Tinsley v. Snyder*, 922 F.3d 957, 977 n.6 (9th Cir. 2019) (refusing to uphold certification on an "alternative … theory presented by the plaintiffs" because "doing so would substitute the district court's

role in certifying the class" and circumvent the "rigorous analysis" requirement (quotation marks omitted)).

In any event, Plaintiffs' efforts to attack Google's evidence are uniformly unpersuasive. Plaintiffs object to the "time frames" involved in Dr. Burtis's study, claiming that a month is too short a period to see a price change. Answer in Opp. 20. But Dr. Burtis also analyzed whether service fees changed during the entire class period—not just a one-month window. *See* 2-ER-268-269. That is how she determined that 93% of prices *did not change at all within the entire class period*, despite Google's multiple service-fee reductions. *Id.*

In contrast, Plaintiffs offer zero evidence that developers lowered prices for consumers in response to decreased service fees. Instead, Plaintiffs speculate that prices did not change in Dr. Burtis's study because they "are sticky." 2-ER-107. But that argument boomerangs. If prices are sticky, it means that app developers *are not passing on cost decreases* to consumers—and that consumers are thus uninjured. As Plaintiffs' own expert put it: "[W]hy would you expect a developer to go back and revisit its pricing" where a service-fee reduction "touched such a small percentage of the app developer's revenues at issue?" 2-ER-108. The app developers' testimony confirmed that point.

Plaintiffs also contend that prices did not decrease in some cases in response to lower service fees because Google for a time "provided no mechanism for

developers to lower their prices." Answer in Opp. 20. But, as Plaintiffs do not dispute, this issue at most affected a subset of *subscriptions* offered through the Play Store. *See* 2-ER-104-105. Subscriptions constituted only 3.6% of the SKUs in Dr. Burtis's study. There is no dispute as to the other 96.4% of SKUs that app developers could have lowered their prices for apps and IAPs in response to lower service fees—yet they largely chose not to. *See* 2-ER-270 tbl. 5; 2-ER-105.

In short, Google presented powerful evidence that most class members are uninjured, while Plaintiffs failed to meet their burden to demonstrate that common issues predominate. This Court should reverse class certification.

## II. THE DISTRICT COURT ERRED IN CONCLUDING THAT PLAINTIFFS' MODEL ESTABLISHES COMMON PROOF OF INJURY AND DAMAGES.

The District Court's class certification ruling erred in a second fundamental respect. Plaintiffs' assertion that they can show injury through common proof relies on the model proposed by their expert, Dr. Singer. But Dr. Singer's model is unfit for that purpose. His model assumes that every developer would have passed lower service fees through to consumers, without accounting for obvious reasons why developers would not have done so—including competitive conditions and focal-point pricing. Had the District Court conducted the rigorous analysis of Dr. Singer's model that Rule 23 required, the court would have concluded that this model cannot

38

serve as common proof of injury.  Indeed, the model is so unsound that it should never have been admitted in the first place under *Daubert*.

### A.    Dr. Singer's Model Fails To Account For Key Independent Variables.

A model can show injury through common proof *only* where "each class member could have relied on [the model] to establish liability if he or she had brought an individual action."  *Tyson Foods*, 577 U.S. at 455.  By contrast, a model cannot supply that proof where it is "inadequate to prove an element of the claim for the entire class," relies on "unsupported assumptions" or "erroneous inputs," or demonstrates "nonsensical results."   *Olean*, 31 F.4th at 666 n.9, 683 (collecting cases).  An injury model is likewise deficient if it does not account for "independent or explanatory variables" that could affect price, "including product characteristics, input costs, customer type, and variables related to consumer preference and demand."  *Id.* at 671, 683.[5]  Although Plaintiffs' model need not establish that each

---

[5] Courts regularly reject certification requests on this basis.  *See Parko v. Shell Oil Co.*, 739 F.3d 1083, 1086 (7th Cir. 2014) (certification unwarranted where plaintiffs assumed every class member experienced same diminution in property value based on experiencing same level of contamination); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 29 (1st Cir. 2008) (certification unwarranted where "[t]oo many factors play into" "the final price paid"); *Blades*, 400 F.3d at 572 (certification unwarranted where plaintiffs' evidence of injury "would vary according to individualized market conditions"); *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 307 (5th Cir. 2003) (certification unwarranted "where the formula by which the parties propose to calculate individual damages is clearly inadequate").

class member will prevail, the district court must ensure that the model is *capable* of resolving these questions on a class-wide basis. *See id.* at 666-667.

Dr. Singer's model fails this test many times over. The model uses a formula that works as follows: Developers list their app in one of 35 broad categories in the Play Store, such as Games or Health & Fitness. *See* 1-ER-12 & n.5. Dr. Singer calculates each app's share of that overall category. He then subtracts the app's share from 100%, and declares the resulting percent (which he says is above 99% for almost all apps, *see* 2-ER-272) to be how much of the savings the developer will pass through to consumers rather than keep. *See* 2-ER-227-229. Thus, Dr. Singer assumes that a game with 0.2% of the Games category share will pass through to consumers 99.8% of any savings from a lower service fee, that a running app with a 0.5% share of the Health & Fitness category will pass through 99.5%, and so on. And Dr. Singer assumes that if Google changes its service fee, a developer will *always* change its prices in *perfect proportion* to the app's share of its category.

The model is so simplistic that it has never before been used by anyone—including Dr. Singer himself—to calculate consumer injury. *See* 2-ER-175-177. For good reason: It is completely artificial. The model fails to isolate and control for independent variables that determine whether an individual developer would have charged less—and thus whether an individual consumer would have paid less—absent the alleged anticompetitive conduct. Allowing Plaintiffs to proceed to trial

as a class based on a model that does not and cannot show injury to individual consumers gives Plaintiffs a free pass to avoid the proof they would otherwise be required to present in an individual action, which is precisely what Rule 23 is designed to protect against.

Dr. Singer admitted that his model fails to account for two variables that would affect whether developers would pass lower service fees through to consumers.

*First*, Dr. Singer's model does not account for the competitive conditions of each individual app, which naturally affect how developers set prices. Dr. Singer's model relies on the assumption that every app in each of the 35 Play Store categories is a substitute for all of the other apps in that category. That assumption undergirds Dr. Singer's conclusions about consumer injury: Because competition affects developers' pricing decisions, if Dr. Singer makes an incorrect assumption about who a developer's competitors are, then his model naturally will be wrong about how that developer will set prices. *See* 2-ER-275.

The inaccuracy of Dr. Singer's assumption is obvious. The evidence (not to mention common sense) shows that not all apps in the same category are substitutes. Swimming apps are not substitutes for smoking-cessation apps in the Health & Fitness category. If the price of IAPs in the toddler-oriented *Elmo Loves 123s* game decreased, consumers would not flock to it instead of playing the adult first-person-

41

shooter game *Doom*—much less in proportion to either app's share of the Games category.  But that is what Dr. Singer's model assumes.  *See* 2-ER-120-121; 2-ER-274.

Dr. Singer agreed that it is inaccurate to assume that apps within the same category compete and conceded that not every app in each category "is a good substitute necessarily" for every other app.  2-ER-156.  He further conceded that even for apps that are substitutes, they are "[n]ot [substitutes] in perfect proportion" to their category-share.  2-ER-155.  And he admitted that his model does not "determine which apps in each category are complements and which are substitutes." 2-ER-183.  Nor did he use any real-world data about competition, substitution, prices, or service fees to create his model.  The only "real-world" input he used was an app's share of a given Play Store category.  *See* 2-ER-224-225.  As Dr. Burtis explained, because the categories do not meet the substitutability requirement, "the pass-through rates are wrong because the formula depends on the categories."  2-ER-275.

Before the District Court, Dr. Singer defended his model on the ground that a logit model is a "standard economic calculation[]" and "standard … formula."  2-ER-294.  Even setting aside Dr. Singer's own admission that no one has ever used a logit model to calculate pass-through and show individual injury in an antitrust case, 2-ER-175-177, the problem is *Dr. Singer's* logit model, not logit models in general.

The requirement that products be substitutes is a well-known limitation of the logit model. *See* 2-ER-182; 2-ER-127-128; 2-ER-155. Once Dr. Singer chose to use a logit model and the broad Play Store categories, he was required to ensure that each app in a given category was in fact a substitute. *See* 2-ER-127-130; 2-ER-155; 2-ER-182. He failed to take that necessary step.[6] The thousands of apps in each one of Google's 35 broad categories are not all substitutes, which is why a logit model based on these categories is unreliable.

Dr. Singer maintained that it made "economic sense" to use the broad Play categories because "they reflect economically reasonable groupings of consumer tastes for different varieties of Apps." 2-ER-296. But neither Plaintiffs nor the District Court ever explained what that meant, let alone how it could justify using the broad Play Store categories for apps that are not substitutes. As even Dr. Singer admitted, Google created these categories for other purposes, including to "help users to search for and discover" apps, 2-ER-296-297 (quotation marks omitted), much as Walmart sells both ceiling fans and duct tape in its Home Improvement

---

[6] Dr. Singer claimed that his model could also be applied to subcategories within the Games category, which is one of the 35 Play Store categories. 2-ER-299 & n.155. That does not solve this fundamental problem with respect to the 34 other categories, nor does it solve the problem as to Games. The Action subcategory, for example, includes both Super Mario Run and Mario Kart Tour (rated E for "Everyone") and Grand Theft Auto and Hitman Sniper (rated M for "Mature 17+").

category.[7]  That does not mean all products in a particular category are substitutes or that using a product's share of the category would dictate how prices for that product would be set.  The share of ceiling-fan sales as compared to duct-tape sales says very little about how prices for either are chosen.  By assuming otherwise, Dr. Singer's model relies on the type of "unsupported assumptions" that this Court has said would preclude certification.  *Olean*, 31 F.4th at 666 n.9; *see also In re Processed Egg Prods. Antitrust Litig.*, 312 F.R.D. 124, 161 (E.D. Pa. 2015) (common issues do not predominate because "pricing at the retail level is far more individualized and complex" than Plaintiffs' expert's "single-pass-through model acknowledges and can accommodate").

*Second*, Dr. Singer's model fails to account for focal-point pricing, which is the practice of setting prices that end in 99-cent increments.  The overwhelming majority of Play Store transactions during the class period used focal-point pricing. 2-ER-262-263 & fig. 7.  Because focal-point pricing is so predominant, developers are unlikely to deviate from that pricing strategy even if Google's service fees were some pennies less.  2-ER-263.  Yet Dr. Singer's pass-through model admittedly fails to account for this consideration.  2-ER-190-191.  That too renders his model insufficient to support class certification.

---

[7] *See Home Improvement*, Walmart, https://www.walmart.com/cp/home-improvement/1072864 (last visited June 8, 2022).

Focal-point pricing is, as Dr. Singer admits, "a well-established concept in economics." 2-ER-230-231. It follows from evidence that consumers find prices ending in $.99 "significantly more attractive" than the nearest whole-number price. 2-ER-262; *see In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2018 WL 1156797, at *4 (N.D. Cal. Mar. 5, 2018) (noting "evidence in the literature that retailers use focal points or price points" and that doing so can "increase consumer demand"). Once sellers adopt focal-point pricing, they are unlikely to deviate from it, even if it means absorbing small cost changes rather than passing those changes through to consumers. *See* 2-ER-252; 2-ER-264. Sellers may therefore absorb increases in cost without changing prices—just as they may pocket decreases in cost without changing prices. *See id.*; *In re Lithium Ion Batteries*, 2018 WL 1156797, at *4. Focal-point pricing can maximize profits even if it means retaining, rather than passing through, potential savings to consumers. 2-ER-263.

Real-world data confirms that developers nearly always set prices ending in $.99. Approximately 97% of U.S. consumers' Play Store transactions for apps, subscriptions, and IAPs had prices ending in $.99—nearly 4.3 billion in total. *See* 2-ER-262-263; 2-ER-281. Developers who rely on this pricing strategy may not pass through savings from a service fee reduction, if doing so requires departing from a focal-point price. 2-ER-263; 2-ER-281.

45

As Dr. Singer conceded, his model does not account for this marketplace reality and does not "have a separate control variable for focal point [pricing]." 2-ER-190-191. Instead, Dr. Singer's model relies on the assumption that the nearly 80,000 developers who use focal-point pricing in the real world would—for the sake of passing through a few cents of savings—abandon the pricing strategy they believe increases demand and maximizes profits. *See* 2-ER-278. Dr. Singer thus assumes that in the but-for world, *every* developer would change its prices and pass on cost savings. 3-ER-354-355 tbls. 13 & 14.

Dr. Singer utterly fails to justify this implausible assumption. His opening report did not mention focal-point pricing once. After Google's expert highlighted this oversight, 2-ER-278; 2-ER-282, Dr. Singer was forced to acknowledge that "focal point pricing is an important consideration here" as it can explain "developers' pricing in the actual world." 2-ER-187. He could not justify omitting that concededly important consideration from his model.

Dr. Singer pointed out that 130 million transactions in the Play Store did not end in $.99. 2-ER-290. But the data show that *4.3 billion* transactions—97% of the total—*did* end in $.99. *See* 2-ER-262-263. Dr. Singer dismissed this data as failing to prove that developers would "feel compelled to charge prices ending *only* in '99' in the but-for world." 2-ER-290 (emphasis added). But that misses the point of Rule 23. The question is not whether *every* developer would have used focal-point

46

pricing; the question is whether *individualized inquiry* is required to determine whether any given developer would have used that pricing strategy.

Dr. Singer suggested that developers used focal-point pricing because Google initially required developers "to charge at least 99 cents" for apps and subscriptions. 2-ER-290-291. At most, that could account for apps priced at exactly $0.99 during the period in which Google set a 99-cent threshold. But only 17% of transactions involved purchases of $0.99. 2-ER-263 fig. 7. In contrast, 80% of transactions—about 3.5 billion in total—were priced higher than $0.99, yet still used a price point that ended in $.99 (such as $1.99, $2.99, or $9.99). *See id.* And Dr. Singer's report demonstrates that even when developers steered customers to other payment processors that did not set a 99-cent threshold, they *still* overwhelmingly used prices ending in $.99. 3-ER-346 tbl. 9. Dr. Singer provided no reason to assume that *all* developers would abandon this pricing strategy if Google reduced its service fee.

Dr. Singer asserted that "[n]othing would prevent" developers in the but-for world from adopting a less strict version of focal-point pricing, such as prices ending in 5 cents or 9 cents, rather than 99 cents (e.g., $2.75 or $2.79 instead of $2.99). 2-ER-291-292. This assertion ignores the data, which shows that developers overwhelmingly select price points that end in $.99. And even if Dr. Singer were correct that some developers in the but-for world would use different focal-point pricing strategies, that would require even *more* individual inquiries to determine

47

what kind of focal-point pricing each developer would have adopted and whether that developer would have passed cost savings through to consumers. *See* 2-ER-262.

District courts in this Circuit have refused to certify classes in pass-through cases much like this one where an expert's model failed to account for focal-point pricing. In *In re Lithium Ion Batteries*, the court held plaintiffs could not show classwide proof of injury where they relied on a model that failed to account for focal-point pricing. 2018 WL 1156797, at \*4. Because plaintiffs' expert failed to explain the effect of focal-point pricing on plaintiffs' "ability to demonstrate pass-through, and to quantify it for purposes of damages," the court held that "antitrust injury to the class [could not] be determined on a common basis as to the putative class." *Id.* at \*5; *accord In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2017 WL 1391491, at \*12 (N.D. Cal. Apr. 12, 2017) (same). *In re Apple* likewise declined to certify a class where "overwhelming [real-world] evidence," including evidence from the Google Play Store, suggested "that developers would choose to price their apps at focal points ending in 99 cents," and the plaintiffs' model "fail[ed] to incorporate such pricing." 2022 WL 1284104, at \*8. In light of that deficiency, the model did "not provide a reliable method for determining but-for pricing in the presence of focal pricing" and was incapable of showing "common proof of antitrust injury." *Id.* at \*8, \*12. The same is true here.

48

**B.      The District Court Failed To Rigorously Analyze Dr. Singer's Model.**

The District Court failed to perform the requisite rigorous assessment to ensure that Dr. Singer's model was capable of supporting class certification. *Olean*, 31 F.4th at 664, 666. At minimum, the District Court was required to thoroughly consider all the evidence, address the relevant arguments, acknowledge the limitations of Dr. Singer's model, and identify rational grounds to excuse those shortcomings. *See id.* at 675-676; *Parko*, 739 F.3d at 1086 (court must evaluate "the realism of the plaintiffs' injury and damage model in light of the defendants' counterarguments" prior to certifying class); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (rigorous analysis requires evaluating and explaining "persuasiveness of the evidence presented"). That analysis should have been especially "searching" here, *In re New Motor Vehicles*, 522 F.3d at 25-26, given that Dr. Singer's model has never been used before to show pass-through injury in an antitrust case.

The District Court did none of this. Instead, it excused the model's flaws whole-ticket. The court acknowledged Google's arguments about competitive conditions and focal-point pricing, and agreed that "individualized issues" were present here. *See* 1-ER-22. Yet the court deemed it irrelevant for Rule 23 purposes that Dr. Singer's model did not attempt to control for these independent variables. *Id.* That is not a "rigorous" analysis. That is the epitome of permitting a plaintiff to

"simply plead" rather than "actually prove" that a model is capable of establishing antitrust impact on a class-wide basis. *Olean*, 31 F.4th at 664, 666 (quotation marks omitted).

The District Court declared it "unclear" why it mattered for class certification that Dr. Singer's model lumps together apps that "are not necessarily substitutes." 1-ER-21. But Google had directly explained why that mattered in its papers and at the two hearings on these issues: The accuracy of a logit model depends on the "underlying assumption" that all goods within a given category are substitutes. 2-ER-127 ("a fundamental requirement of that logit model is that all of the products in that share have to be substitutes"); *see, e.g.*, 2-ER-274-275. Even Dr. Singer agreed that substitutability is a requirement. *See, e.g.*, 2-ER-120-121; 2-ER-155; 2-ER-274-275. And Dr. Singer admitted that the categories he chose to create his logit model do not satisfy that requirement. *See, e.g.*, 2-ER-155-156; 2-ER-183.

The District Court did not dispute any of this. Instead, it excused Dr. Singer's choice to use the Play Store categories, reasoning that "Dr. Singer can only work with what Google actually does." 1-ER-21 (quoting 2-ER-128). But Dr. Singer was retained to create a model tailored to this case. He chose a logit model, which required him to use groupings of comparable products that fulfilled the fundamental requirements of that model. *See* 2-ER-129-130; 2-ER-277 ("the formula depends critically on finding the 'right categories'"). If Dr. Singer could not do so, he could

not use a logit model. A class cannot be certified on the basis of an unreliable model simply because the plaintiffs' expert lacked an easy way to make it reliable.

The District Court posited that Dr. Singer's model could withstand scrutiny because plaintiffs' expert in *In re Apple* relied on the Apple App Store's categories to model similar questions. 1-ER-21. But the District Court omitted two key facts. First, the expert in *In re Apple* did *not* use a logit model and therefore did not assume that all apps in each category were substitutes. Second, the district court in *In re Apple* concluded that the expert's model was *insufficient* to support class certification because it failed to account for key independent variables, including focal-point pricing. *See* 2022 WL 1284104, at *8, *10, *16. At a minimum, the District Court was required to explain why Dr. Singer's model was sufficient to support class certification, whereas the model in the *In re Apple* litigation was not. *See Olean*, 31 F.4th at 675-676; *Ellis*, 657 F.3d at 982 (rigorous analysis requires "judging the persuasiveness of the evidence presented"). The District Court never did so.

The District Court excused Dr. Singer's failure to account for focal-point pricing because "predominance does not demand perfection," and "[t]he salient point is that the same methodology can be used by every class member to establish antitrust impact." 1-ER-22-23. But that's just it—Dr. Singer's model cannot be used to establish antitrust impact because of focal-point pricing. Google argued, and

51

the evidence showed, that a developer's individual decision whether and how to employ focal-point pricing will affect whether the developer passes lower service fees through to consumers, which in turn affects whether a consumer is injured. Even Dr. Singer admitted he would "need to account for" this in his "overall opinions about what the but-for world would look like."  2-ER-190-191.  Yet the District Court waved this concern away without acknowledging any of this data, any of Dr. Singer's statements, or the fact that other district courts declined to certify a class based on a model that suffered this exact flaw.  That "brief and conclusory" analysis was deficient and cannot support certification.  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).

### C.  Dr. Singer's Model Should Never Have Been Admitted.

Dr. Singer's model is so flawed that it should never have been admitted. Under Federal Rule of Evidence 702, expert testimony is admissible only if it is rooted in "sufficient facts or data" and "the product of reliable principles and methods."  Fed. R. Evid. 702(b)-(c).  "To evaluate reliability, the district court must assess the expert's reasoning or methodology, using as appropriate criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance."  *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) (quotation marks omitted).  Where those "guarantees of reliability are not satisfied," especially for models developed in "the litigation context," an expert must

"point to some objective source" to show that his approach "is practiced by (at least) a recognized minority of scientists in [his] field." *Lust ex rel. Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 597 (9th Cir. 1996) (quotation marks omitted). A methodology "based on implausible assumptions," *Tyson Foods*, 577 U.S. at 459, or "connected to existing data only by the *ipse dixit* of the expert," *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997), will not suffice, *see United States v. Hermanek*, 289 F.3d 1076, 1093-94 (9th Cir. 2002).

Dr. Singer's model flunks these standards. As the District Court acknowledged, Dr. Singer's methodology, developed solely for this case, is neither "generally accepted" nor the "subject of peer review." 1-ER-13. And not a single other economist has used a logit model in the way Dr. Singer uses his model here. *See* 2-ER-90. Dr. Singer agrees that a logit model works only where products are substitutes—which Dr. Singer admitted is not true here. Dr. Singer's failure to account for competitive conditions and focal-point pricing renders his model incapable of yielding "reliable conclusions," and his model should have been excluded on that ground as other courts have done. *See In re Apple*, 2022 WL 1284104, at *8 ("Having failed to use or address the issue, the model does not provide a reliable method for determining but-for pricing in the presence of focal pricing."); *In re Lithium Ion Batteries*, 2018 WL 1156797, at *3-5 (excluding

testimony where expert "offer[ed] no reliable method for proving pass-through in the presence of focal point pricing").

Ignoring these flaws, the District Court parroted Dr. Singer's statement that he could not use "the more traditional approach of a regression analysis." 1-ER-13. That an expert says he cannot show common injury through a regression analysis does not justify using a different methodology that is *also* unreliable under the circumstances. Nor is Dr. Singer's model saved by the fact that his "overall approach" incorporated the accepted Rochet-Tirole and Landes-Posner models to calculate Google's but-for service fees. 1-ER-12-13. As Dr. Singer admitted, the Rochet-Tirole and Landes-Posner models do not say anything about pass-through and do nothing on their own to establish any consumer injury. 2-ER-152. To make that showing, Dr. Singer used his logit model, which is unreliable. Thus even if the Rochet-Tirole and Landes-Posner models are reliable in theory, their reliability depends on accurate inputs. And here the average pass-through rate generated by Dr. Singer's logit model is one of those inputs. Because that input is unreliable, the output of these other models is unreliable as well.

The District Court disregarded Google's substantive objections to Dr. Singer's model on the ground that these arguments were "mainly" directed at "commonality and predominance." 1-ER-14. That is incorrect. Google cited Dr. Singer's failure to account for competitive conditions and focal-point pricing *both*

in opposing class certification and in seeking to exclude Dr. Singer's model under Rule 702. 2-ER-195-196; 2-ER-165-166; 2-ER-239-240. Dr. Burtis was not required to invoke Rule 702 explicitly when testifying about these shortcomings at the concurrent expert proceeding. And by faulting *Google* for failing to demonstrate Dr. Singer's shortcomings, 1-ER-14, the District Court once again erroneously flipped the burden of proof. *See Lust ex rel. Lust*, 89 F.3d at 598 (expert's proponent must prove admissibility in the first instance).

"[D]istrict courts do not have discretion to abandon the gatekeeping function" under Rule 702. *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1189 (9th Cir. 2019) (per curiam) (quotation marks omitted). That is precisely what happened here. The Court should reverse the District Court's decision to admit Dr. Singer's novel and unsupported pass-through model.

## III. THE DISTRICT COURT ERRED IN CONCLUDING THAT INDIVIDUALIZED DAMAGES ISSUES CANNOT DEFEAT PREDOMINANCE.

The District Court acknowledged that this case presents "individualized questions" with respect to "damages" but declined to evaluate those questions or explain how they could be addressed on a classwide basis in a 21-million-plaintiff trial. 1-ER-28. Instead, the District Court understood this Court to apply a bright-line rule that the presence of individualized damages questions "cannot, by itself, defeat class certification." 1-ER-25 (quoting *Leyva v. Medline Indus. Inc.*, 716 F.3d

510, 514 (9th Cir. 2013)). That was legal error. The text of Rule 23, the Supreme Court's decision in *Comcast*, and this Court's recent applications of *Comcast* all underscore that individualized damages questions can defeat predominance.

The plain text of Rule 23(b)(3) makes clear that "questions of law or fact common to class members" must "predominate over *any* questions affecting only individual members"—including damages questions. Fed. R. Civ. P. 23(b)(3) (emphasis added). And in *Comcast*, the Supreme Court confirmed that plaintiffs "cannot show Rule 23(b)(3) predominance" without establishing "that damages are capable of measurement on a classwide basis." *Comcast*, 569 U.S. at 34. There, plaintiffs' damages model did "not even attempt" to measure damages stemming from plaintiffs' injury, and thus could not "possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.* at 35. The Supreme Court held that Rule 23's requirements were not met because "[q]uestions of individual damage calculations" would "inevitably overwhelm questions common to the class." *Id.* at 34.

This Court's applications of *Comcast* confirm that individualized damages issues, just like any other individualized issue, can preclude certification. Rule 23(b)(3) requires "that the district court determine after rigorous analysis whether the common question predominates … , including [over] individualized questions about injury *or entitlement to damages*." *Olean*, 31 F.4th at 669 (emphasis added).

Thus, a "Rule 23(b)(3) plaintiff must show a class wide method for *damages calculations as a part of the assessment* of whether common questions predominate over individual questions." *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1182 (9th Cir. 2017) (emphasis added), *rev'd on other grounds*, 139 S. Ct. 710 (2019).

More recently, a panel of this Court unanimously reversed class certification on the ground that "any common question as to misclassification is outweighed by the individual questions going to injury *and damages*." *Bowerman v. Field Asset Servs., Inc.*, 60 F.4th 459, 469 (9th Cir. 2023) (emphasis added). Plaintiffs thus must show that individual damages can be calculated "feasibly and efficiently," *Leyva*, 716 F.3d at 514, such as through "common evidence," *Bowerman*, 60 F.4th at 470, for certification to be warranted.

The District Court's bright-line rule that individualized damages calculations can never defeat class certification rests on a basic misreading of this Court's precedent. The District Court cited this Court's statement that "damage calculations alone cannot defeat certification." *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010); *Leyva*, 716 F.3d at 513 (same). But this means that the need to *calculate* individual damages does not preclude certification, if there is a common—and efficient—method for performing that calculation. *See Doyle v. Chrysler Grp., LLC*, 663 F. App'x 576, 579 (9th Cir. 2016) (individual damages calculations cannot defeat certification "in cases where there existed a common

57

methodology for calculating damages"). This Court has thus explained that "*[t]he amount of damages* is invariably an individual question and does not defeat class action treatment." *Yokoyama*, 594 F.3d at 1094 (emphasis added) (quoting *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975)); *Leyva*, 716 F.3d at 514 (same). This Court has not, however, created an exception to Rule 23's predominance requirement that applies only to the issue of damages.

In *Levya*, for example, the Court concluded that plaintiffs satisfied the predominance requirement notwithstanding that each plaintiff would be entitled to a different amount of damages, because "damages could feasibly and efficiently be calculated once the common liability questions are adjudicated." 716 F.3d at 514. In *Yokoyama*, the Court similarly held that class certification was proper because "the damages calculation" would not require "highly individualized and fact-specific determinations." 594 F.3d at 1093-94. In *Blackie*, the Court reasoned that individualized damages calculations did not defeat certification because "the process of computing individual damages [would] be virtually a mechanical task." 524 F.2d at 905. And in *Olean*, the Court noted that "a district court is not precluded from certifying a class even if plaintiffs may have to prove individualized damages at trial," where that conclusion is "based on the determination that such individualized issues do not predominate over common ones." 31 F.4th at 668-669.

This Court's decision in *Bowerman* illustrates that point. There, the district court had initially certified a class after plaintiffs' expert assured the court "that individualized injury and damages assessments would not be prohibitively cumbersome." 60 F.4th at 464-465, 469. Plaintiffs later withdrew their expert after the court raised questions about the reliability of his model, and were thus "left relying on individual testimony to establish the existence of an injury and the amount of damages." *Id.* at 469. This would not *necessarily* doom the class, "so long as common questions continued to predominate." *Id.* But this Court held they did not: The damages phase would be "far messier" than originally promised, testimony of many of the 156 individual vendors would be necessary, and this would result in a series of "individualized mini-trials." *Id.* at 469-470 (quotation marks omitted). These mini-trials differentiated *Bowerman* from other cases where plaintiffs relied on "common evidence" of damages. *Id.* at 470. "In light of the complexity of the individualized questions" about who was injured and whether they suffered damages, this Court held that individual issues predominated. *Id.* at 471; *see* 1 McLaughlin on Class Actions § 5:45 (19th ed. 2022 update) (where "proof of individual class members' damages is so different as to require individualized mini-trials (or other similar proceedings), courts have repeatedly denied certification for lack of both predominance and manageability.").

This Court should thus reverse the District Court's ruling that individualized damages calculations can never preclude class certification. Because the District Court did not evaluate whether the individualized damages issues present here prevent certification, if this Court finds for Google solely on the issue of damages, the Court should remand to the District Court to determine whether individualized issues with respect to damages prevent class certification.

As Google has explained, Dr. Singer's model cannot demonstrate common injury to any plaintiff, because it fails to account for the reasons—such as focal-point pricing and the fact that apps in the same category are not substitutes—that mean a consumer is uninjured. For the same reasons, this model also cannot be used as a common method for calculating damages. Dr. Singer's model does not calculate the amount that any individual developer would have decreased its prices for any individual consumer, which means that establishing damages would require an *individualized method* for calculating damages for each class member. And because the putative class comprises 21 million individuals who made purchases from over 270,000 different apps, these individualized inquiries would be utterly unworkable, cumbersome, and inefficient—requiring plaintiff-by-plaintiff mini-trials at a scale that is unprecedented in federal court litigation and utterly overwhelming common issues. The Court should reverse the class certification order for this reason, too.

## CONCLUSION

For the foregoing reasons, the District Court's class certification order should be reversed.

Respectfully submitted,

June 8, 2023                                    /s/ Neal Kumar Katyal

Katherine B. Wellington                        Neal Kumar Katyal
HOGAN LOVELLS US LLP                           Jessica L. Ellsworth
125 High St., Suite 2010                       HOGAN LOVELLS US LLP
Boston, MA 02110                               555 Thirteenth Street NW
Telephone: (617) 702-7745                      Washington, DC 20004
Facsimile: (617) 371-1037                      Telephone: (202) 637-5600
katherine.wellington@hoganlovells.com          Facsimile: (202) 637-5910
                                               neal.katyal@hoganlovells.com

Brian C. Rocca
Sujal J. Shah                                  Kyle W. Mach
Michelle Park Chiu                             Justin P. Raphael
Minna Lo Naranjo                               Emily C. Curran-Huberty
Rishi P. Satia                                 MUNGER, TOLLES, & OLSON LLP
MORGAN, LEWIS & BOCKIUS LLP                     560 Mission Street
One Market, Spear Street Tower                  Twenty Seventh Floor
San Francisco, CA 94105                         San Francisco, CA 94105
Telephone: (415) 442-1000                       Telephone: (415) 512-4000
Facsimile: (415) 422-1001                       Facsimile: (415) 512-4077
brian.rocca@morganlewis.com                     kyle.mach@mto.com

Richard S. Taffet                              Glenn D. Pomerantz
MORGAN, LEWIS & BOCKIUS LLP                     Kuruvilla Olasa
101 Park Avenue                                MUNGER, TOLLES, & OLSON LLP
New York, NY 10178                             350 South Grand Avenue
Telephone: (212) 309-6000                       Fiftieth Floor
Facsimile: (212) 309-6001                       Los Angeles, CA 90071
richard.taffet@morganlewis.com                  Telephone: (213) 683-9100
                                               Facsimile: (415) 512-4077
                                               glenn.pomerantz@mto.com

*Counsel for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limits of Ninth Circuit Rule 32-1(a) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 13,958 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman.

/s/ Neal Kumar Katyal
Neal Kumar Katyal

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form15instructions.pdf

**9th Cir. Case Number(s)** | 23-15285

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

Opening Brief for Defendants-Appellants (Provisionally-Sealed)

**Signature** | /s/ Neal Kumar Katyal | **Date** | 06/08/2023

*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 15** | *Rev. 12/01/2018*