No. 23-15285

IN THE
# United States Court of Appeals
# for the Ninth Circuit

IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION

MARY CARR, INDIVIDUALLY AND ON BEHALF OF
ALL OTHERS SIMILARLY SITUATED; ET AL.,

*Plaintiffs-Appellees,*

v.

GOOGLE LLC; ET AL.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of California,
No. 21-md-2981; No. 20-cv-5761

**EXCERPTS OF RECORD**
**VOLUME IV OF V (ER592-640) (Provisionally-Sealed Volume)**

Katherine B. Wellington
HOGAN LOVELLS US LLP
125 High St., Suite 2010
Boston, MA 02110

Neal Kumar Katyal
Jessica L. Ellsworth
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
neal.katyal@hoganlovells.com

June 8, 2023

*Counsel for Defendants-Appellants*

*(Additional Counsel Listed on Inside Cover)*

Brian C. Rocca
Sujal J. Shah
Michelle Park Chiu
Minna Lo Naranjo
Rishi P. Satia
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, CA 94105
Telephone: (415) 442-1000
Facsimile: (415) 422-1001
brian.rocca@morganlewis.com

Richard S. Taffet
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
Telephone: (212) 309-6000
Facsimile: (212) 309-6001
richard.taffet@morganlewis.com

Kyle W. Mach
Justin P. Raphael
Emily C. Curran-Huberty
MUNGER, TOLLES, & OLSON LLP
560 Mission Street
Twenty Seventh Floor
San Francisco, CA 94105
Telephone: (415) 512-4000
Facsimile: 415-512-4077
kyle.mach@mto.com

Glenn D. Pomerantz
Kuruvilla Olasa
MUNGER, TOLLES, & OLSON LLP
350 South Grand Avenue
Fiftieth Floor
Los Angeles, CA 90071
Telephone: (213) 683-9100
Facsimile: 415-512-4077
glenn.pomerantz@mto.com

*Counsel for Defendants-Appellants*

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)

# EXHIBIT D

# CONFIDENTIAL-FILED UNDER SEAL

Page 1

1
2    UNITED STATES DISTRICT COURT
3    FOR THE NORTHERN DISTRICT OF CALIFORNIA
4    SAN FRANCISCO DIVISION
5    ------------------------------------X
6    IN RE GOOGLE PLAY STORE ANTITRUST
     LITIGATION
7
     Case No. 3:21-md-02981-JD
8
     THIS DOCUMENT RELATES TO:
9    Epic Games Inc. v. Google LLC, et al.
     Case No.:  3:20-cv-05671-JD
10
     In re Google Play Consumer Antitrust
11   Litigation
     Case No.:  3:20-cv-05761-JD
12
     In re Google Play Developer Antitrust
13   Litigation
     Case No.:  3:20-cv-05792-JD
14
     State of Utah, et al. v. Google LLC,
15   et al.
     Case No.:  3:21-cv-05227-JD
16   ------------------------------------X
17
18           ** HIGHLY CONFIDENTIAL **
19       REMOTE VIDEOTAPED DEPOSITION OF
20              RICHARD CZESLAWSKI
21            Crystal Lake, Illinois
22                March 21, 2022
23
24   Reported By:
25   ERIC J. FINZ

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)

Page 2

1

2                    March 21, 2022

                     9:04 a.m.

3

4        Remote Videotaped Deposition of

5    RICHARD CZESLAWSKI, taken by Defendants,

6    pursuant to Notice, before ERIC J. FINZ,

7    a Shorthand Reporter and Notary Public

8    within and for the State of New York.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1
 2   A P P E A R A N C E S: (All Via Remote)
 3   CRAVATH SWAINE & MOORE LLP
     Attorneys for Plaintiff Epic Games
 4        825 Eighth Avenue
          New York, New York 10019
 5
     BY:  MONICA KOZYCZ, ESQ.
 6        mkozycz@cravath.com
 7
 8   KOREIN TILLERY
     Attorneys for Consumer Plaintiffs
 9        205 North Michigan Avenue
          Chicago, Illinois 60601
10
     BY:  RANDALL P. EWING, JR., ESQ.
11        rewing@koreintillery.com
12
13   O'MELVENY & MYERS LLP
     Attorneys for Defendants
14        400 South Hope Street
          Los Angeles, California 90071
15
     BY:  STEPHEN McINTYRE, ESQ.
16        smcintyre@omm.com
          ALEXANDRA WOLTER, ESQ.
17        awolter@omm.com
          LAURA KAUFMANN, ESQ.
18        lkaufmann@omm.com
19
20
     SPERLING & SLATER, P.C.
21   Attorneys for Developer Class Plaintiffs
          55 West Monroe Street
22        Suite 3200
          Chicago, Illinois 60603
23
     BY:  MARTIN AMARO, ESQ.
24        mamaro@sperling-law.com
          MICHAEL DICKLER, ESQ.
25        mdickler@sperling-law.com
```

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)

**Page 4**

1

2    A P P E A R A N C E S: (Continued)

3    UTAH ATTORNEY GENERAL'S OFFICE

     Attorneys for State of Utah, et al.

4         111 S Main Street

          Salt Lake City, Utah 84111

5

     BY:  MICHAEL ALTEBRANDO, ESQ.

6         maltebrando@agutah.gov

7

8

9    ALSO PRESENT:

10   LEE BOWRY, Videographer

11   PAUL RAFFERTY, Veritext Concierge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)

Page 5

I N D E X

EXAMINATION BY                          PAGE

MR. McINTYRE                              7

MR. EWING                               397

MR. DICKLER                             415

MR. McINTYRE                            418

Page 6

1        CZESLAWSKI - Highly Confidential

2              THE VIDEOGRAPHER:  Good

3        morning.  We are going on the

4        record at 9:04 a.m. Central Time on

5        March 21, 2022.  Please note that

6        audio and video recording will

7        continue to take place unless all

8        parties agree to go off the record.

9              This is Media Unit 1 of the

10       video recorded remote deposition of

11       Richard Czeslawski, testifying as a

12       corporate representative of Pure

13       Sweat Basketball, in the matter in

14       re Google Play Store Antitrust

15       Litigation, filed in the United

16       States District Court, for the

17       Northern District of California,

18       San Francisco Division, Case

19       No. 3:21-md-02981-JD.

20             My name is Lee Bowry from the

21       firm of Veritext, and I am the

22       videographer.  The court reporter

23       is Eric Finz, and the concierge is

24       Paul Rafferty, also with Veritext.

25             I am not related to any party

Page 7

1        CZESLAWSKI - Highly Confidential

2         in this action, nor am I

3         financially interested in the

4         outcome.

5             Counsel attending remotely

6         will be noted on the stenographic

7         record.

8             Will the court reporter please

9         swear in the witness.

10  RICHARD CZESLAWSKI,

11  having been first duly sworn by the

12  Notary Public (Eric J. Finz), was

13  examined and testified as follows:

14             EXAMINATION BY

15             MR. McINTYRE:

16        Q.    Good morning, sir.  How are

17    you?

18        A.    Good morning.  I'm fine.

19        Q.    Can you hear me okay?

20        A.    I can.

21        Q.    Great.

22             Sir, would you mind stating

23    your full name on the record?

24        A.    Richard Czeslawski.

25        Q.    Czeslawski, am I saying that

Page 8

1      CZESLAWSKI - Highly Confidential
2   correctly?
3      A.   Yes.
4      Q.   Great.
5           Sir, do you understand that
6   you are under oath?
7      A.   I do.
8      Q.   And is there any reason you
9   cannot testify fully and truthfully
10  today?
11     A.   No.
12     Q.   And currently where are you
13  located?
14     A.   In my office in Crystal Lake,
15  Illinois.
16     Q.   And just so I know, is there
17  anyone else in the room with you?
18     A.   There is not.
19     Q.   Okay.  Great.
20          Mr. Czeslawski, you have been
21  deposed before.  Do I have that right?
22     A.   Yes.
23     Q.   How many times have you had
24  your deposition taken?
25     A.   Just one time.

Page 9

1          CZESLAWSKI - Highly Confidential

2          Q.     And what case was that?

3          A.     It was in a case versus Apple.

4    I don't remember the exact case name.

5    But versus Apple.

6          Q.     That was a case that Pure

7    Sweat Basketball brought against Apple.

8    Correct?

9               MR. DICKLER:  Object to the

10         form.

11         A.     Yeah, I don't know that I

12   understand the question exactly.

13         Q.     That was a case between Pure

14   Sweat Basketball and Apple.  Correct?

15         A.     We were part of a class.  We

16   were a class representative in a case

17   versus Apple, correct.

18         Q.     So Pure Sweat Basketball was

19   one of the plaintiffs in that case?

20         A.     Correct.

21         Q.     And you testified in a

22   capacity as a corporate representative

23   for Pure Sweat Basketball in that case.

24   Correct?

25         A.     I believe that's correct.

Page 10

1        CZESLAWSKI - Highly Confidential

2        Q.    Okay.  Do you understand that

3    you have been designated by Pure Sweat

4    Basketball to testify on behalf of the

5    company today?

6        A.    I do.

7        Q.    And so you understand that

8    that means you are required to testify as

9    to Pure Sweat's knowledge and not just

10   your own knowledge.  Correct?

11       A.    Correct.

12       Q.    Okay.  I'd like to show you an

13   exhibit, sir.

14            MR. McINTYRE:  Laura, why

15        don't we go ahead and introduce tab

16        5.

17            Sir, do you have access to the

18        Exhibit Share platform on your

19        computer?

20            THE WITNESS:  I do.

21            MR. McINTYRE:  Great.  We will

22        be introducing this exhibit

23        electronically.  If you could

24        please let us know once it appears

25        for you.

1          CZESLAWSKI - Highly Confidential

2     ahead and take a quick look at this page.

3          A.    Okay.

4          Q.    On lines 11 and 12, the

5     questioning attorney asks, "Do you set

6     the retail price without regard to what

7     the commission rate is?"

8               Do you see that?

9          A.    Yes.

10         Q.    And how did you respond to

11    that question?

12         A.    "Yes."

13         Q.    In other words, Pure Sweat set

14    the retail price without regard to what

15    the commission rate was?

16         A.    Yes.

17         Q.    You're not changing that

18    testimony today?

19         A.    No.

20         Q.    And it would be the same

21    testimony with respect to the price on

22    the Google Play Store as on the Apple App

23    Store?

24               MR. DICKLER:  Object to the

25          form.

Page 307

1          CZESLAWSKI - Highly Confidential

2                  But you may answer.

3          A.      Yes.

4          Q.      So in setting these prices in

5      early 2019, did you conduct a study or

6      analysis of your users' price elasticity?

7          A.      I did not.

8          Q.      Did you try to calculate the

9      exact price at which Pure Sweat would

10     maximize its profits?

11         A.      Not that I recall.

12         Q.      This just seemed like the

13     right price to you; right?

14                 MR. DICKLER:  Object to the

15         form.

16                 You may answer.

17         A.      We felt this was a fair price,

18     yes.

19         Q.      You can go ahead and set that

20     document aside.

21                 MR. McINTYRE:  I'd like to

22         show you another document.  This is

23         going to be tab O as in orange.

24         Defendants' Exhibit, I think we're

25         up to 266 now.

Page 315

1      CZESLAWSKI - Highly Confidential

2    first twelve months of a subscription,

3    and then a 15 percent fee for

4    subscriptions that lasted for more than

5    one year.  Correct?

6          A.     Correct.

7          Q.     But then it states here that

8    from July 2021 to the present, Pure Sweat

9    has paid a 15 percent service fee.

10   Correct?

11         A.     Yes, it -- yes.

12         Q.     So you understand that

13   currently Pure Sweat is paying a 15

14   percent service fee on the Google Play

15   Store?

16         A.     Yes.

17         Q.     When Google changed the

18   service fee for Pure Sweat from a default

19   of 30 percent to a 15 percent fee, Pure

20   Sweat itself did not change its prices;

21   correct?

22              MR. DICKLER:  Object to the

23         form.

24              You may answer.

25         A.     Correct.

Page 316

```
1          CZESLAWSKI - Highly Confidential
2          Q.     In other words, even after
3     Google reduced its service fee, Pure
4     Sweat continued charging 4.99 per month
5     and 49.99 per year.  Correct?
6          A.     Correct.
7          Q.     So Pure Sweat charges the same
8     prices even though Pure Sweat itself is
9     paying a lower service fee to Google.
10    Correct?
11               MR. DICKLER:  Object to the
12          form.
13               You may answer.
14          A.     Yes.
15          Q.     In other words, Pure Sweat
16    hasn't passed on the savings to its
17    consumers.  Correct?
18               MR. EWING:  Objection to form.
19               MR. DICKLER:  Objection to
20          form.
21               You may answer.
22          A.     Correct.
23          Q.     I'm sorry, my audio went out.
24    You said correct?
25          A.     Yes, I did.  Correct.
```

Page 317

1    CZESLAWSKI - Highly Confidential

2    Q.    So why hasn't Pure Sweat

3    passed on the savings to its consumers?

4    A.    We still feel this is a fair

5    price for our app.

6    Q.    So, Mr. Czeslawski, what if I

7    were to say that as a matter of

8    economics, I would expect Pure Sweat to

9    pass 99 percent of the savings from any

10   service fee reduction on to your users by

11   lowering their prices.  Does that ring

12   true to you?

13        MR. DICKLER:  Object to the

14        form.

15        You may answer.

16   A.    I'm not an economist.  But as

17   a business owner, I would say that we

18   feel this is still a fair price for our

19   app.

20   Q.    So at least in your

21   experience, it has not been the case that

22   you felt that you needed to reduce your

23   prices to pass on 99 percent of the

24   savings to your consumers?

25        MR. DICKLER:  Object to the

Page 433

C E R T I F I C A T E

STATE OF NEW YORK    )

                          : ss.

COUNTY OF NEW YORK  )


        I, ERIC J. FINZ, a Shorthand

Reporter and Notary Public within and for

the State of New York, do hereby certify:

        That RICHARD CZESLAWSKI, the witness

whose deposition is hereinbefore set

forth, was duly sworn by me and that such

deposition is a true record of the

testimony given by the witness.

        I further certify that I am not

related to any of the parties to this

action by blood or marriage, and that I

am in no way interested in the outcome of

this matter.

        IN WITNESS WHEREOF, I have hereunto

set my hand this 22nd day of March, 2022.


        _____

        ERIC J. FINZ

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)

# EXHIBIT C

# CONFIDENTIAL-FILED UNDER SEAL

Page 1

1  ** H I G H L Y   C O N F I D E N T I A L **
2  ** ATTORNEYS' EYES ONLY **
3  UNITED STATES DISTRICT COURT
   FOR THE NORTHERN DISTRICT OF CALIFORNIA
4  SAN FRANCISCO DIVISION
   Case No. 3:21-md-02981-JD
5  ------------------------------------X
   IN RE GOOGLE PLAY STORE
6  ANTITRUST LITIGATION
7
   THIS DOCUMENT RELATES TO:
8  Epic Games Inc. v. Google LLC, et al.,
   Case No: 3:20-cv-05671-JD
9
   In re Google Play Consumer
10 Antitrust Litigation,
   Case No: 3:20-cv-05761-JD
11
   In re Google Play Developer
12 Antitrust Litigation,
   Case No: 3:20-cv-05792-JD
13
   State of Utah, et al.,
14 v. Google LLC, et al.,
   Case No: 3:21-cv-05227-JD
15 ------------------------------------X
16                   March 11, 2022
                     10:00 a.m.
17
18
19      Videotaped Deposition of DANIEL
20 SCALISE, taken by Defendants, pursuant to
21 Notice, held via Zoom videoconference,
22 before Todd DeSimone, a Registered
23 Professional Reporter and Notary Public.
24
25

Page 2

1    A P P E A R A N C E S :

2    Counsel for Plaintiff Epic Games, Inc. in:
     Epic Games, Inc. v Google LLC, et al:

3
     CRAVATH, SWAINE & MOORE LLP

4    825 Eighth Avenue
     New York, New York 10019

5    BY: DAVID KUMAGAI, ESQ.
          dkumagai@cravath.com

6        BRENT BOMKAMP, Law Clerk
          bbomkamp@cravath.com

7

8

9
     Counsel for the Proposed Class In re:

10   Google Play Developer Antitrust Litigation
     and Pure Sweat Basketball, Inc:

11
12   HAUSFELD LLP
     888 16th Street N.W.

13   Suite 300
     Washington, DC 20006

14   BY:  YELENA W. DEWALD, ESQ.
           ydewald@hausfeld.com

15        MELINDA R. COOLIDGE, ESQ.
           mcoolidge@hausfeld.com

16

17

18

19

20

21

22

23

24

25

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)

Page 3

```
 1   A P P E A R A N C E S: (Continued)
 2   Counsel for the Proposed Class In re:
     Google Play Consumer Antitrust Litigation:
 3
 4   BARTLIT BECK LLP
     1801 Wewetta Street
 5   Suite 1200
     Denver, Colorado 80202
 6   BY: KARMA M. GIULIANELLI, ESQ.
           karma.giulianelli@bartlitbeck.com
 7
 8
     KOREIN TILLERY LLP
 9   205 North Michigan Avenue
     Suite 1950
10   Chicago, Illinois 60601
     BY:  RANDALL P. EWING, JR., ESQ.
11         rewing@koreintillery.com
12
13
14   Counsel for Plaintiff States:
15
     OFFICE OF THE UTAH ATTORNEY GENERAL
16   160 East 300 South
     6th Floor
17   Salt Lake City, Utah 84114
     BY:  MICHAEL ALTEBRANDO, ESQ.
18         maltebrando@agutah.gov
19
20
21
22
23
24
25
```

Page 4

1  A P P E A R A N C E S: (Continued)
2  Counsel for Google LLC, et al:
3  MUNGER, TOLLES & OLSON LLP
   560 Mission Street
4  27th Floor
   San Francisco, CA 94105
5  BY:  KYLE W. MACH, ESQ.
            kyle.mach@mto.com
6
          - and -
7
   MUNGER, TOLLES & OLSON LLP
8  350 South Grand Avenue
   50th Floor
9  Los Angeles, CA 90071-3426
   BY:  JAMIE LUGURI, ESQ.
10          jamie.luguri@mto.com
11
12
13  ALSO PRESENT:
14   JOE RAGUSO, Videographer
15   DYLAN BRASCH, Veritext Concierge Tech
16
17
18
19
20
21
22
23
24
25

Page 5

1      THE VIDEOGRAPHER: Good morning.

2  We are going on the record at 10:00 a.m.

3  EST on Friday, March 11th, 2022.  Audio and

4  video recording will continue to take place

5  unless all parties agree to go off the

6  record.

7      This is media unit one of the

8  video-recorded deposition of Daniel

9  Scalise, a 30(b)(6), taken by counsel, here

10 for the matter of In Re Google Play Store

11 Antitrust Litigation, case number

12 3-20-CV-05671-JD.  This deposition is being

13 held via videoconference.

14      My name is Joe Raguso with

15 Veritext and I am the videographer.  The

16 court reporter is Todd DeSimone with

17 Veritext.  I am not authorized to

18 administer an oath, I am not related to any

19 party in this action, nor am I financially

20 interested in the outcome.

21      At this time counsel and all

22 present in the room and everyone attending

23 remotely will state an appearance and

24 affiliation for the record, followed by the

25 court reporter swearing in the witness.

Page 6

1          MR. MACH:  Good morning.
2     Please go ahead.
3          MS. DEWALD:  I'm Yelena Dewald
4     from Hausfeld LLP on behalf of the
5     developer class plaintiffs and representing
6     the witness, Dan Scalise, here today.
7          MS. COOLIDGE:  Melinda Coolidge
8     from Hausfeld also representing the witness
9     and developer plaintiffs.
10          MR. KUMAGAI:  This is David
11     Kumagai on behalf of Epic Games, Inc.,
12     plaintiff in the action, from Cravath
13     Swaine & Moore, and also with me is Brent
14     Bomkamp also from Cravath Swaine & Moore.
15          MR. EWING:  Randall Ewing from
16     Korein Tillery LLP representing the
17     consumer plaintiffs.
18          MS. GIULIANELLI:  Karma
19     Giulianelli is also here from Bartit Beck
20     representing the consumer plaintiffs.
21          MR. ALTEBRANDO:  Michael
22     Altebrando for the Utah Attorney General
23     and the plaintiff states.
24          MR. MACH:  Anyone else for the
25     plaintiffs who is on and who has not made

Page 7

1    an appearance?

2              MR. MACH:  Great.  This is Kyle

3    Mach, Munger Tolles & Olson, representing

4    the defendants, and with me is my colleague

5    Jamie Luguri also from Munger Tolles &

6    Olson.

7         *    *    *

8    D A N I E L   S C A L I S E,

9    called as a witness, having been first duly

10   sworn, was examined and testified

11   as follows:

12   EXAMINATION BY MR. MACH:

13        Q.     Good morning, Mr. Scalise.

14        A.     Good morning.

15        Q.     Am I pronouncing that

16   correctly, Scalise?

17        A.     Yeah, that is correct.

18        Q.     Great.  It is a pleasure to

19   meet you.  My name is Kyle Mach, as I

20   mentioned at the top.  I represent the

21   defendant Google.

22              Before we dive into the

23   questions that I have for you, I have a

24   quick administrative issue to take up with

25   your counsel that should only take a

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)

Page 8

1    moment.  I apologize for the delay.

2              MR. MACH:  Yelena, are you

3    defending the deposition today?

4              MS. DEWALD:  Yes.

5              MR. MACH:  I have an e-mail

6    from you this morning that discloses

7    documents responsive to paragraph 14 of the

8    Court's standing order for discovery in

9    civil cases, which I appreciate you sending

10   that.  The disclosure says that the -- the

11   disclosure includes the responses to the

12   first set of -- first set of

13   interrogatories and the documents cited

14   therein.

15              Now, I have not gone back and

16   scoured those responses this morning to

17   confirm my recollection, but my

18   recollection is that those interrogatories

19   do refer to documents but they do not refer

20   to the documents in any individual way,

21   but, rather, they say -- they say things

22   like -- that you also refer to forthcoming

23   productions, but they don't identify those

24   individual documents.

25              Was your disclosure intended to

Page 207

1  is that fair?

2          MS. DEWALD:  Objection to form.

3      A.     I think that's fair.

4      Q.     And that would be the case even

5  if some aspect of your cost structure

6  changed, right?

7          MS. DEWALD:  Objection to form.

8      Q.     Your development -- I will

9  start that again because we spoke over each

10  other.

11          That calculation wouldn't

12  change if your costs went down, right?

13          MS. DEWALD:  Objection to form.

14      A.     Yes, I agree.  If anything, if

15  my costs went down, I would donate more,

16  since I would like to be able to eventually

17  donate 50/50.

18      Q.     I see.  So you have anticipated

19  a question I have later on.  If your

20  costs -- if your costs went down, the most

21  likely thing you would do is take those

22  savings and give some chunk of it to

23  charity, correct?

24          MS. DEWALD:  Objection to form.

25      A.     At some point, yes.

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)

Page 212

1      A.      Yes.

2      Q.      And therefore, as compared to

3   Scalisco, a larger developer might have the

4   resources that made it possible for them to

5   adjust their pricing more frequently in the

6   course of their business, right?

7              MS. DEWALD:  Objection to form.

8      A.      Yes.

9      Q.      And what factors do you

10   consider when you make pricing decisions?

11      A.      Well, ultimately I'm trying to

12   maximize revenue and, you know, I

13   definitely think about what a customer

14   would be willing to pay and, you know, I

15   can definitely look at other similar apps

16   to see that the prices that I chose aren't

17   out of the realm of reasonability and they

18   are not too low either.  That's basically

19   how I decide the price.

20      Q.      I notice that you didn't

21   mention cost.  Is that because cost is not

22   a predominant factor in how you price your

23   product?

24              MS. DEWALD:  Objection to form.

25      A.      Well, for in-app purchases I

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)

Page 213

1    think -- well, in general, people are

2    willing to pay something regardless of how

3    much it costs, and I think for in-app

4    purchases it is hard to even calculate the

5    true costs of it, with the commission fee

6    and in our case the donation percentage

7    being the primary, ideally, real thing that

8    is a cost per transaction.  And so it's not

9    like a physical item was created and we

10   have a cost that way.  But in general I

11   think people are going to pay what they

12   think it is worth regardless of how much it

13   cost.

14        Q.     In other words, you really

15   don't use that cost information when you

16   determine the pricing?

17        A.     At least not to determine

18   pricing.  I might use it to calculate

19   profit or something.

20        Q.     Got it.  Do you recall whether

21   pricing for Rescue Pets' in-app purchases

22   changed in the six months prior to Rescue

23   Pets joining this lawsuit?

24        A.     I probably did change some

25   in-app purchases at some point, and I know

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)

Page 214

1  that the commission fee went down sometime

2  last year because I joined the small

3  business program that was just launched.

4       Q.    Well, that's a cost, right?

5       A.    Okay, yeah, that's a cost.

6       Q.    Do you recall changing the

7  price for Rescue Pets' digital products

8  since filing a lawsuit?

9           MS. DEWALD:  Objection to form.

10       A.    I don't believe I changed any

11  of the prices, no.

12       Q.    You mentioned a minute ago

13  Google's decision to lower the commission

14  rate from 30 percent to 15 percent for

15  developers like you.  Do you recall that?

16       A.    Yes.

17       Q.    And based on our conversation

18  earlier, am I right to assume that when

19  Google reduced those commissions from 30

20  percent to 15 percent that did not cause

21  you to reduce digital pricing within Rescue

22  Pets?

23           MS. DEWALD:  I object to form.

24       A.    It did not.

25       Q.    Did that reduction in the

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)

# EXHIBIT B

# CONFIDENTIAL-FILED UNDER SEAL

Page 1

1
2   UNITED STATES DISTRICT COURT
3   FOR THE NORTHERN DISTRICT OF CALIFORNIA
4   SAN FRANCISCO DIVISION
5   -------------------------------------X
6   IN RE GOOGLE PLAY STORE ANTITRUST
    LITIGATION
7
    Case No. 3:21-md-02981-JD
8
    THIS DOCUMENT RELATES TO:
9   Epic Games Inc. v. Google LLC, et al.
    Case No.:  3:20-cv-05671-JD
10
    In re Google Play Consumer Antitrust
11  Litigation
    Case No.:  3:20-cv-05761-JD
12
    In re Google Play Developer Antitrust
13  Litigation
    Case No.:  3:20-cv-05792-JD
14
    State of Utah, et al. v. Google LLC,
15  et al.
    Case No.:  3:21-cv-05227-JD
16  -------------------------------------X
17
18          ** HIGHLY CONFIDENTIAL **
19       REMOTE VIDEOTAPED DEPOSITION OF
20               LACEY ELLIS
21            Kansas City, Missouri
22              March 22, 2022
23
24  Reported By:
25  ERIC J. FINZ

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)

Page 2

1

2                    March 22, 2022

                     9:05 a.m.

3

4        Remote Videotaped Deposition of

5    LACEY ELLIS, taken by Defendants,

6    pursuant to Notice, before ERIC J. FINZ,

7    a Shorthand Reporter and Notary Public

8    within and for the State of New York.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)

Page 3

```
 1
 2    A P P E A R A N C E S: (All Via Remote)
 3
      CRAVATH SWAINE & MOORE LLP
 4    Attorneys for Plaintiff Epic Games
           825 Eighth Avenue
 5         New York, New York 10019
      BY:   BRENT BOMKAMP, ESQ.
 6         bbomkamp@cravath.com
 7
 8    KOREIN TILLERY
      Attorneys for Consumer Plaintiffs
 9         205 North Michigan Avenue
           Chicago, Illinois 60601
10    BY:   RANDALL P. EWING, JR., ESQ.
           rewing@koreintillery.com
11
12
13    HAGENS BERMAN SOBOL SHAPIRO
      Attorneys for LittleHoots LLC and the
14    Witness
           1301 Second Avenue
15         Seattle, Washington 98101
      BY:   BEN HARRINGTON, ESQ.
16         benh@hbsslaw.com
           TED WOJCIK, ESQ.
17         tedw@hbsslaw.com
18
19
      MUNGER, TOLLES & OLSON, L.L.P.
20    Attorneys for the Defendant Google LLC,
      et al:
21         601 Massachusetts Avenue, NW
           Washington, D.C. 20001
22    BY:   KURUVILLA J. OLASA, ESQ.
           kuruvilla.olasa@mto.com
23
24
25
```

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)

Page 4

```
 1
 2    A P P E A R A N C E S: (Continued)
 3    UTAH ATTORNEY GENERAL'S OFFICE
      Attorneys for State of Utah, et al.
 4         111 S Main Street
           Salt Lake City, Utah 84111
 5
      BY:  MICHAEL ALTEBRANDO, ESQ.
 6         maltebrando@agutah.gov
 7
 8
 9    ALSO PRESENT:
10    BOB JORISSEN, Videographer
11    JAKE FRANKS, Veritext Concierge
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)

Page 5

1

2                        I N D E X

3    EXAMINATION BY                    PAGE

4    MR. OLASA                          7

5    MR. EWING                        379

6    MR. OLASA                        406

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1        ELLIS - Highly Confidential

2                THE VIDEOGRAPHER:  Good

3        morning.  We are going on the

4        record at 9:05 Central Daylight

5        Time, on Tuesday, March 22, 2022.

6                Please note that audio and

7        video recording will continue with

8        any objection to going off the

9        record.

10               This is Media Unit 1 of the

11       remote video recorded deposition of

12       Lacey Ellis, in re Google Play

13       Store Antitrust Litigation, filed

14       in the United States District

15       Court, for the Northern District of

16       California, San Francisco Division,

17       Case No. 3:21-md-02981.

18               The court reporter is Eric

19       Finz.  My name is Bob Jorissen,

20       your legal video specialist, we are

21       both here today representing the

22       firm Veritext.

23               Appearances will be noted on

24       the stenographic record.  And as

25       all parties to this proceeding do

Page 7

```
 1          ELLIS - Highly Confidential
 2          stipulate as to their acceptance of
 3          this remote video arrangement and
 4          the court reporter swearing in the
 5          witness remotely.
 6                  Will the court reporter please
 7          swear the witness.
 8   LACEY ELLIS,
 9   having been first duly sworn by the
10   Notary Public (Eric J. Finz), was
11   examined and testified as follows:
12                  MR. OLASA:  Do we make
13          appearances or just get started?
14                  THE COURT REPORTER:  I have
15          the appearances on the record.
16                  MR. OLASA:  We can get started
17          then.
18                  EXAMINATION BY
19                  MR. OLASA:
20          Q.    Good morning, Ms. Ellis.  My
21      name is Kuruvilla Olasa, I'm an attorney
22      at Munger Tolles & Olson, I represent
23      defendant Google.  Along with me in the
24      room but off camera is Lauren Beck, one
25      of my colleagues.
```

Page 8

1          ELLIS - Highly Confidential

2              Ms. Ellis, can you state and

3      spell your name for the record, please?

4          A.    Lacey Ellis.  L-a-c-e-y,

5      E-l-l-i-s.

6          Q.    And Ms. Ellis, are you the

7      founder and CEO of LittleHoots LLC?

8          A.    Yes.

9          Q.    Where is LittleHoots based?

10         A.    Kansas, Kansas City area.

11         Q.    And do you live in the Kansas

12     City area?

13         A.    Yes.

14         Q.    Are you in the Kansas City

15     area now for this deposition?

16         A.    Yes.

17         Q.    And are you the person who

18     would know the most about the business of

19     LittleHoots LLC?

20         A.    Yes.

21              MR. HARRINGTON:  I'm sorry to

22          interject, I'm having a hard time

23          picking you up, it's a little

24          faint.

25              Ms. Ellis, are you able to

Page 9

1          ELLIS - Highly Confidential

2          hear him okay?

3                  THE WITNESS:  It is a little

4          faint.

5                  MR. HARRINGTON:  Is there a

6          way to --

7                  MR. OLASA:  Let's go off the

8          record.

9                  THE VIDEOGRAPHER:  We'll be

10          going off the record at 9:08.

11                  (Discussion off the record.)

12                  (A recess was taken.)

13                  THE VIDEOGRAPHER:  We are back

14          on the record at 9:11 a.m.  Go

15          ahead, counselor.

16                  MR. OLASA:  Thank you for

17          bearing with the technical

18          difficulties, Ms. Ellis.

19   BY MR. OLASA:

20          Q.    I think my last question was

21      are you the person who would know the

22      most about the business of LittleHoots

23      LLC?

24          A.    Yes.

25          Q.    And are you the person who

Page 241

1          ELLIS - Highly Confidential
2     that were similar.  We had to look at
3     like gaming apps and things where people
4     would buy little in-app purchases.  And
5     there seemed to be a pretty low amount,
6     around 99 cents and 2.99-ish.
7               And then also we just wanted
8     to drive sales.  So we wanted it to feel
9     like it wasn't super expensive.  But we
10    also didn't want it to feel too cheap
11    either, because we wanted it to convey
12    that it was valuable.  So that was really
13    how we landed on pricing.
14         Q.    I see.
15               Did you ever consider offering
16    the design packs for under 99 cents?
17         A.    No.
18         Q.    When LittleHoots offered
19    design packs, where could you buy them?
20         A.    You could buy them inside the
21    app.
22         Q.    And until 2017, LittleHoots
23    didn't have an Android app.  Right?
24         A.    Right.
25         Q.    So prior to 2017, the only

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)

```
 1              ELLIS - Highly Confidential
 2         Q.      What other factors did you
 3    consider in setting the price for the
 4    LittleHoots subscription?
 5                 MR. HARRINGTON:   Objection to
 6         form.
 7         A.      Those are all the factors I
 8    can think of.
 9         Q.      Did you consider the service
10    fee charged by either Apple or Google in
11    setting the price you charged users for a
12    LittleHoots subscription?
13         A.      No.
14                 MR. EWING:   Objection to form.
15         Q.      First, did you understand my
16    question, Ms. Ellis?
17         A.      Yeah.   So did I consider the
18    service fees either charged by Apple or
19    Google when setting the prices.
20                 The answer is no.   I primarily
21    considered a price that I knew would best
22    drive sales.
23         Q.      How did you determine what a
24    price that would best drive sales would
25    be?
```

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)

Page 265

```
 1            ELLIS - Highly Confidential
 2        A.    We switched to subscription in
 3    order to generate more revenue.
 4        Q.    Did you consider charging for
 5    downloads instead?
 6        A.    No, we did not.
 7        Q.    Why not?
 8        A.    Because charging for downloads
 9    wouldn't be a successful way to monetize.
10    Potential users, like we discussed
11    earlier, need a way to trial the app.  So
12    we created actually the free trial that's
13    in there today, we launched that when we
14    launched subscriptions in 2019, so that
15    users can at least experience the app to
16    the point at which they create three free
17    memories, and then they get to choose
18    whether or not they want to continue to
19    use the app or not via a premium
20    subscription.
21        Q.    Has the price for the
22    LittleHoots subscription stayed the same
23    since LittleHoots introduced
24    subscriptions in 2019?
25        A.    Yes.
```

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)

Page 266

ELLIS - Highly Confidential

1

2    Q.    Do you re-evaluate that

3    pricing from time to time?

4    A.    No.

5    Q.    Why not?

6    A.    It's a price that's working.

7    It's a price that, you know, seems to be

8    working with the users that we have.

9    There is really no reason for us to

10    re-evaluate it.  We need the revenue that

11    we get.  We need every little bit of it

12    to continue to keep it available and on

13    the App Store for users.  So no, we

14    haven't re-evaluated.

15    Q.    Why does your price, both for

16    the monthly and the annual subscription,

17    end in 99 cents?

18    A.    You know, it's a typical

19    pricing strategy where it just feels a

20    little bit less than the next rounded up

21    dollar.  There is really nothing to it

22    more than that.  It just seems a little

23    more affordable when you say 5.99 versus

24    $6.  When you say 35.99 versus $36.  It

25    just kind of staying in line with kind of

Page 267

1            ELLIS - Highly Confidential
2     that typical pricing strategy where it
3     just seems that much cheaper.
4            Q.    Do you know if Google requires
5     prices to end in 99 cents?
6            A.    I don't know.
7            Q.    Do you know in Apple requires
8     prices to end in 99 cents?
9            A.    No, I don't know that.
10           Q.    You told me earlier that you
11    didn't consider Google or Apple's service
12    fees in setting subscription price of the
13    LittleHoots app.  Right?
14           A.    Mm-hmm, yup.
15                 MR. EWING:  Objection to form.
16           Q.    If Google's service fee at the
17    time you launched your subscription had
18    been 15 percent instead of 30 percent,
19    would LittleHoots have set a different
20    price?
21                 MR. EWING:  Objection to form.
22           A.    No.  It would have been
23    wonderful if it had been a 15 percent
24    service fee versus a 30 percent service
25    fee.  But it would not have affected my

(***UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*** HIGHLY CONFIDENTIAL— ATTORNEYS' EYES ONLY)

Page 268

1          ELLIS - Highly Confidential
2     decision to set the prices the way we
3     did.
4          Q.    Have you considered changing
5     your subscription price in the last six
6     months?
7          A.    No.
8          Q.    Are you currently considering
9     any change to your subscription price?
10         A.    No.
11         Q.    Have you had any discussions
12    with anyone about changing your
13    subscription pricing over the last six
14    months?
15         A.    I have -- I have had some
16    discussions about potentially changing to
17    a freemium model that would make
18    available a version of the app that's way
19    less -- with way less functionality in
20    terms of design packs and some watermarks
21    over memories.  And maybe even some
22    advertising inside the app.  But that
23    would not change our subscription prices.
24         Q.    I see.
25               Who have you had those

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form15instructions.pdf*

**9th Cir. Case Number(s)** | 23-15285

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

[x] I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**

[ ] I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

Excerpts of Record Volume IV of V (Provisionally-Sealed Volume);
Excerpts of Record Volume V of V (Sealed Volume)

**Signature** | /s/ Neal Kumar Katyal | **Date** | 06/08/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*