No. 23-15285

IN THE

# United States Court of Appeals for the Ninth Circuit

IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION

MARY CARR, INDIVIDUALLY AND ON BEHALF OF
ALL OTHERS SIMILARLY SITUATED; ET AL.,

*Plaintiffs-Appellees,*

v.

GOOGLE LLC; ET AL.,

*Defendants-Appellants.*

On Interlocutory Appeal from the United States District Court
for the Northern District of California,
No. 21-md-2981; No. 20-cv-5761

## REPLY BRIEF FOR DEFENDANTS-APPELLANTS

Katherine B. Wellington
HOGAN LOVELLS US LLP
125 High St., Suite 2010
Boston, MA 02110

Neal Kumar Katyal
Jessica L. Ellsworth
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
neal.katyal@hoganlovells.com

August 21, 2023

*Counsel for Defendants-Appellants*

*(Additional Counsel Listed on Inside Cover)*

Brian C. Rocca
Sujal J. Shah
Michelle Park Chiu
Minna Lo Naranjo
Rishi P. Satia
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, CA 94105
Telephone: (415) 442-1000
Facsimile: (415) 422-1001
brian.rocca@morganlewis.com

Richard S. Taffet
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
Telephone: (212) 309-6000
Facsimile: (212) 309-6001
richard.taffet@morganlewis.com

Kyle W. Mach
Justin P. Raphael
Emily C. Curran-Huberty
MUNGER, TOLLES, & OLSON LLP
560 Mission Street
Twenty Seventh Floor
San Francisco, CA 94105
Telephone: (415) 512-4000
Facsimile: (415) 512-4077
kyle.mach@mto.com

Glenn D. Pomerantz
Kuruvilla Olasa
MUNGER, TOLLES, & OLSON LLP
350 South Grand Avenue
Fiftieth Floor
Los Angeles, CA 90071
Telephone: (213) 683-9100
Facsimile: (415) 512-4077
glenn.pomerantz@mto.com

*Counsel for Defendants-Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................... ii

INTRODUCTION .................................................................................1

ARGUMENT .......................................................................................4

    I.    THE DISTRICT COURT FAILED TO RIGOROUSLY ANALYZE THE ISSUE OF UNINJURED CLASS MEMBERS ......................................................................4

        A.    The District Court Did Not Conduct A Rigorous Analysis ...............................................................4

        B.    This Court Should Reject Plaintiffs' Attempt To Backfill The District Court's Flawed Reasoning ...........8

    II.    PLAINTIFFS' MODEL CANNOT PROVIDE COMMON PROOF OF INJURY OR DAMAGES ....................................14

        A.    Plaintiffs' Model Fails To Account For Independent Variables Important To Injury And Damages ...............15

        B.    The District Court Failed To Rigorously Analyze Plaintiffs' Model ...............................................24

        C.    Plaintiffs' Model Should Have Been Excluded Under *Daubert* .........................................................26

    III.    THE DISTRICT COURT ERRED BY APPLYING A BRIGHT-LINE RULE THAT INDIVIDUALIZED DAMAGES ISSUES CANNOT DEFEAT PREDOMINANCE .............................................................29

CONCLUSION ..................................................................................31

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

CASES:

*Allegra v. Luxottica Retail N. Am.*,
341 F.R.D. 373 (E.D.N.Y. 2022) ..................................................................28

*B.K. ex rel. Tinsley v. Snyder*,
922 F.3d 957 (9th Cir. 2019) .........................................................................8

*Bowerman v. Field Asset Servs., Inc.*,
60 F.4th 459 (9th Cir. 2023) .........................................................................30

*Castillo v. Bank of Am., N.A.*,
980 F.3d 723 (9th Cir. 2020) ...........................................................................4

*Chavez v. Plan Benefit Servs., Inc.*,
957 F.3d 542 (5th Cir. 2020) .........................................................................8

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ..............................................................................15, 29

*Davidson v. O'Reilly Auto Enters., LLC*,
968 F.3d 955 (9th Cir. 2020) ...........................................................................9

*Doyle v. Chrysler Grp., LLC*,
663 F. App'x 576 (9th Cir. 2016) ..................................................................30

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ...........................................................................7

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*,
141 S. Ct. 1951 (2021) ..................................................................................18

*In re Apple iPhone Antitrust Litig.*,
No. 11-CV-6714-YGR, 2022 WL 1284104
(N.D. Cal. Mar. 29, 2022)..............................................................20, 21, 24, 26

*In re Gen. Motors Corp. Air Conditioning Mktg. & Sales Pracs. Litig.*,
No. 18-MD-02818, 2023 WL 2215953 (E.D. Mich. Feb. 24, 2023) ................28

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*In re Lithium Ion Batteries Antitrust Litig.*,
   No. 13-MD-2420 YGR, 2018 WL 1156797
   (N.D. Cal. Mar. 5, 2018)........................................................................21, 24, 26

*Leyva v. Medline Indus. Inc.*,
   716 F.3d 510 (9th Cir. 2013) ...............................................................................29

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022) (en banc) ......................................................*passim*

*Primiano v. Cook*,
   598 F.3d 558 (9th Cir. 2010) ...............................................................................26

*Van v. LLR, Inc.*,
   61 F.4th 1053 (9th Cir. 2023) ...............................................................5, 6, 9, 10

**OTHER AUTHORITIES:**

Kenneth E. Train, *Discrete Choice Methods with Simulation* (2d ed.
   2009) ...................................................................................................................18

Frank Verboven & Theon Van Dijk, *Cartel Damages Claims and the
   Passing-On Defense*, 57 J. Indus. Econ. 457 (2009) ..........................................28

IN THE

# United States Court of Appeals
# for the Ninth Circuit

No. 23-15285

IN RE GOOGLE PLAY STORE ANTITRUST LITIGATION

MARY CARR, INDIVIDUALLY AND ON BEHALF OF
ALL OTHERS SIMILARLY SITUATED; ET AL.,

*Plaintiffs-Appellees,*

v.

GOOGLE LLC; ET AL.,

*Defendants-Appellants.*

On Interlocutory Appeal from the United States District Court for the Northern
District of California, No. 21-md-2981; No. 20-cv-5761

**REPLY BRIEF FOR DEFENDANTS-APPELLANTS**

**INTRODUCTION**

Plaintiffs defend certifying a class of 21 million individuals (who are seeking over a billion dollars in damages) based on a hypothesis refuted by the record. They contend that Google's service fee for app developers was too high, and that, if Google had lowered its service fee in Plaintiffs' hypothetical "but-for" world, every app developer would have passed on cost savings to consumers. But that isn't what actually happened in the real world when Google lowered its service fee. And it

isn't even what developers testified they would have done in the but-for world. Plaintiffs rely solely on their expert Dr. Singer's theoretical model to support certification. That model rests on the implausible assumption that every developer would have lowered app prices by a few cents rather than pocketing those pennies as additional revenue. Dr. Singer's model does not address the many reasons why individual plaintiffs may be uninjured, and thus does not support class certification.

Plaintiffs cannot avoid the fundamental problems with their theory, and they cannot cite any portion of the District Court's opinion conducting a rigorous analysis of uninjured class members. Instead, they seek to back-fill the District Court's flawed analysis on appeal—thus confirming that the court's order is indefensible.

Plaintiffs' defense of Dr. Singer's model is equally unconvincing. Plaintiffs have no answer to the incontrovertible fact that gaming apps like *Elmo Loves 123s* and *Doom* are not substitutes—even though the substitutability of every app for every other app in a Play Store category is a crucial assumption of Dr. Singer's model. *See* Opening Br. 4. That assumption is obviously untrue. And Plaintiffs cannot claim that Dr. Singer's model accounts for focal-point pricing by developers—a key reason why individual consumers may be uninjured.

Plaintiffs do not defend the District Court's bright-line rule that individualized damages issues can never preclude class certification, claiming instead the District Court applied no such rule. But the District Court's opinion makes clear that it

2

applied the wrong legal standard, rather than analyzing whether the individualized damages questions here prevent class certification.

Throughout their brief, Plaintiffs try to insulate these problems from review by claiming that the "clear error" standard applies. But Plaintiffs find no safe haven in factual findings because, on the critical issues in this appeal, the court repeatedly refused to engage with Google's evidence and consistently avoided resolving factual disputes as Rule 23 requires. 1-ER-20-24.

Certifying this class creates precisely the problem that the predominance requirement is intended to prevent. Class actions are permissible only when they do "not alter the defendants' rights or interests in a substantive way." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022) (en banc). Allowing this 21-million-member class to barrel toward trial—on a demonstrably flawed model and despite strong evidence that a great many class members are uninjured—would permit Plaintiffs to avoid proving an Article III injury and deprive Google of its right to litigate individualized defenses.

This Court should vacate the class certification. And, in keeping with the Court's decision to expedite, the Court should act if possible before the trial currently set for November, where individual class representatives and several States plan to present the deeply flawed evidence at the heart of this appeal.

# ARGUMENT

## I. THE DISTRICT COURT FAILED TO RIGOROUSLY ANALYZE THE ISSUE OF UNINJURED CLASS MEMBERS.

Before certifying a class, district courts must rigorously analyze whether "the presence of uninjured class members means that the class definition is fatally overbroad." *Olean*, 31 F.5th at 669 n.14; *see also Castillo v. Bank of Am., N.A.*, 980 F.3d 723, 730-731 (9th Cir. 2020) (certification properly denied where class included those who "have no actual injury and hence have no claim"); Computer & Communications Industry Ass'n et al. Amicus Br. 7-9 (cataloging precedent). The District Court failed to conduct that analysis, and this Court should reject Plaintiffs' attempts to rehabilitate the District Court's opinion by flipping the burden of proof and invoking evidence the District Court never analyzed.

### A. The District Court Did Not Conduct A Rigorous Analysis.

Plaintiffs insist (at 36-44) the District Court conducted the rigorous analysis of uninjured class members required by Rule 23. But the District Court dedicated one paragraph to Google's evidence of uninjured class members—with only two sentences of substantive analysis. *See* 1-ER-23; Product Liability Advisory Council Amicus Br. 8 (noting that the District Court instead "devotes many pages to" issues "that are not particularly significant"). That is plainly insufficient.

Plaintiffs cite (at 3) the District Court's statement that "Dr. Singer raised several serious questions about Dr. Burtis's analysis." 1-ER-23. But they do not

suggest—because they couldn't—that the District Court *resolved* those questions or addressed developer testimony corroborating Dr. Burtis's analysis. *Id.* Instead, the District Court treated Dr. Singer's disagreement with Dr. Burtis's criticism of his model as a sufficient reason to give her criticisms no weight. *Id.* That flouts precedent requiring plaintiffs to "actually *prove*—not simply plead—that their proposed class satisfies" Rule 23. *Olean*, 31 F.4th at 664 (quotation marks omitted).

This Court's decision in *Van v. LLR, Inc.*, 61 F.4th 1053 (9th Cir. 2023), confirms that once a defendant presents evidence of potentially uninjured class members, the burden returns to the plaintiff to *prove* that certification remains appropriate. In *Van*, this Court held certification improper after the district court failed to evaluate evidence that "at least eighteen" transactions at issue—out of around 72,000 total—resulted in no injury. 61 F.4th at 1059, 1068 & n.13. Plaintiffs attempt to distinguish *Van*, asserting (at 42) that the defendants there had "introduced conclusive evidence that 18 class members had not been injured." But that characterization is inaccurate. *Van* highlighted evidence of 18 *transactions* where a consumer suffered no injury, without discussing whether the consumers in those transactions engaged in other transactions and without reaching a "conclusive" determination about whether they were injured. *See* 61 F.4th at 1068-69.[1]

---

[1] *Van* involved over 72,000 transactions but just over 10,600 consumers, so at least some consumers must have engaged in multiple transactions. 61 F.4th at 1059.

*Van* thus does not require defendants to have "conclusive evidence" that class members were uninjured. Instead, the question is whether the evidence of uninjured class members establishes "that an inquiry into the circumstances and motivations behind each of the" potentially affected transactions "might be necessary." *Id.* Here, Google has done far more than what this Court deemed sufficient in *Van* to raise such a question: Google produced real-world evidence that, when Google reduced its service fees for over 450,000 products in the Play Store, consumer prices for 93% of the affected products *did not change*, meaning developers did not pass that cost saving on to consumers. 5-ER-684-685. Developer testimony confirmed that conclusion. *See* 4-ER-606; 4-ER-620; 4-ER-638-639. This evidence at a *minimum* "substantiates" that an app-by-app or even transaction-by-transaction analysis is necessary to determine whether any given class member suffered injury, *Van*, 61 F.4th at 1069—particularly because Plaintiffs do not dispute (at 41 n.11) that around 40% of consumers made purchases from a single app.

Unable to defend the District Court's thin analysis, Plaintiffs try to insert findings the court never made. They claim (at 37) the District Court "credited" all Dr. Singer's critiques and made a "finding[] about the relative probative value of Dr. Singer's and Dr. Burtis' testimony." Not so. The District Court said it accorded Dr. Burtis's evidence "minimal value" because Dr. Singer had raised "questions" about her analysis—not because the District Court had independently analyzed those

critiques and resolved them in Plaintiffs' favor. 1-ER-23. Nor did the District Court conclude that Dr. Singer was more credible than Dr. Burtis. *See id.* Rule 23 requires more than just acknowledging "disputed issues of law and fact": It requires a district court to "*resolve*" those issues. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980 (9th Cir. 2011) (emphasis added); *see also* U.S. Chamber of Commerce et al. Amicus Br. 16 ("The proper analysis pierces the veil of jargon to scrutinize whether any proof of injury applies to the whole class.").

Comparing the analysis this Court found insufficient in *Ellis* to the analysis here confirms that the District Court's order cannot stand. In *Ellis*, this Court reversed a certification order premised on the district court's statement that the defendant's expert "presented an alternative approach but [had] not discredited [the plaintiff's expert's] results or methods." 657 F.3d at 984 (quotation marks omitted). Similarly, the District Court's reasoning below was limited to stating that it "cannot say Dr. Burtis's 2% conclusion is enough to deny certification" because "Dr. Singer raised several serious questions about Dr. Burtis's analysis." 1-ER-23. As in *Ellis*, this Court should reject the District Court's incomplete analysis.

Citing *Olean*, Plaintiffs hypothesize (at 35 n.8) that the District Court might adjust the class definition before trial to deal with uninjured class members. But *Olean* calls for district courts to identify overbroad classes and adjust them at class certification, not at some future date under a different class definition. *See* 31 F.4th

at 669 n.14. Nor can the problems with class certification in this case be fixed through a revised definition. Plaintiffs propose no way to do so; their view, after all, is that "all class members were injured." Resp. Br. 43.

Plaintiffs briefly suggest (at 43) that *Dr. Burtis*'s methods could be used on a class-wide basis to identify which class members were uninjured. But Dr. Burtis concludes, based on real world data, that "individualized, app-by-app analysis" of injury is required, 5-ER-686, and her methods offer no way to identify which app developers would have reduced prices or which consumers would have benefitted from lower app pricing. *Id.* Plaintiffs cannot conscript Dr. Burtis into doing their work.

## B. This Court Should Reject Plaintiffs' Attempt To Backfill The District Court's Flawed Reasoning.

Plaintiffs attempt to fill the gaps in the District Court's flawed analysis with arguments it never adopted. But it is the *District Court's* responsibility to conduct a rigorous analysis at class certification, and its failure to do so requires vacatur even if other untested arguments are available. *See B.K. ex rel. Tinsley v. Snyder*, 922 F.3d 957, 977 n.6 (9th Cir. 2019); *accord Chavez v. Plan Benefit Servs., Inc.*, 957 F.3d 542, 551 (5th Cir. 2020) ("[T]he rigor requirement does not turn on how much material the parties submit or on how carefully the court seems to weigh the issues at a hearing. It instead asks whether the court's order sufficiently analyzes Rule 23."). Regardless, Plaintiffs' arguments cannot salvage the certification order.

8

*First*, Plaintiffs question whether Dr. Burtis analyzed data representative of consumers or developers. Because they never advanced this argument in the District Court, 2-ER-101-160; 3-SER-418-419; FER-7, they forfeited it. *See Davidson v. O'Reilly Auto Enters., LLC*, 968 F.3d 955, 966 (9th Cir. 2020). Plaintiffs' critiques are also meritless.

As to consumers, Plaintiffs contend (at 41 n.11) that "47 percent of consumers purchased *none* of the SKUs Dr. Burtis analyzed." (SKUs are the Play Store's unique product ID numbers.) But Plaintiffs cannot plausibly critique Dr. Burtis for analyzing data representing *more than half* of consumers. *See* 5-ER-684. That is orders of magnitude beyond the small number of transactions involving no injury that led to vacatur of the class certification order in *Van*. *See supra* p. 5.

Plaintiffs also question (at 41 n.11) whether the dataset Dr. Burtis analyzed was representative of developers. But sheer numbers make Dr. Burtis's analysis impossible to dismiss. She examined 467,660 total SKUs, representing "22,995 developers worldwide" and "51,847 apps." 5-ER-684. Dr. Singer recognized that this data encompassed both emerging apps earning their "first $1 million" and "high-profile developers." 3-SER-418; *see* 5-ER-672-675 (explaining eligibility criteria for discounts at issue).

In any event, *Van* makes clear that representativeness is not required. There, this Court did not analyze whether the 18 discounted transactions—out of over

72,000—were representative. *See* 61 F.4th at 1068-69. On the contrary, the evidence suggested that at *most* 13,680—or about 19%—of the total disputed transactions might have been affected by a similar discount. Nonetheless, given this evidence, it was the *plaintiffs'* burden to establish that "a class-member-by-class-member assessment of the individualized issue" would be either "unnecessary or workable." *Id.* at 1069.

*Second*, Plaintiffs fault (at 22-23) Dr. Burtis for failing to perform a regression analysis. This, too, is a new argument on appeal and thus forfeited. *See* 2-ER-101-160; 3-SER-418-419; FER-7.

Even if the Court considers it, however, this argument is futile; a regression would be informative only if *prices changed* and Dr. Burtis were attempting to tease out *why*. *See* Resp. Br. 23 (recognizing Dr. Burtis did not study "whether an observed price change was caused by a service fee reduction" (quoting 5-ER-686)). Here, nearly all prices *did not change*, so Dr. Burtis had no need to conduct a regression analysis. Of course, *Plaintiffs'* expert could have run a regression in an attempt to show that—for the small percentage of developers who did change their prices—the price reduction resulted from Google's service fee reduction rather than some other reason. *See* 5-ER-686. He did not; and, given the small number of developers who even *potentially* reacted with a price change, such a regression would never be able to support certification of this 21-million-member class.

*Third*, Plaintiffs assert that Dr. Burtis examined "too narrow a window" when evaluating whether developers changed prices. Resp. Br. 38 (quoting 2-ER-106-107)). This criticism simply ignores Dr. Burtis's conclusion that 93% of SKUs experienced no price change *during the entire class period*. 5-ER-684-685. Instead, Plaintiffs attack Dr. Burtis's subsidiary analysis examining the month before and after Google lowered its service fees. *See* 5-ER-685. That Dr. Burtis examined both a broader and more specific time period and reached the same conclusion strengthens—rather than weakens—her analysis. Notably, the District Court did not address that point.

Relatedly, Plaintiffs contend (at 38) that developers would have behaved differently if service fees had been lower from the beginning. But Plaintiffs offer no evidence to support this hypothesis, which is contradicted by the only testimony of actual developers in this case. *See* Opening Br. 30. Plaintiffs' theory also runs headlong into their failure to account for focal-point pricing, a consideration that affects initial pricing decisions. *See infra* pp. 20-24.

*Fourth*, Plaintiffs complain about Dr. Burtis's analysis of subscriptions, objecting (at 37-38) that it "was not technically feasible for developers to lower their prices" for only those subscribers eligible for the reduced rate. But, as Dr. Burtis explained, a "large number" of subscriptions in her sample were unaffected by this issue. 2-ER-105. And even if Plaintiffs are correct, subscriptions are just *3.6% of*

*the data* in Dr. Burtis's study, meaning this issue does not undermine her conclusion for most products—a point Plaintiffs do not dispute. *See* Opening Br. 38. Again, the District Court did not address this evidence.

*Fifth*, Plaintiffs take issue with Dr. Burtis's choice to use the Play Store's SKUs. They claim (at 39-40) that, rather than adjust an existing SKU's price, the "obvious alternative explanation" is that "developers often change prices for a product by changing the SKU." The record, however, is almost entirely devoid of evidence supporting Plaintiffs' hypothesis.

Dr. Singer identified *a single example* in the real world of a developer introducing a new SKU to reflect a price change. His example involved iHeartRadio, one of over 470,000 SKUs in the record. 2-ER-111-112. Even for that single app, the evidence was mixed, showing some people continued purchasing the SKU at the higher price, while others began purchasing the subscription at the lower price. 2-ER-115. This single example does not support certifying a class; it reinforces that an individualized inquiry *for each* of 470,000 SKUs is necessary to determine whether a developer would have introduced a price reduction through a new SKU and whether a consumer would have purchased a lower-price SKU. *See* 2-ER-115. The District Court did not engage with that evidence.

On appeal, Plaintiffs add a reference to Tinder, without pointing to any evidence Tinder has ever introduced a new SKU to lower prices. *See* 3-SER-426.

Instead, Plaintiffs simply highlight Tinder's total number of SKUs. *See* Resp. Br. 22 (citing 3-SER-426-427). But that figure supports Google, not Plaintiffs. The fact that apps may have many SKUs demonstrates an individualized inquiry is required to determine each developer's pricing strategy with respect to SKUs and how consumers are affected.

Plaintiffs likewise claim (at 22) that Dr. Burtis's data involves "3.7 percent of the revenue of the apps she purported to analyze." But this figure comes from a chart calculating revenues of "subscription developers"—a subset who account for less than 3.5% of the dataset. *See* 3-SER-426-427; 3-SER-433; 5-ER-686. And, of course, Dr. Burtis had no reason to examine products with service fees that did not change over the class period, so a focus on *overall* revenue is beside the point.

*Sixth*, Plaintiffs claim (at 41) that *Dr. Burtis* "did not identify even a single class member who was uninjured." But the question at class certification is whether *Plaintiffs* have shown that their proposed class does not contain a great many uninjured members. Plaintiffs cannot make that showing here, given that Google is the only party to introduce real-world evidence demonstrating what actually happened when developers confronted lower service fees. *See* Opening Br. 19; Business and Antitrust Law Professors Amicus Br. 8-16. Although Plaintiffs *claim* (at 36 n.9) that they relied on "real world" evidence, too, they are referencing data regarding app category shares and price changes—not data about whether

13

*developers* passed through savings from service fees. *See infra* pp. 18-19 (discussing Plaintiffs' data). Because the District Court dismissed Google's evidence that a substantial majority of the class was uninjured without meaningful analysis, its certification order cannot stand.

## II. PLAINTIFFS' MODEL CANNOT PROVIDE COMMON PROOF OF INJURY OR DAMAGES.

Dr. Singer's model is fundamentally flawed and does not support the sprawling certified class. Plaintiffs do not dispute that Dr. Singer's model assumes that every single developer would lower app pricing *in direct proportion to an app's share of the Play Store category* in order to pass on to consumers the developer's savings from a lower Google service fee. Nor do Plaintiffs dispute that the model assumes that because nearly every app's share of its Play Store category is miniscule, nearly every developer will pass on *almost all savings to consumers*, yielding a pass-through rate above 99% for almost all apps, no matter what.[2]

Plaintiffs offer no plausible defense of these assumptions. Dr. Singer's model fails to account for obvious "independent or explanatory variables" affecting

---

[2] Plaintiffs' amici claim that Google "concedes its anticompetitive conduct was uniform" and "that it extracted supra-competitive commissions from nearly *every purchase* in the Google Play Store." American Economic Liberties Project Amicus Br. 9. That is wrong, and in any event it addresses underlying merits issues irrelevant to this class certification appeal. Google denies engaging in any unlawful conduct and seeks to vindicate its procompetitive conduct through its defense in this suit. *See, e.g.*, Netchoice et al. Amicus Br. 3 (explaining why Google's "design choices" in the Play Store "provide benefits to app developers and consumers alike").

whether any individual consumer is injured, and it rests on "unsupported assumptions" refuted by real-world evidence. *Olean*, 31 F.4th at 666 n.9, 671. The District Court excused these glaring problems without engaging in the necessary rigorous analysis.

## A. Plaintiffs' Model Fails To Account For Independent Variables Important To Injury And Damages.

Dr. Singer's logit model is entirely unsuited to serve as common proof regarding whether or how hundreds of thousands of different developers would choose to pass through savings to 21 million consumers had Google lowered its service fees. This Court affords the District Court no deference on the critical question of what a statistical model is capable of proving. *Comcast Corp. v. Behrend*, 569 U.S. 27, 36 n.5 (2013). Indeed, Dr. Singer has effectively agreed that his model cannot provide reliable common proof for two reasons: apps in each Play Store category are not substitutes and developers engage in focal-point pricing.

1. *Substitutability.* Dr. Singer agreed that "one feature of logit demand is that *all goods in the market where demand is being measured are substitutes*." 2-ER-182 (emphasis added); *accord* 2-ER-120-121. And he agreed that in "a logit model, all of the goods in the market being studied *have to be substitutes in proportion to their shares of that market*." 2-ER-155 (emphasis added). By using each Play Store category as "the market" for a given app, the model thus rests on the premise that all

apps in a category are substitutes such that consumers will proportionally switch to every other product in the same Play Store category.

But Dr. Singer agreed that those requirements are not met for each app in the Play Store. He agreed that apps in each category are "[n]ot" substitutes "in perfect proportion" to their share of a category. *Id.* And he further acknowledged that not "all apps in each Google Play app category are substitutes," that "some of the apps in each Google Play category could be complements" rather than substitutes, and that he never analyzed whether any individual app was a complement or a substitute for another app. 2-ER-183-184. Plaintiffs do not ultimately dispute Dr. Singer's admissions, instead raising a host of unpersuasive arguments to distract from these fatal problems.

*First*, Plaintiffs (at 7) complain that Google "cherry-picked" examples of non-substitute apps, but the list could go on (and on and on) because many (if not most) apps in each Play Store category are just not substitutes: *Bicycle Route Navigator*, offering 47,000 miles of bicycle routes, is not a substitute for the *Gettysburg Battle Auto Tour*, a narrated driving tour of the historic Gettysburg battlefield (both in the Travel & Local category); *Duolingo: language lessons* is not a substitute for *Picture This: Plant Identifier* (both in the Education category); and *My Perfect Resume Builder* is not a substitute for *Invoice Simple*'s invoicing services (both in the Business category). Dr. Singer chose a model requiring each app to be a substitute

for every other app in its Play Store category, but Plaintiffs have no answer to the myriad apps within each category that flunk that requirement.

Plaintiffs instead say Dr. Singer's logit model follows from a supposedly "bedrock economic principle" that whether an app developer will adjust consumer prices more or less in response to lower costs "is inversely proportional to the app's share *of the market*." Resp. Br. 18 (emphasis added). Bedrock or not, this principle only applies if Plaintiffs demonstrated that each Play Store category is actually a "market" composed of substitute goods, and Dr. Singer concedes that is not the case. 2-ER-155-156. Because Plaintiffs did not establish that customers engage in proportionate substitution within a given Play Store category—an undertaking they did not even attempt—the "bedrock principle" they invoke is inapplicable.

*Second*, Plaintiffs claim (at 56) that Dr. Singer was justified in using the Play Store categories because Google finds those categories "reliable enough to inform its decision-making." But Google chose those categories to help consumers find products, much as Wal-Mart labels the various sections of its store. *See* Opening Br. 43-44; TechNet Amicus Br. 7-8. Lawn mowers, macrame plant holders, and gas grills are all in Wal-Mart's "Patio & Garden" department, but they are plainly not substitute goods. No one would think that a manufacturer of macrame plant holders sets its consumer pricing strategy based on concerns about losing market share for

macrame plant holders to gas grill or lawn mower purchases—even though all three items are in Wal-Mart's "Patio & Garden" category.

Plaintiffs also claim (at 57 n.20) that "Google has no empirical evidence that substitution does not occur between apps in a category." That argument flips Plaintiffs' burden and ignores Dr. Singer's own statements. Regardless, Google submitted substantial evidence that apps within each category are not substitutes. *See, e.g.*, 2-ER-274-275. That evidence is confirmed "by a good dose of common sense." *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1960 (2021) (quotation marks omitted).

*Third*, Plaintiffs rely extensively (at 54, 56-57) on a "regression analysis" Dr. Singer conducted, which they assert "confirmed that logit's predictions were accurate." Plaintiffs claim (at 56-57) that "Dr. Singer's regressions show that when prices rose for an app within a category, consumer demand shifted to other apps in that category." But Plaintiffs' carefully worded description is telling. That regression did not attempt to measure proportional substitution—that is, whether "improvement in one alternative draws *proportionately* from the other alternatives," which is a bedrock requirement of a logit model. Kenneth E. Train, *Discrete Choice Methods with Simulation* 47 (2d ed. 2009) (emphasis added) (cited at 2-ER-274 n.363). A shift in demand to *some* other app in the same category does not mean that demand shifted *proportionately* to *all* other apps; it will shift *disproportionately*

18

to whatever apps consumers view as actual alternatives. *See* 5-ER-682-683; 5-ER-690-691; International Center for Law & Economics Amicus Br. 14-19. So while a price increase in *Duolingo: language lessons* might increase demand for other language-learning apps, Plaintiffs have no evidence that it will also proportionally increase demand for all the non-language learning apps also found in the Education category like *Picture This: Plant Identifier* or *Simply Guitar—Learn Guitar*.

*Fourth*, Plaintiffs argue (at 57) that Google did not sufficiently "develop[] its argument" regarding the Play Store categories in the District Court. But Plaintiffs do not argue forfeiture, for good reason. Google explained why Plaintiffs' failure to account for "the varied competition faced by hundreds of thousands of different apps" and "Dr. Singer's admitted failure to put forth a model to determine which apps in each category are complements and which are substitutes" were fatal to class certification. 2-ER-240-241 (quotation marks and alterations omitted). Google presses the same argument here.

*Fifth*, Plaintiffs assert (at 57) that even if "all apps within a category are not perfect substitutes," Dr. Singer's model is reliable because "[l]ogit does not require perfect substitutability." But this assertion ignores Dr. Singer's agreement that "all of the goods in the market being studied have to be substitutes in proportion to their shares of that market" for a logit model to work, which again is plainly not true here. 2-ER-155. To support this argument, Plaintiffs cite one page of one source, which

19

says nothing about substitutability and instead discusses the use of logit models in the merger context. *See* Resp. Br. 57 (citing 1-SER-26). And while Plaintiffs seek support (at 56 n.19) from the fact that a "leading economist" used "app categories to model demand" in the *Apple* litigation, the model in *Apple was not a logit model*, and the District Court there *denied class certification* because the model "made unjustifiable assumptions regarding the commission rate upon which much of their analysis rests." *In re Apple iPhone Antitrust Litig.*, No. 11-CV-6714-YGR, 2022 WL 1284104, at *1 (N.D. Cal. Mar. 29, 2022).

2. *Focal-Point Pricing.* Plaintiffs' discussion of focal-point pricing fares no better. Dr. Singer's model assumes that every app will reduce its price in direct proportion to a reduction in Google's service fee—even if those reductions would pass on only a few pennies of savings to consumers. Dr. Singer's model assumes developers would depart from familiar prices ending in 99 cents, despite evidence that 97% of transactions in the Play Store during the relevant period ended in 99 cents. Even though developers overwhelmingly use focal-point pricing, Dr. Singer's model simply does not control for it, *see* 2-ER-191, and his expert report did not mention it even though he later agreed that "focal point pricing is an important consideration here." 2-ER-187. The District Court *did not even address* the experts' dispute regarding focal point pricing.

20

District courts in two other cases have denied class certification where plaintiffs' experts failed to consider focal-point pricing. *See In re Apple*, 2022 WL 1284104, at *8; *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2018 WL 1156797, at *4 (N.D. Cal. Mar. 5, 2018). Plaintiffs offer no justification for Dr. Singer's assumption that all developers would have abandoned this well-established pricing strategy in Plaintiffs' but-for world—or the District Court's failure to analyze this issue. *See* Washington Legal Foundation Amicus Br. 11-12 (explaining the psychological roots of focal-point pricing).

Plaintiffs suggest (at 59) that Dr. Singer *could* factor in focal-point pricing "on an app-by-app level" at the back-end. They never say *how* he could do so when he doesn't know which apps would deviate and which would not, and Plaintiffs' suggestion just highlights that the model on which certification is based fails to account for focal-point pricing. In the District Court, Dr. Singer stated that "we know that a lot" of apps "do" use focal-point pricing, while claiming that "a lot don't." 2-ER-230-231. But Dr. Singer's model does not provide any way to differentiate those that "do" from those that supposedly "don't."

Plaintiffs' contention that Dr. Singer could somehow address this failure at some later stage of the proceedings is equally wrong. The notion (at 59) that different calculations could "be run on an app-by-app basis" but "without resorting to any individualized analysis" is an inherent contradiction—an "app-by-app"

analysis requires individualized inquiry. And if Plaintiffs think some hypothetical model could conduct this analysis without individualized inquiry, they have not produced it. Plaintiffs quote the District Court's statement that Dr. Singer's "methodology can be run at an app-by-app level," 1-ER-22 (quotation marks omitted), but running a model that does not account for focal point pricing, even "app-by-app," does not solve the problem.

Plaintiffs argue (at 60) that, under *Olean*, even if focal-point pricing results in uninjured class members, there will only be a "small number[]" of them and "the class definition can be adjusted at [a later] time." But *Olean* permits courts to "redefine the overbroad class to include only those members who can rely on the same body of common evidence to establish the common issue"—it does not permit courts to grant certification by ignoring individualized inquiries or kicking the can down the road. *Olean*, 31 F.4th at 669 n.14. Plaintiffs offer no methodology for identifying uninjured class members and no support for their naked assertion that the number of uninjured class members is "small." Resp. Br. 60. To the contrary, the evidence showing that the vast majority of app developers utilize focal-point pricing demonstrates that the number is exceptionally large.

Plaintiffs next assert (at 60) that there is "substantial record evidence that developers are willing to depart from focal point pricing and did not do so largely because of Google's conduct." But the evidence refutes that assertion. Dr. Singer

speculated that developers "could" use ten-cent intervals, rather than prices ending in ".99," 5-ER-706, but he has no answer to the actual Play Store data showing developers overwhelmingly do not make that choice. Plaintiffs point to the fact that "Google imposed a 99-cent price floor until early 2022," Resp. Br. 60, but only 17% of transactions involve apps priced at exactly $0.99 during the relevant period. 2-ER-263 fig. 7. In contrast, as even Dr. Singer agreed, approximately 80% of transactions were priced higher than $0.99 but still used a price ending in 99 cents. *See id.*; 2-ER-232.

Plaintiffs also cite (at 60) Google's supposed "prohibition on steering" as contributing to focal-point pricing. This argument is difficult to follow—and again, the District Court did not address it. Plaintiffs cannot explain why steering to platforms outside the Play Store would affect focal-point pricing inside the Play Store. Dr. Singer's report itself demonstrates that when developers *in fact* steered customers to other payment processors, many continued to use focal-point pricing, while some did not. *See* 3-ER-346 tbl. 9. And to the extent Plaintiffs argue that *some* developers would use focal-point pricing in the but-for world while others would not, that just highlights that individualized inquiry is required.

Plaintiffs attempt to distinguish (at 62) the precedent denying class certification where plaintiffs' expert failed to consider focal-point pricing, contending that the experts in those cases "failed to account for overwhelming record

evidence" of focal-point pricing. But the same is true here because the record shows that more than 97% of transactions in the Play Store during the relevant period involved focal-point pricing. Where, as here, "focal point pricing is common" but the proffered model "fail[ed] to incorporate such pricing," class certification is inappropriate. *In re Apple*, 2022 WL 1284104, at *8; *see also In re Lithium Ion Batteries*, 2018 WL 1156797, at *4.

### B. The District Court Failed To Rigorously Analyze Plaintiffs' Model.

Plaintiffs repeatedly insist (at 25, 45, 46, 64, 65) that the District Court's analysis was "rigorous." But even a cursory review of the District Court's opinion demonstrates that the District Court failed to conduct the necessary rigorous analysis of the glaring problems with Dr. Singer's model.

In response to Google's argument that each app in a Play Store category is not a substitute for every other app in that category, the District Court concluded that "Dr. Singer can only work with what Google actually does." 1-ER-21 (quoting 2-ER-128). But Rule 23 does not permit certification using a flawed methodology merely because an expert did not develop an appropriate methodology—especially where there is no evidence Google created the categories *because* apps within them are substitutes. *Supra* pp. 17-18.

The District Court found it "unclear" why, at class certification, the lack of substitutability across all apps in a given Play Store category mattered. 1-ER-21.

24

But Dr. Burtis explained at length why it mattered—because "a fundamental requirement of that logit model is that all of the products in that share have to be substitutes." 2-ER-127; *see* 5-ER-656-657. Dr. Singer agreed that in "a logit model, all of the goods in the market being studied have to be substitutes in proportion to their shares of that market." 2-ER-155. And Dr. Singer agreed that was not true here, where some apps may be complements and others are neither substitutes or complements. Certifying a class without even acknowledging this basic problem despite both experts' *agreement* on the importance of substitutability is not rigorous analysis.

The District Court also barely addressed focal-point pricing. It dismissed the problem on the ground that "predominance does not demand perfection," faulting *Google* for failing to "demonstrate[] that Dr. Singer's analysis falls short on this score." 1-ER-22. But Plaintiffs bear the burden of proving predominance, and the District Court plainly erred by failing to address whether there was common proof that developers would abandon the undisputed, widespread practice of focal-point pricing. *Id.*

The District Court also accepted Dr. Singer's conclusory assertion "that his method can be customized to fit particular situations" and could be run "at an app-by-app-level." *Id.* (quotation marks omitted). But the court did not attempt to explain how that could be done without raising individualized questions. Instead, it

stated that "the same methodology can be used by every class member to establish antitrust impact," 1-ER-23, without attempting to reconcile that conclusion with the need to account for focal-point pricing on an app-by-app basis. Such rubber-stamping is exactly what Rule 23 prohibits.

### C.    Plaintiffs' Model Should Have Been Excluded Under *Daubert*.

All these problems with Dr. Singer's model demonstrate why it should never have been admitted. *See* Atlantic Legal Foundation Amicus Br. 7 ("Rule 702 takes on an even more prominent role in cases where, as here, a class certification decision relies *entirely* on expert testimony."). As Plaintiffs agree (at 47), admissibility turns on "the soundness of his methodology." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (quotation marks omitted). Dr. Singer's methodology is unsound. The District Court acknowledged that this methodology was developed solely for this case and is neither "general[ly] accept[ed]" nor the "subject of peer review." 1-ER-13. No other economist has used a logit model as Dr. Singer does here. And other district courts have refused to admit models containing similar but less glaring problems. *See In re Apple*, 2022 WL 1284104, at *10; *In re Lithium Ion Batteries*, 2018 WL 1156797, at *4.

Plaintiffs maintain (at 49, 52) that Dr. Singer uses "well-established economic techniques" that are "regularly used to calculate pass-through." But these arguments assume away the problem. Logit models are well-established when the products at

issue *are substitutes* in proportion to their market share, but that does not permit the use of a logit model when this fundamental requirement is not satisfied.

Plaintiffs insist (at 49) that logit models are used in "analogous situations," but their own sources refute this characterization. Plaintiffs tout (at 50) the "peer-reviewed literature confirming logit's use by the Department of Justice in merger analysis." But Plaintiffs' source makes clear that the "assumption" underlying "logit" is "that when the price of one product is increased, consumers switch to others *in proportion to the relative shares of those products*," and cautions that data "may yield very different substitution patterns because certain goods may be viewed as closer substitutes than others." 1-SER-38 (emphasis added). This is a quintessential case where the logit model's assumption about substitution does not hold because apps within the same broad Play Store category are not all substitutes, much less substitutes in proportion to their category share.

Plaintiffs cite (at 51) materials outside the class certification record for the proposition that logit models are used in other circumstances such as "pass through effects from cartels." This is procedurally improper, particularly given the District Court's role in vetting these issues under Rule 23 and Dr. Singer's admission that he had not seen a logit model used to calculate pass-through before. 2-ER-176-177. But if the Court considers these studies, they only hurt Plaintiffs. They make clear that a logit model is "characterized by symmetric substitution patterns," which yet

again "means that a loss in the market share of plaintiff firm 1 (or of any other firm) is associated with an increase in the market shares of the rivals *in proportion to their market shares*."  Frank Verboven & Theon Van Dijk, *Cartel Damages Claims and the Passing-On Defense*, 57 J. Indus. Econ. 457, 473 (2009) (emphasis added).  Dr. Singer's reliance on Play Store categories fails to satisfy this basic condition.

Plaintiffs also cite (at 51 n.17) out-of-circuit district court cases, but these cases likewise only highlight the problem.  One involved a logit model used to calculate consumer preferences between digital and manual eyeglass measurement. *Allegra v. Luxottica Retail N. Am.*, 341 F.R.D. 373, 451 (E.D.N.Y. 2022).  The other involved a mixed logit model used to calculate consumer preferences regarding motor vehicle air conditioners.  *In re Gen. Motors Corp. Air Conditioning Mktg. & Sales Pracs. Litig.*, No. 18-MD-02818, 2023 WL 2215953, at *10 (E.D. Mich. Feb. 24, 2023).  These cases—which involve substitute goods or services and did not use logit to calculate a pass-through charge—merely illustrate the flaws in Dr. Singer's analysis.  Here, Dr. Singer is *not* comparing substitutes and he is *not* measuring consumer preferences.  He is instead trying to use a logit model to calculate pass-through for thousands of apps that are *not* substitutes or even complements.  Dr. Singer's model is contrary to the record (and common sense) and should have been excluded.

### III. THE DISTRICT COURT ERRED BY APPLYING A BRIGHT-LINE RULE THAT INDIVIDUALIZED DAMAGES ISSUES CANNOT DEFEAT PREDOMINANCE.

Plaintiffs do not defend the District Court's bright-line rule that the presence of individualized damages questions "cannot, by itself, defeat class certification." 1-ER-25 (quoting *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)). As Google's opening brief explained, and as Plaintiffs do not dispute, the plain text of Rule 23 and binding precedent confirm that Plaintiffs "cannot show Rule 23(b)(3) predominance" without establishing "that *damages* are capable of measurement on a classwide basis." *Comcast*, 569 U.S. at 34 (emphasis added).

Rather than defend the District Court's rule, Plaintiffs dispute (at 69) that the court relied "on any sort of bright-line rule." But after recognizing that "individualized questions on … damages" existed, 1-ER-28, the District Court provided two grounds for ruling against Google on damages. The court overruled Google's damages arguments "on the same grounds" as it overruled Google's arguments about injury, 1-ER-25, and it then invoked what it called "well-established circuit law" that "the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)." *Id.* (quotation marks omitted). There is no way to construe this holding as anything other than a bright-line rule that individual damages questions cannot defeat certification.

Plaintiffs say (at 70) that a "district court is not precluded from certifying a class even if plaintiffs may have to prove individualized damages at trial," quoting *Olean*, 31 F.4th at 668-669. But this precedent means that the need to calculate individual damages *amounts* cannot defeat certification "in cases where there existed a *common methodology* for calculating damages." *Doyle v. Chrysler Grp., LLC*, 663 F. App'x 576, 579 (9th Cir. 2016) (emphasis added). This Court has never created a damages exception to Rule 23(b)(3)'s predominance requirement. In fact, it recently reversed a class certification order after the bellwether damages phase showed that proving damages required "individualized mini-trials" defeating predominance. *Bowerman v. Field Asset Servs., Inc.*, 60 F.4th 459, 469-470 (9th Cir. 2023).

In this case, the problem is not just mechanically calculating damages amounts. Dr. Singer's model does not supply a common *method* for calculating damages because the model relies on plainly erroneous assumptions, contradicts real-world data, and fails to account for obvious independent variables affecting developers' pricing decisions—including competition, focal-point pricing, and developers' reasonable preference to pocket minor cost savings. The model's inability to supply common proof of damages is yet another reason why class certification was improper.

**CONCLUSION**

For the foregoing reasons, and those in the opening brief, the District Court's class certification order should be reversed.

August 21, 2023

Respectfully submitted,

/s/ Neal Kumar Katyal

Katherine B. Wellington
HOGAN LOVELLS US LLP
125 High St., Suite 2010
Boston, MA 02110
Telephone: (617) 702-7745
Facsimile: (617) 371-1037
katherine.wellington@hoganlovells.com

Neal Kumar Katyal
Jessica L. Ellsworth
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
neal.katyal@hoganlovells.com

Brian C. Rocca
Sujal J. Shah
Michelle Park Chiu
Minna Lo Naranjo
Rishi P. Satia
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, CA 94105
Telephone: (415) 442-1000
Facsimile: (415) 422-1001
brian.rocca@morganlewis.com

Kyle W. Mach
Justin P. Raphael
Emily C. Curran-Huberty
MUNGER, TOLLES, & OLSON LLP
560 Mission Street
Twenty Seventh Floor
San Francisco, CA 94105
Telephone: (415) 512-4000
Facsimile: (415) 512-4077
kyle.mach@mto.com

Richard S. Taffet
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
Telephone: (212) 309-6000
Facsimile: (212) 309-6001
richard.taffet@morganlewis.com

Glenn D. Pomerantz
Kuruvilla Olasa
MUNGER, TOLLES, & OLSON LLP
350 South Grand Avenue
Fiftieth Floor
Los Angeles, CA 90071
Telephone: (213) 683-9100
Facsimile: (415) 512-4077
glenn.pomerantz@mto.com

*Counsel for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limits of Ninth Circuit Rule 32-1(b) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,963 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman.

<u>/s/ Neal Kumar Katyal</u>
Neal Kumar Katyal

## CERTIFICATE OF SERVICE

I certify that on August 21, 2023, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

/s/ Neal Kumar Katyal
Neal Kumar Katyal